**IN THE MATTER OF AN *AD HOC* ARBITRATION**

**BETWEEN:**

## HUNTINGTON INGALLS INCORPORATED (USA)

### (*CLAIMANT*)

*vs./*

### THE MINISTRY OF DEFENSE OF THE BOLIVARIAN REPUBLIC OF VENEZUELA (VENEZUELA)

### (*RESPONDENT*)

# Final Award

**Arbitral Tribunal:**

**Horacio A. Grigera Naón**

**Antonio Hierro**

**José Emilio Nunes Pinto**

**TABLE OF CONTENTS**

I.   The Parties and Their Counsel ...........................................................1

   A.   Claimant ..................................................................................1

   B.   Respondent..............................................................................2

II.  The Arbitral Tribunal ......................................................................3

   A.   Co-arbitrator appointed by Claimant...........................................3

   B.   Co-arbitrator appointed by Respondent.......................................3

   C.   President of the Arbitral Tribunal appointed by the International
      Court of Arbitration of the International Chamber of Commerce
      acting as Appointing Authority ...................................................3

III. Arbitration Clause.........................................................................3

IV.  Law Applicable to the Merits and Procedural Rules ...........................4

V.   Place of Arbitration .......................................................................5

VI.  Language of the Arbitration ...........................................................5

VII. Deadline for Making the Award.......................................................5

VIII. Jurisdiction of the Arbitral Tribunal.................................................5

IX.  Procedural History ........................................................................5

X.   Admission of New Evidence Brought by Respondent.......................23

XI.  Introductory Notes to the Description of the Dispute ......................25

   A.   Historical Background of Bid Solicitation.....................................25

   B.   The Contractual Relationship between the Parties .......................26

   C.   The Condition of the Frigates on Delivery by the Ministry .............27

   D.   The Price and Its Permitted Modification – The Construction of and
      Interrelationship between Clauses 8 and 59 of the Contract .........29

   E.   The Contract – an Administrative Contract or a Works Contract?...42

   F.   The Performance of the Services by Claimant under the Supervision
      of the VIC. ..............................................................................44

   G.   The Requests for Equitable Adjustment and the Master Affidavit ...44

XII. Claimant's Claims Duly Analyzed ..................................................46

   A.   The Amounts Claimed by Claimant and Methodology for Calculation47

   B.   1st Category of Claims: Fully uncontested out-of-scope work claims54

(1)    REA-84 – Increased Labor Rate and Deferred Work ...............54

(2)    REA-93 – MCS-5 System/CPP System Interface....................58

(3)    REA-94 – Clean and Paint Diesel Exhaust Trunks ..................59

(4)    REA-95 – Weighing $CO_2$ System Bottles................................60

(5)    REA-97 – Intake Duct Drains –Diesel Engines and Generators.61

(6)    REA-98 – Sea Trials ...................................................62

(7)    REA-99 – System Testing ...............................................64

(8)    REA-100 – Additional Icemakers.........................................67

(9)    REA-101 – Refrigeration Seawater Pump Failure...................68

(10)   REA-102 – Additional Subcontractor Costs – Carrier..............70

(11)   REA-103 – ARPA M-25 Navigation Radar System ..................70

(12)   REA-104 - Additional Subcontractor Costs – Elbit Systems......72

(13)   REA-106 – 21 HS-7 Sonar System ......................................73

(14)   REA-107 – OTOMAT Missile Launching System MK-2.............74

(15)   REA-109 – DRS Centralized Communication System .............76

(16)   REA-110 – Weapons Demonstrations ..................................77

(17)   REA-111 – Additional Subcontractor Costs – PRISMA ............78

(18)   REA-112 – Canceled Requests for Additional Work (Proposal
       Efforts).....................................................................80

(19)   REA-113 – Additional Subcontractor Costs (IAI-MBT) .............81

(20)   REA-115 – Ensign Staff Replacement ..................................82

(21)   REA-116 – Glide Slope Indicator System .............................84

(22)   REA 117 – Additional Wall Covering ....................................86

(23)   REA- 118 – ALBATROS Missile Launchers, Torpedo Launchers,
       Cannons and Guns..........................................................88

(24)   REA-119 – Extended Language Translation Services .............90

(25)   REA-120 – Extended Training Services .................................91

(26)   REA-121 – Reefer Doors...................................................92

(27)   REA-122 – Fuel Oil Tank Repairs .......................................94

(28)   REA- 123 – Underwater Hull Cleaning .................................95

(29)   REA-124 – Air Filter Cleaning ............................................97

(30)   REA-125 – Air Conditioning Plant Pressure Switches..............98

(31)   REA-126 – Blackwater Piping ............................................99

(32)   REA-127 – Lifeboat Exhaust Risers ...................................100

(33)   REA- 128 – Helicopter Auxiliary Power Unit.........................102

(34)  REA-129 - Handrails in Engineering Spaces........................ 104

(35)  REA-130 – Replacement of Missing Electrical Components .... 106

(36)  REA-132 – Life Jacket Storage Lockers .............................. 107

C.  2nd Category of Claims – Claims to Which the Ministry Has Only
    Responded in Annex A .......................................................... 109

(37)  REA-1 – Electronic Warfare ("EW") House Extension ............ 113

(38)  REA-2 – Gas Turbine ("GT") Units; REA-3 – Gas Turbine Fuel
      Control and Starters; and REA-91 – Gas Turbine System Design
      Defect ........................................................................... 116

(39)  REA-6 – Anchor Windlass................................................. 125

(40)  REA-7 – Clutch ............................................................... 130

(41)  REA-8 – Foundation Modification ...................................... 132

(42)  REA-10 – VIC Travel Expenses (Factory Testing) ................ 136

(43)  REA-11 – Increased Per Diem Payments demanded by the VIC138

(44)  REA-13 – Stanchion Mounting Bases ................................. 141

(45)  REA- 14 – Excessive VIC Office and Equipment Costs........... 143

(46)  REA-15 – Additional Steel Inspections ............................... 144

(47)  REA-17 – Designated Subcontractor – ALENIA ................... 147

(48)  REA-18 – Designated Subcontractor – IAI.......................... 148

(49)  REA-19 – Added Costs due to Ministry Interactions with
      Subcontractors................................................................ 150

(50)  REA-20 – Processing OCRs and RAWs ............................... 153

(51)  REA-21 & REA-47 – Engineering and Drawings Approval Process155

(52)  REA-22 – Additional Administrative Functions...................... 158

(53)  REA-25 – Ladder Replacements........................................ 162

(54)  REA-28 – Deck Stanchions............................................... 163

(55)  REA-30 – Stem Bar Repair............................................... 166

(56)  REA-32 – MAAG Gears .................................................... 167

(57)  REA-33 – Shore Power Improvements Proposal Efforts......... 169

(58)  REA-34 – Increasing Dry Docking Costs............................. 171

(59)  REA-35 – Navigation Radar System Proposal Efforts ............ 172

(60)  REA- 36 – Black and Gray Water Systems Proposal Efforts.... 173

(61)  REA-37 – Electric Power Management System Proposal Efforts174

(62)  REA-38 – Habitability/Domestic Equipment Proposal Efforts .. 176

(63)  REA- 39 – Automatic Telephone and Entertainment Systems

Proposal Efforts ................................................................ 177

(64)   REA-40 – Force Majeure .................................................. 178

(65)   REA-41 – Degaussing System .......................................... 179

(66)   REA-42 – Seduction and Distraction System ....................... 180

(67)   REA-44 – Excessive Paint Thickness.................................. 183

(68)   REA-46 – Work Definition Conferences .............................. 185

(69)   REA-48 – Propeller Guard Replacement ............................. 186

(70)   REA-51 – Power Factor Correction .................................... 188

(71)   REA-55 – Stack Closure Strip .......................................... 189

(72)   REA-56 – 127/54-mm Gun Shroud Proposal Efforts.............. 190

(73)   REA-57 – Air Conditioning System Motors (115v vs. 440v) ... 191

(74)   REA-58 & 59 – Air Conditioning and Ventilation and Exhaust. 194

(75)   REA 62 – Controllable Propeller Oil Distribution Boxes .......... 197

(76)   REA-64 – Flight Deck Modifications (Proposal Efforts) ........... 199

(77)   REA-65 – Submarine Telephone System Amplifier................ 200

(78)   REA-66 – Aft Mast/Ship Vibration .................................... 201

(79)   REA-67 – Ladder Relocation ............................................ 203

(80)   REA-68 – Fuel Oil Coolers ............................................... 205

(81)   REA-69 – Additional Dogged Doors ................................... 207

(82)   REA-70 – Aqueous Film Forming Fluid System..................... 208

(83)   REA-72 – Equipment Damage .......................................... 210

(84)   REA-74 – Low Pressure Air System – Foundations .............. 213

(85)   REA-75 – 40/70mm Machine Gun Foundations .................... 215

(86)   REA-76 – Temporary Power Grid ...................................... 216

(87)   REA-77 – Repair of Existing F-21 Deck – Completion of
        Unwelded Area ............................................................. 218

(88)   REA-78 – Batteries and Charges....................................... 219

(89)   REA-79 – Fire Control System Cabling................................ 221

(90)   REA-80 – Speed Log ...................................................... 224

(91)   REA-81 – Increased Warranty Costs.................................. 226

(92)   REA-27 & 86 – Mooring Bitts and Mooring Bitt Back-up Structure 227

(93)   REA-87 – Field Engineering Requests ................................ 229

(94)   REA-88 – Instrumentation List ......................................... 230

(95)   REA-89 – Fuel Oil Transfer System ................................... 232

(96)   REA-90 – Additional – Other Changes Required by the Ministry234

   (96.1)   REA-90.2.1 – Stern Tube Leak ..................................... 235

   (96.2)   REA-90.2.2 – RAN 10S Radar System ........................... 236

   (96.3)   REA-90.2.4 – Centralized Communications System ......... 237

   (96.4)   REA-90.2.5 – List of Transducers and Pressure Switches . 239

   (96.5)   REA-90.2.6 – Portable Stanchion.................................. 240

   (96.6)   REA-90.2.7 – F-25 and F-26 Shipchecks ...................... 240

   (96.7)   REA-90.2.8 – Shaft Alignment .................................... 241

   (96.8)   REA-90.2.9 – Added Plumbing Fixtures in Crew Pantry and
            Café ...................................................................... 242

   (96.9)   REA-90.2.10 – Reach Rods for Valves ........................... 242

   (96.10) REA-90.2.11 – Anchor Windlass Piping.......................... 243

   (96.11) REA-90.2.12 – Electrical distribution (Lighting) .............. 244

   (96.12) REA-90.2.13 – Electrical Commutators.......................... 245

   (96.13) REA-90.2.14 – Steering Gear System Commutator ......... 245

   (96.14) REA-90.2.15 – Reduction Gears .................................. 246

   (96.15) REA-90.2.16 – Pneumatic System ............................... 247

   (96.16) REA-90.2.17 – Steering Gear System ........................... 247

   (96.17) REA 90.2.18 – Engine Cooling System .......................... 248

   (96.18) REA 90.2.19 – JP-5 – Fuel System............................... 249

   (96.19) REA-90.2.21 – Fire System Pumps .............................. 249

   (96.20) REA-90.2.22 – Bailing System, Pump Replacement ........ 251

   (96.21) REA-90.2.23 – Bailing System Ejectors ........................ 252

   (96.22) REA-90.2.24 – Shaft and Stern Tube Removal .............. 252

   (96.23) REA-90.2.25 – Automatic Air System............................ 253

   (96.24) REA-90.2.26 – Air Starting System............................... 254

D.   3rd Category of Claims – The Ministry's Responses to Claimant's
     Remaining Claims Fail on the Merits ....................................... 255

   (97)   REA-4 – Fire Control System ............................................ 255

   (98)   REA-5 – Missing Electronic Components ............................. 258

   (99)   REA-16 – Designated Subcontractor ELISRA ....................... 260

   (100) REA-26 – Additional Structure.......................................... 261

   (101) REA-29 – Deck Grating and Floor Plates ............................ 264

   (102) REA-31 – Watertight Doors and Scuttles............................ 265

   (103) REA-43 – Fin Stabilizer................................................... 267

(104) REA-45 – Second Dry Docking on F-22 ................................ 268

(105) REA-50 – Machinery Command and Control System ............. 270

(106) REA-54 – Air Conditioning Plant Failure ............................... 272

(107) REA-61 – Steel Plate (Metric Ton. vs. U.S. Ton) ................... 273

(108) REA-71 – Stanchion Relocation (Frame 79) ......................... 275

(109) REA-73 – Asbestos Removal ............................................. 276

(110) REA-82 – Live Ammunition Aboard Ship ............................. 277

(111) REA-83 – New Blackwater Tanks ........................................ 278

(112) REA-85 – Ship Condition ................................................... 279

(113) REA-90.2.3 – Radio Power Supply ...................................... 280

(114) REA-90.2.20 – 5-inch Gun ................................................. 281

(115) REA-91 – Gas Turbine System Design Defect ...................... 281

(116) REA-105 – 3D-STAR Radar System Cooling Water Modification 283

(117) REA-108 – DARDO Fire Control System .............................. 284

(118) REA-114 – Sea Trial Deficiencies ....................................... 286

(119) REA-131 – Lighting System .............................................. 287

E.     Delay Damages and Disruption .............................................. 288

F.     Claimant's Credit for Outstanding Payments under the Fixed-Price
       Portion of the Contract .......................................................... 312

XIII. The Ministry's Counterclaim ...................................................... 313

XIV. Interest Rate applicable to Pecuniary Orders ............................... 327

XV.  Request for Reversal of the Interim Measure regarding the Trust Fund 329

XVI. Allocation of Arbitration Costs .................................................... 336

XVII. Dispositive Section .................................................................. 340

**FINAL AWARD**

This FINAL AWARD is issued on the date indicated below by the Arbitral Tribunal formed to settle the dispute between the Parties.

## I.    The Parties and Their Counsel

### A.    Claimant

**HUNTINGTON INGALLS INCORPORATED**, a subsidiary of Huntington Ingalls Industries, Inc., and successor to Ingalls Shipbuilding, Inc. and Northrop Grumman Ship Systems, Inc. is represented in these proceedings by

**HUGHES HUBBARD & REED LLP**

One Battery Park Plaza

New York, NY 10004

USA

**John F. Wood, Esquire**

john.wood@hugheshubbard.com

**Michael A. Debernardis, Esquire**

michael.debernardis@hugheshubbard.com

and

**SHEPPARD MULLIN RICHTER & HAMPTON**

333 South Hope Street, 43rd Floor

Los Angeles, CA 90071-1422

USA

**Kenneth A. O'Brien, Jr., Esquire**

kobrien@sheppardmullin.com

**Mary E. Tarduno, Esquire**

mtarduno@sheppardmullin.com

**DLA PIPER LLP**

200 South Biscayne Boulevard

Suite 2500

1

Miami, FL 33131-5341

USA

**Juan José Delgado Alvarez, Esquire**

juanjose.delgado@dlapiper.com

**Maria Cecilia Rachadell, Esquire**

maria.rachadell@dlapiper.com

hereinafter referred to as "***Claimant***" or "***Huntington***"

B.   **Respondent**[1]

**THE MINISTRY OF DEFENSE OF THE BOLIVARIAN REPUBLIC OF VENEZUELA** is represented in these proceedings by

**GUGLIELMINO & ASOCIADOS**

Cerrito 1320 – Piso 9º

C 1010 ABB Ciudad Autónoma de Buenos Aires

República Argentina

**Osvaldo Guglielmino, Esquire**

oguglielmino@gyasociados.com.ar

**Diego Brian Gosis, Esquire**

dgosis@gmail.com

**Ignacio Torterola, Esquire**

Ignacio.torterola@gstllp.com

**Pablo Parrilla, Esquire**

pparrilla@gyasociados.com.ar

hereinafter referred to as "***Respondent***" or "***Ministry***"

***Claimant*** and ***Respondent*** are sometimes collectively referred to as "***the Parties***".

---

[1] Respondent was initially represented by the law firm of DIAZ REUS ATTORNEYS & SOLICITORS, of Miami, Florida until that law firm was replaced by the law firm of Guglielmino & Asociados identified above.

## II.   The Arbitral Tribunal

The names and addresses of the members of the Arbitral Tribunal are as follows:

### A.   Co-arbitrator appointed by Claimant

**Horacio A. Grigera Naón, Esquire**, 5224 Elliott Road, Bethesda Maryland 20816, United States of America. Phones: (+202) 436 4877, (+301) 229 1985. E-mails: hgnlaw@gmail.com. hgrigeranaon@yahoo.com

### B.   Co-arbitrator appointed by Respondent

**Antonio Hierro, Esquire,** Hierro Estudio Legal SLP, Paseo de la Castellana nº 8, 2º Derecha, Madrid 28046, Spain. Phones: (+34) 91 063 32 63, (+34) 649 45 46 04. E-mail: antonio.hierro@hierroarbitration.com

### C.   President of the Arbitral Tribunal appointed by the International Court of Arbitration of the International Chamber of Commerce acting as Appointing Authority

**José Emilio Nunes Pinto, Esquire,** José Emilio Nunes Pinto Advogados, Av. Presidente Juscelino Kubitschek, 28 – 9º andar, São Paulo, São Paulo 04543-000, Brazil. Phones: (+5511) 3709-4690, (+5511) 3709-4716. E-mail: jpinto@jenp.com.br

## III.  Arbitration Clause

These proceedings are based on the Arbitration Clause contained in article 42 of the Contract CGA-CNALO-002-97 executed by the Parties in December 1997 (the "Contract") as follows:

> **"CUADRAGÉSIMA SEGUNDA:** En caso de una disputa o incumplimiento, o cuestión de interpretación relacionado a este Contrato, "LA CONTRATISTA" y "EL MINISTERIO" se reunirán y negociarán de buena fe para dirimir el asunto amigablemente. Si las partes no pueden dirimir el asunto dentro de treinta (30) días continuos después de plantearse la disputa, entonces, a solicitud de cualquiera de las partes, el asunto será sometido a arbitraje de acuerdo con esta Cláusula. En caso de no resolverse con el arbitraje antes mencionado, ambas partes tendrán derecho de acudir por ante los Tribunales competentes de la República de Venezuela.
>
> **Parágrafo Primero:** Cualquier disputa, demanda, controversia y/o diferencia que surjan de este Contrato o relacionada con la

3

*interpretación, incumplimiento, terminación o invalidación del mismo, será sometido de acuerdo con las reglas estipuladas aquí y subsidiariamente de acuerdo a las reglas del Código de Procedimiento C.I.V.il [sic] de Venezuela. Las actuaciones de arbitraje, serán realizadas en Caracas, Venezuela, en el idioma Castellano-Inglés. El jurado de arbitraje, consistirá de tres (3) árbitros independientes, quienes deberán ser miembros de la Cámara de Comercio Internacional, fluidos en los idiomas Castellano-Inglés, entendiéndose que cada parte nombrará un árbitro y el tercer árbitro quien presidirá el jurado de arbitraje, será elegido por los dos (2) árbitros nombrados por las partes para este fin. En caso de que dentro de treinta (30) días continuos después de su nombramiento, los dos (2) árbitros no hayan logrado un acuerdo en relación a la elección del tercer árbitro, éste último será nombrado por la Cámara de Comercio Internacional o cualquier sucesor de estos. Los árbitros actuarán como árbitros de derecho y deberán pronunciar su decisión dentro de un término de tres (3) meses máximo.*

***Parágrafo Segundo****: Cualquier arbitraje en virtud de este contrato, será realizado en Caracas, Venezuela. Las partes acuerdan que en caso de arbitraje, se seguirán las reglas convenidas en el Código de Procedimiento C.I.V.il [sic] de Venezuela."*

## IV.  Law Applicable to the Merits and Procedural Rules

1. Pursuant to the decision passed by the Arbitral Tribunal[2] and in light of clause 40 of the Contract, the provisions of the Contract and those of the substantive laws of Venezuela govern this case as to the merits.

2. Pursuant to the decision passed by the Arbitral Tribunal[3], the Arbitration Act of 1998 shall be the law applicable to the proceedings and, on a subsidiary or complementary basis, the UNCITRAL Arbitration Rules of 1976 shall apply.

---

[2] See ¶ 63 of Procedural Order No. 2, of July 16, 2013.
[3] See ¶¶ 64 through 80 of Procedural Order No. 2, of July 16, 2013 and item (d) of the Dispositive Section.

## V.    Place of Arbitration

Pursuant to a decision made by the Arbitral Tribunal[4], these arbitral proceedings shall take place in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil.

## VI.   Language of the Arbitration

Pursuant to a decision made by the Arbitral Tribunal[5], both Spanish and English shall be the controlling languages of these arbitral proceedings, with Procedural Order No. 2, as stated by the Arbitral Tribunal in ¶ 107 thereof, being the last decision written in English only.[6]

## VII. Deadline for Making the Award

Pursuant to a decision made by the Arbitral Tribunal[7], it was decided that the period of three (3) months for the rendering of the Award on the merits shall be computed from the date on which Procedural Order No. 2 was communicated to the Parties, but with the Arbitral Tribunal always having the right under article 22 of the Arbitration Act to extend it one or more times *ex officio*.

## VIII. Jurisdiction of the Arbitral Tribunal

Despite the exception for lack of jurisdiction of the Arbitral Tribunal raised by Respondent, the Arbitral Tribunal decided[8] to reject such exception and affirm its full jurisdiction to hear and decide the case that is the subject of these arbitral proceedings.

## IX.   Procedural History

1. Each of the Parties has timely and properly appointed each one of the

---

[4] See ¶¶ 87 through 97 of Procedural Oder No. 2, of July 16, 2013 and items (f) and (g) of the Dispositive Section.

[5] See ¶¶ 98 a 107 of Procedural Order No. 2, of July 16,2013 and item (h) of the Dispositive Section.

[6] A note regarding the titles of documents filed by the Parties in these proceedings: In the English version of this Final Award, the Arbitral Tribunal will attempt to use the titles used by Claimant and, in the Spanish version of this Final Award, will attempt to use the titles used by Respondent.

[7] See ¶¶ 108 through 115 of Procedural Order No. 2, of July 16, 2013 and item (i) of the Dispositive Section.

[8] See ¶¶ 37 through 60 of Procedural Order No. 2, of July 16, 2013 and item (b) of the Dispositive Section.

party-appointed co-arbitrators pursuant to the applicable arbitration clause.

2. The International Court of Arbitration (the "ICC Court") of the International Chamber of Commerce, of Paris, France (the "ICC"), in its capacity as the appointing authority under the arbitration clause, has appointed the Chairman of the Arbitral Tribunal.

3. Hence, the Arbitral Tribunal is formed by Horacio A. Grigera Naón and Antonio Hierro, as co-arbitrators, and José Emilio Nunes Pinto, as Chairman.

4. Upon the appointment of the Chairman, the Arbitral Tribunal invited the Parties and their counsel to a case management meeting, which was held by telephone on May 24, 2012 with the participation of the Claimant's counsel, representatives of the Respondent, the Respondent's counsel and the members of the Arbitral Tribunal.

5. The matters included in the Arbitral Tribunal's agenda were addressed orally by the Parties, each of which had the opportunity to express its views and supporting arguments, to reply to those of the opposing Party and, whenever judged necessary or requested, any such replies were followed by a rejoinder granted by the Arbitral Tribunal.

6. At the end of the case management conference, it was decided that each Party would submit, no later than June 26, 2012, written briefs on the place of arbitration including, but not limited to, any related judicial decisions and legal provisions in support of their respective positions.

7. It was then also agreed that the Respondent would submit, no later than July 17, 2012, its written brief setting forth its jurisdictional objections and supporting grounds, to be responded to by the Claimant no later than July 17, 2012. Further, the issue of the place of arbitration was to be addressed through simultaneous briefs to be filed on August 15, 2012.

8. By an electronic message dated June 26, 2012, the Parties requested an extension of time for the filing of the briefs until July 26, 2012 and August 16, 2102, respectively, which request was granted by the Arbitral Tribunal by an electronic message on June 26, 2012.

9. On June 11, 2012, by letter addressed to the Parties and their Counsel,

the Arbitral Tribunal requested the Claimant to state the amount in dispute in these arbitral proceedings.

10. On July 2, 2012, the Claimant submitted a letter to the Arbitral Tribunal stating the Claimant's position that fees should be charged on the basis of the number of hours spent (in the Claimant's view, an advantage of *ad hoc* arbitrations over institutional arbitrations), and further estimated the amount in dispute as US$ 275,000,000.00.

11. In turn, the Respondent submitted to the Arbitral Tribunal a letter dated July 10, 2012 stating that: (a) as mentioned during the case management teleconference, the Venezuelan Code of Civil Procedure is the law applicable to the dispute and, pursuant to article 629 thereof, it shall be incumbent upon the Claimant to initially bear the costs of the proceedings; and (b) should there exist any dispute or controversy with respect to such fees and expenses, such dispute was to be decided by the Venezuelan Courts. More generally, the Respondent stated that: (i) the Respondent did not agree with the Claimant's estimated amount in dispute and (ii) the Respondent did not agree with the method used to calculate the arbitrators' fees and costs and the administrative costs of these proceedings.

12. On July 24, 2012, the Claimant and the Respondent jointly requested (and the Arbitral Tribunal granted by electronic mail of July 25, 2012) an extension for the filing of the written briefs due on July 26, 2012 and August 16, 2012.

13. As a result, the new deadlines for the filing of the written briefs were established as follows: (i) August 15, 2012, for the filing of the simultaneous briefs on the place of arbitration and the Respondent's brief on jurisdictional objections; and (ii) August 31, 2012, for the filing of the Claimant's reply to the Respondent's brief on jurisdictional objections.

14. On August 12, 2012 the Arbitral Tribunal issued Procedural Order No. 1 whereby: (i) the new deadlines for the filing of briefs were ratified; (ii) the ICC Court was appointed as collection agent, depositary and administrator of the advance of funds to cover the arbitrators' fees and expenses; (iii) the deadline for the deposit of such advance was fixed; (iv) the total amount of

such advance of funds was quantified and allocated in equal shares between the Parties; and (v) it was established that should one of the Parties fail to pay its share, the other Party would be invited to make such payment in the defaulting Party's stead.

15. On August 15, 2012, the Parties filed their briefs regarding the place of arbitration, and the Respondent filed its brief on jurisdictional objections.

16. On August 29, 2012 the Claimant paid its share of the cost advance in compliance with the instructions issued by the ICC Court on August 16, 2012. The Respondent has, however, failed to pay its share.

17. On August 31, 2012 the Claimant filed its brief in response to the Respondent's brief raising jurisdictional objections.

18. By a letter dated September 11, 2012, the Secretariat of the ICC Court invited the Claimant to substitute for the Respondent and pay the Respondent's share in the fee and cost advance within ten (10) days.

19. By a letter dated September 25, 2012, the Secretariat of the ICC Court acknowledged receipt of the deposit by the Claimant of the Respondent's share in the fee and cost advance.

20. By a letter dated October 25, 2012 addressed to the Secretariat of the ICC Court, the Respondent challenged the Arbitral Tribunal and proposed the formation by the Parties of a new one to replace the current Arbitral Tribunal.

21. By a letter dated November 2, 2012 addressed to the Respondent, the Secretariat of the ICC Court granted leave to Respondent to indicate within seven (7) days the legal grounds for the challenge against the Arbitral Tribunal in view of the inapplicability of article 14 of the 2012 ICC Rules of Arbitration to the proceedings.

22. By a letter dated November 20, 2012, the Respondent provided the Secretariat of the ICC Court with a justification for resorting to the ICC Rules to proceed with the challenge.

23. By a letter dated November 26, 2012 addressed to the Claimant, the

Secretariat of the ICC Court informed the Claimant that the ICC Rules, as acknowledged by the Respondent, do not apply to the case and the Court would only be in a position to decide on such challenge should the Claimant empower it accordingly and, to that effect, gave the Claimant the period of five (5) days to file its response.

24. By a letter dated November 29, 2012, the Claimant informed the Secretariat of the ICC Court that it would not agree to have the Court to take a further role in the arbitration beyond being the agent, depository and administrator for the funds advanced.

25. By a letter dated December 3, 2012, the Secretariat of the ICC Court informed the Parties that, in the absence of an agreement by the Claimant, the Court was not in a position to process the challenge posted by Respondent against all members of the Arbitral Tribunal.

26. By an electronic message dated March 4, 2013, the Arbitral Tribunal communicated to the Parties the interruption of the deliberation process and granted them leave to file by not later than March 22, 2013 Additional Briefs on the matter dealing with the place of arbitration which were deemed a reply by each Party to the opposing Party's Brief dated August 15, 2012.

27. Due to the events occurred in Venezuela and following subsequent requests for extensions filed by Respondent and to which the Arbitral Tribunal consented, the Parties submitted their Additional Briefs on April 23, 2013.

28. By an electronic message dated April 30, 2013, the Arbitral Tribunal acknowledged that the Claimant, upon submitting its Additional Brief, proposed the Arbitral tribunal to set up a conference call to discuss certain aspects related to the place of arbitration. In such message, the Arbitral Tribunal granted the Claimant the period of up to May 7, 2013 to elaborate on the purpose of the call and provide the Arbitral Tribunal and the Respondent with a list of matters to be discussed during such call.

29. By an electronic message dated May 7, 2013, the Claimant stated that, since it appeared that the Arbitral Tribunal had no further questions on that

specific topic, the call needed not be held.

30. By an electronic message addressed to the Parties on May 9, 2013, the Arbitral Tribunal stated it was satisfied with the written submissions filed by the Parties decided not to hold the conference call.

31. On July 16, 2013, the Arbitral tribunal issued Procedural Order No. 2 whereby it (i) rejected the claim submitted by Respondent and affirmed the legal standing of Claimant to appear before the Arbitral Tribunal, (ii) rejected the exception of lack of jurisdiction raised by Respondent and affirmed its full jurisdiction to hear and decide the case, (iii) rejected the claim submitted by Respondent as to the application of the Civil procedure Code of Venezuela to the conduct of the proceedings, (iv) affirmed that the Arbitration Act of 1998 should be the applicable law to the proceedings and, on a subsidiary or complementary basis, the UNCITRAL Arbitration Rules of 1976, (v) rejected the claim submitted by Claimant as to where the arbitral proceedings should take place, (vi) affirmed that the arbitral proceedings should thereafter take place in the City of Rio de Janeiro, State of Rio de Janeiro, Brazil, (vii) rejected the claims of the Parties as to the language of the arbitration, (viii) affirmed that both Spanish and English should be thereafter the controlling languages of the arbitral proceedings, (ix) affirmed that the period of three (3) months for the rendering of the award on the merits should be computed from the date Procedural Order No. 2 was communicated to the Parties and (x) affirmed that the Arbitral Tribunal had the right under the Arbitration Act to extend the period for the rendering of the award on the merits one or more times *ex officio.*

32. Following the comments provided by the Parties and the conference call held on December 17, 2013, the Arbitral Tribunal issued on December 26, 2013 Procedural Order No. 3 whereby the provisional timetable and the rules applicable to the conduct of the arbitral proceedings were approved and communicated to the Parties.

33. On October 11, 2013, the Arbitral Tribunal issued Procedural Order No. 4 whereby the term for rendering the final award was extended through January 12, 2014.

34. On December 26, 2013, the Arbitral Tribunal issued Procedural Order No. 5 whereby the term for rendering the final award was extended through April 12, 2014.

35. On March 6, 2014, Claimant submitted its Statement of Claim pursuant to the timetable contained in Procedural Order No. 3.

36. On March 24, 2014, the Arbitral Tribunal issued Procedural Order No. 6 whereby it granted leave to the Parties to express by not later than March 31, 2014 if they agreed with the extension of the period of time for the rendering of the award on the merits until April 30, 2015 in view of the timetable for these arbitral proceedings as established by Procedural Order No. 3. The Arbitral Tribunal further established that in the event of failure to express their agreement, the time for the rendering of the award on the merits should be deemed extended until July 11, 2014.

37. On March 24, 2014, the Arbitral Tribunal issued Procedural Order No. 7 whereby it (i) appointed the ICC Court as the collection agent, depositary and administrator of the total aggregate amount contributed as an advance of arbitrators' fees and expenses, (ii) directed the Parties to enter into the deposit and administration agreement with the collection agent within a period of time that would permit the deposit of the advance amount on April 22, 2014, and declared that the relevant fees shall be borne in equal share by both parties and (iii) directed each Party to advance by not later than April 22, 2014 the amount of US$ 344,324.50 to cover the arbitrators' fees and expenses.

38. On April 9, 2014, Respondent's counsel addressed a letter to the Arbitral Tribunal whereby they requested an extension of 90 days to submit Respondent's Statement of Defense due to the large volume of documents attached by Claimant to its Statement of Claim and further requested that the Arbitral Tribunal also revise the deadlines applicable to subsequent submissions.

39. On April 11, 2014, Claimant's counsel submitted a letter to the Arbitral Tribunal in response to Respondent's counsel letter referred to in the preceding paragraph whereby they comment on the contents of such letter

and are adamant in stating that Respondent should not be granted any extension that might place in jeopardy a January 2015 hearing on the merits.

40. On April 12, 2014, the Arbitral Tribunal issued Procedural Order No. 8 whereby it (i) granted Respondent, on an exceptional basis, an extension of sixty (60) days from the original date to file its Statement of Defense, (ii) stated that the dates for the hearing on the merits remained unchanged and (iii) revised the timetable of the proceedings in light of the extension granted thereby.

41. On April 30, 2014 and in light of the failure by the Parties to agree on the extension of the term for the rendering of the award on the merits until April 30, 2015, such term was automatically deemed extended until July 11, 2014, as per the language contained in Procedural Order No. 6.

42. On July 4, 2014, Respondent submitted its Statement of Defense and Counterclaim.

43. On July 7, 2014, the Arbitral Tribunal issued Procedural Order No. 9 whereby the term for rendering the final award was extended through October 9, 2014.

44. By an electronic message dated August 28, 2014 submitted by Claimant's counsel to the Arbitral Tribunal (which message was confirmed by another electronic message submitted by Respondent's counsel dated that same date), the Parties informed the Arbitral Tribunal that they had agreed on some adjustments to the procedural calendar whereby (i) Claimant's submission of its Reply to the Statement of Defense and Answer to the Counterclaim should be due on September 19, 2014, (ii) Respondent's Rejoinder and Reply to the Counterclaim should be due on November 17, 2014 and (iii) Claimant's Rejoinder on the Counterclaim should be due on December 25, 2014, the dates of the hearing on the merits remaining unchanged.

45. On September 19, 2014, Claimant submitted its Reply to the Statement of Defense and Answer to the Counterclaim.

46. On October 3, 2014, the Arbitral Tribunal issued Procedural Order No. 10 whereby the term for rendering the final award was extended through January 7, 2015.

47. On November 7, 2014, Respondent submitted to the Arbitral Tribunal a request to lift the existing injunctive relief granted by the United States District Court for the Southern District of Mississippi.

48. By an electronic message dated November 7, 2014, the Arbitral Tribunal granted leave to Claimant until November 11, 2014 to comment on Respondent's request to lift the injunctive relief referred to in the preceding paragraph.

49. On November 10, 2014, Claimant submitted its response to Respondent's request whereby it claimed that the Arbitral Tribunal had no authority to vacate an order of a United States District Court nor any jurisdiction over The Bank of New York, a non-party to the arbitral proceedings, requesting therefore that the Arbitral Tribunal reject Respondent's request.

50. On November 17, 2014, Respondent submitted its Rejoinder and Reply to the Counterclaim.

51. By an electronic message dated November 21, 2014, the Arbitral Tribunal granted leave to Respondent until November 28, 2014 to comment on Claimant's submission dated November 10, 2014 on the request to lift the injunctive relief granted by the United States District Court for the Southern District of Mississippi.

52. On November 26, 2014, Respondent submitted its comments on Claimant's response to the request to lift the injunctive relief whereby it stated that in its previous submission it had shown that Claimant's reasons for opposing the lifting of the injunctive relief were of no avail considering the reasons for lifting the injunctive relief provided by Respondent. Moreover, Respondent reiterated its availability to attend an in-person or telephonic hearing to discuss such request.

53. On November 27, 2014, the Arbitral Tribunal issued Procedural Order

No. 11 whereby it (i) increased the advance on arbitrators' fees and costs from US$ 930,000.00 to US$ 1,185,000.00, (ii) directed the Parties to pay an equal share of the additional US$ 255,000.00 and (iii) established the date of December 19, 2014 as the relevant payment date with the ICC Court.

54. By an electronic message dated November 29, 2014, the Arbitral Tribunal invited the Parties to attend a conference call to be held on December 4, 2014 to discuss in more detail the request by Respondent to lift the injunctive relief issued by the United States District Court for the Southern District of Mississippi over the funds held by the Bank of New York and laid down rules for the submission of arguments by the Parties.

55. By an electronic message dated December 16, 2014, the Arbitral Tribunal, in light of the arguments put forward by the Parties during the conference call held on December 4, 2014 and their written submissions, decided to postpone the decision on Respondent's request until after the hearing on the merits to the extent that it was its understanding that the matter to be decided was intertwined with the construction of certain provisions contained in the Contract.

56. On December 17, 2014, the pre-hearing conference call took place with the attendance of the President of the Arbitral Tribunal and the Parties' counsel.

57. On December 18, 2014, Claimant submitted a draft Joint Hearing Proposal to govern the hearing.

58. On December 18, 2014, Respondent submitted a letter concerning the unavailability of witnesses appointed by Respondent and requested that the witness statements of Messrs. Dalton, Higginbotham, Hinkel, Galloway and Thornhill be stricken from the record of these arbitral proceedings.

59. By an electronic message dated December 19, 2014, the Arbitral Tribunal granted leave to Claimant until December 23, 2014 to comment on the letter submitted by Respondent on the unavailability of certain of Claimant's witnesses to attend in person the hearing in Rio de Janeiro in early January 2015.

60. On December 23, 2014, Claimant filed its comments on Respondent's letter.

61. On December 24, 2014, Claimant submitted its Rejoinder to the Counterclaim.

62. On December 26, 2014, the Arbitral Tribunal issued Procedural Order No. 12 whereby the term for rendering the final award was extended through April 10, 2015.

63. By an electronic message dated December 26, 2014, the Arbitral Tribunal (i) granted leave to Claimant until December 30, 2014 to (a) elaborate on the reasons why Mr. Higginbotham was not willing to be cross-examined during the hearing and (b) provide the Arbitral Tribunal and the opposing party with medical certificates justifying the medical unavailability of Messrs. Galloway, Thornhill and Hinkel to be cross-examined during the hearing, (ii) informed the Parties that it would not strike from the record the Master Affidavit signed by the late Mr. Dalton but would determine the probative value of such testimony during the deliberation process and in light of the evidence presented by the Parties during the hearing and (iii) requested Respondent to inform the Arbitral Tribunal if it was willing to cross-examine by video conference the witnesses unavailable to attend the hearing.

64. On December 30, 2014, Claimant submitted its letter pursuant to the Arbitral Tribunal's message referred to in the preceding paragraph whereby it explained that Mr. Higginbotham was no longer an Ingalls employee and his participation in these proceedings might create a potential conflict with his current employer. Said letter was accompanied by the medical certificates justifying the unavailability of Messrs. Galloway, Thornhill and Hinkel.

65. On December 31, 2014, Respondent submitted its response to the aspects raised by the Arbitral Tribunal whereby it rejected the arguments and evidence tendered by Claimant regarding the witnesses not attending the hearing in person and highlighted that acceptance of the arguments in light of the circumstances would give rise to a dangerous precedent in

connection with the production of evidence in arbitration.

66. On January 7, 2015, the Arbitral Tribunal issued Procedural Order No. 13 to approve the rules governing the hearing, as agreed upon by the Parties, which were made an Annex thereto.

67. By means of an electronic message dated January 7, 2015, the Arbitral Tribunal communicated to the Parties that (i) it would make a final decision with respect to the cross-examination of certain of Claimant's fact witnesses only after having had the opportunity to meet in person in Rio de Janeiro on Sunday, January 11, 2015, and (ii) if it should decide to order that such fact witnesses be cross-examined, the Arbitral Tribunal would make the necessary arrangements with the Parties for securing the cross-examinations on a date subsequent to the hearing in Rio de Janeiro.

68. By means of an electronic message dated January 7, 2015, Respondent requested an urgent decision be made by the Arbitral Tribunal as to the nature of the Master Affidavit insofar as the examination of the witnesses and experts to take place in Rio de Janeiro would require Respondent to know whether the Master Affidavit would be treated as a witness statement.

69. By means of an electronic message dated January 8, 2015, Claimant requested that the Arbitral Tribunal reconsider its decision to delay any cross-examination of the three witnesses unable to travel to Rio until after the Rio hearings, basing such request on the difficulties the Parties and their counsel would encounter given their caseload in the coming months.

70. By means of an electronic message dated January 8, 2015, the Arbitral Tribunal acknowledged receipt of Respondent's counsel's message regarding the decision to be made with respect to the nature of the Master Affidavit and informed the Parties that such decision necessarily overlaps with the decision regarding the unavailable witnesses to be made by Arbitral Tribunal in Rio de Janeiro. Nevertheless, the Arbitral Tribunal highlighted that Respondent's December 31, 2014 message indicated two possible scenarios in that respect. Therefore, the Arbitral Tribunal indicated to the Parties that until its members could meet in person, both scenarios must be assumed to be as possibilities.

71. By means of an electronic message communicated to the Parties on January 11, 2015 following the meeting in person of its members in Rio de Janeiro, Brazil, the Arbitral Tribunal made the following decisions, to wit: (i) the Master Affidavit was deemed a written statement of the witnesses referred to therein and the testimony of said witnesses in the course of a cross examination would be necessary for the Arbitral Tribunal to ascertain the probative value of such document, (ii) therefore, in the best interest of the Arbitral Tribunal, Messrs. Hal Galloway, Carey Thornhill and Gary Hinkel would have to be cross-examined in the form indicated below; as far as the testimony of Mr. T.C. Dalton was concerned, the Arbitral Tribunal confirmed its previous decision on the matter, (iii) counsel were invited to jointly identify a solution with respect to the form under which the cross-examinations would be conducted, i.e. (y) by videoconference during the week of January 12 to January 18, 2015 or, alternatively, (z) in the United States in the course of the month of February 2015 with the attendance in person of the President of the Arbitral Tribunal and the attendance by videoconference of the co-arbitrators, (iv) counsel for the Parties were instructed to communicate to the Arbitral Tribunal, by e-mail message, their choice by no later than January 12, 2015, at 9 PM, Brasilia time, (v) the Arbitral Tribunal deemed it preferable to start the hearing sessions at 9 AM in lieu of 8:30 AM and to adjourn them at 6:30 PM, (vi) Counsel were instructed to communicate to the Arbitral Tribunal by no later than January 12, 2015, at 9 PM, Brasilia time, the daily schedule for the presentation of the witnesses, (vii) the Arbitral Tribunal took note of Claimant's written submission on the failure by Respondent to pay its portion of the advance on arbitrators' fees and expenses and stated it would make a decision on that issue in due course, (viii) as to the request by Respondent as to the place of arbitration, the Arbitral Tribunal referred the Parties to ¶¶ 96 and 97 of Procedural Order No. 2 and (ix) by applying the provision contained in ¶ 4.7 of Procedural Order No. 3, the Arbitral Tribunal decided to exclude from the record the written statement of Mr. Al Higginbotham.

72. During the period from January 12, 2015 to and including January 18, 2015, the hearing on the merits was held in the city of Rio de Janeiro, State of Rio de Janeiro, Brazil at the Caesar Park Hotel Ipanema and the following

activities took place, to wit: (i) counsel for both Parties presented their oral opening and closing statements and (ii) fact and expert witnesses appointed by the Parties were cross-examined by the opposing Party.

73. By means of an electronic message dated January 12, 2015, the Parties communicated to the Arbitral Tribunal their agreement to hold a session on February 11, 2015 in New Orleans at which those Claimant's witnesses who were unable to travel to Brazil to attend the hearing on the merits would be cross-examined.

74. On January 18, 2015, Respondent's counsel informed the Arbitral Tribunal that, despite the agreement that had been reached by the Parties, Respondent waived the cross-examination in the United States of the witnesses designated by Claimant who were unable to travel to Brazil.

75. By means of an electronic message dated February 11, 2015, the Arbitral Tribunal communicated to the Parties that post-hearing briefs should be submitted by both Parties on April 30, 2015; the post-hearing briefs were to be no longer than 100 pages, including annexes and appendices but excluding cover page, tables of contents and similar indices.

76. By means of an electronic message dated March 10, 2015, Respondent brought to the attention of the Arbitral Tribunal that recordings of the hearing sessions had not been received and requested access to such recordings to proceed with the review of the transcripts and, once that problem was solved, an appropriate revision of the deadline for submitting comments.

77. By means of an electronic message dated March 12, 2015, the Arbitral Tribunal granted leave to Claimant until March 16, 2015 to comment on the request submitted by Respondent.

78. By means of an electronic message dated March 16, 2015, Claimant informed the Arbitral Tribunal that no live-feed recording existed and that Respondent had access to all recordings; Claimant also expressed its agreement to a short extension to submit the revised transcripts provided that the other deadlines were not affected.

79. By means of an electronic message dated March 17, 2015, Respondent requested a 10-day extension for the Parties to exchange their revised transcripts and an additional 10-day period for submission of the revised transcripts to the Arbitral Tribunal.

80. By means of an electronic message dated March 17, 2015, Claimant expressed no objection to the extension requested by Respondent on condition that the other deadlines were not affected.

81. By means of an electronic message dated March 18, 2015, the Arbitral Tribunal authorized the extension requested and reiterated that the subsequent deadlines would not be affected.

82. On April 1, 2015, the Arbitral Tribunal issued Procedural Order No. 14 whereby the term for the rendering of the award was extended through July 9, 2015.

83. On April 30, 2015, the Parties submitted their post-hearing briefs.

84. By means of an electronic message dated May 1, 2015, the Arbitral Tribunal acknowledged receipt of the post-hearing briefs submitted by both Parties and authorized them to proceed with the exchange of the relevant texts of such submissions.

85. On June 30, 2015, the Arbitral Tribunal issued Procedural Order No. 15 whereby the term for the rendering of the award was extended through October 8, 2015.

86. By means of an electronic message dated June 30, 2015, the Arbitral Tribunal invited the Parties to submit their Statements of Costs by no later than July 24, 2015.

87. On July 24, 2015, the Parties submitted their respective Statements of Costs.

88. On October 2, 2015, the Arbitral Tribunal issued Procedural Order No. 16 whereby the term for the rendering of the award was extended through January 6, 2015.

89. On January 2, 2016, the Arbitral Tribunal issued Procedural Order No.

17 whereby the term for the rendering of the award was extended through April 5, 2016.

90. By means of an electronic message dated January 6, 2016, Claimant's counsel requested the Arbitral Tribunal to state whether it was in a position to provide an estimated date for rendering the award on the understanding that any such estimate would be non-binding and subject to change.

91. By means of an electronic message dated January 7, 2016, the Arbitral Tribunal informed the Parties that deliberations were under way and covering various aspects and that it estimated that it might be in a position to render the award by the end of the month of May given the complexity of the case; nonetheless, the Arbitral Tribunal also stated that any deviations from the estimated date would be communicated to the Parties.

92. On April 2, 2016, the Arbitral Tribunal issued Procedural Order No. 18 whereby the term for the rendering of the award was extended through July 4, 2016.

93. By means of an electronic message dated June 1, 2016, the Arbitral Tribunal informed the Parties that due not only the complexity of the case but also in view of the impressive amount of documents submitted by the Parties the rendering of the award would require more time; the Arbitral Tribunal also informed the Parties that it would not make at that juncture any estimate with a view toward not creating any expectations but reiterated it was committed to provide the Parties with an estimate as soon as circumstances permitted.

94. On June 27, 2016, the Arbitral Tribunal issued Procedural Order No. 19 whereby the term for the rendering of the award was extended through October 2, 2016.

95. On September 26, 2016, the Arbitral Tribunal issued Procedural Order No. 20 whereby the term for the rendering of the award was extended through December 31, 2016.

96. On December 27, 2016, the Arbitral Tribunal issued Procedural Order No. 21 whereby the term for the rendering of the award was extended

through March 31, 2017.

97. On March 3, 2017, Respondent submitted a note to the Arbitral Tribunal communicating the occurrence of certain facts that had come to its knowledge which, in Respondent's view, evidenced the lack of independence and impartiality of Claimant's witness, Mr. Román Duque-Corredor.

98. By means of an electronic message dated March 4, 2017, the Arbitral Tribunal decided to reopen the arbitral proceeding to proceed with the examination of the incident raised by Respondent, and advised the Parties that the term for the rendering of the award, as provided by Procedural Order No. 21 was therefore superseded by those events. Moreover, the Arbitral Tribunal ordered Respondent to file by no later than March 7, 2017 the documents referred to in the note and granted leave for Claimant to comment on the note and documents provided by Respondent by no later than March 16, 2017.

99. On March 7, 2017, Respondent filed the documents referred to in its note of March 3, 2017.

100. On March 16, 2017, Claimant filed its response to Respondent's note whereby it denied that the information cited by Respondent was anything new and, further, that it could not be inferred from the webpage that Mr. Duque was not independent or impartial for the purposes of this proceeding, nor could the open letter published by Mr. Duque-Corredor in October 2016 in the Venezuelan press criticizing the current Ministry of Defense call Mr. Duque's independence in this matter into question.

101. On March 22, 2017, the Arbitral Tribunal granted leave for Respondent to respond to Claimant's message by no later than April 3, 2017.

102. On March 27, 2017, the Arbitral Tribunal issued Procedural Order No. 22 whereby the term for the rendering of the award was extended through June 29, 2017.

103. On April 3, 2017, Respondent filed its response to Claimant's message whereby it challenged all arguments brought by Claimant and reaffirmed that such documents were new and that the open letter was an institutional

attack against the Ministry of Defense and the Government of the Bolivarian Republic of Venezuela.

104. In the items below, the Arbitral Tribunal describes the latest events that led to the subsequent extension of the time limit for the rendering of the Award, to wit:

- ✓ On June 26, 2017, the Arbitral Tribunal issued Procedural Order No. 23 whereby the term for the rendering of the award was extended through August 15, 2017;

- ✓ On August 8, 2017, the Arbitral Tribunal communicated to the Parties by means of an electronic message that the term for the rendering of the award was extended through September 15, 2017;

- ✓ On September 13, 2017, the Arbitral Tribunal issued Procedural Order No. 24 whereby the term for the rendering of the award was extended through December 5, 2017 and at such time decided that such term would not be subject to any further extension;

- ✓ On November 28, 2017, the Arbitral Tribunal, due to the fact that it had imposed on itself a limitation to extend the term for the rendering of the award, requested the consent of the Parties to extend it until January 30, 2018, which consent was granted by the Parties and is reflected in electronic messages addressed by the Parties' counsel to the opposing Party and the Arbitral Tribunal;

- ✓ On January 26, 2018, the Arbitral Tribunal requested the consent of the Parties to extend the term for the rendering of the award to not later than February 9, 2018, which consent was granted by the Parties and is reflected in electronic messages addressed by the Parties' counsel to the opposing Party and the Arbitral Tribunal on that same date;

- ✓ On February 8, 2018, the Arbitral Tribunal communicated to the Parties that it had been confronted with some technological problems with the Spanish version of this Award, which required rework. The Arbitral Tribunal offered the Parties two options: impart only the

English version of the Award on February 9, 2018 or, if they so wished, impart both versions on February 19, 2018. The Arbitral Tribunal invited the Parties to discuss this offer and then let the Arbitral Tribunal know their decision. On February 8, 2018, Claimant expressed its preference for receiving the English version of the Award on February 9, 2018, while the Ministry supported the communication of both versions simultaneously;

✓ On February 9, 2018, due to the lack of agreement between the Parties, the Arbitral Tribunal decided that the Award, in its two versions, was to be imparted simultaneously to the Parties on or before February 19, 2018.

## X.   Admission of New Evidence Brought by Respondent

105. As reported in the Procedural History of this arbitration[9], Respondent filed on March 3, 2017 a note in connection with the contents of two documents that had come to its knowledge, to wit: (i) the webpage of the law firm Hoet, Pelaez, Castillo & Duque, of Caracas, Venezuela evidencing that Mr. Duque-Corredor is a partner of said law firm and has been since 1992 and (ii) an open letter published by Mr. Duque-Corredor by means of which he perpetrated an institutional attack against the Republic and, in particular, a personal attack against the Minister of Defense.

106. Invited to comment on the Note, Claimant analyzed the documents brought by Respondent to the attention of the Arbitral Tribunal and concluded that (i) the new webpage of the law firm of Hoet, Pelaez, Castillo & Duque simply repeats the same information that was available at the time of the hearing on the merits in January 2015 although under a different format and design, and (ii) the open letter of Mr. Duque-Corredor was published in October 2016 with respect to some contemporaneous political occurrences in Venezuela in which the Minister of Defense had been a protagonist. In support of his submission, Claimant cited excerpts of the

---

[9] See ¶¶ 97 to 101 and 103 above.

transcript of the hearing[10] and print media on the events reported.

## Discussion and Decision

107. The question of the lack of independence and impartiality of Mr. Duque-Corredor played a major role in his cross-examination during the hearing. Mr. Duque Corredor was asked various questions at various instances of his testimony regarding his position at the law firm. Mr. Duque-Corredor stated that he had retired from the firm in 2007 and that he serves as consultant to the firm and issues opinions to the firm's clients as he does with any other law firm in the marketplace. Furthermore, Mr. Duque-Corredor indicated that the reference to his name as partner of the firm on the website was for promotional purposes only, and that it should not be construed as evidence of his personal interest as a partner at the firm.

108. Those same arguments were offered by Claimant in its response in 2017, and strongly repudiated by Respondent.

109. In light of the arguments tendered by the Parties, the Arbitral Tribunal shall decide on the request by Respondent to reopen the record and admit the new documents and, further, not to take into account Mr. Duque-Corredor's written statements due to his lack of independence and impartiality.

110. The Arbitral Tribunal takes note of the arguments of the Parties and the new documents provided by Respondent in the context of this incident, but reminds the Parties that the decision of the matters dealt with in the proceeding shall take into account not only witness testimonies but also a voluminous number of documents brought to the record. Claimant has offered other experts who opined on the same topics as Mr. Duque-Corredor did in his written statement and the opinions of those other experts are readily available for consultation by the Arbitral Tribunal. Furthermore, the open letter published by Mr. Duque-Corredor in the press of Venezuela refers primarily to a particular event that occurred in Venezuela in 2016 subsequently to Mr. Duque-Corredor rendering his testimony before the

---

[10] Tr. 831:7-20, 834:7-11 and 828:5-19.

Arbitral Tribunal, and expresses his personal views as a citizen of Venezuela on an event that is of a domestic political nature and foreign to the core discussions pursued by the Parties in these proceedings.

111. Therefore, the Arbitral Tribunal sees no reasonable justification to reopen the record at this juncture with a view to admitting the documents Respondent annexed to its note. This does not mean that the Arbitral Tribunal is not cognizant of the facts reported by the Parties and the arguments offered in support of their respective positions.

112. Despite dismissing the request submitted by Respondent, the Arbitral Tribunal anticipates that it shall determine the weight to be afforded to the opinions of Mr. Duque-Corredor in light of the circumstances and the significant amount of evidence contained in the record.

## XI.   Introductory Notes to the Description of the Dispute

### A.   Historical Background[11] of Bid Solicitation

113. In 1991 the Ministry of Defense of the Bolivarian Republic of Venezuela (at such time, named Republic of Venezuela) issued a request for proposal to repair and overhaul two of the six LUPO class frigates, namely ARV MARISCAL SUCRE (hereinafter "F-21") and ARV MARISCAL BRION (hereinafter "F-22"); F-21 and F-22 are sometimes referred to collectively as the "Frigates". The request for proposal provided prospective bidders with technical specifications and other documents defining certain specified work to be performed on the Frigates. Multiple shipyards submitted proposals for the Ministry's request. In September 1991, Claimant and three other shipyards submitted bids in response to the Ministry's request. Due to discrepancies among the bids, the Ministry cancelled the competitive bidding process. In January 1992, the Ministry circulated a second, more detailed request. Claimant bid again.

114. After receiving the bids under this second round, the Ministry decided that Claimant's April 1992 bid was the most advantageous and on May 25,

---

[11] Based on the information contained in the Master Affidavit and the Statement of Claim submitted by Claimant in this arbitration.

1992, the Ministry selected Claimant as the "Buena Pro" bidder and notified all bidders that the final contract would be negotiated solely with Claimant.

## B.   The Contractual Relationship between the Parties

115. The relationship between the Parties derives from a certain contract entered into by the Ministry and Claimant on December 17, 1997 (the "Contract")[12]. It must be noted that a lapse of roughly five years ran between the award of Claimant's bid by the Ministry and the actual execution of the Contract. The purpose of the Contract is described in the First Clause of the Contract.

116. As per the Second Clause of the Contract, the agreed upon fixed and non-reviewable price was the total sum of US$ 315,000,000 payable by the Republic of Venezuela through the Ministry of Finance. In order to meet the payment obligations, the Ministry of Finance issued Eurobonds for the total sum of US$ 315,000,000 in a private placement, and the proceeds of such issuance were placed in a trust fund created by the Ministry of Finance and the Bank of New York with the sole and specific purpose of making the payments under the Contract.

117. Nevertheless, the contractual price was subdivided into a number of items corresponding to different categories of work to be performed by Claimant. The total amount allocated to the in-scope work amounted to US$ 250,608,216 while the Contract provided for the sum of US$ 21,439,766 to cover disbursements related to the purchase of spare parts and US$ 42,952,018 to cover extras and/or contingencies[13].

118. Furthermore, the sum related to the in-scope work was to be paid in installments in accordance with agreed upon milestones, with an initial down payment guaranteed by a bond posted by Claimant in favor of the Ministry, and with the subsequent installments paid at the end of each of the stages into which the scope work was divided after Perceptive Control and approval by the Comptroller General of the National Armed Forces. The

---

[12] The Spanish version of the Contract is under Doc. J0071 while its English translation is under Doc. J2104.
[13] See Second and Third Paragraphs of the Second Clause of the Contract.

completion of each stage was required to be certified by the chief of the Venezuelan Inspection Commission ("VIC")[14] and by the authorized representative of Claimant indicating that Claimant had completed the work for that stage.

119. The Parties also agreed that should Claimant do any work without previously presenting the appropriate quotation to be analyzed and approved by the Ministry, the latter would not recognize the relevant costs associated with such work[15].

120. Despite the fixed and non-reviewable nature attributed to the price, the Parties introduced into the text of the Contract a certain Fifty-Ninth Clause (hereinafter "Clause 59") whereby upon it being determined during the performance of the Contract that additional works, repairs, services, supplies and tests not included in the specifications but which were considered absolutely necessary to fulfill the purpose of the Contract and which were not included in the agreed total price, the Parties should determine by mutual agreement the work and applicable prices and the influence of such additional work on the deadlines for the delivery of the Frigates. It also provided that, whenever necessary, the Parties should sign additional agreement or agreements, the prior approval by the Comptroller General of the National Armed Forces being first secured[16].

## C.   The Condition of the Frigates on Delivery by the Ministry

121. Claimant asserts that in entering into the Contract it relied upon the Ministry's express representation that it was maintaining the Frigates in their 1991 condition[17]. Nevertheless, Claimant reports in its Statement of Claim that the condition of the Frigates had deteriorated beyond normal wear and tear since the ship checks held in Venezuela. Despite the

---

[14] The structure and functions to be performed by VIC during the performance of the works are spelt out in the Fifth and Seventh Clauses of the Contract.
[15] See Fifty-Sixth Clause of the Contract.
[16] The Arbitral Tribunal will discuss at the appropriate time the construction and interpretation of Clause 59, but it highlights that the English translation of Clause 59 refers solely to the "*approval of the General Controller's Office of the National Armed Forces*", while the original Contract in Spanish refers to "*prior approval*".
[17] See Doc. J-0006.

statement made by the Ministry that the Frigates complied with NATO norms, asbestos was found in the Frigates upon their arrival to the shipyard. In the presence of conditions different from those that had been observed by Claimant during local inspections, work outside the scope of the Contract has proven to be necessary, since Claimant had not included in its proposal the cost associated with asbestos removal from the Frigates.

122. Furthermore, Claimant asserts that upon arrival the Frigates were contaminated with human and food waste as well as insects and vermin, including the discovery by Claimant of the presence of harmful bacteria. Claimant had to stop the works, hire subcontractors and incur in unexpected costs and delays. Moreover, Claimant also notes that in addition to deterioration detected, certain components of systems installed in the Frigates had been cannibalized.

123. Conversely, Respondent in its Statement of Defense and Counterclaim contradicts the description of the condition of the Frigates[18] provided by Claimant and states that Claimant had the opportunity to inspect the Frigates without any interference or limitation imposed by the Ministry. The inspections took place in Puerto Cabello, Venezuela and in Pascagoula, in the United States. Respondent asserts that the deterioration of the Frigates was not unforeseeable. Firstly, Respondent claims that Claimant knew that the Frigates had not undergone the 5-year maintenance procedure; secondly, had the Frigates not been deteriorated, the contracting of services of around US$ 300,000,000 would have been unnecessary. Last but not least, Claimant inspected the Frigates at various instances between 1992 and 1997 in addition to other inspections during five months in its shipyard[19].

124. Respondent also claims that Claimant, despite the late allegation of deterioration, and having had the opportunity to inspect the Frigates, not only executed the Contract with the Ministry but also signed without making any reservation the Act of Initiation of Work on June 1, 1998, five months

---

[18] See ¶ 26(a) of the Statement of Defense and Counterclaim.
[19] See ¶ 116 of the Statement of Defense and Counterclaim.

after the arrival of the Frigates to the shipyard[20]. Hence, Respondent avers that any change in the condition of the Frigates was duly admitted and remunerated by the Ministry in accordance with the Contract.

125. Indeed, this aspect is of paramount importance for the decision of some of the claims brought by Claimant in these proceedings and is, *per se*, a litigious aspect to be decided at the appropriate time by the Arbitral Tribunal.

### D.   The Price and Its Permitted Modification – The Construction of and Interrelationship between Clauses 8 and 59 of the Contract

126. As aforesaid, the Contract provided for a total aggregate amount payable by Respondent to Claimant for the in-scope services to be rendered thereunder which amounted to US$ 250,608,216. Nonetheless, it also reserved the amount of US$ 42,952,018 to cover extras and/or contingencies. While such amount was set forth in the Second Clause, the use of any portion of the reserved amount towards extras and/or contingencies was governed by the Eighth Clause of the Contract (hereinafter "Clause 8").

127. It may not be averted that in incurring in expenses under such concept, this would render the fixed price affected by a change. In reality, such amount was contemplated together with the one due for the performance of the in-scope work and that allocated for the purchase of spare parts as components of the total aggregate contractual price of US$ 315,000,000. Thus, this confirms the fixed nature of the price.

128. Nonetheless, Clause 59 of the Contract introduces under the caption of Final Provisions certain circumstances that might affect the fixed-price nature of the Contract related to work, repairs, services, supplies and tests not included in the technical specifications, on condition that (i) such works were absolutely necessary to fulfill the purpose of the Contract and (ii) were not included in the agreed total price. Moreover, following determination by the Parties, the prior approval of the Comptroller General of the National

---

[20] See Doc. J0191.

Armed Forces was to be previously secured.

129. There is a clear tension between the scope and operation of Clauses 8 and 59. Furthermore, under the language of these two relevant clauses of the Contract, there may be an overlapping of the circumstances that would authorize the use of the Contract proceeds under one or the other clause, at least insofar as the amount set aside under Clause 8 has not been exhausted. Those aspects will be analyzed in more detail later in this Award.

130. Meanwhile, it is worthwhile to note the position of the Parties with respect to the interrelation between those two clauses. In its oral opening statement[21], Claimant asserted that "*the parties always envisioned that there would be a fixed price for the base Contract work, meaning the work that was set out in the specifications, but the Parties also always envisioned that additional work would be priced separately. This additional work is sometimes referred to as extras and incidentals. (…) While the Ministry made an attempt to get a fixed price for an unlimited amount of work during the Contract negotiations and failed to do so, the Ministry then tried to get the same thing effectively and limit its financial obligations by claiming that proposed work was within the scope of the Contract and by refusing to grant compensation for extensions. (…) Despite what the Ministry is saying in this proceeding, Ingalls has always maintained that Clause 59 entitles it to compensation beyond the amount provided for in Clause 8 of the Contract*"[22].

131. Furthermore, in his Witness Statement[23], Mr. Samuel Roberts, Claimant's representative responsible for processing and negotiating change order work with the Ministry, through the Venezuelan Inspection Commission – VIC - reports the discussions held with Admiral Luis Torcott Sanabria, VIC's Chief, and states that, in addition to establishing the

---

[21] A general note regarding quotations of oral statements made during the hearing: In this Award, the Arbitral Tribunal has decided to translate what was said in English during the hearing using the English transcript of the hearing and to translate what was said in Spanish during the hearing using the Spanish transcript. Thus, if an attorney spoke English during the hearing, that attorney's statements from the hearing will be taken from the English transcript and vice versa for an attorney who spoke Spanish during the hearing.

[22] Tr. 29: 23-25; Tr. 30: 1-21.

[23] See ¶¶ 4 to 8 of the Declaration of Samuel R. Roberts and Tr. 65: 3-25; Tr. 66: 1-25; Tr. 67: 1-23.

methodology for seeking and obtaining authorization for a change activity, "*at no time during my interactions with the VIC or the Ministry did anyone indicate or suggest that the total amount of change work on the Contract would be limited or capped in anyway. I was familiar with the budget for "Extras and/or Contingencies" provided for in CLIN-008 of the Contract, but I never understood that to be a limit on the amount that would be paid for changes if additional work was necessary*".

132. In its oral opening statement, Claimant averred that "*the manner that's prescribed in Clause 59, in other words absolutely necessary work gets done right away, and we fight about it later, is wholly consistent with the industry practice. It's not like this is the first time in history that the contractors and owners have made this kind of agreement[24]. (…) The Ministry's claim that Clause 59 is some sort of last minute invention by counsel that the Parties never referenced before September 2014 is obviously incorrect. (…) Before the Acts of Acceptance were signed, we repeatedly invoked Clause 59 saying we have to come to an agreement on this, negotiate. There was no negotiation. That's an obvious violation of the obligation of good faith inherent in the Venezuelan Civil Code applicable to this Contract*"[25].

133. In its oral opening statement[26], Respondent contested the construction by Claimant of Clauses 8 and 59 of the Contract. Responded stated that "*Clause 8: it was agreed that unforeseen contingencies were to follow a process of proposal, approval or rejection and, just there, carry out the works that were not foreseen in the technical specifications. We are talking about, as I just said, many technical specifications and, even so, this figure of 49.2 [sic] million dollars was included for the contingencies, which had to be necessary jobs, naturally, and have been approved in order for the money to be delivered. (…) If, in spite of exhausting the $315 million, and also after the shipyard conducted all of the work corresponding to that amount of money, something came up—and of course now we cannot think of anything because even back then you couldn't think of what the*

[24] Tr. 70: 13-19.
[25] Tr. 73: 11-20.
[26] Tr. 148: 11-25; Tr. 149: 1-18; Tr. (Spanish) 163:4-164:1; 164:3-24.

*unforeseen contingencies would be under [Clause] 8, much less [Clause] 59. But, well; it could happen. (…) So, if such an event should happen and be of absolute necessity of course it gets much harder, more rigid, and in that case—[Clause] 59 says—here's what we're going to do: we're not going to solicit bids again, which, in truth, is generally what states do because otherwise it is very difficult to process the budget items, because internal regulations require that type of action. So, they said: here's what we are going to do, we are going to use that event, if it should happen, we are going to use that same contract, we make a kind of addenda, we sign a supplementary agreement and, if we accept, the authorities accept that what [Huntington] says about this being absolutely necessary is true, and that the price that [Huntington] is presenting for it is correct, in that case we will give approval and the supplementary agreement will be signed and we will award the budgetary means to address that eventuality. That is the nature of [Clause] 59".*

134. Furthermore, Respondent's statement addresses the matter related to the apparent overlapping between Clauses 8 and 59 by saying that[27] "*if there were available funds in the trust, that means there would be no way to exercise a remedy under [Clause] 59, which requires absolutely necessary services for which there is no money allocated. Let it go after the remaining money allocated. If there was allocated money left, [Clause] 59 cannot be invoked*".

**Discussion and Decision**

135. The construction and interpretation of the contractual provisions dealing with the price and its changes are of paramount importance for the decision of this case between the Parties.

136. Indeed, the Parties discussed at length throughout the period of written submissions and during the hearing on the merits the rationale behind those two clauses and to what extent, if any, there existed an interrelationship between them.

137. The Arbitral Tribunal, after having analyzed in detail the two relevant

---

[27] Tr. (Spanish) 183:9-16.

provisions, is in a position to ascertain the scope of application of each clause. In reality, while there exists some similarity between the language of the two clauses, they provide for different scopes and each one has its own requirements for any claims thereunder.

138. The Arbitral Tribunal finds it important to revisit the language of such clauses to identify the main elements contained in each.

139. Clause 8 and its First and Second Paragraphs state that:

> *EIGHTH: "THE MINISTRY" through the General Navy Command, Naval Logistics Command and the "VIC" might request in writing that modifications, additions and maintenance work not previously planned in "THE SPECIFICATIONS" and that might be necessary for proper operation of "THE SHIPS" be performed, and "THE CONTRACTOR" shall proceed to analyze the request and agrees to inform "THE VIC" in writing, within twenty-one (21) days of the date the request is made, indicating its estimated cost and how it would affect delivery deadlines so that the appropriate notification can be made to the General Controller's Office of the National Armed Forces. The price of all modifications that will be agreed in writing in advance upon initiation of the work shall be charged against contingencies and the total may not exceed the sum allotted for this concept in the Second Clause. If necessary, the deadline will be extended to accommodate the additional work.*

> *First Paragraph: It is hereby expressly agreed that in order to do the work referred to in this Clause, an approval will be required from "THE MINISTRY" through the Naval Logistics Command, General Navy Command, which will issue an approval in writing and will determined if the work should really be charged against contingencies. In any case, to proceed with any financial expenses, it will be necessary to have the approval of the General Controller's Office of the National Armed Forces.*

> *Second Paragraph: "THE CONTRACTOR" may recommend in writing to "THE MINISTRY" to make a change necessary in the installation of*

*equipment not previously planned for in "THE SPECIFICATIONS", explaining the need to make these changes and shall present a technical study justifying them. It is hereby expressly agreed that in no event shall "THE CONTRACTOR" make any changes or technical studies without the express consent and approval of "THE MINISTRY", granted through the Naval Logistics Command of the General Navy Command. Should "THE MINISTRY" be the one to propose the change to "THE CONTRACTOR", the latter must submit its budget for analysis by the Chef of the "VIC" before making it, and if, for any reason out of the control of "THE CONTRACTOR" this change were not made, the Naval Logistics Command, General Navy Command shall approve the administrative costs of the technical studies performed upon submission of the appropriate invoice.*

140. Clause 59, in turn, states that:

*FINAL PROVISIONS*

*FIFTY-NINTH: If during the execution of this Contract it is decided to do additional work, repairs, services, supplies and tests not included in "THE SPECIFICATIONS" which are considered absolutely necessary to fulfill the purpose of this Contract and that are not included in the agreed total price, "THE CONTRACTOR" and "THE MINISTRY" shall determine by mutual agreement the work and prices of the work and how these will influence the delivery deadlines and shall sign the supplemental agreements as needed, with the [prior] approval of the General Controller's Office of the National Armed Forces. Any supplemental agreement or agreements signed by the contracting parties shall become a part of this contractual document. Their terms and conditions shall be applicable to their whole content as if such agreements were reproduced in this document, except when otherwise stated. Including payment conditions, they must be determined prior to the signing of the "Certificate of Final Acceptance" of "THE SHIPS" under this Contract.*

141. In the interest of a complete analysis of the contractual provisions, the Arbitral Tribunal also transcribes Clause 56, which states that:

*FIFTY-SIXTH: It is hereby understood that if "THE CONTRACTOR" were to do any work without previously presenting the appropriate quotation to be analyzed and then approved by "THE MINISTRY", these costs will not be recognized by "THE MINISTRY". (…)*

142. The Arbitral Tribunal underscores that the Contract, in its Second Clause, provided for the following allocation of the total price, to wit: (i) US$ 250,608,216 as compensation for the services itemized therein and which relate to the work in connection with the specifications, (ii) US$ 21,439,766 for spare parts and, finally, (iii) US$ 42,952,018 for extras and/or contingencies, those three sums amounting to the total aggregate amount of the Contract of US$ 315,000,000.

143. In principle, the works to be performed by Claimant in connection with the overhaul of the Frigates, as per the specifications, should not exceed the amount of US$ 250,608,216 insofar as the price of the Contract should remain fixed and non-reviewable, or in other words, the Contract provided for a lump sum fixed price.

144. Nonetheless, due to the size and complexity of the work contracted it would be unrealistic for one to assume that deviations might in no circumstance occur. The Ministry at inception assumed this and provided for two different categories of additional concepts to be included in the fixed price, i.e. the occurrence of extras and/or contingencies and a certain amount allocated to the purchase of spare parts.

145. Based on the scenario designed by Clause 2, the use of the contractual proceeds for extras and/or contingencies and/or the purchase of spare parts is regulated by Clause 8.

146. The Arbitral Tribunal will focus first on the variation of the components of the fixed price. Under Clause 8, only the Ministry may request modifications, additions and maintenance work not previously planned in the specifications and necessary for proper operation of the Frigates to be performed by Claimant. It would be erroneous to assume, as discussed in the proceedings, that any extra work so performed was to be charged to the amount allocated as extras and/or contingencies up to its total amount

and irrespective of who had requested the performance of the works. This is not true.

147. As a matter of fact, the Contract contains no provision entitling Claimant to request modifications, additions and maintenance work as such position was reserved for Respondent only. Claimant might, however, recommend that the Ministry make changes necessary in the installation of equipment which were not previously planned for in the specifications.

148. Hence, there is a significant difference between the position held by the Ministry and that by Claimant under Clause 8. While the Ministry might request, Claimant might recommend to the Ministry. Moreover, the Ministry was entitled to request modifications, additions and maintenance work, the core purposes of the Contract and of Claimant's role, whereas Claimant was only entitled to recommend changes in the installation of equipment. In both cases, however, such modifications, additions and maintenance work or changes in the installation of equipment had to be necessary for the proper operation of the Frigates and not planned for in the specifications.

149. The distribution of different roles between the Parties, i.e. the Ministry entitled to request and Claimant to make recommendations of change of installation of equipment only, is consistent with a lump-sum fixed-price contract. Once Claimant was requested to submit a fixed-price bid, and to the extent that such bid covered all the work necessary for the overhaul of the Frigates as provided by the specifications, any request for modifications, additions and maintenance work would be outside the scope of those specifications, making them extra or contingent requests and, consequently, reserved for the Ministry.

150. It is irrelevant to the interpretation of the Contract whether during the performance of the works Claimant indicated to the Ministry that any modifications, additions or maintenance work were necessary for the proper operation of the Frigates. We may assume that occurred at several junctures. However, the important point at issue is who was entitled to give rise to expenses chargeable to such contractual account. As per Clause 8, it was the Ministry only.

151. Clause 59, in turn, has a wider scope since it encompasses additional work, repairs, services, supplies and tests absolutely necessary to fulfill the purpose of the Contract and which were not included in the agreed total price. This means that, in the absence of the performance of the same, the purpose of the Contract would not be fulfilled.

152. Furthermore, Clause 59 utilizes a passive verb tense and does not expressly identify which party might be entitled to trigger the request for the change. It has to be assumed that both parties would hold such right, since the clause simply says "*if it is decided*", which leads to the conclusion that both Parties have to decide to undertake such additional work, repairs, services, supplies and tests absolutely necessary to fulfill the purpose of the Contract.

153. Nonetheless, the fulfillment of the Contract is of interest to both parties; to Claimant with a view to properly discharge its duties thereunder and to the Ministry as the owner of the Frigates that have to be overhauled.

154. In addition to the aforementioned differences between Clause 8 and Clause 59, the important point is that in the case of Clause 59 there is no account pre-established by the Parties with funds sitting therein, and the compensation was to be determined on a case-by-case basis, with the funds to honor such payments coming from additional budgetary allocations.

155. Hence, arguments tendered by Respondent in this proceeding that the mechanism under Clause 59 would only be operative upon exhaustion of the funds for extras and/or contingencies established under Clause 8 are incorrect. Under the Contract, the two mechanisms would run in parallel in accordance with their specific purposes and designs, which would not lead to, nor authorize a different conclusion.

156. It must be stressed that in both clauses "necessity" is a key element to trigger their operation. Nonetheless, in Clause 8, modifications, additions and maintenance work must be necessary for the proper operation of the Frigates, while in Clause 59 additional work, repairs, services, supplies and tests must be absolutely necessary to fulfill the purpose of the Contract.

157. Most of the time spent in the discussions held by the Parties during

this arbitration with respect to the aforementioned clauses derived from the vagueness of the language adopted, where "*necessary*" contrasted with "*absolutely necessary*" and the complement in each case was different; "necessary for proper operation of the Frigates", and "absolutely necessary for the fulfillment of the contractual purpose". "*Necessary*" means that something is indispensable. Therefore, if something is indispensable it does not allow any sort of graduation to indicate its being more or less indispensable. It is indispensable *per se.* This becomes more important when "*necessary*" is confronted with the complements added to it.

158. The only conclusion that may be extracted from such contractual scenario is that in including Clause 59, as drafted, in the text of the Contract to properly address a justified concern of the Parties, they created a system that was not aligned with the backbone of the Contract, as they had to allude to the term "*absolutely necessary*" to differentiate it from the existing one. Even if those clauses may be interpreted by reconciling the intent of the Parties under those two different scenarios, they were eventually affected by lack of clarity.

159. In reality, under the two clauses the activities contemplated by them were necessary. The difference rests with the procedure applicable to each of them. While under Clause 8, there existed a firm funding with the trustee to pay off the costs incurred, under Clause 59, however, a specific budgetary allocation was required.

160. In reviewing Clause 59, the Arbitral Tribunal identified a difference between the texts of the Contract in Spanish, which, as the version signed by the Parties, is the controlling one, and its translation into English.

161. When reference is made to the approval of the Comptroller General, in the Spanish version it is qualified by the word "previous" while the English translation of Clause 59 omits such word. Undoubtedly, any construction has to take into account that the relevant approval shall be first secured.

162. There exists a disagreement between the Parties as to the methodology for the implementation of the mechanism provided by Clause 59. Assuming, at this stage, that the circumstances that triggered the

application of such methodology were present, it must be determined how it really should have worked.

163. Firstly, Claimant and the Ministry were required to determine by mutual agreement the work and prices and how these would affect the deadlines. In addition, they were to sign supplemental agreements, as needed, with the prior approval of the Comptroller General of the National Armed Forces. The clause states the following: "*any supplemental agreement or agreements signed by the contracting parties shall become a part of this contractual document. Their terms and conditions shall be applicable to their whole content as if such agreements were reproduced in this document, except when otherwise stated. Including payment conditions, they must be determined prior to the signing of the 'Certificate of Final Acceptance' of 'THE SHIPS' under this Contract*".

164. The core dispute between the Parties relates to what has to be approved by the Comptroller General, and the moment when such prior approval has to be secured.

165. Claimant argues that the relevant approval deals with the supplemental agreement and that it must be obtained at any time prior to the Final Acceptance of the Frigates. However, while the Ministry does not disagree that the supplemental agreement must be subjected to approval, it contends that such approval was a condition precedent to the performance of the additional work.

166. The Arbitral Tribunal's understanding coincides with that expressed by Claimant. Based on the language of Clause 59, it is clear that the expression "with the prior approval of the General Controller's Office" qualifies "supplemental agreement" rather than the performance of the works themselves. In addition to that, the remaining subsequent portion of the clause refers expressly and solely to the supplemental agreement and states that the terms and conditions, including payment terms, must be determined ("*pautado*" in the Spanish version) prior to the signing of the "Certificate of Final Acceptance".

167. Hence, if the terms and conditions, including payment terms, must be

determined prior to the signing of the Certificate of Final Acceptance, how would the approval be required prior to the performance of the works?

168. In combining the various portions of the language of the clause, the interpreter is led to admit that such prior approval by the Comptroller General may occur at any time prior to the execution of the supplemental contract. Further, the terms and conditions contained in such supplemental agreement, including payment terms, must be determined prior to the final acceptance of the Frigates.

169. This construction makes sense. The Arbitral Tribunal draws the attention of the Parties to the fact that such works fall within the category of "absolutely necessary for the fulfillment of the Contract". Hence, it may not be accepted that the Ministry would not approve them and force a default on Claimant by preventing Claimant from being able to fulfill the purpose of the Contract. Even if one admits that Claimant would not be responsible for such a default, other important aspects come into play.

170. The Frigates are part of the defense of the Bolivarian Republic of Venezuela and, therefore, a matter of national security. In deciding to contract the overhaul of the Frigates, the Ministry was seeking updated Frigates in full operating conditions. This would justify, as a matter of principle, the performance of the works for fulfillment in full of the purpose of the Contract. Furthermore, as per item 4, 1 (u) of DIR-LO-CGA-0038-A, it was the Ministry's intention that the overhauled Frigates would last for 20 years. Thus, the failure to implement the additional works, repairs, services, supplies and tests deemed absolutely necessary would hinder the fulfillment of the purpose of the Contract and, consequently, would frustrate its purpose and the target duration for the survival of the Frigates following the overhaul and maintenance.

171. From a technical standpoint, the Ministry created a sophisticated structure to administer the development of the activities *in situ* by creating the VIC to operate in the United States as its *longa manus* at a distance[28].

---

[28] Doc. R-110, J0149 – DIR-LO-CGA-0038-A, VIC being therein styled as CIVEUA, the Spanish acronym for "Comisión Inspectora de Venezuela en los Estado Unidos".

Amongst the various functions attributed to VIC, one of them was the oversight of the services under performance by Claimant, in full conditions to appraise and approve the services and works.

172. In turn, the Comptroller General was not required to approve of any technical aspects but rather was tasked with the approval of financial aspects. The last sentence of the First Paragraph of Clause 8 of the Contract clearly states this purpose and function of the Comptroller General.

173. Clause 58 of the Contract clearly shows that approval of the Contract by the Comptroller General was issued on December 4, 1997, thus, prior to the beginning of the services. This reinforces the argument that such required approval refers to the financial aspects of Contract (and not technical aspects or requirements), such approval being inherent to the function of the Comptroller.

174. Lastly, a word on the role played by Clause 56 of the Contract. The Ministry claims that the understanding stated above would be in violation of the mandatory nature of Clause 56 and its application in relation to all services and works performed under the Contract.

175. The Arbitral Tribunal disagrees with such construction. Clause 56 is in the section of the Contract captioned by the expression "General Provisions". Nonetheless, Clause 59 is in the section of the Contract captioned "Final Provision". While Clause 56 applies to all works generally, Clause 59 does contain the methodology for the approval of the works. Thus, in principle Clause 59 overrides Clause 56. Clause 59 is a special provision inserted into the text of the Contract to regulate the situation described therein.

176. The reading of the language of Clause 59 leads to the conclusion that the approval is part of the process of proceeding with the implementation of the additional works, repairs, services, supplies and tests, and is reflected under the undetermined form "if it is decided". Moreover, there exists little room with respect to such determination since the additional works, repairs, services, supplies and tests are deemed "absolutely necessary for the fulfillment of the purpose of the Contract".

177. Assuming that Claimant might have determined that such additional works, repairs, services, supplies and tests would be absolutely necessary, the disagreement between the Parties might rest with the appropriateness of such determination. The Ministry, through the VIC, might challenge such understanding or simply agree with the arguments of Claimant. In the latter case, the purpose of Clause 56 would be fulfilled to the extent that Claimant and the Ministry agreed with the price and the impact, if any, on deadlines.

178. Due to the special nature of Clause 59, there is no reasonable argument to submit the decision to the terms of Clause 56. Moreover, this is not a point under Clause 8 because, under that provision, the Ministry is the one to take the lead and place a request for modifications, additions and maintenance work not previously planned in the specifications.

179. Hence, Claimant's claims in this arbitration shall be analyzed and decided in light of the requirements provided by Clause 59.

## E.    The Contract – an Administrative Contract or a Works Contract?

180. The nature of the Contract gave rise to long discussions between the Parties. While Claimant provided the Arbitral Tribunal and the opposing party with expert witness statements on Venezuela law that each took a different position as to the nature of the Contract[29], the Ministry's position was that the Contract was not an administrative contract.

181. Upon taking the microphone in representation of the Ministry during the hearing and in the course of its oral opening statement, Dr. Alfredo de Jesús O., after defending the sanctity of the Contract and the respect for the will of the parties, stated that[30] *"this contract does not contain the components of an administrative contract, so it cannot be an administrative*

---

[29] In his First Statement attached to the Reply to Statement of Defense and Answer to Counterclaim, Professor Luis A. Ortiz Alvarez states that the Contract is an administrative contract and within its typology, an administrative contract for the performance of works (see ¶¶ 56 to 70 thereof). In his First Statement attached to the Statement of Claim, Professor Manuel A. Gomez concludes that the Contract is a contract for the performance of works governed by the provisions of the Civil Code of Venezuela (see ¶ 25 thereof). Nonetheless, during the cross examination, Professor Gomez stated that the Contract was not a works contract but rather a contract that attains the work to be performed under the contract and governed by the Civil Code (Tr. 795:6-23).

[30] TR. 201: 1-25, Tr. 202: 1-2; See ¶¶ 66 to 79 of the Statement of Defense and Counterclaim.

*contract or have the provisions of the Administrative Contract regime applied to it because the Ministry never acted with an authority other than that which derived from its quality as a contracting party. It did not invoke any of the intrinsic powers of the administration often referenced in connection with administrative contracts. We think that the Tribunal understood this in the same way, and it was evident in its Procedural Order No. 2 in Paragraph 71, and I will limit myself to three citations in English. Paragraph 71 states the following: 'Even if the dispute submitted to the Arbitral Tribunal opposes the Ministry of Defense, as an instrumentality of the Government of Venezuela, to a private party, its subject matter is purely of a commercial nature.' Another citation: 'There is not again phrase of the Republic (rectius: there is not any trace of the exercise by the Republic) of its "ius imperium" in connection with the Contract. Indeed, any State, its entities, agencies and instrumentalities may enter into commercial transactions with private parties without thereby enjoying any privilege or special prerogative in the performance of the Contract or changing the commercial nature of the transaction'. 'The contractual relationship between the Parties under this Contract is exclusively commercial'. That's part of Procedural Order No. 2".*

182. In sum, the Ministry assumed the position that the Contract is not an administrative contract, since such Contract is not a public service contract, nor a utility contract[31].

183. Despite the efforts expended by Claimant to categorize the Contract as an administrative contract, the Arbitral Tribunal had already decided that such Contract deals with a pure commercial transaction between the Parties[32], and found that the Ministry had not exercised its *"ius imperium"*. Therefore, there is no room for debate on the nature of the Contract.

184. Hence, the claims brought by Claimant shall be analyzed and decided in light of the contractual provisions contained in the Contract and, whenever the Contract is silent, with recourse to the applicable provisions of the Civil Code.

---

[31] Tr. 204: 8-12.
[32] See Procedural Order No. 2, of July 16, 2013, ¶ 71.

**F.   The Performance of the Services by Claimant under the Supervision of the VIC.**

185. In its Statement of Claim[33], Claimant avers that the Ministry was fully informed of the Ministry-caused problems, added work scope, and attendant delay and disruption Claimant was facing on the Frigate project.

186. Pursuant to the terms of the Contract, members of the VIC participated in every step of Claimant's work[34]. Claimant had weekly, and sometimes daily, meetings with the VIC to discuss on-going work and outstanding issues. The VIC received copies of all of Claimant's engineering drawings, Requests for Additional Work ("RAWs"), and related documentation. The VIC had members present on the Frigates at all times during the project, it had free access to every part of the Frigates, and it often provided instructions directly to Claimant's workers. All of Claimant's work on the Frigates was performed with the VIC's knowledge and consent.

187. In its Statement of Defense and Counterclaim[35], the Ministry does not challenge Claimant's assertion, but avers that through the VIC it performed the duties of follow up and inspection, as provided by the Contract. It was Claimant who created successive obstacles and difficulties to the fulfillment of the Contract, forcing the VIC to take additional efforts to minimize to the extent possible Claimant's failure to fulfill the Contract.

188. Hence, it remains undisputed that the VIC was at the shipyard at all times during the performance of the works for the overhaul and retrofitting of the Frigates, and therefore discharging of the duties incumbent upon it under the Contract and pursuant to DIR-LO-CGA-0038-A[36].

**G.   The Requests for Equitable Adjustment and the Master Affidavit**

189. Claimant reports in its Statement of Claim[37] that the Ministry's evasion of responsibility for its damages continued even after Claimant invoked the formal dispute resolution provision of the Contract. On April 5, 2002, after

---

[33] Statement of Claim dated March 6, 2014, pages 4 and 5.

[34] Statement of Claim dated March 6, 2014, page 15.

[35] Statement of Defense and Counterclaim dated July 4, 2014, pages 42 and 43.

[36] See Doc. R-110, J0149.

[37] Statement of Claim dated March 6, 2014, page 7.

waiting more than a year and a half for the Ministry to negotiate in good faith, Claimant formally demanded the first arbitration.

190. As part of the arbitration, Claimant provided the Ministry with a July 2004 Request for Equitable Adjustment ("REA") updating Claimant's damage claim through November 2002. Moreover, Claimant asserts that a supporting Master Affidavit ("MA") was also provided to the Ministry in the context of the first arbitration and again Claimant has provided the Arbitral Tribunal of this case with the REA and the MA.

191. Upon submitting its Reply to the Statement of Defense and Answer to the Counterclaim on September 19[38], 2014, Claimant claims that it has repeatedly described in detail the 132 separate out-of-scope work items for which it seeks compensation (the "REA EXH"). The Ministry has consistently refused to join the issue. Instead of addressing these specific claims, the Ministry did not respond to the REA at all, and responded to the Statement of Claim with only generalized assertions regarding the fixed-price nature of the Contract.

192. The Ministry, however, in filing its Rejoinder and Reply to the Counterclaim on November 17, 2014, also filed as Annex A thereof a certain document called Technical Oppositions to Ingalls's Claims. As a means of introduction, the Ministry avers[39] that despite the arguments by Claimant referred to above, it has addressed not only the details related to the various technical claims in its Statement of Defense and Counterclaim to the extent applicable but has also filed a certain document called Technical Report prepared by the Head of the VIC. Such document, the Ministry continues its assertion, has a detailed response to each one of the claims included by Claimant in the REA.

193. In analyzing the claims posted by Claimant, certain references will be made to the 2004 Request for Equitable Adjustment ("REA") and to the Technical Report of the Head of the VIC ("TR").

194. Furthermore, the Arbitral Tribunal may also refer, from time to time, to

---

[38] See ¶ 127 of the Reply to the Statement of Defense and Answer to the Counterclaim.
[39] See Annex A to the Rejoinder and Reply to the Counterclaim, page 2.

certain passages of the Master Affidavit. The Arbitral Tribunal reminds the Parties that in its message dated January 11, 2015, it was established that the Master Affidavit is deemed a written statement of the witnesses referred to therein and that the testimony of said witnesses in the course of a cross-examination would be necessary for the Arbitral Tribunal to ascertain the probative value of such document. Any references to the Master Affidavit will be referred to hereafter using the acronym "MA".

195. Lastly, in certain cases the Arbitral Tribunal may make reference to the Requests for Additional Work which will be identified by the acronym "RAW".

## XII. Claimant's Claims Duly Analyzed

196. Due to the voluminous number of claims brought by Claimant in this proceeding, the Arbitral Tribunal has opted for adopting a methodology which addresses one by one the claims listed in different categories in Claimant's Post Hearing Brief. Nonetheless, for the sake of completeness and thorough review and analysis of the evidence brought by the Parties in support of their claims and contentions, the Arbitral Tribunal will revisit the comments made by Claimant in the REA and those by Respondent in the TR, also referred to as the "Ministry's Response".

197. Since the Arbitral Tribunal has already determined that the analysis of Claimant's claims shall be made in light of the provision contained in Clause 59 of the Contract, the standard of proof shall be higher than the one that might be applied in other circumstances. The main element to be ascertained in each case shall necessarily be the existence of evidence capable of proving that any such works performed complied with the requisite element of such additional works being *absolutely necessary*" for the fulfillment of the purpose of the Contract. This means that, in light of the exceptional nature of Clause 59 and its operation in conjunction with the contractual backbone, the standard of proof applicable to this case is set up at a high threshold to ensure that the operation of the mechanism provided by such clause is not distorted, when it is not, and was not designed to be, a system to substitute or complement, when it is exhausted, Clause 8. Moreover, the content of the claims and arguments in support thereof, as they derive from the REA, might suffice were Claimant proposing an

equitable adjustment to the Contract to the Ministry with the Parties having sufficient room to negotiate or to accept, in whole or in part, any adjustments. But that is not the circumstance in which we find ourselves. The Arbitral Tribunal was formed to decide on the claims in light of the applicable contractual provisions. For this very reason, a long interpretation of contractual clauses was provided hereinabove by the Arbitral Tribunal. The exceptional nature of Clause 59 was recognized, and to preserve the role played by it in a fixed-price contract the Arbitral Tribunal has to be convinced that the claim complies with the exceptional requirements which will be appraised by applying a high standard of proof. Otherwise, any claim for allegedly extra work would eventually fall under Clause 59. That was not the spirit of the Parties in inserting it into the Contract, and this would certainly distort the spirit of the Parties' agreements.

198. While Clause 59 referred to any supplemental agreements to be executed by the Parties, it is clear from the analysis of the record that they have never entered into such agreements. In appraising the claims in this proceeding, the nonexistence of any such supplemental agreements shall not, in any way, excuse the Ministry from indemnifying, when applicable, the costs incurred by Claimant in performing such additional works as qualify under Clause 59.

### A. The Amounts Claimed by Claimant and Methodology for Calculation

199. The amounts claimed by Claimant for extra or additional works are referred to in the 2004 Request for Equitable Adjustment – REA which updated Claimant's damages claim through November 2002. The Parties disagree as to whether such works claimed as extra or additional actually fall within such category and are, in light of the Contract Technical Specifications, of such nature. Later in this Award, this Arbitral Tribunal will analyze each one of the claims put forward by Claimant and will decide if they have to be awarded in light of the provision contained in Clause 59 of the Contract and the compliance by Claimant with the standard of proof required by the Contract.

200. At this juncture, the Arbitral Tribunal focuses on the valuation of such

claims and the appropriateness of the methodology adopted by Claimant for valuation of each one of such claims.

201. As noted in its Statement of Claim[40], Claimant has provided this Arbitral Tribunal with reports by two damages experts, namely one prepared by Ms. Cheryl LeeVan and one prepared by Mr. George Householder, the latter focusing on the delay and acceleration analysis. Ms. LeeVan's report, however, independently reviews and updates the July 2004 REA.

202. In submitting its claims, Claimant divided them into seven (7) different categories, indicating in each one of them the reason it was forced to perform out-of-scope work for which the Ministry allegedly has refused to pay[41].

203. Amongst the various reasons listed by Claimant, a special reference is made to (i) the Ministry having delivered the Frigates in a condition that was not customary or reasonably foreseeable, and (ii) the Ministry having delivered the Frigates in an excessively deteriorated condition such that the Contract Specifications did not describe all the work necessary to restore the Frigates to working order.

204. It is noteworthy mentioning that the Ministry rejects such arguments by stating that Claimant inspected the Frigates without any interference or limitation by the Ministry in several instances, and further that Claimant executed the Act of Initiation of Work, in June 1998 without expressing any reservations, disagreements or conditions: therefore, Claimant may not allege that the Frigates were in a surprising, unknown or unforeseeable condition. From the standpoint of the Ministry, the condition of the Frigates was known (or should have been known) to Claimant since it never opposed any reserve to its agreement to perform the works[42].

205. The Ministry argues that the works to be performed by Claimant were detailed in the Contract's Technical Specifications, and Claimant undertook

---

[40] See page 7 of the Statement of Claim.
[41] See pages 20 through 22 of the Statement of Claim.
[42] See pages 7 and 8 of the Statement of Defense and Counterclaim.

to perform such works in accordance with the Technical Specifications which certainly include those jobs necessary to secure the accomplishment of the works provided therein. By that same token, the Ministry says, those works for accomplishment of the specifications were priced and such price was included in the total price agreed upon by the Parties under Clause 2 of the Contract.

206. The Ministry further claims that the need for the performance of unforeseeable works was not unknown to Claimant since one of the line items found in Clause 2 referred to such unforeseeable works, which would be governed by Clause 8.

207. This is the core discussion between the Parties in these proceedings. The scenario for the analysis hereafter is to a certain extent defined and decided by the Arbitral Tribunal. It has been decided already that, depending on the evidence brought by Claimant and to the extent that the proper requirements are complied with, such as the standard of proof and evidence of such works being absolutely necessary for the secure and proper operation of the Frigates, the claims may be awarded under Clause 59 of the Contract.

208. This being said, the decision by the Arbitral Tribunal is postponed into a later stage in this Award. The focus at this juncture is the adequacy and appropriateness of the valuation carried out by Claimant and the relevant confirmation by Ms. LeeVan's report.

209. The Ministry is adamant in stating that Claimant submitted the valuation report prepared by Ms. Cheryl LeeVan in an attempt to give any reasonable foundation to the exorbitant and unjustified amounts claimed[43]. The Ministry argues that such report evidences the total lack of credibility of Claimant, this being the result of Claimant's pursuit for more than a decade of certain claims that were designed to hide the essential defaults by

---

[43] Upon submission of the Statement of Defense and Counterclaim, there existed only the first report prepared by Ms. Cheryl LeeVan. Nonetheless, another report signed by Ms. LeeVan was filed later in the course of these proceedings.

Claimant[44].

210. The Ministry argues that Ms. LeeVan's report is tainted by significant mistakes and technical omissions. Primarily, such report contradicts prior arguments and claims put forward by Claimant, and validates the claims without any sort of analysis. Respondent argues that Ms. LeeVan's report is fallacious since it takes as its starting point ungrounded bases on which to generate a series of economic claims that are equally groundless.

211. In its Reply to the Statement of Defense and Counterclaim, Claimant states that the Ministry seeks something to which Claimant never agreed and to which no reasonable shipbuilder would agree: an unlimited amount of work for a fixed price. The Parties agreed to a fixed price for specified work, but entered into a contract that also expressly requires the Ministry to pay Claimant for out-of-scope work that is "considered absolutely necessary to fulfill the purpose of the Contract and that is not included in the agreed total price"[45].

### Decision by the Arbitral Tribunal

212. In reality, the summary of the positions the Parties expressed in their submissions as to the valuation of the claims is less developed than the arguments raised by the Parties with respect to the delay and disruption damages and the applicable interest rates over the quantified amount of the damages. This gave rise to a thorough review of the elements available to the Arbitral Tribunal.

213. The Ministry's elected strategy was not to bring up arguments (save for the comments made in the past by the Head of the VIC and reflected in Annex A), nor has the Ministry or its expert provided any alternative calculation. In opting for a blanket denial of any merit attached to the claims tendered by Claimant, the Ministry assumed the risk of this Arbitral Tribunal construing otherwise the contractual provisions – as it actually happened – that give rise to the right to indemnification attributable to Claimant .

---

[44] See item C of the Statement of Defense and Counterclaim at pages 94 through 97.
[45] See Reply to Statement of Defense and Counterclaim at pages 1 through 8.

214. Claimant, on the other hand, since the inception – especially when it submitted the REA in 2004 – has attributed an amount certain to each of its claims. Those amounts have been reviewed by Ms. LeeVan in her reports submitted during these proceedings. To that end, Ms. LeeVan had access to the data and information available at Claimant's office.

215. Furthermore, Claimant has always made available to the Ministry its pricing calculation and the majority of the REA EXH contain a language stating that pricing details are available upon request. Thus, it may not be said that Claimant has failed to give full access to the information supportive of amounts described in the References of each REA EXH. It was incumbent upon the Ministry to request the information. It is true that one cannot find in the record of this case any evidence that such information was requested but nor is there any evidence that, although requested, any such request was denied by Claimant.

216. Hence, it is incumbent upon the Arbitral Tribunal to report the outcome of its analysis of Ms. LeeVan's expert reports as well as its decision as to the reliability of the valuation submitted by such reports.

217. The First LeeVan Report is dated March 6, 2014. Such LeeVan report dedicates one full section – Section IV – to the review of Claimant's claims, therein named Constructive Changes which amount to 132 claims including 25 additional sub-claims, which amount to roughly US$ 66.8 million.

218. The LeeVan report, although challenged generally by the Ministry on grounds of using an erroneous starting point, addresses what Claimant properly pointed out as to the price nature of the Contract, *i.e.* the price is fixed for the performance of the works itemized and agreed upon by the Parties. However, the fact that the Contract provides for a line item contemplating out-of-scope works gives a sense of the rationale behind the Contract negotiation. The overhaul retrofitting of the Frigates was a major work and the Parties anticipated that some activities had not been precisely estimated. Then, this line item was created to reserve a portion of the total price to pay off such additional costs.

219. Since the Arbitral Tribunal has analyzed at length the interaction

between Clauses 8 and 59 of the Contract and has already made a decision, it invites the Parties to refer to those paragraphs as complementing comments made in the preceding paragraph.

220. Hence, in view of the Arbitral Tribunal's decision referred to above, the challenges brought up by the Ministry as to the essential error existing in the LeeVan report that might taint the conclusions and, further, Mr. Fabian Bello's allegation - the Ministry's expert - that REA 2004 had been prepared by Claimant's counsel[46], are hereby dismissed. In arriving at such conclusion, the Arbitral Tribunal has examined Ms. LeeVan's reply report dated September 19, 2014. The LeeVan Reply report addresses the opinions and critiques brought up by Mr. Bello, and Ms. LeeVan states that her reliance on the July 2004 REA was not unfounded and she did not accept the claim values without further testing and analysis[47].

221. Ms. LeeVan further indicates that Mr. Bello acknowledged that he had not analyzed or addressed Claimant's US$ 66.8 million Constructive Change claim which were included in the July 2004 REA[48]. Those amounts, Ms. LeeVan says, were not disputed by Mr. Bello and remained unchanged in her Reply Report[49].

222. The Arbitral Tribunal also takes into account that Ms. LeeVan, upon submitting her March 6, 2914 report declared her independence with respect to Claimant, either technical or financial. It is noteworthy mentioning that Ms. LeeVan's statement of independence has not been challenged at any time during these proceedings. Moreover, prior to submitting her testimony in the course of the evidentiary hearing, Ms. LeeVan agreed to testify under oath.

223. Mr. Bello's second report dated October 31, 2014 brings into discussion the statement contained in Claimant's 2013 Annual Report which addresses

---

[46] See paragraph 9 of LeeVan's Reply report where Ms. LeeVan denies that REA 2004 had been prepared by Claimant's counsel and identifies the authorship of REA 2004 as being a product of Claimant's knowledgeable and experienced employees in conjunction with C.L. Willis and Associates. Mr. Bello's statement is contained in paragraph 56 of his June 27, 2014 report.
[47] See footnote # 3 on page 5 of Ms. LeeVan's Reply report.
[48] This statement derives from Mr. Bello's June 27, 2014 report on page 29 where he lists the claims analyzed by him and the Constructive Claims are not listed.
[49] See paragraph 10 of Ms. LeeVan's Reply report

the then current dispute with U.S. Navy and the U.S. Department of Homeland Security, including the U.S. Coast Guard, regarding alleged mischarged time or misstated progress on U.S. Navy and U.S. Coast Guard contracts. Mr. Bello concludes that Claimant recognizes that its own employees mischarged time or misstated progress. Moreover, the report also concludes that the cost accounting system of Claimant lacks the accuracy spelt out by the LeeVan reports[50], notably the fact that such cost accounting system is audited and reviewed by the U.S. Government, being tested and approved, and that such same system has been applied to the Contract.

224. The Arbitral Tribunal has taken note and examined Mr. Bello´s statement and opinions on such specific aspect. The Arbitral Tribunal flags that the news that came to public knowledge were reported by Claimant. Moreover, the lead of the report is that in getting knowledge of the deviation observed by its customers, Claimant conducted an internal investigation, led by external counsel, and has taken remedial actions, including the termination of employees in instances where it believed grounds for termination existed.

225. The events reported are not contemporaneous with the performance of the services, more precisely over 10 years following the redelivery of the ships. In any event, the occurrence of such event remedied by Claimant does not give justified grounds for any sort of extrapolation to make usual an isolated event. Although Mr. Bello's report does not clearly state that the values determined by Claimant and validated by Ms. LeeVan would be somewhat inflated, the opinion contained in his report allows one to infer that inflated values might be under discussion. The Arbitral Tribunal rejects drawing any adverse inference from such statements, dismissing any possible arguments that might be indirectly contained in the report.

226. In the Arbitral Tribunal's view, the LeeVan report is assertive and well grounded. Technically speaking, the LeeVan report details the methodology adopted for the validation of the amounts and indicates the data and

---

[50] See paragraphs 29 and 30 of Mr. Bello's October 31, 2014 report

information that served as a basis for such validation[51]. The Arbitral Tribunal further states that it has no reasons to believe that the LeeVan's report and the validation of values might be in any way tainted by any of the events referred to hereinabove, and that any such events are not capable of affecting the credibility of the calculations carried out by Claimant's appointed experts.

227. Following the thorough review of the LeeVan reports and of Mr. Bello's reports, all the arguments spelt out herein and in light of the Ministry's inaction to provide the Arbitral Tribunal with an alternative calculation of the values appertaining to the Constructive Changes, the Arbitral Tribunal decides to adopt the values validated by the LeeVan's reports as good for quantification of the awarded claims by Claimant under the Constructive Changes, save for determining interest rates which will be analyzed separately upon the Arbitral Tribunal appraising the delay and disruption damages claims later in this Award.

## B.   1st Category of Claims: Fully uncontested out-of-scope work claims

228. In bringing this first category of claims to the attention of the Arbitral Tribunal, Claimant highlights that it has submitted evidence with respect to 36 claims for which the Ministry has offered no response on the merits in its submissions, nor has the Ministry mentioned any of them during the hearing on the merits either through argument or cross- or direct examination. Furthermore, those claims not have been responded to in the TR.

229. Claimant alludes to the First REA which included REAs 1-90. The subsequent REA revised certain claims and added REAs 91-132. Claimant emphasized that Annex A submitted by the Ministry does not address the additional REAs included in the most recent REA.

### (1)  REA-84 – Increased Labor Rate and Deferred Work

230. Claimant claims the amount of US$ 2,341,649 before interest

---

[51] See paragraphs 47 through 61 and paragraph 110 of the March 6, 2014 LeeVan report

calculation as indemnification for the increased labor rate and deferred work[52]. Claimant reports that, as per the Contract, the total term for the performance of the overhaul work and redelivery of the Frigates to the Ministry was defined as 23 months running from December 17, 1997 (date on which the Contract was executed by the Parties) to and including November 16, 1999 or, as provided by the Contract, twenty (20) months from the execution of the Act of the Initiation of Work[53] which took place on June 1, 1998.

231. Claimant alleges that as a result of contractually compensable and/or Ministry-responsible causes of delay, the actual time required for the completion of the works ran from December 17, 1997 to and including October 25, 2002, this being the date on which Frigate F-22 was delivered to the Ministry, i.e. 1,095 days later than the completion date originally required in the Contract[54].

232. Claimant also alleges that, because the labor it expended in performing the base Contract was performed not only over a longer period of time than originally anticipated, but also in a later and more costly time frame, the costs incurred by it were necessarily increased. Claimant asserts that the difference between its incurred actual labor rates expended for such deferred labor hours and the labor rates calculated at the time it finalized its Contract Bid represents the incremental rate differential used to price the deferred work covered by the change. In REA EXH. C.84, Claimant provides the details of the methodology applicable for price calculation and also refers to selected Industrial Engineering Weekly Performance Reports and the scoping worksheet[55].

233. Claimant claims that such deferred work costs were not within the scope of the original Contract and were not included in the agreed total price because they were incurred solely due to Ministry-responsible and

---

[52] See REA EXH C.84.
[53] See Clause Third of the Contract.
[54] See MA.
[55] See J1895, C0035674 and C0035675.

otherwise contractually compensable delays[56].

234. The Ministry has not submitted any evidence to challenge Claimant's assertions but has noted that such claim was not addressed in Annex A.

235. Claimant's expert, Ms. Cheryl A. LeeVan[57], has also calculated the Extended Labor Costs and arrived at a total number of 511,187 total delay hours. In his Expert Report dated June 27, 2014, the Ministry's expert, Mr. Fabián Bello, contested the conclusions of LeeVan's report but he has not gone into the detail with respect to the calculation of increased labor rate.

### Decision by the Arbitral Tribunal

236. The delay experienced by Claimant in performing the duties under the Contract was due to certain causes that were beyond the control of the Parties, such as storms and hurricanes that affected the area of the shipyard and also the problems in obtaining certain foreign trade licenses which added a 150-day period to the Contract term, as mutually agreed by the Parties.

237. Regardless of the assertiveness of Ms. LeeVan in validating the calculations made by Claimant, the Arbitral Tribunal finds that the Ministry failed to challenge such assertion. As aforesaid, the Ministry has not provided any response to such claim.

238. Whilst Ms. LeeVan claims to have adopted the methodology developed to calculate the impact of delays in the naval industry, her report assumes, as does REA EXH. C.84, that all delays stemmed exclusively from action or omission of the Ministry. In reviewing the record, the Arbitral Tribunal finds that there have been situations where an initial delay may have been caused by the Ministry but, subsequently, the effects derived therefrom may have been aggravated by Claimant or Claimant's failure to mitigate the effects of such delay.

239. The Ministry, in its Statement of Defense and Counterclaim[58], reports

---

[56] See .pdf presentation by Claimant as its Closing Statement, page 151.
[57] See. Ms. LeeVan's Expert report filed on March 6, 2014.
[58] See ¶¶ 317 to 334 of the Statement of Defense and Counterclaim.

the various postponements of the delivery date. Certainly, not all delays are attributable to Claimant, but, on the other hand, the Ministry may not be held exclusively responsible for such delays.

240. The magnitude of an overhaul such as the one involving the Frigates may encompass unexpected events. Claimant, as one of the largest shipyards in the world, certainly knew that such events might occur, as some may have occurred on other occasions involving a different ship owner. In light of such previous experience, Claimant may have (or should have) taken certain precautionary steps for its own protection when confronted by those unexpected events.

241. Furthermore, the Arbitral Tribunal has not found in the record any evidence that, throughout the period of performance of the Contract, Claimant has specified to the Ministry that the delays would have an impact on its original bid price due to the postponement into a later stage of certain works provided by the specifications.

242. The reality is that an undefined portion of the amount now claimed by Claimant had been included under the bid price. However, in analyzing the claims under the scope of Clause 59, the Arbitral Tribunal has to take into account the language of such clause and the requirements provided thereby. The main element being tested is that such works were absolutely necessary for the fulfillment of the purpose of the Contract and they were not provided by the specifications.

243. The assertion made by Claimant that certain services were performed at a later stage when compared with the original scheduled dates clearly shows that such delays occurred and may not be attributed only to the Ministry. Based on the civil liability regime under Venezuelan law, the amount claimed by Claimant must be moderated by the fact that Claimant also contributed to the occurrence of the delay. However, in view of Claimant being unable to determine the exact percentage rate of the contribution by each Party to the delay, the Arbitral Tribunal shall apply the parity allocation.

244. In sum, the Arbitral Tribunal decides to award this claim, but also

decides to moderate it due to Claimant's contribution to the delay.

245. Thus, in awarding this claim, the Arbitral Tribunal orders the Ministry to pay Claimant the amount of US$ 1,170,842.50 plus interest accruing thereon.

### (2)  REA-93 – MCS-5 System/CPP System Interface

246. Claimant states[59] that for the original Ministry Solicitation issued in 1992, Motoren- und Turbinen-Union ("MTU"), as the Ministry's direct vendor, was awarded a subcontract to provide a machinery control system for the two (2) Frigates, and that MTU had proposed a system of its own design called the MCS-4 System. In the time elapsed between the original solicitation and the execution of the Contract, many advances in technology had been made. As a result, during the Work Definition Conferences (WDC), the Ministry decided to upgrade the MCS-4 System to an MCS-5 System.

247. However, as demonstrated by the events which later occurred, the MTU design for the new MCS-5 Machinery Control System (at least with regard to the Controllable Pitch Propeller (CPP) System) was inadequate. Due to MTU's inadequate design for the connection to the ships' existing CPP System (manufactured by LIPS), testing of the CPP System and Harbor/Sea Acceptance Trials were disrupted and delayed.

248. The CPP System (as controlled by the original SEPA Machinery Control System) received its input and operated the propeller blade hydraulic positioning system through a system of servos. MTU proposed replacing those servos and installing potentiometers to transmit the signals between the MCS-5 console and the CPP servo valves.

249. Claimant further reports the difficulties in solving technical problems and the successive orders for multiple types of potentiometers to install new converters and repair servo valves. Claimant claims that these technical meetings delayed F-21 Frigate Sea Trials for 49 days.

250. Claimant is adamant in stating that such works were outside the

---

[59] See REA EXH. C.93 and J1572, J1578, J1591, J1593 and J1895:C0035692-93.

specifications and claims it is owed a credit of US$ 288,060 before interest calculation.

251. As anticipated by Claimant, this REA was included after the preparation of Annex A and there are no comments from the Ministry on the matter.

### Decision by the Arbitral Tribunal

252. Claimant has properly and fully described the technical problems that have arisen in connection with the MCS-5 system and its interfacing with the CPP system. Based on the documentation in the record and the explanations provided by Claimant, it is certain that such work was outside the scope of the specifications, especially because the upgrade from MCS-4 system to the newly developed MCS-5 system was decided during the WDC.

253. The Arbitral Tribunal highlights that the specifications initially provided for the replacement of the original main propulsion engines with new Main Propulsion diesel engines manufactured by MTU and to couple those new engines to the existing Command and Control System. Later, the Ministry changed the specifications and required the successful bidder to remove the existing Machinery Command and Control System, and replace such system with a new MTU MCS-4. With the passing of time and the technological enhancements achieved, during the WDC convened by the Ministry, the new MCS-5 System was chosen.

254. The Arbitral Tribunal finds that such claim meets the requirements under Clause 59 and, therefore, such claim is granted and the Ministry is hereby ordered to pay Claimant the amount of US$ 288,060 plus interest accruing thereon.

### (3)  REA-94 – Clean and Paint Diesel Exhaust Trunks

255. Claimant claims that that the Contract did not require any work or modification to the Frigates' existing Diesel Exhaust Trunks. In fact, the Contract required that only new and disturbed areas be cleaned and painted[60]. The existing forward and aft Diesel Exhaust Trunks were not

---

[60] See REA EXH. C.94.

disturbed during Contract production work on either ship. Nonetheless, in order for the Diesel Exhaust Trunk areas to match the rest of the ships' surface, which had been cleaned and painted, the Ministry required Claimant to clean and paint those. Such extra work was in addition to the original Contract work[61].

256. Claimant also claims to have issued its Overhaul Condition Report (OCR) 13517 on September 20, 2000 requesting modification to the Contract to cover the cleaning and painting of the Diesel Exhaust Trunks. The Ministry, as per Claimant, orally agreed to increase the Contract price for this work but it failed to sign RAW 970466 dated October 27, 2000.

257. Thus, Claimant claims to be entitled to receive US$ 201,163 before interest accruing thereon being computed.

### Decision by the Arbitral Tribunal

258. This claim meets the requirements under Clause 59 of the Contract. However, in reviewing the MA[62], the Arbitral Tribunal found that the Ministry had agreed orally with Claimant to split such cost on a 50-50 basis, as reported by Messrs. Sam Roberts and T.C. Dalton. Thus, while Claimant claims in this arbitration the payment of the full cost incurred for the cleaning and painting of the Diesel Exhaust Trunks, it had, however, agreed to split the cost with the Ministry.

259. Hence, this claim is partially awarded, and the Ministry is ordered to pay Claimant the amount of US$ 100,581.50 plus interest accruing thereon, which corresponds to 50% of the total cost incurred by Claimant.

### (4) REA-95 – Weighing $CO_2$ System Bottles

260. Claimant asserts that the Contract Specification C.22 required that maintenance be accomplished to the Fixed, Semi-Fixed, and Portable $CO_2$ System, which included maintenance on some seventy-five (75) 50-pound bottles and forty (40) 18-pound bottles[63]. The maintenance to the $CO_2$

---

[61] See MA ¶ 318.
[62] See MA ¶ 320.
[63] See REA EXH C.95, J2069, J1602, J1607, J1895, C0035696-97

System had been completed and the system was ready for Sea Trials at some time before June 22, 2001.

261. The Ministry removed some of the $CO_2$ cylinder bottles from the completed and verified $CO_2$ System on Frigate F-21. In the absence of assistance from the Ministry with reconnecting the bottles at their correct points in the system, Claimant was instructed to engage Hiller Systems to weigh all $CO_2$ System bottles and verify the F-21 system's integrity prior to Sea Trials. This effort by Claimant was in addition to the original Contract work. To that end, Claimant issued RAW 970912 in accordance with an oral agreement with the Ministry to increase the Contract price for the Ministry-directed extra work done by Hiller. The Ministry, however, failed to sign the RAW although Hiller was under subcontract to do the mandatory work. Claimant claims compensation of US$ 4,299 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

262. The report provided by Claimant in the Exhibit C.95 speaks for itself. In light of the directions given by the Ministry, Claimant hired Hiller to render such services, which were out-of-scope and, therefore, this claim meets the requirements under Clause 59 of the Contract.

263. Hence, this claim is awarded, and the Ministry is ordered to pay Claimant the amount of US$ 4,299 plus interest accruing thereon.

### (5) REA-97 – Intake Duct Drains –Diesel Engines and Generators

264. Contract Specification C.31 titled "Diesel Generators" required Claimant to remove the existing four (4) Diesel Generator sets on each Frigate and replace them with new units.

265. Further, Contact Specification C.1 titled "Diesel Main Engines" called for the removal and replacement of the two (2) diesel main engines on both Frigates[64].

266. In performing the works under the aforementioned specifications,

---

[64] See REA EXH C.97. See also J2057, J2072, J1613, J1895, C0035700-01 and MA ¶ 482.

Claimant discovered water in the diesel generator air intake ducts. In OCR 16627 dated July 11, 2001, Claimant notified the Ministry that ten (10) drains had to be installed in the existing air intake ducting for diesel engines and generators on each Frigate. Such additional drain installation was extra work not required by the Contract.

267. Claimant did the extra work not provided by the Contract as it was absolutely necessary for the operation of the Frigates and claims reimbursement of the amount of US$ 7,065 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

268. Unlike other cases where the Ministry agreed in advance but later failed to make the appropriate payment, in this case Claimant reports that it notified the Ministry but never got any response. Claimant, however, proceeded with the work due to the necessity of fixing the problem to secure the proper operation of the engines.

269. The Arbitral Tribunal finds that in the absence of any dispute by the Ministry and in light of the original specifications, the extra work meets the requirements under Clause 59 of the Contract.

270. Hence, this claim is awarded and the Ministry is ordered to pay Claimant the amount of US$ 7,065 plus interest accruing thereon.

### (6)  REA-98 – Sea Trials[65]

271. Claimant reports that in its bid price it had forecasted two separate sea trials for each ship[66]. Nonetheless, Claimant also reports that due to two major reasons attributable to the Ministry, it was unable to perform the sea trial work as originally planned.

272. The first cause of extra sea trial work was the delayed installation and integration schedule for the new, Ministry-selected, IAI-MBT Fire Control System (FCS). The Parties were at such time unaware of the full scope of

---

[65] The REA EXH. C.98 provides for very detailed technical information. Although the Arbitral Tribunal decided to transcribe herein the main features involved, it has not failed to analyze its full text.
[66] See REA EXH. C.98. See also J1687, J1694, J1696, J1700, J1706 and J895, C0035702-03.

the work required to replace the existing NA-10 FCS with the upgraded IAI-MBT FCS. Additionally, it was the Ministry's failure to negotiate in good faith the pricing for the replacement FCS that resulted in the delayed authorization to upgrade the known-to-be obsolete NA-10 FCS until March 8, 1999.

273. The second cause of extra sea trial work that is attributable to the Ministry was the defective design of the original Frigate Gas Turbine (GT) exhaust system. In early August 2001, the new 3D-STAR Radar antenna on F-21 was found to be inoperable. The Parties then decided that in order to expedite completion of the ships and to avoid delay of the then scheduled F-21 sea trial, the 3D-STAR radar antenna installed on Frigate F-22 would be "borrowed" and placed on Frigate F-21 so that F-21's antenna could be removed and returned to IAI/Elta for inspection and repair. Return of the antenna to the manufacturer required Claimant to obtain an additional Export License through the U.S. State Department for shipment to Israel. Claimant further details the technical problems on GT exhaust design deficiency experienced with the F-21. Those technical details are not relevant for the decision to be made but do elucidate the delays recorded.

274. Claimant claims that it conducted four (4) separate sea trials for F-21, as follows: on June 25-27, 2001; October 24-26, 2001; December 5-6, 2001 and April 18-19, 2002.

275. As far as F-22 is concerned, Claimant claims that it conducted three (3) separate sea trials, as follows: October 17-18, 2001; August 13-15, 2002 and October 9-10, 2002.

276. Claimant demands compensation for the added labor and other costs required for performing four (4) F-21 and three (3) F-22 sea trials instead of the two sea trials for each ship as originally planned. Claimant's claim amounts to US$ 1,416,767.

### Decision by the Arbitral Tribunal

277. Although Claimant had adopted a conservative approach in budgeting when it submitted its bid that included two sea trials for each of the Frigates, in the end it was obligated to conduct four (4) sea trials on F-21

and three (3) on F-22.

278. In addition to the time delays triggered by the technical problems experienced with F-21, the additional sea trials triggered the increase of extra labor hours for each out-of-sequence sea trial and the level of productivity that could be achieved was less than that which could be achieved under stable conditions. Worker reassignment also caused delays between work operations. The main reason for that was the fact that the vessel labor personnel working on each ship had to be assigned to new work operations in several cases while the ships were at sea.

279. REA Exhibit C.98 identifies the following average numbers of vessel labor personnel who were performing work on F-21 and F-22 prior to each sea trial:

| | |
|---|---|
| F-21 Sea Trial #1 June 25-27, 2001 | 212 Vessel Labor Personnel |
| F-21 Sea Trial #2 October 24-26, 2001 | 108 Vessel Labor Personnel |
| F-21 Sea Trial #3 December 5-6, 2001 | 94 Vessel Labor Personnel |
| F-21 Sea Trial #4 April 18-19, 2002 | 116 Vessel Labor Personnel |
| F-22 Sea Trial #1 October 17-18, 2001 | 182 Vessel Labor Personnel |
| F-22 Sea Trial #2 August 13-15, 2002 | 135 Vessel Labor Personnel |
| F-22 Sea Trial #3 October 9-10, 2002 | 192 Vessel Labor Personnel |

280. Since Claimant has performed in total three (3) more sea trials than the two originally scheduled on each Frigate, such additional work meets the requirements under Clause 59.

281. Hence, this claim is awarded and the Ministry is ordered to pay Claimant the amount of US$ 1,416,767 plus interest accruing thereon.

## (7)  REA-99 – System Testing

282. Claimant asserts[67] that when it prepared its bid estimate for the Frigates project, it planned and priced the F-21 and the F-22 system testing based on its many years of experience performing similar work for the U.S. Navy. Claimant, however, expended approximately three times the Engineering and Vessel labor manhours originally planned and budgeted for system testing.

---

[67] See REA EXH. C.99, MA ¶¶ 656-664, J1895, C0035704-05.

283. The chart below shows that the average duration of testing activity increased substantially from a planned duration of less than two weeks to an actual average of seven months, which also increased the number of labor testing hours, to wit:

| | F-21 | F-22 |
|---|---|---|
| Delayed Start of Testing | 361 days | 562 days |
| Average Planned Duration of Testing Activity | 12 days | 11 days |
| Average Actual Duration of Testing Activity | 215 days | 221 days |

284. Claimant attributes such increases to delays caused by the Ministry, primarily the decision to repair and maintain the ALBATROS System even though the Ministry was well aware that the very age of that system made the acquisition of parts very difficult. Claimant also gives special consideration to the cost of testing the Platform and Arms and Electronics ("A&E") Systems, which in many cases required re-testing systems/components that had been previously tested and approved on account of emerging changes and new work which caused parts of those otherwise completed systems to need to be reopened and modified in some way.

285. REA EXH. C.99 contains a full description of the problems encountered in each one of the systems tested, but Claimant justifies the increased costs by stating that:

> In summary, through its actions and inactions, The Ministry caused Ingalls to incur major increases in the time and cost of system/component testing under the Frigate Contract. Such Ministry-required added, changed, and delayed testing work includes but is not limited to: (1) carrying out testing on the Frigates over a much longer period than required by the Contract, (2) repeating many tests on previously approved systems, (3) performing added work on Test Procedures, and (4) performing added testing after such procedures were revised to suit The Ministry.

286. Claimant claims a compensation for all of its added effort to complete the system testing for the Platform and A&E Systems because such efforts were not part of the original scope of work provided under the Contract. The

compensation claimed by Claimant amounts to US$ 2,863,798.

### Decision by the Arbitral Tribunal

287. The information provided by Claimant makes clear that in performing the systems testing it actually incurred various additional work hours and also work that was out of scope. The table comparing the number of planned days and the number of days actually expended on such testing is compatible with the allegations brought by Claimant.

288. Furthermore, the events occurred during the system testing indicate that no bidder could have originally computed the hours involved in fixing the problems. As a matter of fact, after the Contract was awarded, the Ministry made certain decisions involving the upgrade of systems which might have an unforeseeable impact on other systems or components.

289. In general, a major overhaul such as the one involving the Frigates normally gives rise to circumstances requiring new or alternative decisions to be made during the works. It would be unreasonable to miss the opportunity to improve the operation of the ships and to equip them with state-of-the-art systems, equipment and components. For obvious reasons, especially in light of the time passed between the date when the Contract was awarded and its signature, there had been significant technological improvements in that area. The Ministry might not be prevented from enjoying those improvements and upgrading and retrofitting its Frigates since the rationale behind the overhaul, as mentioned before, was to have them fully operative and last 20 years. However, more tests were required to satisfy the Ministry and give it the requisite assurance of the proper operation of those systems.

290. Nonetheless, it is also true that such enhancements had not been foreseen at the time the technical specifications were defined. Moreover, the decision to maintain certain aged systems would eventually lead to difficulties with respect to the supply of components and other spare parts.

291. Despite the action by the Ministry being justified, it is also true that such changes imposed additional work on Claimant and Claimant's crew. The Ministry knew (or should have known) that in determining the fixed

price, the shipyard's calculations had taken into account manhours. In implementing the changes and fixing the incidental problems, the number of manhours increased. The mode of calculation of manhours, as detailed in REA EXH. C.99, shows that the industry takes into account the period of time involved in moving workers from one activity to a different one. Therefore, it should have been assumed that the increase of manhours would be certainly impacted by the industry practice.

292. Therefore, the Arbitral Tribunal finds that the increase of additional manhours has to be compensated by the Ministry to the extent that such works performed by Claimant were outside of the original scope.

293. Hence, this claim is awarded and the Ministry is ordered to pay Claimant the amount of US$ 2,863,798 plus interest accruing thereon.

### (8)  REA-100 – Additional Icemakers

294. As per the Contract, Claimant was required to procure and install four (4) icemakers, one large- and one small-capacity per ship.

295. Claimant reports[68] that it procured the icemakers that met the Contract specifications. However, when it attempted to install the specified small-capacity icemakers in the Officer's Pantry, they were too wide to fit the available installation space. Despite its efforts to return the icemakers, Claimant did not succeed because the manufacturer, SENCO Products, had gone bankrupt and was no longer in operation. Claimant alleges that had the Contract performance period not been extended due to the Ministry's actions and inactions, it would have identified this problem much earlier and should have been able to exchange the non-fitting icemakers for units that would fit into the designated areas.

296. Claimant then had to procure two (2) Scotsman icemakers that would fit into the available space, and installed them on the Frigates. The Ministry, as per Claimant, benefitted from the larger capacity of the replacement icemakers.

---

[68] See REA EXH. C.100, MA ¶¶ 1261-62, J1540, J1895, C0035707-07.

297. Claimant claims that no credit could be obtained from SENCO, because it was insolvent. The SENCO small-capacity icemakers are worthless and in storage, Claimant stating that they will be returned to the Ministry on request.

298. Claimant's claim a payment of US$ 7,191 as an increase of the Contract price, including burdens and profit but excluding delays and disruption.

### Decision by the Arbitral Tribunal

299. The problem encountered by Claimant was a specification for the small-capacity icemakers that did not fit into the designated area. Claimant was then obligated to procure a different model from a different manufacturer due to the bankruptcy of SENCO.

300. Since the small-capacity icemaker model called for in the technical specification was too wide, Claimant had to procure a different model to fulfill its contractual obligations.

301. Claimant claims to have paid for the SENCO icemakers and not received any credit in turn. This is the reason why the SENCO icemakers are in storage and will be returned to the Ministry upon request. Thus, there shall not be any double cost being imposed on the Ministry even if the icemakers are worthless to Claimant and, most probably, to Respondent too.

302. It would be unfair to impose on the Claimant an additional cost for procurement if the problem derives from an imprecise specification made by the Ministry.

303. Hence, this claim is awarded, and the Ministry is ordered to pay Claimant the amount of US$ 7,191 plus interest accruing thereon.

### (9)  REA-101 – Refrigeration Seawater Pump Failure

304. Claimant asserts that the original specifications A.17 were revised and

replaced on July 31, 2000[69]. It also reports that the new refrigeration equipment was provided and installed as required and operation testing began. However, OCR 16734 reported on August 24, 2001 that while conducting routine preventive maintenance on the refrigeration system, it was discovered that the F-21 and the F-22 refrigeration seawater pump motors had excessive corrosion. The pumps were removed to the shop, opened and inspected. Claimant then found that the pump/motor shafts were made of carbon steel as opposed to corrosion-resistant (stainless) steel as specified.

305. The pumps had been specified by the Ministry as well as its manufacturer, Aurora, but in reviewing the specifications for the required pump model it was revealed that such model included shafts made of carbon steel. Carrier inspected the pumps on August 2001 and confirmed that the shafts were damaged by corrosion. Carrier also confirmed that although Claimant had correctly specified salt-water pumps, the wrong pumps had been provided by Aurora.

306. Claimant alleges it was forced to apply additional resources and incur additional expenses as a direct result of the incorrect material furnished by the Ministry-appointed pump supplier.

307. In light of the problems identified, Claimant offered two options to make the corrections. The Ministry opted for the one that required Claimant to overhaul and modify the discrepant pumps previously furnished by Aurora. For these extra efforts, Claimant seeks compensation from the Ministry in the amount of US$ 29,714 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

308. The elements and evidence brought by Claimant show that such work is out-of-scope. In this case, the original specifications were later revised, and the technical problems identified and the measures taken by Claimant to overhaul and modify the discrepant pumps meet the requirements of Clause 59 of the Contract.

---

[69] See REA EXH. C.101; MA ¶¶ 948 to 954, See J1418, J1634, J1643, J1895 C0035708-9.

309. Hence, this claim is awarded and the Ministry is ordered to pay Claimant the amount of US$ 29,714 plus interest accruing thereon.

### (10) REA-102 – Additional Subcontractor Costs – Carrier

310. This claim derives from the holding of two training courses on maintenance of the air-conditioning system. Claimant claims[70] to have arranged for course to be held at the Carrier plant in Miami, Florida with the attendance of crew members.

311. Further, Claimant states that the Ministry found the training program unsatisfactory even though it was given by highly qualified Carrier experts and demanded that Claimant hold another training in its Pascagoula plant. Claimant paid for Carrier personnel to travel to Pascagoula and provide a second training course. Claimant seeks reimbursement for costs associated with this second training course, which amount to US$ 24,325 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

312. Despite Claimant's description of the circumstances behind this claim, it remains unclear whether the initial course at the Carrier plant was satisfactory or not. It is true that Claimant was required to make available one training course and not two, as indicated in the documentation. However, in the absence of evidence that Claimant negotiated with the Ministry the terms applicable to this second training program and, further, since Claimant failed to show that this second program was really additional and not held because it was necessary to meet the requirements imposed by the Contract's specifications, this claim is dismissed.

### (11) REA-103 – ARPA M-25 Navigation Radar System

313. Claimant states that the technical specifications did not specifically require any work on the ARPA M-25 System. Claimant's only responsibility for action was under the "inspect and report" provisions of the

---

[70] See REA EXH. C.102.

specifications[71].

314. However, the inspections revealed the need for substantial work on the ARPA system. In response to Claimant's inspection findings and recommendations, the Ministry directed Claimant to do certain out-of-scope work. Claimant further states that the Ministry provided it with partial compensation for the labor and material incurred by the issuance of ten (10) RAWs, but the Ministry did not pay Claimant for all of its added effort expended in repairing the ARPA system, the remaining unpaid compensation for which amounts to US$ 133,319.

## Decision by the Arbitral Tribunal

315. The REA EXH. C.103 is accompanied by various references regarding the out-of-scope nature of the services rendered by Claimant, including the exchange of correspondence between Claimant and the VIC. Such correspondence shows the approval of various RAWs on the basis of cost estimates provided by Claimant to the Ministry.

316. This claim, however, deals with a portion of the costs which has not been paid off by the Ministry and which is claimed hereby.

317. The Arbitral Tribunal finds, following a thorough review of the supporting documentation, that Claimant does not indicate in detail which portion of the costs have not been settled by the Ministry and whether such same portion had been submitted for the Ministry's approval.

318. Due to the extensive discussions held between the Parties in that same respect, and although such claim is substantiated by a voluminous number of documents, it seems inappropriate that such costs claimed by Claimant have not been submitted to the Ministry at the appropriate time.

319. Despite the work falling outside the technical specifications, but taking into account that the Ministry was presented with various estimates of costs which apparently have not included the costs sought by this claim and, further, without evidence explaining why such costs were not submitted contemporaneously with all costs estimates, the Arbitral Tribunal dismisses

---

[71] See REA EXH. C.103.

this claim.

### (12) REA-104 - Additional Subcontractor Costs – Elbit Systems

320. Claimant states that the Ministry's delay in selecting IAI-MBT to design and supply the Upgraded Fire Control System (UFCS) prevented timely dissemination of UFCS information to the Combat Systems Integrator, Elbit Systems. The impact of the UFCS on the balance of the ship system installations could not be known until Elbit received the UFCS data and integrated such data into the total Combat Systems Suite (CSS). Therefore, when the Ministry belatedly selected IAI-MBT to design and supply the UFCS, neither Claimant, nor the Ministry knew the true scope of work required to incorporate the UFCS into the entire upgraded CSS on the Frigates[72].

321. Thus, the actions and inactions of the Ministry significantly delayed the Contract performance schedule past the original November 17, 1999 Contract completion date. Consequently, Claimant claims that it was forced to perform its subcontract administration functions regarding Elbit for a much greater period than originally planned. The sum claimed by Claimant amounts to US$ 51,654.

### Decision by the Arbitral Tribunal

322. Despite the explanation provided by Claimant and the evidence of the delay caused by the Ministry in selecting IAI-MBT to design and supply the UFCS, Claimant has not detailed the calculation of such costs, nor has Claimant evidenced the increased labor and the other expenses associated with the administration of this subcontract with Elbit.

323. The Arbitral Tribunal finds that in order to award this claim it should have been provided with full detail of the costs incurred and adequate supporting documentation. Unlike in other claims, Claimant bases this claim on supporting documentation containing certain contractual clauses. Regardless of whether the claimed work was or was not out-of-scope work under Clause 59, Claimant had to provide evidence of the costs and

---

[72] See REA EXH. C.104.

expenses incurred to allow the appraisal of the same by the Arbitral Tribunal. In sum, Claimant has not discharged its burden of proof, especially when the standard of proof for a claim under Clause 59 is placed at a high threshold.

324. Hence, the Arbitral tribunal dismisses this claim.

### (13) REA-106 – 21 HS-7 Sonar System

325. Claimant reports[73] that after the Contract was awarded and in one of the WDCs, the Ministry requested Claimant to evaluate replacement of the existing EDO 610 Sonar System. Claimant, after studying the existing system, recommended replacing it with the Commercial Off-the-Shelf (COTS) 21 HS-7 Sonar System.

326. Claimant states that although it had initially proposed an increase in the Contract price for changing the scope of work and providing the new Sonar system, the Ministry rejected such proposal, as shown in Reference 4 attached to REA EXH. C.106. In July 1998, however, after exchange of proposals and detailed discussions between the Parties, they agreed on a package of WDC changes, including replacement of the obsolete Sonar system. The Ministry confirmed its agreement with the changes reflected in Reference 5 attached to REA EXH. C.106 by countersigning Claimant's letter in the space provided by Claimant.

327. Moreover, on September 12, 2000, the Parties finally had a definitive, written, agreed scope of work as per Reference 8 attached to REA EXH. C.106. By virtue of the agreement reached by the Parties, additional requirements became known to Claimant. Such additional requirements are reflected in Reference 8. Although the Ministry's signature constitutes written approval to change the agreed scope of work, the Contract price and redelivery schedule were not changed. Such scope-of-work change included engineering and other efforts by Claimant associated with implementing the increased requirements from Northrop Grumman, the Ministry-selected vendor of the 21 HS-7 Sonar System.

---

[73] See REA EXH C.106.

328. Claimant asserts that Clause 35 is applicable as well as Clause 59. Claimant claims that without such adjustment, the Ministry will have received the benefit of its added effort and expense without paying for them. Claimant then claims a payment of US$ 639,440 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

329. Although it was proved that there was a change of the Sonar system ordered on both Frigates, Claimant failed, however, to produce evidence of the costs being claimed. Even if Claimant claims that such additional efforts were made and proved necessary after execution of the agreement to replace the Sonar system, it does not itemize its costs or provide sufficient documentation in support.

330. Regardless of whether the claimed work was or was not out-of-scope work under Clause 59, Claimant had to provide evidence of the costs and expenses incurred to allow the appraisal of the same by the Arbitral Tribunal.

331. Hence, this claim is dismissed by the Arbitral Tribunal.

### (14) REA-107 – OTOMAT Missile Launching System MK-2

332. Claimant reports that upon execution of the Contract, Alenia Difesa, of Italy, was one of the Ministry-designated subcontractors responsible for the OTOMAT Missile System, as reflected in Clause 3 of the Contract. As required by the relevant contractual provisions, Claimant issued a Ministry-negotiated Designated Subcontract to Alenia.

333. Although Claimant had no contractual obligation to do any shipboard work on such system, the Ministry required and directed it to perform certain shipboard work on the OTOMAT Missile System and, after the period of planned performance expired, the Ministry required and directed Claimant to resolve certain problems with Alenia's performance[74]. Having discovered during a shipcheck that certain cabling was defective and could

---

[74] See REA EXH. C.107.

not be reused in the repaired/overhauled installation, Alenia claimed that the necessary waveguide work and cable replacements were beyond its work scope, and any work to be performed with that respect would depend upon the issuance of a change order.

334. Faced with the refusal by Alenia, Claimant issued a RAW requesting the Ministry to fund the necessary waveguide and cabling work, but the Ministry refused to approve it, taking the position that Claimant was responsible for the replacement of all defective cabling and waveguides throughout the ships. Thus, instead of requiring Alenia to carry out the work required by the subcontract, the Ministry demanded that Claimant do the work.

335. Although Claimant presented all facts supporting its positions to the Ministry, it adamantly maintained that Claimant had to do the work identified in References 7 and 8 as part of its Contract work. Claimant claims that it finally decided to carry out the work to mitigate delay and to avoid holding up completion of the work.

336. Claimant seeks compensation in the amount of US$ 273,267 for works performed out of scope.

## Decision by the Arbitral Tribunal

337. This claim derives from a clear conflict between Claimant and the Ministry-designated subcontractor Alenia. The conflict, in essence, relates to the definition of the scope of work of each party involved.

338. Firstly, despite Claimant claiming to be exempted from performing any work in connection with the OTOMAT system and, further, that the replacement of cables and waveguides would fall within the scope of work of Alenia, a Ministry-designated subcontractor, Claimant has taken a position that this was under the Ministry's responsibility. But even if the subcontractor was designated by the Ministry, the day-to-day relationship under the subcontract rested with Claimant. For technical or other reasons, the Ministry opted to select certain subcontractors, but they were under the supervision of Claimant.

339. Since it was unsettled who would be responsible for the additional

work, Claimant notified the Ministry and, in the end, Alenia's change order was rejected by the Ministry.

340. This incident gave rise to a significant exchange of correspondence between Claimant and the Ministry, and the Ministry's position has been that the replacement of bad cabling and waveguides was under the responsibility of Claimant and was part of Claimant's scope of work.

341. In reading the documentation supporting this claim, it is clear that the Ministry's position was quite firm in not authorizing extra costs, as was the position assumed by Alenia that such work was outside the scope agreed upon with the Ministry.

342. Even if Claimant alleges that it decided to carry out the work to mitigate delays and avoid holding up the completion of the works, it made such decision conscious that the Ministry was reluctant in accepting to increase the Contract's and the subcontract's price. Hence, in deciding to proceed with the work and discuss the scope and any reimbursement of costs later, Claimant did that on its own account and risk under the uncertainty of succeeding in future negotiations.

343. The Arbitral Tribunal notes that the claim as brought by Claimant does not address in detail the core argument of whether the works under discussion were within Claimant's or Alenia's scope of work. Had this information been provided, it would have been important to the decision to be made by the Arbitral Tribunal. But it is not available, nor is any breakdown of the reimbursement claimed.

344. In view of the foregoing, this claim is dismissed by the Arbitral Tribunal.

### (15) REA-109 – DRS Centralized Communication System

345. Claimant reports[75] that, as a result of decisions made during WDCs following the signing of the Contract, the Parties decided to change the

---

[75] See REA EXH. C.109.

specified communication equipment from a SPAR[76] system to a SHINCOM system, the latter decision being made in 2000[77].

346. Claimant states that within the period from December 17, 1997 until February 17, 1999, the Ministry revised the detailed requirements for components to be furnished six (6) times. Thus, the overall capabilities of the Centralized Communication System and the necessary components to be supplied and installed by Claimant were changed from the original specifications upon which the bid price was based. In addition to the supply of components, Claimant had to furnish additional Level 2 maintenance training and additional services of manufacturer's technicians to groom and test the additional components.

347. Claimant claims to be entitled to recover its extra costs for additional material and vendor services to satisfy Ministry requirements that exceeded the original scope of the Contract work. Therefore, Claimant seeks payment of US$ 170,735 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

348. In this case, Claimant provided not only the evidence related to the changes produced with respect to the specification, but also copies of invoices issued by vendor in connection with services rendered.

349. It is unquestionable that the specifications were changed after the execution of the Contract, and costs evidenced. This claim falls within Clause 59.

350. Hence, this claim is awarded and the Ministry is ordered to pay Claimant the amount of US$ 170,735 plus interest accruing thereon.

### (16) REA-110 – Weapons Demonstrations

351. Claimant asserts that, under the Contract[78], it was not required to handle weapons and/or ammunition within its facility. The Frigates were to be delivered to Claimant without ammunition. To the extent required,

---

[76] See Reference 1 and Reference 4 to REA EXH. C.109.
[77] See Reference 3 to REA EXH. C.109.
[78] See Clause 3, ¶ 2 and Clause 24 ¶¶ 2 and 3 of the Contract.

Claimant might cooperate with the crew to obtain such supplies and, in such case, the Ministry would pay the related costs.

352. However, in the end, the Ministry concluded that it was absolutely necessary for Claimant to obtain the ammunition for live firing demonstrations[79]. Therefore, Claimant developed a plan to safely demonstrate the weapons, solicited suppliers and procured the ammunition requested by the Ministry. Claimant also obtained the necessary permits and organized and trained a special crew to operate, load and fire the guns. Claimant seeks payment in the amount of US$ 272,105 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

353. It was proven that, even though Claimant and the Ministry had established in the Contract that the Frigates should be delivered free of any ammunition and, further, that Claimant was not supposed to handle ammunition and/or weapons, Claimant, in the end, procured and handled ammunition for live firing demonstrations. Claimant also brought evidence as to the need for obtaining permits and developing a training plan.

354. While Clause 24 of the Contract refers to a pre-transit period, it may, however, be extracted from the text that the Ministry had agreed to pay the costs for the ammunition in connection with such period since that would be deemed an additional work that was not incumbent upon Claimant.

355. The Arbitral Tribunal finds that the same treatment must be applied to the live fire demonstrations due to their extracontractual nature.

356. Hence, this claim is awarded and the Ministry is ordered to pay Claimant the amount of US$ 272,105 plus interest accruing thereon.

### (17) REA-111 – Additional Subcontractor Costs – PRISMA

357. Claimant asserts that because the electronic components were missing when the Frigates arrived at the shipyard, it had to consolidate parts from both Frigates to obtain a complete Frigate-set to enable restoration of the

---

[79] See J1241, J1291, j1328, J1343, J1608, J2176.

Arms and Electronics equipment on one ship[80]. This Frigate-set was installed on F-21, and its assembly and use resulted in earlier readiness of F-21. Such acceleration was achieved at a substantial unplanned cost, including extra costs for the on-site services of PRISMA as well as costs of the needed replacement material.

358. Claimant states that the estimated PRISMA subcontract price increase caused by the Ministry-responsible delay is US$ 1,940,605, and such amount is treated separately.

359. Claimant claims to be entitled to compensation for the increased labor and other expenses associated with having to administer the subcontract with PRISMA after the original Contract completion date of November 17, 1999, and such claim encompasses added engineering, planning, and program labor required to support the subcontract administration function. The claim amounts to US$ 46,412 before computing the interest accruing thereon.

## Decision by the Arbitral Tribunal

360. While Claimant's claim indicates that costs reimbursable contemplate increased labor and other expenses associated with having to administer the subcontract after the original Contract completion date, the evidence brought by Claimant[81] is limited to a worksheet that indicates a total labor amounting to 864 hours and a total amount due of US$ 46,412 which corresponds to the amount of the claim.

361. Due to the exceptional nature of payments to be made under Clause 59, Claimant was expected to comply with the standard of proof required thereunder. The Arbitral Tribunal finds that the unilateral worksheet provided by Claimant may not be deemed sufficient evidence to substantiate its claim under the aforementioned contractual clause.

362. Hence, the Arbitral Tribunal dismisses this claim.

---

[80] See REA EXH. C.111.
[81] See J1895, C0035728-29.

### (18) REA-112 – Canceled Requests for Additional Work (Proposal Efforts)

363. Claimant claims that the Contract provided for reimbursement of its efforts should it be required by the Ministry to submit proposals for the accomplishment of a requested change or added work, including a general identification of the required material and a price quotation[82]. Claimant states that, as is customary in the industry, the RAWs included the proposal preparation effort in the proposed price for the change. Thus, when authorized by the Ministry, Claimant was compensated for its efforts in preparing the related proposal. Should the proposed change not be authorized by the Ministry, the Contract provided that Claimant should nonetheless be compensated for its efforts in preparing the related proposal[83].

364. Claimant asserts that it prepared and processed eighty (80) RAWs listed in Reference 1 that were ordered by the Ministry but later canceled during performance of the Contract. The compensation claimed includes all engineering studies and analyses conducted in association with such Ministry requests. The amount of such claim is US$ 122,412 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

365. As discussed by the Arbitral Tribunal earlier in this Award, the requests for changes and added work under Clause 8 of the Contract could only be placed by the Ministry. This claim relates to such requests and the efforts Claimant put into preparing the relevant proposals requested by the Ministry. Claimant also explains that when preparing its proposals for additional work or changes, it included the cost associated with the preparation. Thus, if work is authorized, the preparation cost is recovered. The problem arises where the Ministry requested the proposal and then decided not to pursue it; Claimant expected to be compensated for preparing the proposal. In eighty (80) cases, however, requests were placed by the Ministry and later cancelled. Claimant is seeking to recover for

---

[82] See REA EXH. C.112 and Reference 1 thereto.
[83] See Clause 8 ¶ 2 of the Contract.

its preparation efforts in those cases.

366. However, Claimant bases its claim on the Second Paragraph of Clause 8. As per such paragraph, the changes foreseen thereby are solely those related to the change in installation of equipment not provided by the specifications. That paragraph also states that whenever the request was placed by the Ministry, Claimant had to submit a budget for the technical study to be approved by the Head of the VIC, and no changes should be made prior to such approval being first secured. The costs associated with the study would only be deemed reimbursable should the proposed change not occur by virtue of a reason foreign to the VIC, the General Command of the Navy will approve the administrative costs of such technical studies upon presentation of the corresponding invoice.

367. However, the list submitted by Claimant in Reference 1 to REA EXH. C.112 does not identify properly that the RAWs reflected therein related only to changes in installation of equipment. In reviewing the list, it may be determined that although they may refer to additional work added, they fall within the portion of Clause 8 which deserves a different treatment.

368. The exceptional nature of payments under Clause 59 would require Claimant to evidence that (i) the RAWs related to additional or extra work requested by the Ministry, or, if recommended by Claimant, related to a change in installation of equipment, (ii) such RAWS were approved by the Ministry, (iii) the RAWS were later cancelled for a reason foreign to the VIC and (iv) the General Command of the Navy had approved the administrative costs encompassed by the technical studies. Nonetheless, the evidence shown by Claimant fails to comply with such contractual requirements.

369. Hence, the Arbitral Tribunal dismisses this claim.

### (19) REA-113 – Additional Subcontractor Costs (IAI-MBT)

370. Claimant claims and reports in detail the problems encountered with the replacement of the original Existing Fire Control System (EFCS) with the UFCS designed and supplied by the Ministry's selected supplier, IAI-MBT. In

its request[84], Claimant claims that, despite the inspections of the Frigates on different dates in Venezuela, the condition of the Frigates upon arrival in Pascagoula had deteriorated due to cannibalization in addition to normal wear and tear of which the Ministry knew (or should have known due to the passing of time).

371. Claimant also reports the pressure put on it by the Ministry to sign the Act of Initiation of Works, which occurred only on June 1, 1998. The main argument brought by Claimant relates to the time involved in the Ministry's decision to replace EFCS with UFCS and the selection of IAI-MBT, a Ministry-selected subcontractor. Claimant claims to have expended efforts in engineering, planning and program labor required to support the subcontract administration function and this claim amounts to US$ 112,583 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

372. Despite Claimant's very detailed description of the reasons that would, according to Claimant, have given rise to its right to be paid for the additional efforts, it failed to bring to the record evidence of the costs incurred and has only attached the language of the contractual clauses. Indeed, the amount claimed by Claimant is unilaterally determined and lacks support and evidence. This scenario is inconsistent with a claim made under Clause 59 due to the high threshold of the standard of proof inherent to the application of that clause.

373. Hence, the Arbitral Tribunal dismisses this claim.

### (20) REA-115 – Ensign Staff Replacement

374. Claimant asserts[85] that neither the Contract nor the specifications provided for modifications, replacement or repairs of the Existing Ensign Staff located on the Frigates' Fantails. However, after the arrival of the ships at the shipyard in Pascagoula, the Ministry requested Claimant to prepare and submit an estimate for a major maintenance on the Ensign

---

[84] See REA EXH. C.113.
[85] See REA EXH. C.115.

Staff.

375. On the basis of Claimant's proposal, the Ministry approved the replacement, rather than mere refurbishment, of the Existing Ensign Staff due to the poor condition of such equipment. Claimant's proposal was to install new aluminum Ensign Staffs manufactured with the same configuration as the original ones. The new Ensign Staff would not deteriorate as rapidly as the existing units and would require less in-service maintenance. The new Ensign Staff design was similar to the ones installed on U.S. Navy ships. Claimant claims that the VIC reviewed the documentation submitted to it and it offered no objection to Claimant's recommendations.

376. Claimant then manufactured and installed the new aluminum Ensign Staff. However, when the Ministry later issued the formal authorization to manufacture and install the new Ensign Staff, it specified that the upper masts should be made of wood instead of aluminum.

377. Claimant details the problems faced with the attempt to replace the aluminum masts with wooden masts which, in the end, caused the Ministry to revise its decision and accept the aluminum upper masts, but only after Claimant had expended enormous efforts in ordering different types of wood and attempting to manufacture one that might fit the ships. Moreover, due to the new design of the flight deck, Claimant had to introduce modifications to the new lower masts at the request of the Ministry. Claimant claims to be entitled to compensation for labor and material expended for such efforts which amount to US$ 61,147 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

378. There is sufficient evidence in the record to show that this replacement of the Ensign Staff was not provided by the Contract and that the specifications did not call for it. Claimant has properly evidenced that the Ministry approved such extra work and that the VIC, at the inception, knew (or should have known) that Claimant's proposal provided for the replacement of wooden parts with aluminum ones. Even so, the Ministry required Claimant to uninstall the aluminum parts and use the wooden

ones.

379. The Arbitral Tribunal finds that Claimant's efforts, costs, labor and materials must be compensated since the same have been evidenced by Claimant.

380. Hence, this claim is awarded and the Arbitral Tribunal orders the Ministry to pay Claimant the amount of US$ 61,147 plus interest accruing thereon.

## (21) REA-116 – Glide Slope Indicator System

381. Claimant states that after the Contract was awarded, the Ministry required Claimant to provide a proposal/study for added/changed work pertaining to flight deck safety[86]. The proposal submitted included the procurement and installation of a new Glide Slope Indicator System which was not part of Claimant's scope of work under the original Contract. The Ministry rejected Claimant's proposal and took the position that all work related to such system was part of the original scope of work.

382. The Parties held various meetings and exchanged correspondence and reports, but the Ministry, despite Claimant's explanations and arguments, continued to demand that Claimant proceed with the repair of the system. The Ministry enforced its demands by notifying Claimant that no payment would be made for any work on the flight deck, or any work on the lighting system for the flight deck unless Claimant did the Ministry-directed work on the Glide Slope Indicator System.

383. As a result of the Ministry's extracontractual action, Claimant highlights that, without admitting contractual responsibility therefor, Claimant performed very extensive work on the Glide Slope Indicator System. Claimant has also attempted to get the Ministry to recognize that such system could not reasonably be considered to be part of the lighting system since such system was installed to assist the helicopter pilot, and had nothing to do with the safety of personnel on and around the flight deck. All attempts have been made to resolve the differences between the Parties on

---

[86] See REA EXH. C.116 and references thereto, especially OCRs.

that issue, but the Ministry required Claimant to do the work without agreeing to pay for it. Claimant did the work and, as expected, the Ministry did not make the payment. Claimant seeks payment in the amount of US$ 330,097 before computing the interest accruing thereon.

## Decision by the Arbitral Tribunal

384. The core problem with this claim relates to the fact that Claimant did the work even though the Ministry had been adamant that it would not pay for it, as it was the Ministry's understanding that such work was included in the flight deck safety works. Thus, Claimant knew in advance that it would not be paid by the Ministry under contractual provisions and payment practice. The Ministry had consistently refused to admit that such alleged extra work was outside the scope of work assigned to Claimant.

385. There is clearly a technical aspect to be resolved to determine whether or not the system was part of the flight deck safety tasks. While Claimant claims that such system assists the helicopter pilot, the Ministry insists on such system being part of the safety of personnel on or around the flight deck. This matter could have been resolved by the Parties by putting in motion the expert commission provided by Clause 41 of the Contract. Such commission would have cleared *in situ* the disagreements between the Parties. But the Parties did not resort to that technical alternative within the dispute mechanism framework.

386. From the standpoint of evidence attached to the record, Claimant has provided the OCRs that were issued, but failed to bring to the attention of the Arbitral Tribunal the pricing details that were taken into account in determining the amount of the credit being claimed. This despite Claimant knowing that the Ministry would certainly oppose its claim. The OCRs evidence that the work was done and that materials listed therein were used by Claimant, but do not provide a breakdown of costs incurred.

387. Furthermore, Claimant should have provided technical opinions and/or evidence to support its allegation that the Glide Slope Indicator System was indeed foreign to the flight deck safety. Claimant appears to have interpreted the provisions of the RFP issued by the Ministry and the

technical specifications differently from the Ministry's intention for how those provisions should be read.

388. At this juncture the situation remains unchanged. The Arbitral Tribunal is confronted with a technical aspect that, if resolved in one or another sense, would determine whether the payment should be awarded.

389. In claiming payment under Clause 59, Claimant should have attached technical discussions and opinions to comply with the standard of proof required by such clause. But Claimant did not, instead it assumed the correctness of its position as an experienced shipyard without producing any additional evidence. The Arbitral Tribunal notes that evidence in the record is in the sense that Claimant shall have done work knowing that the Ministry would not pay. That is the real dispute between the Parties where the payment is a mere consequence, but Claimant has not shed light on the crucial point of disagreement with the Ministry.

390. Hence, the Arbitral Tribunal dismisses this claim.

## (22) REA 117 – Additional Wall Covering

391. Claimant reports[87] that in accordance with the Specifications of the Contract, it was only expected to clean and paint new and disturbed areas of the Frigates. Where the areas on the Frigates had painted surfaces, it was able to match the paint colors of the areas had been disturbed. Nevertheless, the surface of certain interior areas was covered by vinyl.

392. In certain spaces with vinyl wall covering, Claimant had to disturb portions of the same when performing Contract work. The Ministry required it to re-cover all vinyl covered surfaces in spaces in which any of the vinyl covering had been disturbed by Contract work.  The Ministry, however, did not pay Claimant for such extra work although it clearly was in addition to the original Contract work. Claimant accomplished the Contract work in four (4) interior spaces on each Frigate, or eight (8) spaces total, which had vinyl wall covering instead of painted surfaces. Claimant claims to have been unable to reuse the original vinyl covering that was removed to enable

---

[87] See REA EXH. C.117.

Contract work.

393. Further, much of the vinyl for undisturbed areas in such spaces was deteriorated, peeling, and in some cases even falling down. The Ministry did not approve References 2 and 3, nor would the Ministry allow Claimant to replace only the disturbed vinyl wall covering since it claimed that Claimant's obligation was to re-cover all wall surfaces, both disturbed and undisturbed, so as to provide a uniform appearance. Claimant claims a credit of US$ 20,999 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

394. The subject of this claim differs from the general rule applicable to cleaning and painting. While Claimant can, as it did, paint the disturbed areas and re-cover them bringing back to the original appearance, the same may not be accomplished where the areas are covered with vinyl. Once such areas are disturbed, the vinyl has to be removed and Claimant could hardly re-use such vinyl. Given the deteriorated and peeling condition of the vinyl, Claimant should have realized either by virtue of the visual inspection conducted in Venezuela or upon the arrival of the ships at Pascagoula that it would have to replace all vinyl, as claimed later by the Ministry. It seems fair to have all those areas re-covered by new vinyl to secure the appearance, especially after a major overhaul.

395. The reality is that Claimant missed the opportunity to address during the WDCs and prior to signing the Act of Initiation of Works that extra work would be necessary and would trigger additional costs due to the condition of the vinyl then installed. Inevitably, a later claim led to the disagreement between the Parties which resulted in the non-payment of costs.

396. In light of the non-authorization by the Ministry, Claimant should have known that a payment would be denied. Claimant's obligation to restore the appearance of the disturbed areas certainly included the obligation to also replace old vinyl with new even on the undisturbed areas so as to ensure a uniform appearance. The nature of the material would hardly allow the re-use of the removed material.

397. Hence, the Arbitral Tribunal dismisses this claim.

## (23) REA- 118 – ALBATROS Missile Launchers, Torpedo Launchers, Cannons and Guns

398. Claimant states[88] that when the Frigates were built, they were equipped with what were then the state-of-the-art weapons systems. By virtue of the major overhaul of the Frigates, United Defense, Armament Services Division was hired by the Ministry to accomplish certain portions of the Contract work, more precisely the major maintenance requirements on the cannons, guns, torpedo launchers and the ALBATROS missile launchers. Claimant issued the purchase order to authorize UD to perform the specified work. The work to be performed by UD was established on the understanding that the existing NA-10 FCS would only be overhauled, not replaced or upgraded.

399. Due to problems experienced by UD, additional work that was not included in the scope of work of UD was deemed necessary and RAWs were issued and approved.

400. However, the Ministry directed Claimant to upgrade the NA-10 FCS on March 8, 1999 and all parties understood that changes would be made, but the full impact of such changes on other associated systems was simply unknown at such time. Once the full impact became known, UD notified Claimant on July 2001 of additional impacts and costs associated with the NA-10 FCS upgrade, and that UD had increased its claim for delay and disruption to roughly US$ 1.2 million.

401. There was also a theft of valuable electronic components that had been temporarily removed from the equipment during Contract performance. Such thefts occurred through no fault or negligence of Claimant, and they were beyond Claimant's reasonable control. The value of the stolen equipment was US$ 230,000. Claimant submitted a claim to its Builder's Risk insurance underwriter and received a settlement in the amount of US$ 201,857, but Claimant received nothing for impact or other added costs.

402. Moreover, in January 2002, UD stated that it was entitled to recover for the extended period of performance and continuing extra costs, which

---

[88] See REA EXH. C.118; see MA ¶¶ 405 to 410, J1756, J1795, J1807, J1808, J1831, J1868.

recovery amounted to approximately US$ 2 million. However, Claimant was able to negotiate an agreement with UD that eliminated UD's damages.

403. Claimant claims to be entitled to compensation for the added labor and material costs for work on the weapons systems related to the untimely direction by the Ministry to upgrade the NA-10 FCS. It also claims it is entitled to compensation (less insurance coverage) for replacement of the stolen and/or missing electronic components, and all labor associated therewith. Claimant claims to be entitled to all extra effort for processing and responding to References 32-37, plus negotiating a settlement agreement with UD. All together, the amount of Claimant's claim is US$ 443,181 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

404. Taking into account the description of the multiple events occurred in connection with the services rendered by UD and the activities undertaken by UD as a result of the decision by the Ministry to upgrade the NA-10 FCS, the impact on other systems, the thefts of electronic components, the efforts added to recover indemnification from the underwriter and the negotiation of the settlement agreement by Claimant with UD, it is clear that Claimant's role went well beyond the scope of its work, as defined by the Contract.

405. Claimant has submitted evidence of all the events referred to above and, despite the work done, the Ministry made a claim to Claimant for non-compliance of its contractual obligations with regard to the major maintenance of the ALBATROS System[89]. The Ministry's claim did not take into account the subsequent changes made by it and the impact of those changes on other systems. If delays occurred, such delays derived in a significant extent from the time involved in selecting IAI-MBT and the failure by the Ministry to timely supply to Claimant test equipment, manuals and tools that were necessary for UD to proceed with its work.

406. The Arbitral Tribunal finds that Claimant's claim must be admitted and is satisfied that the evidence submitted by Claimant meets the standard of

---

[89] See Reference 37 attached to REA EXH. C.118

proof under Clause 59 of the Contract.

407. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 443,181 plus interest accruing thereon.

### (24) REA-119 – Extended Language Translation Services

408. Claimant reports that the Contract provided for final documents to be delivered in both the English and Spanish languages[90]. However, due to the alleged delays attributable to the Ministry, Claimant had to incur extra costs related to the availability of extended language translation services.

409. Claimant alleges it is entitled to compensation for such extended services that were priced for the whole duration of the Contract but not through 1,095 days of delay. The credit claimed by Claimant amounts to US$ 929,649 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

410. It is true that the performance of the works under the Contract was extended beyond the original date scheduled for the delivery of the ships. Nonetheless, the delivery of the ships together with the documentation written in both languages was part of the object of the Contract. In other words, the obligation assumed by Claimant implied the delivery of such documents and only to the extent that they were properly delivered would the obligation and the purpose of the Contract be deemed fulfilled.

411. Although Claimant has based its claim on contractual provisions it brought to the attention of the Arbitral Tribunal, Claimant has not detailed what sort of language translation services were rendered and the reasons why they were costlier than originally expected.

412. The argument of delay does not support *per se* the increase of costs. It is a mere indication that it might trigger an increase on certain costs. However, it is far from producing evidence that extra costs have actually been incurred by Claimant.

---

[90] See REA EXH C.119.

413. The Arbitral Tribunal finds that Claimant has not discharged its duty of evidencing the additional costs, nor has Claimant met the standard of proof required for a claim under Clause 59 to be admitted.

414. Hence, the Arbitral Tribunal dismisses this claim.

### (25) REA-120 – Extended Training Services

415. Claimant alleges that the Contract called for it to provide training courses and on-the-job training to certain members of the Frigate crews and other Ministry personnel. Based on the original scheduled completion date of the services, *i.e.* November 16, 1999, Claimant reports that the performance of the Contract was delayed by 1,095 days.

416. The Ministry personnel were present at Claimant's shipyard for the full period of extension, and the personnel training was both enlarged and delayed. Claimant asserts that in order to carry out the training demanded by the Ministry over the extended performance period, it had to retain qualified training personnel on its staff as well as pay such personnel and/or engage others to provide more training than would have been needed, had the Contract performance not been extended.

417. Claimant details the methodology it adopted for determining the compensation to which it is entitled[91]. Claimant claims that its records show 18,644 hours of total actual direct-performance labor hours expended and/or committed for performance of all training work; it then determined the ratio of the original schedule to the extended schedule, arriving at 0.3571; by applying the ratio, it was able to determine that it had originally forecasted for 6,659 hours and added 2,155 hours to avoid double-counting, then deducting the number of hours obtained from 18,644 hours. The resulting total of 9,830 training labor hours were incurred because of the contractually compensable extension of 1,095 calendar days of Contract performance. Then, Claimant priced out those hours using price factors applicable to the periods involved in the same manner as such pricing factors were applied to mutually agreed Contract changes. Thus, the credit

---

[91] See REA EXH. C.120, Page C.120-7.

claimed amounts to US$ 795,410.

### Decision by the Arbitral Tribunal

418. Although Claimant has detailed the methodology for the calculation of the extra training hours, Claimant failed to produce evidence of fundamental elements of the equation, to wit: (i) the total actual direct performance of labor hours expended for performance of all training work and (ii) the original budgeted hours upon preparing its bid in response to the Ministry's RFP.

419. Notwithstanding the practice adopted by the industry, the Arbitral Tribunal asserts that such methodology for calculation may be appropriate for the determination of a given number of hours for any purposes other than for an extra-hours indemnification payment.

420. Claimant stated that it had to hire people from its staff to render such training services as well as other people. Although the Arbitral Tribunal does not have knowledge of the cost accounting system adopted by Claimant, it believes that such data and information are accessible to Claimant and could have been produced to substantiate this claim.

421. The Arbitral Tribunal reminds Claimant that a claim under Clause 59 must meet the standard of proof associated with its exceptional nature in the context of a fixed price contract. Claimant should have produced evidence of the number of training hours it had budgeted and also the evidence of the actual total number of hours committed to such training rather than extrapolating such number from a total number that remained unproved.

422. Hence, the Arbitral tribunal dismisses this claim.

### (26) REA-121 – Reefer Doors

423. The Contract scope of work did not include any work to be accomplished on the reefers of the two ships[92]. Nevertheless, during the work performance, the Ministry requested Claimant to accomplish certain

---

[92] See REA EXH. C.121.

additional inspections, replacements and repairs to the reefers. This additional work is described in the OCR attached to REA EXH. C.121 as Reference 1.

424. Nonetheless, the works described in the OCR did not contain any reference to the installation of insulation of the reefer doors, nor was there a requirement to replace the existing doors with new ones. The Parties agreed on the services described in the RAW which is attached to REA EXH. C.121 as Reference 2.

425. Upon reactivation of the refrigeration equipment, Claimant, in view of the formation of frost and ice on the exterior surfaces of the sub freezer doors, conducted further investigation revealing that the existing refrigeration/freezer doors were not insulated between the inner and outer surfaces. Claimant was then required to remove the existing four (4) doors and provide and install four (4) new reefer doors.

426. Despite the replacement of the existing doors with the new ones, the problem persisted, and frost and ice kept on forming on the exterior surfaces. The Ministry claimed at all times that such problem was under the responsibility of Claimant.

427. Claimant then checked all gaskets and concluded that they were not defective. In turn, Claimant detected that the problem was due to the warped condition of the door frames that had to be removed and replaced. But Claimant had no authorization to replace the door frames. It went beyond the RAW requirements in its effort to correct the reefer discrepancies and mitigate the delay in redelivering the ships. Claimant claims a credit of US$ 29,512.

### Decision by the Arbitral Tribunal

428. The case reported by Claimant shows the extra nature of the works when compared with the specifications. The specifications did not provide for the works to be done and it was approved by Claimant submitting a RAW. On the other hand, the Ministry made a partial payment of the doors replaced, but such RAW did not provide for the replacement of the door frames, the very problem that caused the formation of frost and ice on the

external surface of the reefers.

429. Due to the extra works done by Claimant, the Arbitral Tribunal finds that, at least partially, the Ministry recognized and approved the works, and identically paid in part for the doors. The additional efforts to determine the cause of frost and ice formation remained uncompensated. This includes procurement and installation of four (4) reefer doors and the time expended in determining the cause of the problem, such as engineering and inspections.

430. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 29,512 plus interest accruing thereon.

## (27)REA-122 – Fuel Oil Tank Repairs

431. The Contract specifications did not provide for any repair work on the fuel oil tanks[93]. However, Claimant discovered leaks in three of the ships' fuel oil tanks. Since fuel leaks are exceptionally hazardous, as they can cause fires with potentially serious damage and/or injury to personnel, Claimant took immediate corrective action upon discovery of the leaking tanks.

432. Since the fuel oil tanks leaks were discovered on F-21 10 days prior to the scheduled final departure, with a view to avoid any impediment to redelivery of F-21, Claimant expedited the necessary repairs prior to formal authorization of the extra work by the Ministry. However, such repairs were done with full knowledge of the Ministry. After the departure of F-21, a similar inspection was conducted on the fuel oil tanks of F-22, and Claimant found one leaking fuel oil tank and immediately repaired F-22. The Ministry was fully aware of such extra work.

433. Claimant, however, has not received any Contract adjustment in compensation for the added work. Claimant claims a credit in the amount of US$ 14,085 before computing interest accruing thereon.

---

[93] See REA EXH. C.122.

**Decision by the Arbitral Tribunal**

434. Indeed, fuel oil leaks in tanks are extremely hazardous, and the Arbitral Tribunal finds that the extra work done was justified. As aforesaid, the Ministry, through the VIC, was present at the yard and, due to the fact that such leaks were discovered close to the redelivery dates, Claimant could not wait for a formal approval by the Ministry. Fixing this problem was essential to allow the swift and safe departure and trip of the overhauled ships. The extra nature of the work has been evidenced by Claimant.

435. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 14,085 plus interest accruing thereon.

**(28) REA- 123 – Underwater Hull Cleaning**

436. On various occasions, it was necessary for Claimant to provide underwater hull cleaning for the ships. Such cleaning included both routine hull maintenance required by the Contract and other special underwater hull cleanings caused by each ship's extended stay at the yard. Routine cleaning of the submerged portions of the hulls would normally be performed on dry land during the repair period when the ships were in dry dock for some other scheduled Contract work. In fact, the hulls were cleaned during such dry-docking periods as part of the regular Contract work, and no additional compensation is sought for those hull cleanings[94].

437. The additional underwater hull cleaning services for which Claimant alleges it is entitled to remuneration are those cleanings necessary on account of the longer-than-expected time each ship was afloat at the piers after all contractually required dry dock work was complete. The hulls of each ship were cleaned underwater twice between the original cleaning (during dry docking) required by the Contract, and the final departure of the ships from the yard.

438. But for the delays caused by the Ministry, the required sea trials and final delivery of the ships would have occurred before the formation of marine growth reached the level sufficient to require hull cleaning.

---

[94] See REA EXH. C.123.

Underwater hull cleaning is more difficult and less efficient than cleaning the hull in dry dock. However, it is more practical than putting the ships into dry dock for the sole purpose of cleaning the submerged portions of the hull.

439. In order to clean the marine growth from the hulls while the ships were afloat, divers had to manually scrape the barnacles, moss and other marine growth from the ships from bow to stern using only hand tools such as six (6) inch putty knives. The propellers also had to be cleaned using similar methods.

440. Claimant was not compensated for this additional service in circumstances different from those provided by the Contract and the industry practice and claims a credit of US$ 303,125 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

441. Claimant attached to this claim the Divers Force Report, which amounted to a total 2,776 hours, split between F-21 (849 hours) and F-22 (1,927 hours) as well as the daily time logs on which the calculation was based[95].

442. Indeed, the underwater hull cleaning services were not provided by the Contract. As aforesaid, Claimant did the dry-dock hull cleaning as it had undertaken contractually. The underwater hull cleaning became necessary due to the long amount of time the ships were afloat. Claimant claims that marine growth had reached the level that required the cleaning of the submerged portions.

443. Claimant also explains that the use of divers was the more practical solution than putting the ships in dry dock solely for cleaning the hulls. The personnel of the Ministry were present and witnessed the work done by Claimant.

444. The extended stay of the ships caused the need for two (2) additional underwater hull cleanings.

---

[95] See Reference 1 attached to REA EXH. C.123.

445. The Arbitral Tribunal is satisfied with the compliance by Claimant of the standard of proof for a claim under Clause 59.

446. Hence, the Arbitral Tribunal grants this claim and orders the Ministry to pay Claimant the amount of US$ 303,125 plus interest accruing thereon.

### (29) REA-124 – Air Filter Cleaning

447. Pursuant to the Contract specifications, Claimant was required to remove and replace certain existing air moving (or air handling) units (AHUs) and fan coil units (FCUs) with new equipment. Claimant did the work[96].

448. However, Claimant alleges that, due to delays in redelivery of the Frigates attributable to the Ministry, it was required to remove, clean and reinstall numerous dirty and clogged air filters. These were the new air filters that Claimant had previously replaced in accordance with the specifications.

449. Due to the long period the A/C units were in service between the completion of the required filter replacements and the extended redelivery dates, such new air filters had to be removed, cleaned and reinstalled. Claimant alleges that such work was not part of the Contract scope of work, and such work would not have been necessary except for the delays attributable to the Ministry which caused the delayed redelivery of the ships. Claimant seeks compensation of US$ 44,816 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

450. Although Claimant seeks compensation for the extracontractual nature of such removal, cleaning and installation of air filters, it has not produced any evidence of the costs incurred on such work, nor even any evidence of the efforts by its labor force to complete such work.

451. In the end, all that remains is an allegation of extra work done due to the A/C running during the extended stay of the ships between completion

---

[96] See REA EXH C.124.

of the original work and redelivery of the ships.

452. These allegations are not sufficient to substantiate the claim under Clause 59 due to Claimant's failure to comply with the high standard of proof required for such exceptional mechanism for price change.

453. Hence, the Arbitral Tribunal dismisses this claim.

### (30) REA-125 – Air Conditioning Plant Pressure Switches

454. Claimant reports that it accomplished the required modifications, repairs and maintenance on the A/C systems, which included flow meters that would indicate to the new MCS-5 system that an adequate volume of sea water was being supplied to the A/C plants. However, upon completion of the repairs and modifications, tests showed that the velocity of sea water passing through the existing flow meters caused cavitations (the formation of bubbles) in the stream of sea water that rendered the flow meters inaccurate [97].

455. In consultation with the manufacturer of the flow meters, Claimant was then advised that the problem related to the positioning of the flow meters, which needed to be located inside a straight piece of pipe of a certain minimum length in order for accurate readings to be obtained.

456. Claimant submitted to the Ministry the result of its consultation with the flow meter manufacturer and received authorization to proceed with such extra work[98]. Claimant then removed the existing flow meters from all four (4) A/C plants (per ship) and replaced them with new pressure transducers.

457. Claimant claims to be entitled to a Contract increase for the extra engineering and administrative work necessary to investigate and develop a solution. It also claims to be entitled to compensation for the purchase, installation and testing of the eight (8) new pressure switches and for the integration of those new devices into the MCS-5 system. Claimant claims a credit in the amount of US$ 53,262 before computing interest accruing

---

[97] See REA EXH C. 125.
[98] See Reference 4 to REA EXH C.125.

thereon.

## Decision by the Arbitral Tribunal

458. The Arbitral Tribunal finds that the requirements for a claim to be awarded under Clause 59 have been properly met, i.e. (i) the nature of the extra work performed by Claimant to fix the problem with consultation with the manufacturer of the flow meters, (ii) the procurement of the new requisite switches and (iii) the installation of the switches. Claimant has timely obtained the approval of the Ministry for the implementation of the agreed upon solution.

459. Hence, this claim is awarded by the Arbitral Tribunal and the Ministry is ordered to pay Claimant the amount of US$ 53,262 plus interest accruing thereon.

## (31) REA-126 – Blackwater Piping

460. Contract specifications called for Claimant to perform specified maintenance work on the two (2) Blackwater systems existing onboard each of the two (2) Frigates. Claimant was also required to replace 260 linear feet of system piping for each ship. Claimant asserts that it completed the repair of the Blackwater system satisfactorily, replacing the 260 linear feet of deteriorated piping[99].

461. During the testing of the F-22 Blackwater system piping on October 3, 2000, a hole in a section of 5-inch diameter piping was discovered. Claimant claims to have completed the necessary replacement of the deteriorated piping with the concurrence of the Ministry. According to the Claimant, the additional piping installation is extra work compensable under the Contract. However, the Ministry argued that the work should be at no extra cost by considering the quantity of piping required to repair the leak as being covered by the relevant Contract specification. Claimant submitted a RAW to the Ministry but the latter refused to compensate it. Notwithstanding the refusal, Claimant proceeded with the extra work to avoid any delays. Claimant claims a credit in the amount of US$ 2,993

---

[99] See REA EXH. C.126.

before computing interest accruing thereon.

## Decision by the Arbitral Tribunal

462. According to the letter of the VIC attached to Reference 4, upon refusing to approve the payment on account of the replacement of the piping, Claimant was directed to take the quantity of piping from that quantity that still remains from the anti-fire collector, in which case the replacement in question should not generate additional costs for the Ministry.

463. Claimant is silent as to the direction given by the VIC with respect to the use of the remainder of the piping from the anti-fire collector. This was the basis for the VIC to refuse to approve the additional costs. Nonetheless, Claimant states that the compensation claimed is due to the added work of identifying, procuring, handling, storing and installing the new Blackwater system piping and associated flanges. It remains unsettled whether Claimant finally used the remaining piping. In any event, the extra cost claimed includes the procurement of the replacement piping as well as its handling and storage.

464. Such claim also includes the increased time and direct labor hours required for the completion of that system testing. However, Claimant has not provided a breakdown of its costs.

465. Since a direction was given by the Ministry as to the use of remaining existing piping and Claimant, without making any clarification of any possible difficulties encountered in using such piping, Claimant assumed such obligation on its own risk.

466. Hence, the Arbitral Tribunal dismisses this claim.

## (32)REA-127 – Lifeboat Exhaust Risers

467. The Contract specifications required Claimant to overhaul the F-21 and the F-22 lifeboats by making certain ordered repairs and replacements, including but not limited to, replacement of the lifeboat engines. Claimant claims that it came to its knowledge that the preliminary information available prior to the preparation of the bid calculations was both

incomplete and inaccurate. Claimant advised the Ministry that the specifications were defective, and Claimant suggested that the Ministry select another engine model that would have characteristics similar to the existing engines being replaced[100].

468. Claimant completed an engineering evaluation and recommended Cummings 4B 3.9-11 engines as a substitute, together with three (3) other alternatives. The Ministry rejected the preferred and recommended engine by Claimant and selected the Volvo-Penta TMD-31. LHS1, which was among the other options listed by Claimant. As the work progressed, Claimant received an offer from the supplier of the Volvo-Penta engines to provide upgraded engines in lieu of the ones that had been selected and ordered by the Ministry at no cost increase. The Ministry approved such offer[101].

469. Due to technical problems with the exhaust risers, Claimant submitted a RAW, but the Ministry denied approval. Claimant claims that the changes that it had to implement exceeded the minor modifications reasonably expected by Claimant based on the information available prior to the bid preparation, and the resulting additional costs were not included in the Contract price, Claimant being entitled to be compensated for all such change and added work. Claimant had to fabricate and install stainless steel exhaust risers for the four (4) lifeboats aboard each of F-21 and F-22.

470. For the extra work required which was not part of the Contract specification, Claimant claims a credit in the amount of US$ 8,702 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

471. As per Reference 9 attached to REA EXH. C.127, the Ministry decided that the engine installation design was under the responsibility of Claimant and, consequently, that the additional expense was also under its exclusive responsibility.

472. Indeed, there has been a significant change between the original

---

[100] See REA EXH. C.127.
[101] See Reference 5 to REA EXH. C.127.

Contract specifications as to the engines and those that were finally installed. Since the original selected engines were inappropriate, Claimant researched other models manufactured by other manufacturers and recommended one of those. The Ministry selected one of the engines that was on the list provided by Claimant. Claimant ordered the engines but, subsequently, the Ministry was offered another model at no cost. The Ministry approved the installation of such offered upgraded model.

473. Claimant was confronted with technical problems with the exhaust risers and had to arrange for the supply of stainless steel risers. The efforts expended by Claimant were considerable, but the Ministry decided to deny approval for extra work on the grounds that this fell within the scope of work of Claimant. Clearly, due to the changes identified herein, the final effort exceeded the original scope of work which Claimant had, at the appropriate time, indicated was defective.

474. The Arbitral Tribunal finds that the efforts expended by Claimant characterize extra work that must be compensated under Clause 59, and Claimant has met the standard of proof required thereby.

475. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 8,702 plus interest accruing thereon.

### (33) REA- 128 – Helicopter Auxiliary Power Unit

476. Claimant states[102] that after the Contract was awarded, the Ministry requested that it perform additional work on the Helicopter Auxiliary Power Units (APU) which was not part of the original Contract requirements. In response to the request, Claimant developed a scope of work to provide additional services and material desired by the Ministry. A RAW was submitted by Claimant, the Ministry approved it and Claimant provided the added work as specified by the RAW.

477. While performing such services, Claimant found that several circuit cards were missing from F-22's APU. Claimant found that such cards were obsolete and no longer available as for sale as a "shelf" item. Claimant was

---

[102] See REA EXH. C.128.

then advised that the card design had to be recreated, and the new circuit cards would have to be produced as a "special order". Moreover, Claimant also found that the existing F-21 APU circuit cards were in a questionable condition. Claimant then ordered circuit cards for both F-21 and F-22's APUs.

478. Claimant claims that it procured and installed replacements for the missing and deteriorated APU circuit cards on both ships, but the Ministry did not compensate it for the added labor and material to furnish such replacements. Claimant claims a credit of US$ 38,501 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

479. As stated by Claimant, the Ministry's request[103] with respect to the repair of the APUs provided for the "inspection, cleaning, resistance test to insulation and continuity tests; maintenance to internal components and replacement of damaged, deteriorated or missing ones".

480. However, upon detailing the work effort to be expended by Claimant, the following with respect to the APUs was provided by RAW 970111[104], which was approved by the Ministry: "accomplish cleaning, inspection, testing and maintenance to internal components. Replace damaged or deteriorated components".

481. In comparing the texts used in each document, it is clear they are very similar, but the RAW, unlike the Ministry's request, did not make any reference to replacement of missing components with new ones.

482. Despite this lack of reference to "missing components", the Arbitral Tribunal finds that those were contemplated by the Ministry, and that was certainly the Ministry's intention. If the scope of work was to repair the APUs and replace the components that were damaged or deteriorated, the replacement of any missing components was necessary to secure the safe operation of the APUs. The refusal by the Ministry to pay the amount

---

[103] See Reference 1 to REA EXH. C.128.
[104] See Reference 2 to REA EXH. C.128.

claimed lacks reasonable grounds.

483. Hence, the Arbitral Tribunal awards this claim and the Ministry is ordered to pay Claimant the amount of US$ 38,501 plus interest accruing thereon.

### (34) REA-129 - Handrails in Engineering Spaces

484. This claim relates to work items to be accomplished in several engineering and machinery spaces of the ships. The Contract specified various work items in that respect[105]. When the ships arrived, Claimant found that numerous handrails were missing from those spaces in both ships. Claimant fabricated and installed new handrails in those engineering and machinery spaces to replace such missing components because they were required for safe operation of the ships.

485. Claimant then issued OCR 14829 to list material needed to furnish new handrails[106] which was not approved by the Ministry, which stated that when the ships arrived all handrails were in place. The Ministry has alleged that the deck plating had to be replaced and used such argument to justify its position that Claimant was required to furnish and install new handrails. Claimant states that the replacement of deck plating alluded to by the Ministry were not required by the Contract specifications[107].

486. In view of the Ministry position, Claimant reviewed the video recordings of the arrival of the ships and concluded that the handrails in the reduction gear compartments were in fact in place at the time of the arrival. Claimant's review of the video recordings showed that other handrails for the engineering and machinery spaces were in fact missing[108]. Claimant then prepared a RAW which included OCR 14829 listing the material required to furnish new handrails. The Ministry, however, rejected Claimant's request for funding for new handrails[109] and stated that such areas would require new plating, and that Claimant would therefore be

---

[105] See REA EXH. C.129.
[106] See Reference 1 to REA EXH. C.129.
[107] See Reference 3 to REA EXH. C.129.
[108] See Reference 4 to REA EXH. C.129.
[109] See Reference 5 to REA EXH. C.129.

required to furnish new handrails as a part of the new plating installed. Nonetheless, the relevant specifications make no mention of any new additional handrails.

487. Following the discussions with the Ministry, Claimant complied with the demands of the Ministry and furnished new additional handrails that the Ministry required. Claimant claims a credit in the amount of US$ 44,494 before computing interest accruing thereon.

## Decision by the Arbitral Tribunal

488. The report submitted by Claimant on this specific topic and the position assumed by the Ministry are in contradiction. While Claimant claims that the specifications did not provide for its fabricating and installing new handrails, the Ministry states that the equipment and systems located in the four (4) main machine premises were changed between 80% up to 100% from the original arrangement. Therefore, it stated, all the plating and its respective handrailing had to be installed new, since these comply with a new design where the handrails are an integral part of these premises and must be installed new without any type of extra cost for the Ministry[110].

489. Claimant, despite its allegations that the Contract specifications did not provide for the replacement of handrails, did however mention that the Contract work required Claimant to modify and repair certain components of the ships which then led to a need for modification of some handrails. It also provided for the replacement of existing handrails that were badly deteriorated.

490. Claimant, however, has not submitted the applicable Contract specifications so as to provide the Arbitral Tribunal with evidence of the requirements, nor has Claimant explained why the arguments tendered by the Ministry could not prevail from a technical standpoint. Claimant has failed to discharge the burden of proof imposed upon it, and the mere allegations are insufficient to substantiate its claim.

491. Hence, the Arbitral Tribunal dismisses this claim.

---

[110] See Reference 6 to REA EXH. C.129.

### (35) REA-130 – Replacement of Missing Electrical Components

492. The original Contract specifications[111], as revised during WDC, provided that Claimant would replace specified quantities of certain items regarding habitable spaces aboard F-21 and F-22. Claimant found that items such as mirrors, soap dishes, curtains, entertainment cabinets, refrigerators, locker parts and grab bars were missing on both ships.

493. The Ministry, upon reviewing the relevant OCRs and the RAW issued by Claimant, authorized the extra work. Claimant claims, however, that neither OCR included any replacement of the light fixtures or components of the light fixtures that were missing from those habitable spaces ("Quarters") as well as certain electrical items. Claimant issued two OCRs, one for each ship, and submitted those to the Ministry. In its response, the Ministry stated that such work was included and required by OCRs that had been approved. Claimant claims that no replacement of any missing lighting and/or lenses was included in the work authorized by RAW, such as desk lights, bunk lights, vanity lights, fluorescent light covers and red lens for incandescent lightning or component parts for those lights.

494. Claimant has submitted other requests for funding of such extra work by the Ministry, but the Ministry adamantly refused to grant its approval and insisted that Claimant had to replace such missing items as it had approved in the previous RAW.

495. Claimant states that, without accepting the Ministry's position, and without waiving its Contract rights, it replaced the missing items[112] and claims a credit for the work and procurement in the amount of US$ 14,860 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

496. Claimant has produced evidence of the various exchanges of correspondence with the Ministry in connection with the electrical components in the habitable areas such as cabins, chambers or top decks.

---

[111] See REA EXH. C.130 and Reference 1 thereto.
[112] See Reference 11 to REA EXH. C.130.

497. However, after the approval of the OCRs and the RAW, the Ministry took the position that the remaining extra works claimed thereafter by Claimant had already been contemplated by the previous approval granted and were included therein. Thus, the Ministry was adamant in stating that Claimant bore responsibility for replacement of the missing items at no extra cost. Claimant's position is that it found those missing elements after the submission of the OCRs and the RAW.

498. Claimant has not explained why it missed the items in question at the time it was listing the electrical components to be submitted under the OCRs and the RAW. It may be that, having already reviewed the original Contract specifications and made a subsequent search to determine the missing components, Claimant thought any additional search should be as thorough as possible to avoid any future discussions with the Ministry. Thus, it remained disputed between the Parties whether such late claim for missing components was included in the RAW.

499. Claimant was reluctant to obey the Ministry's insistence that it accomplish the work at no extra cost; it reported that had not authorized its personnel to engage in such activities but, in the end, decided to proceed. However, Claimant further claims that it reserved its rights under the Contract and is exercising such rights in this proceeding.

500. The Arbitral Tribunal finds that the main aspect related to such claim remained open and unproved, i.e. the appropriateness of the time for Claimant determining the extra work and the reasons why one could not assert that such missing items were not covered by the RAW.

501. Hence, the Arbitral Tribunal dismisses this claim.

### (36) REA-132 – Life Jacket Storage Lockers

502. The Contract specification behind this claim is the same that supported the preceding claim, *i.e.* C-47[113]. Claimant claims that such specification was very specific as to repairs/replacements required. In sum, Claimant claims that the specification contained no reference to the replacement of

---

[113] See REA EXH. C.132.

life jacket lockers, nor did any part of the Contract required such replacement.

503. During the accomplishment of the work contractually required in the "Quarters", Claimant discovered that several of F-21's original life jacket storage lockers were missing. Claimant also reports that many more of such lockers were in such poor condition that any attempted repair effort would have resulted in a finished product unsatisfactory to the Ministry. Claimant also found that while F-22 had most of her life jacket lockers, substantial deterioration existed on F-22's lockers as well.

504. Claimant claims that at the time the problems with missing and/or deteriorated life jacket lockers came to light, Claimant was exerting a maximum effort to achieve ship redeliveries in early 2000; in order to mitigate the scheduled impact of the missing/deteriorated life jacket lockers, it removed usable lockers from F-22 and installed them in F-21.

505. Later, Claimant manufactured and installed new lockers in F-22 to replace the lockers used on F-21. Claimant claims that the work was under constant supervision of the VIC and that the Ministry did not object to the substitutions. In the presence of an OCR prepared by Claimant, the Ministry argued that the OCRs and the RAW referred to in the preceding claim covered the replacement of missing and damaged furniture and appliances in various staterooms and other quarters, including life jacket storage lockers. Claimant asserts that no life jacket storage lockers were on the specified list in the RAW.

506. Despite the successive requests for compensation for this work placed by Claimant with the Ministry, the Ministry has not approved. Therefore, Claimant claims a credit of US\$ 89,135 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

507. The analysis of the contractual specification C-47[114], as revised by the WDC, is indeed very specific and there is no mention of any required work

---

[114] See item (c) Quarters of Reference 1 attached to REA EXH. C.132.

related to the life jacket storage lockers. The language of such specification leaves no room for doubts of the additional nature of the work done by Claimant. Even if one might attempt to state that the language encompassed the life jacket lockers as part of the furniture, this would only contemplate "repair" but not "replacement". The specification uses different words to describe the scope of work and they may not be used interchangeably. Thus, "repair" and "recovery" have different meanings than the one ascribed to "replacement". Claimant is claiming a credit for having fabricated and installed and, more generally, replaced the lockers of F-22, and not a mere repair or recovery. Furthermore, the lists of items and other components missing on both F-21 and F-22 do not contain any reference to life jacket lockers[115]. Such lists are attachments to the OCRs to which the Ministry refer.

508. While in the preceding claim it remained unproved that the missing electrical components had not been included in the OCRs and the RAW, in this case, however, the lists of components made no reference to life jacket lockers and such documentation does not provide sufficient evidence that the fabrication and installation of the fifty (50) lockers was within the scope of work of Claimant. Claimant has satisfied the requirement regarding the standard of proof for the claim to qualify under Clause 59 of the Contract.

509. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 89,135 plus interest accruing thereon.

## C.   2nd Category of Claims – Claims to Which the Ministry Has Only Responded in Annex A

510. Claimant states that the Ministry's only attempt to address 97 other claims comes in the form of Annex A to the Ministry's Rejoinder (hereinafter "Annex A"). Those claims are not mentioned in any of its Memorials or attached witness statements, and were not addressed, directly or indirectly, by the Ministry at the hearing on the merits. The only reference to those claims is in the aforementioned Annex A and in a *Nota Informativa* allegedly prepared by the former head of the VIC, Vice Admiral Del Rosario

---

[115] See Reference 4 attached to REA EXH. C.132.

(hereinafter the "Del Rosario Memorandum")[116].

511. Claimant alleges that the Del Rosario Memorandum is not contemporaneous evidence relating to any of the claims. It is, Claimant alleges, an after-the-fact commentary that was, at best, prepared by a Ministry official that offers little corroborative information in support of the conclusory statements contained therein. At worst, Claimant says, it was a document prepared by a subordinate to Vice Admiral Del Rosario, who was not even on site – or is an outright forgery[117].

512. Claimant claims that it has had no opportunity to confront Vice Admiral Del Rosario and cross-examine him. The Ministry refused to provide it with one, notwithstanding a direct request by Claimant. Claimant also states that the Del Rosario Memorandum should be accorded no evidentiary weight by the Arbitral Tribunal and that, by extension, Annex A should also be disregarded because it is simply a reformatted version of the Del Rosario Memorandum.

513. In closing its written arguments, Claimant asserts that according the Del Rosario Memorandum or Annex A any weight at all would violate fundamental notions of due process under Venezuelan law and violate the principle of party equality enshrined in Venezuelan law and the UNCITRAL Model Rules.

### Decision by the Arbitral Tribunal

514. Although Claimant asserts that the Ministry has repeatedly refused to join the discussion regarding the 132 claims submitted to the Arbitral Tribunal, the Ministry contends that, upon submission of its Statement of Defense and Counterclaim, it discussed not only, when applicable, aspects of the claims, but also provided the Arbitral Tribunal with the document prepared by the Head of the VIC. Such Technical Report prepared by the Head of the VIC (namely, Vice Admiral Del Rosario), the Ministry alleges, contains a detailed response to each one of the claims that Claimant included in the original REA, which was the only one Claimant notified the

---

[116] Ex. R-048 to the Ministry's Statement of Defense and Counterclaim.  It is reproduced at J1875.
[117] See Claimant's Post Hearing Brief, pages 28 and 29.

Ministry of during the life of the Contract.

515. The Ministry further asserts that the VIC has expressed its views on all claims brought by Claimant and has demonstrated in each case that they are groundless.

516. The Arbitral Tribunal finds that the Ministry produced the evidence that, in its own opinion, substantiated its position with respect to the claims. The Arbitral Tribunal rejects Claimant's arguments that the fundamental notions of due process and the party equality principle under Venezuelan law might have been violated. Those arguments lack reasonable grounds since the Parties had every opportunity to present their cases. Notwithstanding Claimant's argument that Annex A is no more than a reformatted version of the TR prepared by Vice Admiral Del Rosario, even if it were, and even if Claimant could not cross-examine Vice Admiral Del Rosario, this would not render Annex A of no effect. Claimant is reminded that the absence of Vice Admiral Del Rosario from the hearing on the merits is a matter superseded at this point, and there is no room for Claimant to re-open at this stage the discussions on such matter. The presentation of Annex A by the Ministry during the arbitration confers upon it the nature of an opposition by the Ministry to the claims submitted by Claimant, and, therefore, nothing that might be implied therefrom would reasonably justify a decision by the Arbitral Tribunal to disregard such Annex in the process of making the decisions required by the Parties.

517. The Arbitral Tribunal finds that the data and information contained in Annex A do represent the Ministry's valid position vis-à-vis the claims under discussion. Whether such data and information are convincing or not is a matter to be decided on a case-by-case basis.

518. The materials made available to the Arbitral Tribunal in the course of the arbitration are deemed sufficient to allow the thorough analysis of the claims. It is incumbent upon the Arbitral Tribunal to decide the claims in light of the evidence brought by the Parties and for that reason Annex A shall be maintained in the record and the Ministry's position expressed therein shall be reported and weighted, as the Arbitral Tribunal sees fit.

**Note on the Ministry's Designated Subcontractors**

519. Claimant asserts that the Contract[118] required it to award, on behalf of the Ministry, subcontracts to three (3) Designated Subcontractors, to wit:

> (x)   Procurement and installation of the Electronic Warfare (EW) system by Electronic Systems Limited (Elisra), of Israel;

> (y)   Major maintenance of two (2) AB-212-ASW helicopters by Israel Aircraft Industries (IAI), of Israel; and

> (z)   Major maintenance of: (1) the OTOMAT Missile System MK-2, (2) the Teleguidance System TG-2, and (3) sixteen (16) OTOMAT missiles and their containers by Alenia Difesa, Missile Defense Systems, of Italy.

520. The subcontractors designated under (x) and (y) above were selected by the Ministry following a competitive solicitation process in accordance with the Venezuelan Competitive Bidding Law and its Regulations, whereby the Ministry specified the technical specifications to be met[119]. Moreover, it was contractually established that the Contract should include provisions from the contracts with the Designated Subcontractors in items (x), (y) and (z) above which evidenced the obligations of these Designated Subcontractors to the Ministry with respect to the work to be accomplished by them. The payments due to the Designated Subcontractors were to be made by Claimant under the Contract.

521. Claimant was to administer the subcontracts referred to above in accordance with Clause 36, Fourth Paragraph of the Contract, and the subcontractors' terms and conditions, which were required to conform in all respects to said provision. Claimant had the duty to administer the subcontracts and perform several functions with respect to the technical specifications, as provided by such paragraph. Clause 36, Fifth Paragraph spelt out the Claimant's limited liability to the Ministry with respect to the Designated Subcontractors.

---

[118] See Clause 36 of the Contract.
[119] See First Paragraph of Clause 36 of the Contract.

522. In sum, the work to be performed by the Designated Subcontractors was to be done separate and apart from Claimant's modernization and repair efforts. Lastly, the Contract required the Ministry to save and hold Claimant harmless from any and all costs which it might incur as a result of delays or disruption associated with such Designated Subcontractors' late delivery.

### (37) REA-1 – Electronic Warfare ("EW") House Extension

523. This claim relates to the added work which Claimant had to perform so that the Designated Subcontract could be carried out by Elisra for the new EW system[120].

524. Elisra was responsible for the design, procurement and installation of the EW systems on F-21 and F-22. Elisra had to complete the work within twenty (20) months after the Contract was awarded to Claimant by the Ministry. In the process of developing the EW design, Elisra made numerous visits to Claimant's shipyard to verify the existing shipboard conditions. During one of these visits, Elisra and Claimant conducted a joint survey of the EW room to determine the optimum arrangement of the equipment selected by the Ministry for installation within such space.

525. In order to assure the feasibility of the proposed EW room arrangement, Claimant and Elisra constructed a cardboard mock-up of the new equipment selected by the Ministry. The full-size mock-up was placed aboard the ships to try different arrangements and to assure that the new Ministry-selected equipment would fit into the existing space within the EW room.

526. With a view to accommodate the Ministry's equipment, Claimant prepared and issued a Manufacturing Support Change Record (MSCR) to modify the EW room to incorporate into the EW room the existing breezeway between the existing EW compartment and the existing forward Fire Control compartment. The Ministry approved the MSCR and changes described thereby were incorporated increasing the size of the EW room.

---

[120] See REA EXH. C.1.

527. Claimant reports that it did extra work in assisting Elisra by designing a new, enlarged, EW room aboard the ships and re-planning the EW room arrangement. Claimant also procured material and made the necessary structural modifications to both Frigates. Throughout the process, the Ministry witnessed Claimant's work, and the Ministry knew or should have known that the modifications were necessary as a result of the Ministry's defective specifications. The Ministry approved the modification of its ships and was clearly aware that those modifications were being performed by Claimant.

528. Claimant claims it is entitled to compensation for all labor and material provided which exceeded the Contract scope of work, and seeks US$ 403, 320 before computing interest accruing thereon.

529. Pursuant to Annex A, the Ministry asserts that the Contract contains no provision regarding the payment of any "compensation" for any extra work done and that the provisions in Clause 8 and the rules contained therein control. The Ministry further claims that the specifications were not defective and that Claimant's assertion that the specifications did not provide for the implementation of any changes prior to the installation of the equipment is incorrect, since the subcontract entered into with Elisra contained a description of Claimant's responsibility, particularly to remove of all existing equipment and all works for the installation of new equipment. Finally, the Ministry refers to the language of Clause 56 of the Contract to state that if works had not been approved, no payment would become due.

530. Respondent asserts that such claim is groundless because the work allegedly treated as extra work was within Claimant's contractual scope of work.

### Decision by the Arbitral Tribunal

531. As a matter of fact, neither Claimant nor the Ministry has brought to the attention of the Arbitral Tribunal the technical specifications regarding Elisra's subcontract detailing the scope of work of Elisra and Claimant, respectively. Nonetheless, the role played by Elisra differed substantially

from the one ascribed to Claimant. This is a fair conclusion that derives from the nature of the type of contract entered into by the Ministry and Elisra whereby Claimant, as defined by the Contract, was expected to enter into the subcontract, to administer it and make payments.

532. While the Ministry claims that the subcontract contained a description of the works to be performed by Claimant and, therefore, the changes introduced to accommodate the new equipment supplied by Elisra were under such scope of work, the Arbitral Tribunal finds that this assertion may not prevail. In reviewing Reference 5 to REA EXH. C.1, one may conclude that had such works been within Claimant's scope of work from the start, the MSCR would not have been necessary and the Ministry should not have approved it.

533. The Ministry does not deny that the works were necessary to accommodate the new equipment, nor that such works were done. The Ministry simply states that such works did not trigger any form of compensation since they were included in the scope of work of Claimant.

534. This argument cannot prevail. The Ministry's specification of the new equipment did not take into account its size and the physical space available for installation. Again, following the execution of the Contract, Claimant and the Ministry held various WDCs and, had such incompatibility been known to the Parties, it is certain that the specifications would have been amended to reflect the works deemed necessary. This did not happen, and the specifications remained unchanged. Thus, the need for the works accomplished by Claimant arose in the course of the several visits to the ships by Elisra, and there is no trace in the record that it was incumbent upon Claimant to do such work from the inception.

535. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the total amount of US$ 403,320 plus interest accruing thereon.

**(38) REA-2 – Gas Turbine ("GT") Units; REA-3 – Gas Turbine Fuel Control and Starters; and REA-91 – Gas Turbine System Design Defect**

536. Claimant asserts that, while the Ministry-required changes related to these claims are separately supported and analyzed, the matters presented in the three (3) REAs are inextricably interrelated, and, as such, should be reviewed and analyzed collectively. The Arbitral Tribunal agrees with Claimant's assertion and shall, therefore, proceed to describe, analyze and decide the three (3) REAs collectively.

### REA-2 – Gas Turbine Units[121]

537. Claimant states that this REA covers certain of the items of work on, or related to, the LM-2500 Main Propulsion Gas Turbine Units manufactured by General Electric ("GE") for Frigates F-21 and F-22, which items of work were added to, changed, or delayed by the Ministry. Such extra work was mandatory, and given that GE was the sole source for repairs, service and maintenance of the Gas Turbines, GE was allegedly the equivalent of a Designated Subcontractor under the terms of the Contract. Claimant alleges that, therefore, it had no control over the scope of work which GE determined was necessary to restore the Gas Turbines to proper working order. The Ministry was obligated to timely authorize and pay for (i) all of GE's work on the Gas Turbines, and (ii) all Claimant's support of GE's work.

538. Claimant reports that the Contract Specifications[122] called for certain work to be performed on the GTs installed in Frigates F-21 and F-22, but such specified work was to be performed in-place, *i.e.* without removing the GTs from the Frigates and in accordance with twenty-five (25) GE Service Bulletins[123]. The only other work, in addition to the work required by the Bulletins, was replacement of resilient mounts, certain calibration, and the performance of operational tests at the completion of the specified Gas Turbine work.

---

[121] See REA EXH. C.2.

[122] See Reference 1 to REA EXH. C.2.

[123] Service Bulletins were GE-recommended changes and upgrades which were intended to bring the Gas Turbines operationally up to current, state-of-the-art, standards. Service Bulletins were also intended to effect upgrades to the Gas Turbines without removing them from the ships.

539. Claimant avers that during the bidding phase it obtained quotes from GE for the specified Service Bulletin work, and Claimant priced its accepted bid accordingly. However, after the execution of the Contract, the Ministry called several WDCs during which it tasked Claimant with determining if additional GE Bulletins had been issued for the Frigates' GTs during the approximately five-and-one-half-year period between the Buena Pro award in June 1992 and the Contract award on December 17, 1997. Claimant then found that six (6) additional Service Bulletins had been issued, and on April 23, 1998, Claimant requested the Ministry to authorize performance of such additional GE Service Bulletins. The Ministry, however, delayed authorizing such work until February 15, 1999[124]. The Ministry's delays impacted Claimant's ability to perform basic planning and scheduling efforts.

540. GE also performed a shipboard inspection of the GTs between April and May 1998, and the resulting GE report was dated May 6, 1998[125]. The GE inspection was witnessed by both the Ministry and Claimant production personnel. Defects discovered by the GE representative during the inspections included evidence of possible previous flooding of the spaces with salt water and areas of corrosion throughout the GTs.

541. Following a long explanation on the measures taken and the meetings held with the Ministry, Claimant asserts that it prepared RAW 970018 for the added work and provided it to the Ministry. Claimant reports that long letters were exchanged with the Ministry and the Ministry took a position attempting to hold Claimant responsible for extra work.

542. While the original specifications provided for the work to be performed in-place, Claimant states that on account of the additional GE-recommended service work, it became more practical and efficient to remove the GTs from the ships for performance of the revised scope of work. Once the GTs were in Claimant's shops, other existing deficiencies were found that eventually led to many of the GT components being shipped to GE for further evaluation and testing to determine the full extent of repair work needed. Once certain GT components were dismounted and

---

[124] See Reference 10 to REA EXH. C.2.
[125] See Reference 4 to REA EXH. C.2.

inspected at GE's maintenance facilities, other additional, existing defects/discrepancies of the GT components were found and reported to the Ministry.

543. Claimant reports that in the end the Ministry authorized the performance of all the extra work recommended by GE, and GE, supported by Claimant, carried out such extra work concurrently with the originally specified work.

544. Claimant alleges that, because of the fundamental alterations in the cost and time of Contract performance brought about by the mandatory requirements to correct the massive, hidden, GT defects on both Frigates, it would be unconscionable to attempt to hold Claimant responsible for their correction. Claimant claims to be entitled to reimbursement for all costs expended in carrying out all the original GT work plus the added, changed, and delayed GT work described in REA EXH. C.2, as well as for extra planning, rescheduling, and research involved with the efforts described in such REA. The reimbursement claim submitted by Claimant covers (i) total actual direct labor hours, (ii) total actual material, subcontractual and other direct costs and (iii) same practices regarding burdens and profit used to price and settle agreed RAWs were applied to price this change[126].

545. The Ministry disputes the claim submitted by Claimant. While the factual reports of both do coincide, the Ministry raises the issue regarding the original inspection of the ships upon their arrival at the shipyard. Pursuant to the Ministry, and in light of the provision contained in Clause 12, it is stated that the reason for the Ministry having included Clause 12 in the Contract was to assure that Claimant prepare a scheduling of all works necessary to repair and deliver the Frigates on the agreed upon date.

546. The Ministry further alleges that Claimant did not accomplish any works on the GTs until March 2000 when, at Claimant's entire convenience, GE only started dismantling the GTs to proceed with the works and transferred them to Claimant's shops. Once in the shops, the GTs were inspected one more time and the need for additional work was determined

---

[126] REA EXH. C.2 is accompanied by 166 supporting documents.

by GE. Based on the foregoing, the VIC stated that, had a thorough and detailed inspection been conducted in 1998, most of the problems would have been identified with reasonable anticipation. The VIC concluded its analysis by stating that the inspection pursuant to Clause 12 of the Contract was deficient, presumably because both Claimant and GE trusted that the low number of hours of operation of the turbines did not require a detailed inspection.

547. The Ministry further asserts that, upon the authorization for the performance of the additional work, the prices were agreed upon by both Parties and that no extension of time was established to account for the additional time required for the accomplishment of the extra work. The Ministry then asserts that this equaled Claimant's acceptance to accomplish the works within the original term of the Contract.

548. The Ministry closes its arguments by stating that the claim is not based on reasonably accepted grounds, nor does REA EXH. C.2 contain any justification for the Claimant's delay in redelivering the Frigates.

### REA-3 – Gas Turbine Fuel Control and Starters

549. According to Claimant, this claim focuses on two (2) vital components for the GT units to operate properly – fuel controls and starters[127]. Claimant reports that after the arrival of F-21 at Claimant's yard, the VIC removed the pneumatic starters from the port and starboard gas turbines. Claimant reported such removals in OCRs 10030 and 10031[128]. The Ministry then installed substitute starters which were later deemed defective by a representative of GE[129]. Similarly, the VIC also substituted fuel controls on the gas turbines following the arrival of F-21 which GE found defective[130].

550. Claimant then prepared OCR 10081[131] in response to GE's recommendation. OCR 10081 also covered the removal and repair of the defective Ministry-substituted F-21 starters and their reinstallation after

---

[127] See REA EXH. C.3.
[128] See References 2 and 3 to REA EXH. C.3.
[129] See Reference 4 to REA EXH. C.3.
[130] See Reference 4 to REA EXH. C.3.
[131] See Reference 5 to REA EXH. C.3.

completion of repairs and the removal/repair/reinstallation of the Ministry-substituted but defective F-21 fuel controls. Claimant also prepared RAW 970018[132] which, after negotiations with the Ministry, included the direct labor hours required for removal and reinstallation of such units[133]. The scope of the RAW was modified twice, in July and October 1998[134], but the scope of work to be performed on F-21 remained unchanged.

551. Claimant states that the Ministry agreed to compensate it for 16 machinist labor hours each, (64 manhours total) to remove and install the fuel controls and starters on F-21 pursuant to the agreed scope of work covered in RAW 970018. Nonetheless, Claimant underscores that the scope of work agreed upon by the Parties did not address all of the added labor and materials which it had to provide because the substitute fuel control and starters installed by the Ministry on F-21 were defective and had to be removed, shipped out, repaired, received, warehoused after repair and finally reinstalled on the turbines and tested in place.

552. Furthermore, the scope of RAW 970018 did not address (i) the added labor required to prepare and process OCRs 10030, 10031 and 10081 for removal, repair, and reinstallation of starters and fuel controls or (ii) the added labor required to prepare and process OCR 14009[135] for gaskets and materials required for reinstallation of the F-21 gas turbine starters or (iii) the added labor required to prepare and process OCR 14010[136] for gaskets, "O" rings, and other materials required for reinstallation of the F-21 gas turbine fuel controls.

553. For its part, the Ministry contends that all work related to gas turbine fuel control and starters was authorized by means of RAWs. Such RAWs, as per the Ministry, contain the description of the scope of work and the amount payable. The amount due was paid by the Ministry following the Perceptive Control. There is no delay associated with this work. The equipment was reinstalled aboard F-21, tested and accepted. The Ministry

---

[132] See Reference 6 to REA EXH. C.3.
[133] See Reference 7 to REA EXH. C.3.
[134] See Reference 8 to REA EXH. C.3.
[135] See Reference 9 to REA EXH. C.3.
[136] See Reference 10 to REA EXH C.3.

does not deny but rather confirms that, upon arrival of the ships, the VIC removed the pneumatic starters from the port and starboard gas turbines, but it states that Claimant had to provide the same maintenance services, there existing no room for delay.

554. The Ministry closes its arguments by stating that the claim is not based on reasonably accepted grounds, nor does REA EXH. C.2 contain any justification for Claimant's delay in redelivering the Frigates.

### REA-91 – Gas Turbine System Design Defect

555. This claim is related to the radar system and, in particular, to the damages produced to the radar cables and antenna[137]. While the EXH contains a full description regarding the attempts to replace the radar system as a whole, the Arbitral Tribunal must focus on the portion of the claim related to the gas turbine system, which is more limited in scope.

556. The origin of this claim is associated with the analysis carried out by IAI/Elta, in Israel, at the request of the Ministry, by which it was determined that the F-21 antenna had been damaged by exposure to excessive temperatures. As per Claimant, the 3D-STAR antennae are designed to operate at temperatures below sixty-five degrees Centigrade.

557. Claimant reports that it reviewed the data supplied by IAI/Elta and concluded that the source of the antenna heat damage was the GT exhaust gases. In consultation with GE, the GT manufacturer, Claimant evaluated several different options to alleviate the antenna overheating condition. As evidenced by the extensive e-mail chronology[138], Claimant also enlisted the aid of Davis Engineering, a Canadian firm which was also involved with resolving excessive GT exhaust temperature issues on Italian LUPO frigates. Claimant revisits all the solutions conceived to attempt to solve the problem and states that the Ministry, following a sea trial, directed Claimant how to proceed[139] but also alleged that solving the antenna overheating problem and all associated costs were included in Claimant's Contract

---

[137] See REA EXH. C.91.
[138] See Reference 10B to REA EXH. C.91.
[139] See Reference 12 to REA EXH. C.91.

responsibilities. Claimant, in response to the Ministry's directions, advised the Ministry that a pre-existing defective design caused the heat damage problem. Photographs taken of the existing RAN-10S antennae when the ships arrived at the shipyard strongly support the premise that the existing RAN-10S antenna on F-21 sustained significant damage from high heat prior to the arrival[140]. Claimant further analyzes the technical aspects of the antennae.

558. Claimant further highlights that the damage to the antenna resulted from an existing, as-built, design error, and such damage was in no way the result of any action, omission, or negligence on its part. Hence, Claimant states that any costs to correct the effects of the pre-existing design flaw were the responsibility of the Ministry.

559. Despite Claimant's request to be allowed to measure GT exhaust temperature on other frigates of the Class[141], the Ministry refused Claimant's request[142], and Claimant expressed to the Ministry that the decision made in postponing the sea trial that had been scheduled due to the problems with the antenna was clearly a coercive attempt to force it to initiate actions to correct the pre-existing exhaust temperature condition without receiving compensation for the associated cost and delay[143].

560. Claimant asserts that despite the work done to correct the antenna, the Ministry refused to pay for the work and modifications that Claimant had accomplished as part of its attempts to correct the existing frigate design deficiency, although the Ministry did pay Davis Engineering US$ 14,500[144].

561. Claimant finally asserts that the Ministry should be held responsible for the extra efforts, but also the delay in ship redelivery caused by the defective GT exhaust system design, which remained unresolved, since without the proper authorization by the Ministry for the proposed changes, Claimant could not proceed beyond the technical engineering study

---

[140] See References 14 to 18 to REA EXH. C.91.
[141] See Reference 22 to REA EXH. C.91.
[142] See Reference 25 to REA EXH. C.91.
[143] See Reference 26 to REA EXH. C.91.
[144] See Reference 34 to REA EXH. C.91.

authorized by the Ministry.

562. The Ministry has made no special comment with respect to REA-91, save for alleging delays incurred by Claimant in redelivering the Frigates attributable to the lack of planning in the maintenance work on the GT.

### Decision by the Arbitral Tribunal

563. The three (3) related REAs deal with one of the most important pieces of equipment installed on the Frigates. Despite the lengthy report provided by Claimant with respect to each one of them in justifying the equitable adjustment, the discussion in each of the REAs tends to coincide. While the Ministry does not deny that the services spelt out by Claimant were accomplished, the Ministry strongly refutes the claim for payment for any extra efforts expended by Claimant. In general, the arguments raised by the Ministry against paying for the additional costs claimed are of two varieties. The first derives from the fact that the allegedly extra work was contemplated in the scope of work under the Contract. The second consists of the Ministry, having recognized the "extra" nature of some of the works or portions thereof, claiming that the costs now being claimed were included in the RAWs prepared by Claimant and approved by the Ministry.

564. In reality, the Ministry's contentions have not gone beyond arguments, whereas Claimant has brought to the attention of the Arbitral Tribunal detailed descriptions of the events occurred accompanied by supporting documentation. The details provided by Claimant allow the Arbitral Tribunal to rely on them. In each of the three (3) reported REAs, the work undertaken by Claimant was in support of that being performed by other companies. Moreover, while Claimant is a reputable shipyard and renowned expert in its businesses and operations, in certain cases where the Ministry had selected its Designated Subcontractors, Claimant's work was in addition to the scope incumbent upon the Designated Subcontractor, as designed by the relevant subcontract.

565. As aforesaid, the VIC had, among other functions, oversight, and undoubtedly witnessed the development of the research efforts and the work undertaken by Claimant. Moreover, the nature of the problems with

which Claimant was confronted with respect to the GTs could hardly have been described and contemplated by the Ministry, Claimant and the technical specifications.

566. The technical specifications may, in the eyes of a layperson, look very broad, and the tendency would be to conclude that any works that are related and may fit into a certain category of works would be deemed contemplated by the specifications.

567. Nonetheless, the mere fact that the Parties worked in many instances on the basis of revised specifications derived from their joint WDCs and, further, that various RAWs were prepared and approved by the Ministry clearly shows that there were gaps to be filled during the performance of the works.

568. It is true that the Frigates were inspected several times by Claimant in Venezuela, but it may not be disregarded that with the passing of time the ships were affected by normal wear and tear. The effects from normal wear and tear were identified by Claimant inasmuch as possible upon the arrival of the ships. While the Ministry claims that Claimant failed to conduct a thorough inspection when it could have identified the problems with reasonable anticipation, this may not be taken as appropriate to any and all cases, especially those described in these three (3) REAs. The problem related to the overheating of the radar antenna would not be determined by a mere inspection prior to the commencement of the works, especially because the Ministry attempted to impute it to Claimant's action, omission, or lack of diligence. The failure by the Ministry to authorize the implementation of the solutions proposed by Claimant left this problem unresolved.

569. In other cases, the problem could only be identified upon the equipment or components being disassembled by Claimant during the work. Moreover, in the case of the GTs, it was agreed to update them in reliance upon the latest Service Bulletins issued by GE. While the passing of time may not be treated as a fundamental element to influence the decision, the Arbitral Tribunal has to take it into account to evaluate the reasonableness of the work allegedly required from Claimant.

570. This claim by Claimant is based on Clause 59 of the Contract. Claimant has complied with the standard of proof required thereby in demonstrating that the works by their own nature were not included in the scope of work defined by the Contract. The redefinition of the scope by virtue of WDCs, and the fact that some of them were the subject of RAWs evidence that they fell outside the scope. The existence of a RAW did not mean that any and all costs were contemplated thereby. The Ministry, however, limited itself to disputing the assertions made by Claimant without producing any evidence of its allegations. The general nature of the comments brought by the Ministry to substantiate its contentions was found insufficient by the Arbitral Tribunal to overcome the strength of the facts reported and the supporting documentation.

571. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay to Claimant the amount of US$ 3,606,375 plus interest accruing thereon.

### (39) REA-6 – Anchor Windlass

572. Claimant asserts[145] that Contract Specification C.29 called for certain work to be performed on the equipment generally referred to as the "Anchor Windlass"[146], but it also states that the language of the Specification was inconsistent in that it was both explicit and indefinite at the same time. While it delineated the specific maintenance/repair/replacement work to be accomplished[147], for standards associated with maintenance/repair/replacement of pumps and valves, the scope of work required by some parts of the Specification was poorly defined and unclear.

573. Specification C.29 was titled "Winch and Cable Stand System (Capstan)", and each Frigate had two (2) Capstans (or Anchor Windlasses) mounted on the forward weather deck (one Port and one Starboard) and one (1) Winch mounted on the after main deck. This claim deals specifically

---

[145] See REA EXH. C.6.
[146] See Reference 1 to REA EXH. C.6.
[147] See References 2 and 3 to REA EXH. C.6.

with the Anchor Windlass components located above the weather deck and the hydraulic pumps and motors for two (2) Anchor Windlasses and one (1) winch for each ship. Claimant clarifies that when the added work associated with the Anchor Windlass is discussed, such work involves only the capstans, wildcats, and drive trains for the two (2) Anchor Windlasses. However, when describing the added work on hydraulic pumps and motors, those equipment are the hydraulic pumps and motors for two (2) Anchor Windlasses and one (1) winch.

574. Claimant claims that such work was scheduled to start on March 18, 1998 in light of the original Contract completion date of November 17, 1999. Claimant also alleges that, due to the delays caused by the Ministry, the work did not commence until on June 1, 1998. Moreover, Claimant alleges that the lack of Ministry-furnished technical documentation, the Ministry's persistent incorrect interpretation of the Specification requirements, and other Ministry failures to meet its responsibilities under the Contract caused Claimant to experience significant delay, disruption, and added cost. As per Claimant, from early June 1998 through early September 1998, it produced various OCRs[148], some of which identified material needed to accomplish the production requirements of the Specifications. Some other OCRs[149], however, documented problems that were either not anticipated or were unexpected in terms of their magnitude.

575. Some OCRs[150] presented Claimant's recommendation to replace all the Anchor Windlass components located above the weather deck on both F-21 and F-22 due to their extremely deteriorated condition. The Ministry responded to that[151] recommendation by stating that such repairs had to be performed so that the system would be in a perfect state of operation as required by the Contract, and should therefore generate no additional costs.

576. Claimant also reports its attempts to locate a company that could perform the works, and submitted to the Ministry two (2) vendors who,

---

[148] See References 4 through 39 to REA EXH. C.6.
[149] See References 22-30, 32, 33 and 39 to REA EXH. C.6.
[150] See References 6 and 8 to REA EXH. C.6.
[151] See Reference 40 to REA EXH. C.6.

having visited the shipyard, submitted bids to rebuild/refurbish the equipment[152]. Claimant then submitted OCR 11357 to the Ministry[153] recommending that the Anchor Windlass be rebuilt. After consultations with the Ministry, Claimant submitted a RAW[154] recommending that the four (4) Anchor Windlasses be rebuilt by McElroy Marine Machinery for a price of US$ 204,356 per ship. The Ministry responded by a memo in which it requested that Claimant prepare another proposal to replace the four (4) systems, rather than have them rebuilt.

577. Nonetheless, while Claimant was in the process of responding to the Ministry's request and revising the RAW, the Ministry vacillated as to whether it wanted to have the systems replaced or rebuilt[155]. Claimant then issued a stop work order[156] on anchor windlass equipment repairs, since Claimant expected to receive new direction from the Ministry to replace the existing equipment. Claimant further states that whenever anchor windlass replacement was considered, it was understood by all parties involved, including the Ministry, that it meant replacement of the entire system, including hydraulic pumps and motors.

578. Claimant submitted a revised proposal to the Ministry for the installation of new anchor windlass systems at a price of US$ 386,787 per ship[157]. The Ministry responded to Claimant and generally agreed with the revised proposal; however, it expressed concern over the amount of additional piping included in the proposal[158]. The Parties conducted a joint inspection of the systems onboard ship and while resolving the piping issue, they found previously unknown structural modifications that needed to be taken into account in the revised proposal[159]. Based on such results, Claimant prepared another proposal which amounted to US$ 484,786 per ship[160]. Such proposal was rejected by the Ministry and it directed Claimant

---

[152] See References 43 and 44 to REA EXH. C.6.
[153] See Reference 45 to REA EXH. C.6.
[154] See Reference 46 to REA EXH. C.6.
[155] See References 48, 49 and 50 to REA EXH. C.6.
[156] See Reference 51 to REA EXH. C.6.
[157] See Reference 52 to REA EXH. C.6.
[158] See Reference 53 to REA EXH. C.6.
[159] See References 54 through 59 to REA EXH. C.6.
[160] See Reference 60 to REA EXH. C.6.

to prepare still another proposal that provided for rebuilding the existing units rather than replacing them with new equipment[161].

579. Claimant reports that it worked together with the Ministry to locate a vendor for the hydraulic pumps and motors. Claimant brought Vickers into the shipyard to inspect the equipment, and the Ministry furnished Claimant with a point of contact in Italy, Fincantieri[162]. On August 2, 1999, Claimant submitted to the Ministry a fourth detailed proposal on the anchor windlasses[163] which was approved on September 2, 1999 by the Ministry, and Claimant alleges that such proposal was essentially the same as the OCR that had been submitted to the Ministry seven (7) months earlier on January 27, 1999[164]. Claimant alleges that the actions and inactions of the Ministry directly caused a system completion delay of more than seven (7) months.

580. From August through November 1999, Claimant brought vendors to inspect the hydraulic components, prepared OCRs for material identification and reporting tests results, and negotiated with Fincantieri to the point of issuing that company a letter of intent for the purchase of hydraulic system repair parts[165]. On November 4, 1999, Claimant submitted an OCR[166] dealing with the hydraulic pumps and motors for both anchor windlasses and the winch, and it recommended the procurement of repair parts which were beyond the scope of work. The Ministry disavowed any responsibility in the matter, and it insisted that the repair parts were covered by the Contract. On December 3, 1999, during the Condition Report Meeting, the Ministry's on-site representative orally directed Claimant to stop work on the hydraulic pumps and motors. Claimant responded to the Ministry's oral directions whereby it notified the Ministry that its actions in essence had made it impossible for Claimant to complete repairs on the hydraulic pumps. After negotiations with the Ministry, it approved the RAW prepared

---

[161] See Reference 61 to REA EXH. C.6.

[162] See References 62 through 73 to REA EXH. C.6.

[163] See Reference 74 to REA EXH. C.6.

[164] See Reference 46 to REA EXH. C.6.

[165] See References 75 through 97 to REA EXH. C.6.

[166] See Reference 98 to REA EXH. C.6.

by Claimant but imputed the delay of 171 days to it[167].

581. Based on the scenario described above, Claimant claims a credit of US$ 45,839 before computing interest accruing thereon as equitable compensation for extra effort involved in sourcing material and locating vendors due to inadequate Ministry-furnished technical information, extra equipment/system inspections, OCR preparation, and proposal development.

582. The Ministry focuses its contentions on the delays occurred in connection with the maintenance services that, in the Ministry's view, are attributable to Claimant only. The Ministry also asserts that any and all amounts due thereunder have been timely paid under Section 8 of the Contract, there existing no additional costs to be paid to Claimant because the RAWs approved by the Ministry contemplated the costs of any and all services to be accomplished.

### Decision by the Arbitral Tribunal

583. The summary provided by Claimant gives a fair picture of the events occurred during the period for determining the technical solution to assure the major overhaul of the windlass system, i.e. to rebuild or replace the existing system.

584. The number of supporting documents brought by Claimant is evidence of the tortuous manner in which the decision-making process as to the choice of the most suitable technical solution was conducted. The number of proposals submitted by Claimant at the request of the Ministry and the submission of OCRs and RAWs are also evidence of increased work by Claimant.

585. The events described by Claimant and supported by documents show the difficulties with which it was confronted in planning its activities and allocating manpower. Claimant has also produced a significant amount of proposals and other documentation at the request of the Ministry or as a result of the position assumed by it. It is undisputed, then, that Claimant

---

[167] See References 104 through 108 to REA EXH. C.6.

undertook additional or extra work under the Contract and incumbent upon the Ministry to produce evidence that the costs claimed had been paid under the RAWs. However, the Ministry's allegations were not supported by any evidence while in reviewing the various References attached by Claimant, one may conclude that they do not contemplate any costs of the nature now claimed by Claimant.

586. Furthermore, based on the detailed description of the events occurred, the tortuous route pursued for the accomplishment of the work, it is clear that the effort expended by Claimant went beyond the limits of what was expected from Claimant under the Contract.

587. Hence, the Arbitral Tribunal awards such claim and orders the Ministry to pay Claimant the amount of US$ 45,839 plus interest accruing thereon.

## (40) REA-7 – Clutch

588. This claim relates to the major maintenance of the main reduction gears, which included the gas turbine auto-synchronizing clutches[168]. Claimant reports that work on the main reduction gears began with inspections of the gears and the inspection/replacement of the main reduction gear bearings. Other work in the area of the main reduction gears was impacted because the main reduction gear covers were open. Upon completion of the bearing replacements, inspections started on the auto-synchronizing clutches.

589. On November 11, 1999, the original equipment vendor submitted its report[169] of conditions found on the auto-synchronizing clutches for the F-22 gearboxes. In its report, the vendor, MAAG Gear AG or MGAG, recommended that the Port F-22 clutch coupling be returned to MGAG facilities in Zurich, Switzerland for further inspections and subsequent repairs. MGAG recommended repairs on F-22 and the proposal was submitted by Claimant to the Ministry[170], and the Ministry agreed that the

---

[168] See REA EXH. C.7 and Reference 1 thereto.
[169] See Reference 2 to REA EXH. C.7.
[170] See Reference 5 to REA EXH. C.7.

recommended repair and replacement of the F-22 clutch was necessary[171], but complained that the inspections should have been accomplished earlier. Claimant argues that the Ministry's complaints are without merit[172], and states that it was in no way responsible for any of the impact or extra costs flowing from such Ministry-responsible change.

590. Claimant states that it was compensated for the direct performance of the additional repairs and replacements described above as authorized by the RAWs. However, Claimant explains that no amounts were included in the Contract or any RAWs for impact caused by, or resulting from, the Ministry-responsible added work on the F-22 clutch.

591. This claim is for unforeseeable added work and effort expended to respond to numerous Ministry demands that Claimant perform, or have MGAG perform, corrective work on the Frigate's auto-synchronizing clutches[173]. Claimant attached the Ministry's written directions as References 11-19. The constant theme in the Ministry writings is that Claimant had to do anything and everything necessary to make the frigate clutches perform in a like-new fashion at no change in Contract price. Claimant claims a credit in the amount of US$ 10,457 before computing interest accruing thereon as due compensation for the additional directions and demands from the Ministry.

592. The Ministry asserts that it was Claimant's responsibility to inspect the Frigates and determine the works that would be necessary to fulfill the intent of having the Frigates operating in optimal conditions. The inspection was scheduled to take place upon arrival of the Frigates, but the Ministry states that Claimant decided to conduct such inspections eighteen (18) months after the ships arrived at the shipyard. Such inspections were designed to, the Ministry continues, determine all the works that would be necessary for the operation of the ships.

593. The Ministry claims that there exists no reason that might justify any additional compensation given that all additional and extra works were paid

---

[171] See Reference 6 to REA EXH. C.7.
[172] See pages 2-3 of REA EXH. C.7.
[173] See References 11-19 to REA EXH. C.7.

under Clause 8.

## Decision by the Arbitral Tribunal

594. This claim, despite the description of the events occurred with respect to the auto-synchronizing clutches, relates exclusively to the extra work done by Claimant pursuant to the Ministry's directions, which are reflected in the documents contained in References 11-19.

595. Indeed, Claimant did the extra work, and the Ministry's refusal to pay the amount claimed was based on its understanding that Claimant had to do anything and everything necessary to make the Frigate clutches perform like new at no additional charge.

596. It is important to highlight that the Ministry approved RAWs 970498 and 970513 and made the payments provided therein. These payments are an express recognition that extra work had been performed, and Claimant expressly excluded those amounts received from this claim. Thus, in the claim under analysis, Claimant seeks payment for the costs incurred performing additional extra work, or in having MGAG perform corrective work, all of which was unforeseeable, in response to numerous demands from the Ministry.

597. Moreover, the Ministry, in its contentions, does not deny that any monies are due. However, it claims that any amounts due were settled under Clause 8 of the Contract.

598. Despite the substantial amount of evidence brought to the record, Claimant fails to demonstrate the reasons why such extra work, due to its corrective nature, should be performed by Claimant and MGAG at additional cost. Since the Parties agree that the amounts due under the RAWs were paid, such additional amount claimed required further justification, and Claimant did not submit any justification.

599. Hence, the Arbitral Tribunal dismisses this claim.

## (41) REA-8 – Foundation Modification

600. Claimant asserts that the Contract included, among other things,

specifications that required Claimant to manufacture foundations for certain new or modified systems, and identified maintenance or repairs to be accomplished on specific systems and equipment. Claimant claims that upon submitting its bid to the Ministry, it included only the specified work[174]. As per Claimant, the Ministry's actions and inactions caused it to install more foundations and accomplish more work than was contractually required.

601. 600. Although Claimant fully realized and understood that certain new foundations would be required, Claimant asserts it was required to perform added and changed foundation work that has not been adequately compensated. This added foundation work included: (i) foundation changes due to added requirements and/or design changes caused by inaccurate or deficient data furnished by equipment manufacturers, (2) foundation replacements found to be necessary after Contract award and during performance of required equipment changes and repairs, and (iii) Ministry-directed design changes.

602. As a matter of principle, Claimant claims that the original period of twenty (20) months for the completion of the major maintenance of the Frigates and the delays caused by the Ministry required that the LUPO Frigate project be worked on a "fast track". Fast tracking a project entails doing jobs that would normally be done in a series, such as design and production, concurrently. While this method is occasionally necessary to compensate for short performance periods, it involves several risks, including the possibility that the simultaneous development of drawings and on-ship installations will lead to out-of-sequence work by planners, engineers, and production crafts with resultant rework and added costs.

603. REA EXH. C.8[175] contains a full and detailed description of the work effort required from Claimant with respect to each one of the systems of the Frigates. The Arbitral Tribunal will not reproduce herein the entire text of Claimant's explanations but, for ease of reference, the Arbitral Tribunal draws the attention of the Parties to pages 2-14 of REA EXH. C.8 mentioned

---

[174] See REA EXH. C.8.
[175] See pages 2 to 14 of REA EXH. C.8.

above. Furthermore, a special reference is made to the MSCR 111-02-001-N02[176], MSCR 111-02-001-N10[177] and MSCR 111-02-001-N11[178] which were developed to provide foundations for the units referred to therein and were for design changes that could not be anticipated or included in the original estimates. Such MSCRs were approved by the Ministry's on-site representatives, and such approvals constituted contractual authorization to do the extra work. Claimant's position is that since the Contract did not require Claimant to perform any of the work in the referenced MSCRs, the Ministry's approvals of such MSCRs constituted written orders and approvals to perform the added work as a Contract change.

604. Claimant's claim is based on the added design and production efforts associated with foundation work contained in REA EXH. C.8. This includes redesign efforts, rip-out and rework of shipboard installations, and additional material. Claimant claims to be entitled to recover its costs for the design, production, and installation of foundations, not included in the Contract requirements, that were found after the Contract award to require replacement due to the excessive deterioration discovered on the Frigates during performance of the Contract work. Claimant claims to be also entitled to compensation for the extra design and production efforts that resulted from defective and/or deficient specifications furnished by the Ministry and/or the Ministry's designated subcontractors, or that were required in support of other design changes the Ministry directed after Contract award. The credit claimed by Claimant amounts to US$ 954,449 before computing interest accruing thereon.

605. In its response to REA EXH. C.8, the Ministry asserts that the argument brought up by Claimant is unsupported and hardly credible. The Ministry questions how Claimant could have established the Contract price if it did not have a clear enough understanding of the scope of activities incumbent upon it under the Contract. Hence, it may not be accepted the argument whereby such price was established without Claimant having clear the relevant activities thereunder.

---

[176] See Reference 2 to REA EXH. C.8.
[177] See Reference 3 to REA EXH. C.8.
[178] See Reference 4 to REA EXH. C.8.

606. The Ministry then analyzes each one of the jobs incumbent upon Claimant referring them to various MSCRs issued under the Contract and the position assumed by the VIC which, in most of the cases, indicates that the alleged change claimed by Claimant had been contractually agreed upon by the Parties. Hence, the Ministry then concludes that, despite the arguments put forward by Claimant, this claim is unjustified insofar as each one of the jobs described is part of the scope of the Contract. Furthermore, the Ministry rejects any allegation of the delay experienced in the redelivery of the Frigates as a direct consequence of the additional works claimed by Claimant.

### Decision by the Arbitral Tribunal

607. Notwithstanding the Ministry's efforts to counter any and all arguments put forward by Claimant to justify its claims, it is clear that such counter arguments are insufficient to produce evidence capable of contributing to dismissal of the claim.

608. The position assumed by the Ministry in its response is inconsistent with the granting of approval to MSCRs by the on-site personnel. Indeed, such approvals do constitute an authorization for Claimant to perform the extra work encompassed by them. Claimant has duly indicated the origin of the costs being claimed, and REA EXH. C.8 contains voluminous information of exchange of correspondence and discussions between the Parties in that regard.

609. It is undisputed that the works were performed and were necessary for the purpose sought by the Ministry in retrofitting the Frigates. Moreover, Claimant indicated cases where the technical specifications required it to repair or replace foundations for certain new or repaired systems, as was the case of Specification A-4, which provided instructions to modify existing foundation work to fit new fire pumps.

610. Nevertheless, and this has been alluded to by Claimant at various junctures, as the work progressed it was required to perform foundation work that was not specified in the Contract, including changes directed by the on-site Ministry personnel. The main problem, however, is that the

general principle under the Contract was for Claimant to use existing foundations for new or repaired equipment. Based on the conditions determined during the performance of the work, Claimant was required to furnish new foundations; due to the degree of deterioration of the existing ones, it was not feasible to modify them for new equipment or to reinstall repaired equipment on them.

611. Thus, while it is true that certain specifications provided for the overhaul of the foundations, others could only be deemed unusable during the performance of the works and were certainly not foreseen by the Contract.

612. The position assumed by the Ministry as to the claim put forward by Claimant, denying all arguments and reinforcing that such works were in all cases contractually agreed, is inconsistent with the evidence submitted by Claimant.

613. It is unquestionable that the work performed with respect to the foundation for new or repaired equipment and systems that meet the requirements of Clause 59 of the Contract.

614. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 954,449 plus interest accruing thereon.

## (42) REA-10 – VIC Travel Expenses (Factory Testing)

615. Claimant avers that, pursuant to Clause 19, Paragraph 3 of the Contract, the Ministry would be responsible for any costs associated with the travel of VIC members for factory testing outside the shipyard[179]. Claimant and the Ministry disagree on the construction of that provision. The Parties exchanged several letters on that specific issue[180]. Claimant's understanding was that all costs associated with the travel would be borne by the Ministry, *i.e.* airfare, lodging and meals, whereas the Ministry's position was that all costs should be borne by Claimant save for the airfare or other means of transportation.

---

[179] See REA EXH C.10.
[180] See References 2, 3, 4, 9, 10, 11, 12 and 13 to REA EXH C.10.

616. Claimant also claims that the Ministry impliedly threatened to breach the Contract and withhold Claimant's Phase IV payment if the Ministry's demands regarding factory-testing travel expenses were not met by Claimant[181]. Claimant asserts that soon after receiving such letter, a meeting was convened with the attendance of both Parties and it agreed during that meeting to pay the Ministry US$ 200 per day (US$ 25 normal per diem plus US$ 175) for travel-related expenses associated with the VIC personnel witnessing factory testing outside the shipyard. Claimant claims that such agreement was reached by Claimant under coercion and economic duress by the Ministry. Claimant claims a credit of US$ 49,423 before computing interest accruing thereon.

617. In its response, the Ministry makes express reference to Claimant's assertion that it agreed to pay the per diem because it was under coercion and economic duress. The Ministry provides its construction of Clause 19, Paragraph 3 of the Contract to assert that, for all factory testing outside the shipyard, it was only responsible for transportation ("*traslado*" in the original text of the Contract) and, by that same token, paid the airfares of the VIC personnel.

618. The Ministry further states that demanding that Claimant fulfill its genuine obligation agreed upon by the Parties under the Contract cannot be considered a threat. The Ministry declares that this claim lacks reasonable grounds and must be dismissed.

### Decision by the Arbitral Tribunal

619. The Arbitral Tribunal underscores that the relevant discussion under this claim derives from a conflict of language between the original text of the Contract in Spanish and the working translation into English utilized by Claimant. In the end, each party was relying on a different text. Indeed, the official document is the Spanish text, and not any translations thereof. It seems strange that the Parties should encounter this sort of problem with the language bearing in mind that Claimant signed a contract in Spanish and should have had full support from bilingual interpreters.

---

[181] See Reference 13 to REA EXH. C.10.

620. This claim devolved into allegations of coercion and economic duress by Claimant, especially in light of the letter attached as Reference 13. This clearly shows the tension existing between the Parties.

621. The language of the letter does not imply *per se* a threat by the Ministry against Claimant whereby the installment under the Contract would not be paid unless Claimant should agree to bear all costs associated with the VIC personnel.

622. The withholding of such payment could occur, not as a result of a failure by Claimant to bear the costs, but rather as a result of a failure to produce evidence that a milestone event had actually occurred, which milestone event required factory testing outside the shipyard.

623. Moreover, the Ministry is correct when it asserts that it should only be responsible for the costs associated with the "*traslado"*, which does not contemplate lodging and meals. It must be emphasized that, as per a handwritten note on Reference 13, following the agreement reported by Claimant in respect of this claim, "future requests were charged to the work item of the equipment being tested".

624. Irrespective of the motivation addressed at this point, it is unquestionable that Claimant knew that the Ministry challenged its obligation to bear the costs, as alluded to by Claimant, and that Claimant now claims reimbursement even though it made a decision to bear the costs associated with the VIC personnel.

625. The Arbitral Tribunal finds that Claimant's claim and its allegations of coercion and economic duress lack proper evidence, and Claimant has failed to discharge the burden of proof imposed upon it, and the mere allegations are insufficient to substantiate its claim.

626. Hence, this claim is dismissed.

### (43) REA-11 – Increased Per Diem Payments demanded by the VIC

627. This claim is based on the contractual obligation whereby Claimant, in light of the provisions contained in Annex N, was required to pay a US$ 25 per diem for up to 70 crew members and their families who were present

while the ships were in Pascagoula during the original Contract performance period[182].

628. Under Contract Annex N, items 11 and 12, Claimant agreed to pay such daily allowance for their meals and other incidental costs such as laundry and personal care items. The number of Navy personnel stated in Annex N was derived from Clause 5 of the Contract and referred to the maximum number of VIC members, which might not exceed twenty-five (25) Navy personnel plus the ship's crew comprised of forty-four (44) crewmen. In reading Annex N together with Clause 5, the conclusion is that Claimant was obligated to pay the daily allowance of US$ 25 to a maximum of seventy (70) people.

629. However, despite these provisions and after Claimant issued checks to pay the daily allowance to the 23 people physically present at the shipyard, the Ministry sent a letter to Claimant demanding Claimant pay the daily allowance for the full 70 people. Claimant objected to such request and asserted that the payment obligation was due only to those who were located at the shipyard. The Ministry threatened not to sign the Act of Advancement or Progress of Work and to sue Claimant in Venezuela unless Claimant acceded to the Ministry's demands.

630. In light of the Ministry's unreasonable demands and abusive threats, Claimant agreed to provide a credit corresponding to the difference between the daily allowance amounts for 70 personnel and the daily allowance amounts actually paid by Claimant for the Navy personnel present at the shipyard.

631. Furthermore, due to the Ministry-responsible and other compensable delays, Claimant was required to continue making payments long after the originally-planned completion date for the Contract.

632. Claimant claims a credit for the additional costs incurred due to the Ministry's incorrect interpretation of the Contract and program delay. Claimant was compelled to make the additional per diem payments by the

---

[182] See REA EXH. C.11 and References thereto.

Ministry's direction and threats to further delay the Contract and sue Claimant in Venezuela unless it acquiesced. Claimant seeks to recover US$ 596,646 before computing interest accruing thereon.

633. In its response, the Ministry reiterates its understanding whereby, under the Annex N, Claimant had to pay US$ 25 as a daily allowance for each one of the members of the VIC, which number corresponded to 70 members during the period of performance of the Contract.

634. Since the very beginning of the VIC, the number of its members was smaller than the 70 members provided by the Contract. This was the reason why the Ministry requested Claimant to credit to it the difference between the payment due to the 70 members reduced by the amount actually paid by Claimant for those VIC members in office in Pascagoula.

635. Following various months of discussions, Claimant reached an agreement with the Ministry and recognized that there existed a credit in favor of the Navy. The Ministry claims that there exists a credit in favor of it in the amount of US$ 503,012.60 since payments have only been paid until June 2000. The Ministry also asserts that, despite the existence of such credit, Claimant has not applied such credit to any of the requests submitted by the Ministry. The Ministry states that Claimant is in default of its obligations.

636. As far as Claimant's allegations of economic duress and threats by the Ministry are concerned, the Ministry states that this is not correct nor true since the Ministry requested Claimant to fulfill its contractual obligations. The Parties have reached an agreement and Claimant has complied with its terms. Based on the foregoing, the Ministry asserts that it fails to understand how Claimant now claims that such payment, as aforesaid, breaches the Contract.

637. The Ministry avers that Claimant's claim is without merit and that, in fact, it is owed a credit by Claimant.

## Decision by the Arbitral Tribunal

638. This claim is substantially similar in nature to the preceding one. The

Parties dispute the existence of a credit in favor of the Ministry and, further, the Ministry asserts that Claimant is in default.

639. The Arbitral Tribunal finds that Claimant's claim and its allegations of coercion and economic duress lack proper evidence, and Claimant has failed to discharge the burden of proof imposed upon it, and the mere allegations are insufficient to substantiate its claim.

640. Hence, this claim is dismissed.

### (44) REA-13 – Stanchion Mounting Bases

641. According to Claimant[183], certain lifelines and stanchions were removed to provide access for Claimant to carry out the Contract work (deck place replacements), and certain of the removed items were too deteriorated to re-install. Other components of the lifeline system were simply missing when the ships arrived at the shipyard.

642. Claimant issued a MSCR[184] on July 12, 1999 to replace the defective lifeline stanchion bases. The MSCR provided the necessary material information and instructions to fabricate and install the new replacement parts, and Claimant further asserts that the Ministry approved it.

643. Although no stanchion bases or brace lugs were required to be replaced by the Contract Specifications, Claimant had to provide and install these parts in order to mitigate Ministry-responsible delays to other ongoing production work and in order to be able to reinstall the lifeline system so that it would perform its intended functions in a safe manner. As a result of the deterioration of the components and of those missing, Claimant had to fabricate and install twenty-eight (28) new lifeline stanchion bases and fifty-four (54) new lifeline stanchion brace lugs which were, as per Claimant, absolutely necessary to install the lifeline system for safety on the Frigates.

644. Claimant claims a compensation in the amount of US$ 84,973 for the added work accomplished before computing interest accruing thereon, and adds that although approved by the VIC, the Ministry has refused to

---

[183] See REA EXH. C.13 and References thereto.
[184] See Reference 1 to REA EXH. C.13.

compensate it for the approved work.

645. In its response, the Ministry challenges the arguments raised by Claimant and claims that all payments have been properly made under certain RAWs. The Ministry argues that the materials were damaged during the period of storage at the shipyard due to the lack of proper protection provided by the shipyard. The Ministry further claims that all items removed from the Frigates were exposed to adverse weather conditions.

### Decision by the Arbitral Tribunal

646. The arguments put forward by the Ministry with respect to the lack of protection of the removed items are not accompanied by any evidence to confirm its assertions.

647. As has been the case in other claims appraised by the Arbitral Tribunal, the argument relating to the fact that the Frigates were inspected upon their arrival at the shipyard is used as a general excuse to pass onto Claimant any and all responsibility associated with either deteriorated or missing components.

648. Conversely, Claimant provided the MSCR related to such claim. Nonetheless, while it claims that it was approved by the Ministry, the latter entity makes no reference to it and, in turn, refers to RAWs.

649. In reviewing the MSCR, the Arbitral Tribunal had access to the drawings prepared by Claimant and which are attached thereto. Such work was out of the scope approved by the Parties, and the approval of the MSCR satisfied the requirement for the implementation of such services and the fabrication and installation of the stanchion bases and brace lugs.

650. Furthermore, it is indisputable that such work was absolutely necessary to reinstall the lifeline system for safety purposes.

651. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 84,973 plus interest accruing thereon.

### (45) REA- 14 – Excessive VIC Office and Equipment Costs

652. Claimant claims[185] that, under Annex N to the Contract, it was supposed to provide the VIC personnel with certain industrial safety equipment, but that the VIC requested coveralls, helmet lanterns and safety belts, which fell outside the scope of industrial safety equipment to be supplied by Claimant under Annex N. Claimant claims that it partially complied with the Ministry's requests by providing twenty-five (25) sets of coveralls as a commercial gesture.

653. Nonetheless, by letter sent in August 1998, the Ministry requested twenty-five more sets of coveralls. Claimant then presented a RAW associated with such supply. As per Claimant, the Ministry rejected the RAW and insisted that it was obligated to proceed with the supply since the coveralls were necessary safety equipment and as such were required under the Contract. Claimant asserts that it then supplied the VIC personnel with such additional sets of coveralls.

654. Claimant claims a credit of US$ 3,404 before computing interest accruing thereon.

655. The Ministry asserts that Claimant was obligated to supply the VIC personnel with industrial safety equipment, as reflected in Annex N. The Ministry claims that Claimant provided the initial 25 sets without any objection. Nonetheless, eight months later, upon the Ministry requiring the 25 additional sets, Claimant submitted a RAW which was rejected on the grounds of the obligation assumed by it under the Contract and its Annex N.

### Decision by the Arbitral Tribunal

656. In reality, the Ministry has not acknowledged that the supply of the initial 25 sets of coveralls were, as stated by Claimant, a Claimant's commercial gesture.

657. The Arbitral Tribunal has not found any evidence that such supply was preceded by a statement by Claimant along the lines claimed in this arbitration – commercial gesture.

---

[185] See REA EXH. C.14 and References thereto.

658. In essence, the controversy between the Parties derives from the construction of the Contract, i.e. whether the obligation to supply industrial safety equipment was limited to the items described in Annex N or such list was there by way of example.

659. In any event, such claim by Claimant fails to meet the requirements of Clause 59, and the supply may not be treated as absolutely necessary for the proper performance of the Frigates.

660. Hence, this claim is dismissed.

### (46) REA-15 – Additional Steel Inspections

661. Pursuant to Claimant's pleading[186], Contract Specification C-47 required it to perform a non-destructive test on the hull and a general inspection of bulkhead structure and deck plating on each Frigate to determine where the Frigates had experienced major deterioration. The Contract Specifications then required Claimant to replace deteriorated steel in these structures up to specified amounts.

662. However, Claimant continues, when the Frigates arrived at the shipyard, the steel structures that Claimant was required to inspect were covered with paint or other coatings that masked the true extent of deterioration. As a result, Claimant was required to perform not only its planned visual inspections and non-destructive, ultrasound testing, but also special, labor-intensive cleaning to remove the paint and other coatings to determine the full extent of the deterioration.

663. Claimant asserts that the cleaning effort required an increase of more than 56,000 man-hours beyond those originally planned. In performing this work, Claimant discovered that the hulls of the Frigates suffered from unusually severe deterioration that could not have been discovered prior to the paint removal.

664. In addition to that extra cleaning performed, the Ministry also required Claimant to perform ultrasound testing for each Frigate's hull at two-foot

---

[186] See REA EXH. C. 15 and References thereto.

intervals, which far exceeded what was normal or contemplated when it prepared its Contract bid.

665. Claimant explains that normal ultrasonic testing involves taking 200-300 measurement or shots for an approximately 578-foot ship. Under the standard, the approximate 285-foot Frigates would have required 100-200 shots. In response to the Ministry's demand, Claimant actually performed approximately 2,000 shots on F-21 and F-22. Claimant then avers that it appears that the Ministry required this increased level of inspection because it was aware of the severe deterioration of the Frigates and was attempting to conserve budgeted steel for replacement by requiring inefficient patchwork repairs.

666. Claimant claims a credit of US$ 2,847,031 before computing interest accruing thereon.

667. In its response, the Ministry claims that Specification C-47 covers each and every work to be performed on the hull and bulkhead structure. The Ministry details the applicable specifications and states that Claimant was required to accomplish hull cleaning of 1,350 m², to sandblast and paint the underwater body, topside and flotation line for a 5- to 7-year service life, to perform non-destructive tests on the hull and replace approximately 66 tons of steel plates, to conduct a general deck inspection and replace approximately 45 tons of plating to the F-21 and 32 tons of plating to the F-22, including removal and reinstallation of all plating and to install temporary deck covering and replace up to 300 m² of non-slippery deck tile.

668. The Ministry claims that such claim lacks justified grounds since the work performed by Claimant was only that provided by the Contract and, to that end, it paid to Claimant the amount provided contractually. Thus, the Ministry claims that in view of the foregoing there exists no amount that may be due to Claimant.

### Decision by the Arbitral Tribunal

669. This claim is supported by a detailed description of the works performed in connection with the so-called additional steel inspection.

Nevertheless, the core discussion does not deal with the description of works performed (which is not disputed) but rather with whether such works were included or not within the description contained in Contract Specification C.47, item 113-32-001. The Parties assume different positions and both are adamant in putting forward their arguments.

670. The Arbitral Tribunal notes that, as was the case in other claims, Claimant did not submit a RAW for approval by the Ministry of the work now claimed. Claimant did not issue a RAW to obtain prior approval from the Ministry nor draw the attention of the Ministry to the additional nature of the work to be performed. This would be more important when the basis for the controversy derived from the interpretation of the letter of the Contract Specification as a means to determine the extent of the works that had been foreseen when the specifications were drawn up and prepared. Nonetheless, the factual matters brought forth by Claimant and the additional facts that a visual inspection would not suffice to determine the deteriorated condition and that the number of shots that went far beyond the standard are important elements that have to be taken into consideration by the Arbitral Tribunal.

671. The absolute necessity element that plays a major role when applying Clause 59 is not, *per se*, an automatic recognition of the right of Claimant to be reimbursed. It is true that Claimant failed to evidence that it communicated to the Ministry contemporaneously with the performance of the work that it claims fell outside the scope of work agreed upon and that it should be reimbursed. However, as Claimant has claimed in other cases, the VIC was on the ground and supervised the work performed, which estops the Ministry from challenging the performance of extra work and the obligation to reimburse Claimant. Having considered the positions assumed by both Parties with respect to this claim, the Arbitral Tribunal finds that such works were absolutely necessary for the fulfillment of the Contract and could hardly have been scheduled in light of the condition determined upon inspection at the shipyard.

672. Hence, this claim is awarded and the Ministry is ordered to pay Claimant the amount of US$ 2,847,031 plus interest accruing thereon.

### (47)REA-17 – Designated Subcontractor – ALENIA

673. This claim deals with the incurrence of additional costs by Claimant with the Ministry's designated subcontractor, ALENIA[187]. Claimant reports that, under Clause 36 of the Contract, it was required to use Alenia to install the Frigates' OTOMAT missile systems. However, Claimant claims that its bid only provided for the costs that were to be incurred up to the original date forecasted for the re-delivery of the Frigates.

674. Claimant invokes Clause 3(d) of the Contract to underscore that ALENIA was scheduled and obligated to deliver the OTOMAT missile launching system (MK-2) to Claimant within a period no greater than 17 months from the date of arrival of the launchers in the facility of ALENIA.

675. Claimant claims that, by establishing such deadline, the Ministry warranted that the work assigned to ALENIA could be and would be completed within such period. Hence, Claimant claims that the Ministry breached its warranty as to the timely completion of the work by the Ministry's designated subcontractor, and the additional and extra costs incurred by Claimant were generated by the Ministry's breach[188]. Claimant asserts that, by including such provisions in the Contract, the Ministry warranted that the schedule for redelivery of the ships should be extended without liability to Claimant, and any charges for such delay should be considered additional work pursuant to Clause 8 thereof. Further, the Ministry repeatedly issued letters and/or other documents to Claimant alleging that the latter had to take specific action to obtain performance by Alenia to suit the Ministry.

676. Claimant claims, therefore, a credit in the amount of US$ 17,973 before computing interest accruing thereon.

677. In its response, the Ministry stated that the date for redelivery of the Frigates was July 1, 2000 following the extension granted upon request of Claimant. Hence, from that date onwards the redelivery of the Frigates was late.

---

[187] See REA EXH. C.17 and References thereto.
[188] See Clause 3, Fifth Paragraph, items (a) and (e) of the Contract.

678. The Ministry avers that the VIC did not introduce any variation into the agreements with respect to the work to be performed by the Ministry's Designated Subcontractors. Moreover, the Ministry claims that the costs associated with the administration of the subcontractors should have been included in the total cost submitted by Claimant to the Ministry.

### Decision by the Arbitral Tribunal

679. Notwithstanding the claim put forward by Claimant, it is worth mentioning that the Parties had agreed that in case of delay by a Designated Subcontractor, any charges or costs incurred should be deemed extra work and be compensated under Clause 8 of the Contract.

680. The Arbitral Tribunal has already decided that Clause 59 does not provide for payments to be made in case of shortage of funds under Clause 8. The Arbitral Tribunal has carefully analyzed the two contractual provisions and decided that they ran in parallel in light of the different purposes provided in each.

681. In view of the foregoing, the amounts claimed by Claimant hereunder should have been decided and settled under Clause 8. However, it is clear that Claimant should be compensated for those additional costs derived from delays incurred by the Designated Subcontractors. Thus, the Ministry's allegations that such costs should have been computed on the Contract proposal may not prevail in light of the contractual arrangements in place.

682. In this case, the right of Claimant to be reimbursed derives from the fact that the works to be performed by ALENIA were absolutely necessary for the fulfillment of the Contract. The costs incurred by Claimant are therefore indemnifiable under Clause 59, especially because the delay was caused by a Designated Subcontractor, and Claimant may not be held responsible for it.

683. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US\$ 17,973 plus interest accruing thereon.

### (48) REA-18 – Designated Subcontractor – IAI

684. This claim deals with the incurrence of additional costs by Claimant

with the Ministry's Designated Subcontractor, IAI[189]. Claimant reports that, under Clause 36 of the Contract, it was required to use IAI to perform major maintenance of two helicopters. Because of Ministry-responsible delays that caused the Frigates to be redelivered much later than the original completion date, Claimant incurred administrative costs it had not anticipated in dealing with IAI. Pursuant to Claimant's allegations, these costs included added engineering, planning and program management labor required to support subcontract administrative functions.

685. Thus, Claimant claims a credit of US$ 5,032 before computing interest accruing thereon.

686. In its response, the Ministry stated that the date for redelivery of the Frigates was July 1, 2000 following the extension granted upon request of Claimant. Hence, from that date onwards the redelivery of the Frigates was late.

687. The Ministry avers that the VIC did not introduce any variation into the agreements with respect to the work to be performed by the Ministry's Designated Subcontractors. Moreover, the Ministry claims that the costs associated with the administration of the subcontractors should have been included in the total cost submitted by Claimant to the Ministry.

### Decision by the Arbitral Tribunal

688. Notwithstanding the claim put forward by Claimant, it is worth noting that the Parties had agreed that, in case of delay by a Designated Subcontractor, any charges or costs incurred should be deemed extra work and be compensated under Clause 8 of the Contract.

689. The Arbitral Tribunal has already decided that Clause 59 does not provide for payments to be made in case of shortage of funds under Clause 8. The Arbitral Tribunal has carefully analyzed the two contractual provisions and decided that they ran in parallel in light of the different purposes provided in each.

690. In view of the foregoing, the amounts claimed by Claimant hereunder

---

[189] See REA EXH C.18 and References thereto

should have been decided and settled under Clause 8. However, it is clear that Claimant should be compensated for those additional costs derived from delays incurred by the Designated Subcontractors. Thus, the Ministry's allegations that such costs should have been computed on the Contract proposal may not prevail in light of the contractual arrangements in place.

691. In this case, the right of Claimant to be reimbursed derives from the fact that the works to be performed by IAI were absolutely necessary for the fulfillment of the Contract. The costs incurred by Claimant are therefore indemnifiable under Clause 59, especially because the delay was caused by a Designated Subcontractor, and Claimant may not be held responsible for it. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 5,032 plus interest accruing thereon.

## (49) REA-19 – Added Costs due to Ministry Interactions with Subcontractors

692. Claimant claims that in order to fulfill its duties under the Contract, it planned to and did employ many subcontractors in addition to the Ministry's Designated Subcontractors[190]. It also claims that during the subcontractor selection process, the Ministry did not treat the process as a joint endeavor, did not timely carry out its part of the subcontractor evaluation and selection, and did not timely approve the technical specifications covering the subcontractors' work.

693. Instead, the Ministry generally took the position that it was not required to supply any technical documentation and that Claimant was to find its own sources for this information. Moreover, the Ministry undermined Claimant's efforts to reach agreements, monitor performance, and successfully accomplish the work through the Ministry's direct contact and interference with those subcontractors.

694. Claimant also asserts that, despite agreeing during the WDCs to replace several of the Frigates' command and control, communications and weapons systems with off-the-shelf equipment, the Ministry subsequently

---

[190] See REA EXH. C.19 and References thereto.

demanded the equipment meet military, rather than commercial standards. Claimant had to then expend hours reviewing and revising technical specifications to meet the Ministry's demands for military standards while also retaining the original COTS designs. Claimant avers that the successful completion of its subcontracted work was absolutely necessary to the fulfillment of the Contract.

695. Claimant claims a credit in the amount of US$ 208,624 before computing interest accruing thereon.

696. In its response, the Ministry asserts that it has not created any obstacle whatsoever to the performance of the works by Claimant. It also claims that WDCs were held in Caracas, Venezuela following a joint agreement between the Parties and, as a result of such meetings, the replacement of equipment and products was agreed by the Parties. Such agreements were reflected in documents in compliance with the contractual clauses which, subsequently, were approved by the Comptroller General of the Armed Forces.

697. The Ministry avers that Claimant is attempting to justify its inefficiency as a shipyard and its responsibility for the delays incurred in redelivering the Frigates.

698. Furthermore, the Ministry denies having imposed any requirements different than those contained in the Technical Specifications of the Contract. Therefore, it is not true that the VIC required that Claimant comply with military standards when the technical specifications referred to commercial standards.

699. The Ministry claims that the Contract has been implemented in accordance with its own contents, and neither the Comptroller General nor Claimant have expressed during any control process that any technical specification had not been met. The Ministry challenges, then, the veracity of Claimant's assertions.

### Decision by the Arbitral Tribunal

700. In reality, each Party tells its version of the story and it is incumbent

upon this Arbitral Tribunal to reconcile the various pieces to attempt to restore what really occurred and then decide.

701. It is the Arbitral Tribunal's understanding that the performance of the works by Claimant was followed by the VIC and the length of time expended with the retrofit process of the Frigates created an expected interaction between the Parties. Thus, it is not surprising that contact may have been made by the VIC members with Claimant's subcontractors.

702. The works performed by Claimant under the Contract were based on technical specifications designed by the Ministry and updated and revised by the Parties during the WDCs. It is understandable that such technical specifications might not be too precise and clear enough at the inception. Circumstances occurred that gave rise to changes. Furthermore, in direct contact with the subcontractors, alternative solutions might be suggested. It is true that during the period between the award of the Contract and the commencement of performance of the works, new technology and various technological improvements came to light. This would substantiate the decisions made by the VIC thereafter.

703. Claimant's claim that the Ministry has never taken the selection process of subcontractors as a joint endeavor demonstrates that cooperation of the Ministry would be to Claimant's own benefit insofar as such subcontractors would be adding a significant piece to the final job, and the joint endeavor nature of such selection process would certainly be an important tool to increase the Ministry's confidence in the quality of the work and the final product.

704. The Ministry has not succeeded in bringing any evidence that could be deemed contrary to Claimant's assertions that there was a switch of standards during the performance of the works. Although it stated that the technical specifications were maintained, the Ministry did not bring any evidence capable of overcoming Claimant's assertion that in retaining the COTS designs it had to revise the technical specifications to also retain the military standards.

705. In sum, the fact that neither Party has alleged, during any controlling

processes, that any technical specifications were disregarded is not sufficient evidence to dismiss this claim.

706. The Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 208,624 plus interest accruing thereon.

### (50) REA-20 – Processing OCRs and RAWs

707. This claim relates to the added direct labor required in support of extra meetings and extra processing efforts by Claimant as a result of the Ministry's alleged actions and inactions[191]. Claimant explains that such claim contemplates only those added direct-charged efforts expended on account of the foregoing efforts in excess of normal requirements for OCRs, RAWs, and the Contract requirements for monthly progress meetings.

708. In submitting this claim, Claimant reports the actions taken by it vis-à-vis the VIC members upon their arrival at the shipyard with a view to keeping them abreast of normal industry practices and, particularly, the practice adopted by Claimant with respect to the efficient authorization of growth and out-of-scope work. Claimant states that the Ministry agreed to the use of OCRs and RAWs and, in particular, to the processing and responding to OCRs and RAWs within two weeks due to the short Contract performance time. Claimant emphasizes further that such 2-week timeframe was an industry standard processing time.

709. In this particular case, the evaluation by Claimant of the as-received Frigate conditions caused it to expect an even greater volume of OCRs than would be necessary on comparable U.S. Navy ships. Identically, the Ministry, as stated by Claimant, agreed to ensure a rapid response to both OCRs and RAWs during the performance of the Contract. Claimant further asserts that in anticipation of the expected inordinate amount of growth on the Contract as a result of arrival inspections and the WDCs, it decided on March 12, 1998 to initiate weekly meetings even though the Contract only required monthly meetings.

710. In general, after analyzing some examples, Claimant claims that the

---

[191] See REA EXH. C.20 and References thereto.

Ministry's failure to timely respond to necessary growth and out-of-scope work increased its administrative costs and caused it to have to constantly interrupt work in progress and alter personnel assignments as it waited for Ministry action. It also reports that it expended significant effort to monitor OCR status, reply to Ministry correspondence on OCR issues and revise its planned manning for jobs for lack of Ministry action on OCRs and RAWs.

711. Pursuant to Claimant, the added effort includes, among other things, additional filing and storage of documents, preparation of charts, graphs, and status lists, re-verification of material prices and availability, updating of material orders to reflect changing prices and other requirements, and rescheduling of planned facility and manpower usage. In asserting that such work was out-of-scope but absolutely necessary to ensure that change order work could be processed, Claimant claims a credit in the amount of US$ 512,748 plus interest accruing thereon.

712. In its response, the Ministry asserts that the significant number of OCRs was due to the failure by Claimant to correctly interpret the Technical Specifications. This gave rise to a large number of OCRs requesting payment for extra or additional services which later proved to fall within the scope of work of the Contract. This took an enormous amount of the VIC's time since it had to demonstrate that each and every such "extra" work was part of the works provided by the Contract.

713. The Ministry further asserts that such OCRs are part of the internal process of Claimant. This means that Claimant generates OCRs that have never been submitted to the VIC which are part of the works performed by Claimant. The Ministry states that, as of May 2000, Claimant's position annexed to this claim is that it had generated 4,944 OCRs and, on the date of the response submitted by the VIC, only approximately 900 RAWs derived from OCRs had been executed for the performance of extra work. Hence, the Ministry rejects this claim.

### Decision by the Arbitral Tribunal

714. This claim derives from the administration of the Contract and the proper interpretation of the Technical Specifications. Undoubtedly, the

controversy at issue derives from the challenge put forward by the Ministry with respect to the appropriate cost claim filed by Claimant.

715. The dispute relates to services rendered by Claimant[192] in connection with the preparation and follow-up of OCRs and RAWs in connection with additional or extra works.

716. As the Arbitral Tribunal decided that both Parties contributed to the occurrence of delays, this claim is partially awarded by applying parity as the appropriate methodology.

717. Hence, the Arbitral Tribunal orders the Ministry to pay Claimant the amount of US$ 256,374 plus interest accruing thereon.

### (51) REA-21 & REA-47 – Engineering and Drawings Approval Process

718. This claim relates to the alleged damages suffered by Claimant in connection with the failure by the Ministry to abide by the period of time designed for approval of engineering documents submitted by Claimant[193]. Claimant's claim is accompanied by references to contractual provisions and annexes dealing with the specific activities undertaken thereunder[194].

719. Claimant asserts that, although the Ministry's obligations regarding engineering-related matters were spelt out in the Contract, the Ministry repeatedly breached such obligations. These breaches, as per Claimant, interfered with and otherwise made Claimant's performance of its engineering obligations more difficult, time-consuming, and costly. Claimant lists some examples of breaches by the Ministry. The Ministry's breach of its contractual obligations is exemplified by REA EXH. C.47[195].

720. Claimant reaffirms that the Ministry, as per Clause 17 of the Contract, had 20 days to approve or comment on submitted engineering drawings. Claimant avers that the Ministry, however, failed on many occasions to timely act on submitted drawings. In such instances, after the specified 20

---

[192] See ¶ 680 of this Final Award.
[193] See REA EXH. C. 21 and REA EXH. C.47 and References thereto.
[194] See Clauses 3, 16, 17 and Annex "R" to the Contract.
[195] See items C.21.2.1 through C.21.2.11 of REA EXH. C.21.

days had elapsed without Ministry action, the drawings were deemed automatically approved in accordance with Clause 17 of the Contract.

721. In some cases, Claimant continues its report, the Ministry not only responded beyond 20 days, but responded with comments that required Claimant to revise and resubmit drawings[196]. In addition, the Ministry sometimes ordered revisions to drawings it had formally approved. Late Ministry comments on automatically approved drawings, or retraction of prior Ministry approvals, caused Claimant to perform additional engineering efforts to rework previously completed drawings and in some cases, produce entirely new drawings. In some instances, Claimant asserts, actual production work had started in accordance with the approved drawing, and Claimant had to remove or replace completed work or alter work in progress.

722. Claimant states that, based on a detailed review of its engineering data, it was able to estimate that 20 per cent (or 51,188 engineering labor hours) of its total engineering efforts on the Frigates project was caused by the Ministry's failure to meet its contractual obligations as aforesaid.

723. Claimant claims to have expended an additional 13,612 hours of direct-performance engineering efforts not covered under the Contract for specification-development efforts and Field Engineering Requests (FERs).

724. Claimant claims a credit of US$ 3,415,644 in additional compensation for the added 64,800 engineering hours it expended in the project, before computing interest accruing thereon.

725. In its response, the Ministry criticizes the mode of presentation of such claim by Claimant and avers that it makes preparation of the response more complicated. Nonetheless, the Ministry puts forward its position as detailed in the paragraphs below.

726. The Ministry asserts that the two contractual provisions referenced by Claimant are related to Claimant's duties to the Ministry. Each clause identifies plans, manuals and diagrams that Claimant should deliver to the

---

[196] See item C.21.2.2 of REA EXH. C.21.

VIC for its review and approval. The foregoing notwithstanding, Claimant claims that it was the Ministry that breached such provisions and impeded Claimant from complying with them. The Ministry alleges that Claimant failed to provide until a certain point in time (say, August 2002) any MSCR in Spanish. This is why no such documents had been approved. The Ministry further states that in any and all such documents an observation was included to itemize the documents that had to be handed over and which are specified in such clauses.

727. The Ministry makes reference to the Act of Redelivery of F-21 dated May 16, 2002 and underscores that it expressly mentions the default by Claimant to deliver the Plans and manuals, and that such pending points have to be solved during the technical warranty period. The Ministry then alleges that it was Claimant that breached its contractual obligations.

728. The Ministry denies Claimant's alleged right entitling it to an indemnification for the alleged failure by the Ministry to deliver timely precise information. The Ministry asserts that it delivered all available information even in cases where a contractual obligation to do so did not exist. This, however, does not exempt Claimant of its obligations and duties, and all claims related to inefficiencies, interferences, disruptions and delays are under the exclusive responsibility of Claimant, as provided by the Contract.

### Decision by the Arbitral Tribunal

729. In reality, despite the lengthy submission by Claimant, the Ministry has not focused on the aspects raised therein, preferring instead to come up with a construction of contractual provisions which is not coherent with their letter and spirit. The Ministry claimed that it delivered all documents and information to Claimant even though it had no contractual obligation to do so, and that such clauses spell out the duties incumbent upon Claimant rather than the Ministry.

730. The letter of Clause 17, Third Paragraph of the Contract leaves no room for interpretation. The text is straightforward, and it does reflect an obligation imposed on the Ministry or the VIC, as its representative on

ground.

731. Claimant produced evidence of the delays experienced by it in various instances in receiving comments from the Ministry. The numbers brought up by Claimant speak for themselves and, at a given point in time[197], comments on 216 drawings were untimely, which corresponded to roughly 30 per cent of all comments received from the Ministry at such time, and such delay ranged from 15 to 240 days after the expiration of the period for comments, albeit in most of the cases such delay ranged from 15 to 90 days.

732. The Arbitral Tribunal takes into account the consequences derived from such delay especially given that the Parties had contractually agreed that once the 20-day period for comments elapsed, the drawings would be deemed approved. Claimant explains the additional engineering efforts to rework previously completed drawings, including, in some cases, the production of entirely new drawings in response to the Ministry's request.

733. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 3,415,644 plus interest accruing thereon.

### (52) REA-22 – Additional Administrative Functions

734. This claim, as put forward by Claimant, is based on the alleged changes introduced by the Ministry following the execution of the Contract for securing the payment of the installments of the Contract price. Claimant claims that those changes made the payment process more burdensome, Claimant having to provide the Ministry with a voluminous number of documents in addition to the commercial invoice agreed under the Contract provisions[198].

735. Claimant invokes Clause 2, Sixth Paragraph of the Contract to state that it was supposed to be paid upon meeting each one of the milestones provided by the Contract and upon presentation of the commercial invoice

---

[197] See item C.47.2 of REA EXH. C.47.
[198] See REA EXH. C.22 and References thereto.

only. It also says that it had no reason to expect that the Ministry would not follow the processes spelled out in the Contract and instead would impose additional requirements on Claimant before payments were made. Since Claimant was convinced that, as per the Contract, it was only supposed to supply commercial invoices, it did not include in its bid any amounts for supplying other documents.

736. Claimant also refers to a certain letter dated April 23, 1998 whereby the Ministry demanded allegedly extra, out-of-scope documentation amounting to "tens of thousands" of pages in excess of the commercial invoices required by the Contract. Claimant asserts that, by demanding more documentation than required under the Contract, the Ministry's letter had the effect of a written change order. Thus, throughout the life of the Contract, Claimant had to gather a voluminous number of documents demanded by the Ministry.

737. Furthermore, Claimant alleges that, by virtue of the Ministry's continued refusals to timely perform perceptive control actions caused Claimant to finance more of the Contract work than planned, and it was forced to use its own funds for work done for the Ministry, and then lost use of those funds for the periods of delay in payment.

738. Claimant claims a credit in the amount of US$ 359,672 in additional compensation for (i) the costs of financing delayed payments, (2) the added labor necessary to supply the extra documentation required by the Ministry, and (iii) the added cost of reproduction, before computing interest accruing thereon. Claimant asserts that since the Ministry refused to make payments due without Claimant's performance of this added work, such work was absolutely necessary to fulfill the purposes of the Contract.

739. In its response, the Ministry asserts that, if Claimant incurred additional costs, as claimed hereunder, it was due to Claimant's own failure to comply with the rules provided by Annex W of the Contract. Pursuant to the Ministry, Annex W provided for seven (7) phases that gave rise to payment of the corresponding amount agreed upon thereunder. The Ministry asserts that Claimant repeatedly failed to comply with the relevant schedule dates.

740. As far as additional and extra documentation is concerned, the Ministry explains that such documents were required by the Comptroller General as a support of the commercial invoices issued by Claimant since the payments claimed in each phase were rather elevated. As a result, the Comptroller General required a detailed explanation of the works accomplished. The Ministry further states that such procedure was followed throughout the life of the Contract and that Claimant never objected that such procedure was inappropriate. The Ministry claims that such documents were supplied together with the requests for perceptive control. In sum, the supply of documents in support of the commercial invoices by Claimant was part of its duties under the Contract and there are no amounts due and payable to Claimant as a result thereof.

741. Furthermore, the Ministry states that in case of non-approval of any invoices issued by Claimant in any given phase, the VIC, upon exercising its duty to approve or not, instructed Claimant to issue new commercial invoices where the amounts disapproved were excluded. In any and all cases, the VIC sent a correspondence to Claimant in that regard together with instructions on how to proceed thereafter. The Ministry states that such procedure was conducted without any difficulties, and perceptive control and payments occurred upon fulfillment by Claimant of the requirements provided by the Contract.

### Decision by the Arbitral Tribunal

742. The claim put forward by Claimant lacks reasonable grounds for two (2) major reasons. Firstly, the allegation that the Ministry innovated in claiming supporting documents in addition to commercial invoices may not prevail. While the Contract actually refers to commercial invoices only, it may not be admitted that the Ministry might not be entitled to request additional documents. The reading of the contractual provisions by Claimant is not appropriate. Based on Claimant's past experience in negotiating the Contract, Claimant knew (or should have known) that, in light of the characteristics of such Contract, the Ministry might have internal rules or even be subject to legal provisions that might determine the presentation of other documents.

743. The contractual provisions dealing with payment contain a series of references to other entities and procedures. Examples include the approval to be sought from the Comptroller General and, no less important, the perceptive control. Those procedures may be regarded as normal procedures when payments come from the treasury of a Sovereign State, such as Venezuela. Even though the funding for the retrofit of the Frigates was obtained from the issuance of bonds, the proceeds of such issuance are part of the treasury of Venezuela.

744. The reference in the Contract to commercial invoices does not operate to exclude any other documents to be requested. The State instrumentalities are subject to external controls and, in order to comply with them, those additional requests are deemed reasonable.

745. Claimant should have investigated the applicable procedures and to what extent was Claimant subject to them.

746. Claimant has not evidenced that it timely protested such additional requirements imposed by the Ministry since it strongly asserts that such requests were improper under the Contract. Apparently, Claimant complied with the requisite steps and only raised this claim upon presentation of REA.

747. It is the Arbitral Tribunal's understanding that the extra costs claimed by Claimant fall within its duties to provide documents and evidence that milestones have been reached and, as such, are administrative costs that have to be absorbed by Claimant in lieu of its attempting to pass those onto the Ministry. By that same token, Claimant's allegation that it financed the Contract, and should therefore be compensated by the Ministry, is unreasonable.

748. Lastly, this claim fails to meet the requirements under Clause 59 of the Contract. Although the submission of additional documents may have generated extra costs for Claimant, such costs, even if due, would never meet the absolute necessity requirement under such Clause to secure the reimbursement of extra costs.

749. Hence, this claim is dismissed.

## (53) REA-25 – Ladder Replacements

750. This claim relates to the replacement of vertical ladders on the ships[199]. Claimant asserts that Contract Specification C.47 required it to inspect and repair internal and external ladders but it was not required to replace the ladders. Claimant reports that when it performed the required inspections, it discovered that seven (7) ladders were either too deteriorated to be repaired or were simply missing. Claimant then prepared an MSCR to provide and install new ladders, and the Ministry's on-site representative approved such MSCR. Nonetheless, Claimant alleges that the Ministry refused to compensate it.

751. Claimant claims a credit in the amount of US$ 14,254 before computing interest accruing thereon. The amount to be reimbursed by the Ministry shall compensate the out-of-scope work to provide new ladders where the Contract specifications required only repair. This work, as per Claimant, was necessary for the safe operation of the Frigates and therefore was absolutely necessary to fulfill the purpose of the Contract.

752. In its response, the Ministry states that Claimant has not made in any communication a reference to the fact that the ladders were deteriorated or missing. Moreover, not even during the inspection of the Frigates upon their arrival to the shipyard was it determined that any ladders were missing, nor has it been recorded that any areas were inaccessible due to the poor conditions of the ladders. In fact, the videotape of the inspection may show, as per the Ministry, the good operating conditions of the ladders.

753. The Ministry states that any problems with the ladders should have been fixed in accordance with technical specification C.47 since it refers to the repair of the ladders without indicating the extension of the repair. It further states that Claimant has determined that, in certain cases, it was more convenient to it to install new ladders in lieu of repairing them. In opting for such alternative, the Ministry has not opposed it and it was accepted by the VIC as part of the performance of the technical specification. Hence, the Ministry claims that Claimant is not be entitled to

---

[199] See REA EXH. C.25 and References thereto.

any payment whatsoever.

### Decision by the Arbitral Tribunal

754. This claim is for a credit to Claimant on account of extra works provided to the Ministry under the Contract.

755. The existence of an MSCR approved by the Ministry would, in principle, play in favor of the argument brought by Claimant.

756. It must not be discarded that Claimant might have decided, in certain instances, as stated by the Ministry, to replace ladders rather than repairing them. It remains to be determined which reasons led Claimant to follow such route if one disregards the reasoning exposed by Claimant, i.e. bad operating conditions due to deterioration and missing ladders that had to be replaced.

757. Furthermore, the original specifications provided for Claimant to inspect and repair the ladders. The argument made by Claimant for replacing the ladders is based on the deterioration of the same beyond repair or on the fact that they were missing. Nonetheless, the record shows no supportive evidence that might justify the decision made by Claimant on the basis of the deterioration to replace the ladders rather than repairing them. Claimant has not met the requirements imposed by Clause 59 as to such replacement of the ladders being absolutely necessary for the fulfillment of the Contract.

758. Hence, the Arbitral Tribunal dismisses this claim.

### (54) REA-28 – Deck Stanchions

759. Pursuant to Claimant, Contract Specification C.47 governed the work it was required to perform while the Frigates were in drydock, but did not include any work on the deck stanchions or lifelines, such as replacement or repair[200]. Claimant reports that when the Frigates arrived at the shipyard, it removed the deck stanchions and lifelines that were interfering with the structural and topside repairs required by the Contract, and stored them for

---

[200] See REA EXH. C.28 and References thereto.

possible reinstallation. However, when these items were removed from the vessels and stored, many were already unsuitable for reinstallation on the ships.

760. Claimant alleges that the Ministry also realized that the removed items were seriously deteriorated and needed maintenance, repair or replacement. On August 7, 1998 the Ministry issued a Condition Report directing Claimant to produce an estimate for major maintenance on the stanchions and related equipment. Claimant then incorporated the Ministry's request into OCR 10559ZZ. Subsequently, Claimant issued a RAW for the engineering labor required to draft the estimate and the Ministry approved the RAW.

761. Claimant claims that in May 1999, the Ministry changed its position and alleged that the poor condition of the equipment was attributable to Claimant's lack of maintenance. Despite the earlier position assumed by the Ministry, it then insisted that Claimant was responsible for the parts' repair and replacement. In response, Claimant states that it advised the Ministry numerous times that the deck stanchions and related items were in poor condition when the Frigates arrived at the shipyard and that work was not required by the Contract.

762. Later, in June 1999, Claimant and the Ministry agreed to conduct a joint survey. As a result of the conditions found during that survey, Claimant developed an MSCR and various OCRs to provide engineering, material, and instructions to the production personnel. Although the Ministry approved the MSCR, and had previously issued a Condition Report for replacement of the deck stanchions and related equipment, it continued to insist that Claimant replace all the equipment at its own expense and did not fully compensate Claimant for its efforts, such as compensation for the additional labor and material costs for the work performed under OCR 15760, additional costs incurred for reinstalling the parts for the joint inspection, performing the joint inspection, removing and then placing the parts back in storage.

763. Claimant states that in Annex A – the Ministry's Response – the Ministry additionally argues that this claim is duplicative of REA-13.

However, REA-13, as per Claimant, relates to Claimant's installation of distinct parts, specifically 28 new lifeline stanchion bases and 54 new lifeline stanchion brace lugs.

764. Claimant claims a credit in the amount of US$ 179,684 before computing interest accruing thereon.

765. In its response, the Ministry simply argues that this claim is duplicative and was included in two different annexes with different costs.

### Decision by the Arbitral Tribunal

766. As a matter of fact, this Arbitral Tribunal has already appraised and decided on Claimant's claim pursuant to REA-13, and such claim was awarded.

767. The main point of disagreement between the Parties is the alleged duplicative nature of this REA when compared with REA-13, despite Claimant having priced them differently.

768. In reality, the Ministry attempts to overcome the arguments tendered by Claimant by arguing the duplicative nature of the REAs, as aforesaid. Nonetheless, the Arbitral Tribunal has examined in detail the References attached to REA-13 and REA-28, respectively, and finds that, although the existence of the two REAs might lead to confusion, the reality is that the scope of the work under each is different.

769. By way of example, REA-13 deals with stanchion bases and stanchion brace lugs while in this REA-28, the works performed by Claimant refer to the repair and replacement of the stanchions themselves.

770. Undoubtedly, not only the bases and brace lugs were deteriorated, but also the stanchions. Even though the Ministry attempts to place under Claimant's responsibility the deterioration of such stanchions, it seems improper since the Ministry was the one who first issued the Condition Report. The Condition Report was incorporated into an OCR and a RAW was issued by Claimant and approved by the Ministry.

771. Furthermore, as indicated by Claimant, a joint survey was conducted

by the Parties which required Claimant to reinstall the parts, conduct the joint survey, remove them and place in storage. This is in addition to the costs associated with the replacement and repair of the stanchions.

772. In view of the foregoing, the Arbitral Tribunal finds that this REA-28 is not duplicative of REA-13. Even though both REAs contemplate the deck stanchions, the works performed by Claimant and claimed hereunder are distinct and may not be commingled. Moreover, such claim meets the requirements established by Clause 59 of the Contract for reimbursement, insofar as the good condition of the stanchions was absolutely necessary for the safe operation of the Frigates.

773. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 179,684 plus interest accruing thereon.

### (55) REA-30 – Stem Bar Repair

774. Claimant asserts that the Contract did not require Claimant to replace the stem bar on Frigate F-21[201]. Despite the exchange of correspondence between the Parties as to such replacement being included or not in the Claimant's scope of work, Claimant concluded that its inspection of the F-21 revealed that the condition of the stem bar posed only a cosmetic problem which did not represent a threat to the mission of the ship in any way.

775. Claimant reports that the Ministry did not change its position, and it insisted that the F-21 Stem Bar be repaired. Hence, Claimant issued OCR 11263 to define the required material and labor[202] and two MSCR[203], the latter being approved by the Ministry, Claimant being then authorized to do the work.

776. Claimant claims a credit of US$ 22,415 plus interest computed thereon.

777. The position assumed by the Ministry is similar to that already expressed in previous items. Moreover, the Ministry claims that Claimant

---

[201] See REA EXH. C.30 and References 1 and 2 thereto.
[202] See Reference 4 to REA EXH. C.30.
[203] See References 5 and 6 to REA EXH. C.30.

does not do any work other than those under its responsibility and it is illusory to assume that Claimant has done any and all work required by the Ministry. On the other hand, the Ministry avers that it has only required Claimant to do the work to comply with the Technical Specifications. Lastly, the Ministry claims that it had to demonstrate that the works were included in the Technical Specifications since Claimant, at all times and at its exclusive convenience, insisted that the works required had to be compensated as extra or unforeseen works.

### Decision by the Arbitral Tribunal

778. Claimant has brought to the record evidence as to the approval of different forms utilized for the request for the performance of the works. Conversely, the arguments put forward by the Ministry do not make any reference to such evidence, nor has the Ministry challenged that such approval existed. Rather, the Ministry opted for discussing whether or not such work was included in the Technical Specifications. In the end, the Ministry has only argued but not produced any evidence.

779. Hence, the Arbitral Tribunal awards the claim and orders the Ministry to pay Claimant the amount of US$ 22,415 plus interest accruing thereon.

### (56) REA-32 – MAAG Gears

780. Claimant asserts that Section C.15 of the Contract Specifications called for certain work to be performed on the propulsion system main reduction gears on both F-21 and F-22[204]. Specifically, the appropriate specification called for the "rebabbiting"[205] of 50% of the bearings. Claimant performed an open inspection of the main reduction gears on both ships as early as March 1998, and a report was made of the findings and placed on file on March 9, 1998[206]. However, no production or maintenance began at that time because of the condition of the ships upon arrival at the shipyard.

781. Despite the Ministry's dissatisfaction with the representative of MAAG who was hired to assist Claimant with the inspection, Claimant states that

---

[204] See REA EXH. C.32 and Reference 1 thereto.
[205] "Rebabbitting" means relining with Babbitt metal.
[206] See Reference 6 to REA EXH. C.32.

such representative was a chief engineer and was the same person who originally installed the gears during the construction of the ships. Claimant also claims that the delay in starting the inspections was due to the delay by the Ministry to sign the Act of Initiation of Work, which disrupted Claimant's production manning plan.

782. The REA EXH. C.32 contains the comprehensive list of OCRs[207] issued by Claimant, some of them called for the replacement of the identified bearings rather than rebabbiting them. Since replacement of bearings was outside the Contract scope, Claimant had to negotiate each of the OCRs with the Ministry. Claimant reports that the Ministry initially argued that the replacement of bearings was in scope, and the erroneous interpretation of the Contract caused delays in the Ministry issuing approval of the necessary extra work.

783. In sum, all main reduction gear bearings were purchased, received and installed by Claimant, despite the delay by the Ministry to approve them which delay averaged 14 days from the date they were submitted. Out of the 20 OCRs issued by Claimant for the replacement of the bearings and approved, the Ministry has compensated Claimant for only 4 OCRs and refused to pay the amount relating to the remainder.

784. Claimant claims a credit in the amount of US$ 238,750 before computing interest thereon.

785. The Ministry discusses the inappropriateness of Claimant's argument with respect to the delay in the execution of the Act of Initiation of Work since such act was executed at the right time, once the Parties agreed on the revised Technical Specifications.

786. The Ministry recognizes that the Contract specification called for the rebabbiting of the bearings rather than their replacement. Nonetheless, the Ministry avers that it approved the replacement because that was Claimant's suggested alternative to avoid generating additional repair costs for the Ministry.

---

[207] See References 9 to 33 to REA EXH. C.32.

**Decision by the Arbitral Tribunal**

787. Given the discussion presented by the Parties to the Arbitral Tribunal, the reality is that (i) the Ministry recognized that the Contract called for the rebabbiting of the bearings, and not for their replacement, (ii) Claimant provided the Ministry with a detailed report of the condition of the bearings, (iii) the Ministry approved the replacement of such deteriorated bearings but claims that such replacement was in lieu of the Ministry incurring higher costs with the repair.

788. Claimant has provided the Arbitral Tribunal and the Ministry with a substantial number of OCRs. The Ministry, despite the argument tendered, compensated Claimant for 4 OCRs which related to the same type of work.

789. The Ministry's arguments are in the Arbitral Tribunal's view insufficient to justify its interpretation that Claimant's suggestion was to avoid any additional costs associated with the repair and its refusal to compensate Claimant. Moreover, the Ministry does not deny that the service was performed by Claimant.

790. It is undisputed that the repair or replacement of the bearings was necessary for the operation of the Frigates. It must be stressed that there existed a Contract specification that dealt with such work. Even if the specification called for the rebabbiting of 50% of the bearings, it must be assumed that this was the number of bearings to be repaired, and this was absolutely necessary for the operation of the Frigates. The later decision of replacing the bearings and not simply repairing them is a clear evidence of compliance with the requirement for the operation of Clause 59. The standard of proof has been complied with by Claimant.

791. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 238,750 plus interest accruing thereon.

### (57) REA-33 – Shore Power Improvements Proposal Efforts

792. Claimant asserts that the Ministry directed it to conduct an engineering study for the repair and/or replacement of the entire shore power system in

the servomotor room of each Frigate[208]. Claimant provided the Ministry with a complete engineering study along with a pricing proposal for recommended system changes.

793. Claimant claims that the Ministry requested a revised proposal that included additional changes and updated specifications for the requested changes. Ministry approval was only secured after revising the proposal three times.

794. Claimant asserts that the Ministry did not compensate Claimant for all the costs associated with the engineering studies and the proposal efforts it performed. Claimant claims a credit of US$ 29,313 before computing interest thereon.

795. The Ministry disputes this claim and states that it may not identify the nature of the costs allegedly incurred by Claimant since the Ministry requested and paid for the study and also for the equipment installed after the Perceptive Control being secured. Hence, there is no amount due by the Ministry to Claimant.

## Decision by the Arbitral Tribunal

796. Despite the documentation presented by Claimant and the arguments used to justify the claim, the Arbitral Tribunal finds that Claimant failed to evidence the origin and itemization of the costs claimed by it. Moreover, payments were made by the Ministry in association with the work performed as well as the study. While Claimant asserts that it had to revise the proposal three times, it is unclear whether such subsequent revisions derived from the Ministry's requests only. It must be stressed that this work was out of scope and the Ministry in accepting to pay for it as an extra work was looking to a final change that complied with the principles that governed the retrofitting of the Frigates, such as quality and life cycle. Furthermore, Claimant was in control of the proposal, its revisions and cost calculation. Thus, the amount claimed hereunder refers to efforts to have a proposal approved by the Ministry and Claimant failed to produce evidence that such costs were not contemplated by the amount charged for the

---

[208] See REA EXH. C.33 and Reference 1 thereto.

study. In any event, such costs did not fall within Clause 59 of the Contract, nor did they comply with the requirements provided by such contractual clause.

797. Hence, the Arbitral Tribunal dismisses this claim.

### (58)REA-34 – Increasing Dry Docking Costs

798. Claimant claims that it was required by Specification C.47 to perform certain works in dry dock[209]. Upon submitting its bid, it planned a three-month dry-docking period. Due to the expansion of steel-plate replacement and structural modifications requested by the Ministry to be performed during the dry-docking period, the Frigates had to be moved five more times than originally planned, reworking the docking blocks and reinstalling gangways. In addition, Claimant discovered that the centerline vertical keel on F-21 was corroded, requiring Claimant to fix the structural problem before F-21 could be dry docked.

799. In Annex A, the Ministry explains that the additional work claimed by Claimant was contracted as extra and unforeseen under Clause 8 of the Contract, as per mutual agreement during the relevant WDCs. The price was provided by Claimant and it should have at that time included costs related to the longer stay of the Frigates in dry-dock or derived from additional moves. The Ministry asserts that during such negotiations Claimant never mentioned that this would imply a longer stay of the Frigates in dry-dock.

800. In its response to the arguments put forward by the Ministry, Claimant avers that the additional dry-docking period was the result of both the approved out-of-scope dry-dock work as well as work that has not been paid by the Ministry.

801. Claimant claims a credit of US$ 258,166 before computing interest accruing thereon.

---

[209] See REA EXH. C.34.

**Decision by the Arbitral Tribunal**

802. As provided by the Contract, any extra or out-of-scope work could qualify for a payment to be made by using the reserve amount created for such purpose under Clause 8 therein.

803. In reviewing the REA Exhibit C.34 it stems therefrom that the Ministry approved the cost estimated by Claimant and settled the amount so approved.

804. Once a price offer was made by Claimant, Claimant should have taken into account not only the services to be performed but also any other costs associated with moving the Frigates from water into dry-dock and then back into the water.

805. The reasons brought up by Claimant for such additional cost being now claimed are disputable. Since Claimant is the responsible shipyard in charge of the works, it should have taken into account that additional moves would be required, and such cost should have been added to the estimate submitted to the Ministry, especially when the Parties were discussing extra and unforeseen works under Clause 8. The claim at this juncture is belated since it should have been brought at the appropriate time upon discussing payments under Clause 8.

806. Hence, the Arbitral Tribunal dismisses this claim.

### (59) REA-35 – Navigation Radar System Proposal Efforts

807. Claimant claims[210] that the Ministry requested a proposal for modification to the navigational radar system. Claimant asserts that it prepared and furnished the proposal and revisions thereto, but the Ministry ultimately decided not to make the proposed change. Claimant claims it was entitled to compensation for its work and the Ministry refused to authorize any funding for the preparation efforts it expended.

808. In Annex A, the Ministry claims that Claimant was supposed to inspect the system and keep it informed on the defects and failures and, further, to

---

[210] See REA EXH. C.35.

prepare a proposal contemplating the corrective actions. In such case, should engineering works be required, Claimant should have provided the Ministry with a proposal including costs. The Ministry states that this system has not been followed by Claimant.

809. Claimant, in its reply, avers that the Ministry has not provided any evidence to support its factual assertions, and its argument is not relevant to Claimant's entitlement to compensation under Clause 8. Claimant claims a credit of US$ 18,273 before computing interest accruing thereon.

## Decision by the Arbitral Tribunal

810. As a matter of fact, taking into account the arguments brought up by Claimant, it is clear that its claim would qualify as an extra service under Clause 8 of the Contract.

811. Nevertheless, as previously defined by the Arbitral Tribunal, the metric for the award of claims in the context of this arbitral proceedings is that used for payments claimed relating to services deemed absolutely necessary for the fulfillment of the purpose of the Contract, as provided by Clause 59 thereof.

812. The amount claimed by Claimant would fall, as Claimant asserted, under Clause 8 and not Clause 59. The efforts made by Claimant, and the related cost being claimed herein, do not qualify under Clause 59, nor do such services meet the requirements imposed by such Clause.

813. Hence, the Arbitral Tribunal dismisses this claim.

## (60) REA- 36 – Black and Gray Water Systems Proposal Efforts

814. Claimant claims[211] that the Ministry directed it to prepare numerous proposals for additional repairs to Black and Gray Water Systems, and due to such request, it spent significant time preparing and revising a series of proposals and modifications to the Specifications.

815. Although the Ministry agreed to fund some of Claimant's proposal

---

[211] See REA EXH. C.36.

efforts, it did not compensate it for effort towards proposals the Ministry rejected.

816. In Annex A, the Ministry asserts that Claimant did not submit its proposal preparation costs in a timely manner and did not submit a technical study, but only data furnished by the manufacturer. Moreover, the Ministry states that in such system important works were performed and which related to the proposals submitted. Nonetheless, the related costs have been settled.

817. Claimant, in its reply, avers that the Ministry has not provided any evidence to support its factual assertions, and its argument is not relevant to Claimant's entitlement to compensation under Clause 8. Claimant claims a credit of US\$ 61,535 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

818. As a matter of fact, taking into account the arguments brought up by Claimant, it is clear that its claim would fall within an extra service under Clause 8 of the Contract.

819. Nevertheless, as previously defined by the Arbitral Tribunal, the metric for the award of claims in the context of this arbitral proceedings is that used for payments claimed relating to services deemed absolutely necessary for the fulfillment of the purpose of the Contract, as provided by Clause 59 thereof.

820. The amount claimed by Claimant would fall, as Claimant asserted, under Clause 8 and not Clause 59. The efforts made by Claimant, and the related cost being claimed herein, do not qualify under Clause 59, nor do such services meet the requirements imposed by such clause.

821. Hence, the Arbitral Tribunal dismisses this claim.

### (61) REA-37 – Electric Power Management System Proposal Efforts

822. Claimant claims[212] that the Parties agreed that Claimant should study

---

[212] See REA EXH. C.37.

whether the addition of an Electric Power Management System ("EPMS"), which would provide the capability for automatic paralleling of the Frigates' diesel generators would be appropriate, and the Ministry initially approved a RAW in relation to this concept.

823. However, the Ministry later revoked its approval, after Claimant had begun planning for the procurement and installation of the EPMS. Later, even though it had not authorized the work, the Ministry nonetheless complained that Claimant had not provided a proposal and directed it to complete various estimates on the EPMS.

824. Claimant responded to the Ministry's requests for further estimates and evaluations. The Ministry did not ultimately approve the work but nonetheless did not compensate Claimant for the proposal efforts.

825. In Annex A, the Ministry has argued that Claimant is not entitled to compensation for its proposal efforts because the Ministry did not approve the work in question.

826. Claimant states that such argument ignores the express terms of Clause 8, Second Paragraph, and claims a credit of US$ 37,932 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

827. As a matter of fact, taking into account the arguments brought up by Claimant, it is clear that its claim would fall within an extra service under Clause 8 of the Contract.

828. Nevertheless, as previously defined by the Arbitral Tribunal, the metric for the award of claims in the context of this arbitral proceedings is that used for payments claimed relating to services deemed absolutely necessary for the fulfillment of the purpose of the Contract, as provided by Clause 59 thereof.

829. The amount claimed by Claimant would fall, as Claimant asserted, under Clause 8 and not Clause 59. The efforts made by Claimant, and the related cost being claimed herein, do not qualify under Clause 59, nor do such services meet the requirements imposed by such Clause.

830. Hence, the Arbitral Tribunal dismisses this claim.

### (62) REA-38 – Habitability/Domestic Equipment Proposal Efforts

831. Claimant claims[213] that during the January 1998 WDCs, the Parties agreed that the Specifications would be revised to include the replacement of the inoperable items in the galley and laundry facilities. During the April 1998 WDCs, The Ministry requested that the Claimant provide characteristics and vendor names for the proposed changes. As a result, Claimant submitted additional information, OCRs, and RAWs to the Ministry in relation to such proposal. The Ministry then requested numerous additional proposals and rejected several of the proposals Claimant prepared, Claimant not being compensated for its efforts in preparing proposals that the Ministry rejected.

832. In Annex A, the Ministry argues that Claimant was compensated for its proposal preparation efforts where the Ministry approved the work at issue, and that Claimant should not be compensated for its efforts in preparing proposals the Ministry rejected because it only did work originally specified in the Contract.

833. Claimant avers that this argument put forward by the Ministry ignores the express terms of Clause 8, Second Paragraph and claims a credit of US$ 52,754 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

834. As a matter of fact, taking into account the arguments brought up by Claimant, it is clear that its claim would fall within an extra service under Clause 8 of the Contract.

835. Nevertheless, as previously defined by the Arbitral Tribunal, the metric for the award of claims in the context of this arbitral proceedings is that used for payments claimed relating to services deemed absolutely necessary for the fulfillment of the purpose of the Contract, as provided by Clause 59 thereof.

---

[213] See REA EXH. C.38.

836. The amount claimed by Claimant would fall, as Claimant asserted, under Clause 8 and not Clause 59. The efforts made by Claimant, and the related cost being claimed herein, do not qualify under Clause 59, nor do such services meet the requirements imposed by such Clause.

837. Hence, the Arbitral Tribunal dismisses this claim.

## (63) REA- 39 – Automatic Telephone and Entertainment Systems Proposal Efforts

838. Claimant claims[214] that the Parties agreed that Claimant should prepare a recommendation concerning the replacement of the Automatic Telephone and Entertainment Systems, and The Ministry signed RAWs authorizing Claimant to prepare engineering studies for the systems' replacement. Claimant conducted the studies and proposals under the approved RAWs, but the Ministry made several additional changes to its requirements, necessitating that Claimant perform further research and proposal efforts, which were not covered under the previously approved RAW. Ultimately, the Ministry did not approve the work included in Claimant's final, revised proposal. Claimant was not compensated for its proposal preparation efforts beyond those encompassed in the RAW. Claimant claims a credit of US$ 7,623 before computing interest accruing thereon.

839. In Annex A, the Ministry avers that it may be observed from RAW 970183 that it was authorized and payment relating thereto was made. Later, the Ministry authorized the purchase of equipment for the telephone system and the entertainment system. Nonetheless, the Ministry has not approved the man-hours for the installation since they were excessively expensive and Claimant refused to reduce them.

### Decision by the Arbitral Tribunal

840. As a matter of fact, taking into account the arguments brought up by Claimant, it is clear that its claim would entail compensation for the rendering of extra work in the spirit of the Contract.

---

[214] See REA EXH. C.39.

841. Nevertheless, as previously defined by the Arbitral Tribunal, the metric for the award of claims in the context of this arbitral proceedings is that used for payments claimed relating to services deemed absolutely necessary for the fulfillment of the purpose of the Contract, as provided by Clause 59 thereof.

842. The arguments made by the Ministry contrast with those brought by Claimant. The Ministry focuses on excessive man hours for installation and the high cost charged therefor. Claimant, in turn, claims costs associated with proposal preparation efforts, but Claimant has not evidenced that the specific services being claimed were absolutely necessary for the fulfillment of the Contract, failing to comply with the requirements imposed by such clause.

843. Hence, the Arbitral Tribunal dismisses this claim.

### (64) REA-40 – Force Majeure

844. During Claimant's performance of the Contract, several *force majeure* events affected the shipyard. These events included: (i) import/export license delays, (ii) Hurricane Georges, (iii) labor strike, and (iv) Tropical Storms Hanna and Isidore and Hurricane Lili.

845. With respect to those events, the Ministry initially denied Claimant's entitled relief to schedule extension. Claimant incurred administrative costs in order to respond to the Ministry's improper denial of Claimant's entitled relief. Claimant also incurred additional costs in moving F-22 to protected areas and for other actions required to secure the Frigate against Tropical Storm Isidore in September 2000, Tropical Storm Hanna in September 2002, and Hurricane Lili in October 2002. Claimant claims a credit of US$ 6,765 before computing interest accruing thereon.

846. In Annex A, the Ministry asserts that this claim was discussed during several meetings held with Claimant. The Ministry states that, due to the force majeure nature of the events, neither Party is held liable for any damages that may arise therefrom. The Ministry's understanding is based on the legal opinion of the Legal Department of the Army, and its content was timely communicated to Claimant.

847. The Ministry further avers that it granted Claimant an extension of 150 days with respect to the term for the redelivery of the Frigates, and such costs, as claimed by Claimant, do not fall within the expenses contemplated by Clause 8, Second Paragraph of the Contract, nor has Claimant complied with the requirements provided therein.

### Decision by the Arbitral Tribunal

848. The *force majeure* events that occurred and affected the area where the shipyard is located gave rise to an extension of 150 days, as asserted by the Ministry and not challenged by Claimant. This claim relates to alleged administrative costs that Claimant had to incur to obtain the extension, which was originally denied by the Ministry. On the other hand, this claim also contemplates the costs incurred in moving Frigates to protected areas. As far as those are concerned, the Frigates were under the custody of Claimant, and Claimant had to take the action deemed necessary to protect them. The Arbitral Tribunal finds that such claim fails to comply with the requirements under Clause 59.

849. Hence, the Arbitral Tribunal dismisses this claim.

### (65) REA-41 – Degaussing System

850. Claimant claims[215] that Specification C.47, *inter alia*, required Claimant to open, inspect, make minor repairs and test the motors, panels and electrical control system that comprised the Degaussing System.

851. Claimant asserts that it discovered that the system motor generator sets and controllers were beyond repair, and that replacement parts were unavailable from either the original system manufacturer or any other source. Claimant reported these findings to the Ministry, and recommended purchasing new components from another manufacturer and relocating certain equipment. The Ministry rejected Claimant's recommendations.

852. Claimant ultimately stopped work on the Degaussing System and credited the Ministry for the work it could not accomplish, but Claimant was

---

[215] See REA EXH. C.414.

not compensated for all its expenditures associated with locating replacement parts for the system and performing administrative work related to the system. Claimant claims a credit of US$ 29,571 before computing interest accruing thereon.

853. In Annex A, the Ministry asserts that the Technical Specification C.47 contemplated the maintenance of the degaussing system. However, during the WDCs the Parties agreed to expand the scope of the major overhaul. It is, the Ministry says, inexplicable that Claimant had submitted an estimate of costs to conduct such maintenance but then a few months later advised that such system is no longer manufactured and recommended the purchase of another system for a disproportionate cost and which failed to comply with the military requirements.

854. The Ministry confirms that it was reimbursed by Claimant for amounts due to Claimant not performing such works and the case was settled. Should there exist any costs that had been incurred in locating parts and performing administrative work, they should have been notified by Claimant to the Ministry at such time so that they were deducted from the amounts owed as reimbursement by Claimant.

### Decision by the Arbitral Tribunal

855. This claim falls outside the scope of Clause 59 of the Contract for failing to comply with the requirements provided therein. There is no room for such costs that were incurred contemporaneously with the decision by the Ministry to not pursue the replacement to be claimed under a special system that was created by the Parties to cover situations where the expense, although not originally foreseen, was absolutely necessary for the fulfillment of the Contract.

856. Hence, the Arbitral Tribunal dismisses this claim.

### (66) REA-42 – Seduction and Distraction System

857. Claimant claims[216] that the Contract excluded weapons and

---

[216] See REA EXH. C.42 and References thereto.

ammunitions load-out services from Claimant's performance requirements, and stated that weapons and/or ammunitions would not be handled at Claimant's facility.

858. Claimant explains that, during the WDCs, the Seduction and Distraction System that was to be installed on the Frigates was described. This required Claimant to provide two test cartridges per ship and a series of ammunition for seduction and distraction countermeasures against missile threats.

859. Given the Contract provision specifying that Claimant would not be handling ammunition at the shipyard, Claimant made it clear in submitting proposals for the chosen system and alternative systems that its price did not include ammunition.

860. The Ministry, however, asserted that Claimant was required to supply enough cartridges both to load the systems themselves and to fill all available storage areas, a total of 184 cartridges. Claimant, due to the Ministry's direction, ultimately supplied 80 cartridges per ship and was not compensated by the Ministry. Claimant claims a credit of US$ 1,747,557 before computing interest accruing thereon.

861. In Annex A, the Ministry avers that, during the WDCs, the specifications were changed to install the SCLAR system made by SIPICAN and that Claimant insisted on the fact that it was required to deliver just one series of cartridges, denying the request by the Ministry to deliver 184 cartridges per ship.

862. It is the Ministry's understanding that Claimant had to deliver 184 cartridges per ship and, further, that it owes no amount to Claimant because the specification required Claimant to provide a series of ammunition for the system, which, in its understanding, meant the full storage capacity, *i.e.* 184 cartridges.

863. Claimant asserts that the Ministry does not dispute the language or meaning of the Contract or the fact that Claimant did not include the price of cartridges in its price for the system.

**Decision by the Arbitral Tribunal**

864. REA EXH. C.42 contain a voluminous number of documents and correspondence exchanged by the Parties. This matter has taken up a substantial portion of the discussions between the Parties, and they have not been able to agree, not even on a compromise solution.

865. In reality, Claimant brings to the attention of the Arbitral Tribunal two contractual provisions – Clause 3, Second Paragraph and Clause 24, Second Paragraph. In reading those provisions, it is undisputed that the Frigates were delivered at the shipyard free of ammunition and that any weapon and/or ammunition load-out services were not included therein and should not be handled at the shipyard.

866. The letter and spirit of the Contract are clear, there existing no room for any sort of interpretation other than literal construction.

867. Even if it were admitted that the specifications contained a provision that could lead to the conclusion that Claimant was obligated to supply 184 cartridges per ship, such provision would be deemed void because Clause 1, Fifth Paragraph of the Contract clearly states that in case of discrepancies between contractual clauses and specifications, the contractual clauses shall prevail. Therefore, it may not be assumed that, such obligation failing to exist, Claimant had included the related costs in its bid offer. It must be stressed that, upon the execution of the Contract, the system foreseen was different from the SCLAR system that finally prevailed.

868. Since the specifications conflict with Claimant's obligation under the contractual provisions by requiring Claimant to provide the cartridges, such supply and related services fall within the scope of Clause 59, not for being an extraordinary cost, but primarily because the supply of cartridges was absolutely necessary for the fulfillment of the performance of the Contract, especially for a seduction and distraction countermeasures system.

869. In view of the foregoing, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the total amount of US$ 1,747,557 plus interest accruing thereon.

## (67)REA-44 – Excessive Paint Thickness

870. Claimant claims[217] that under Specification C.47, it was required to perform abrasive blasting of each Frigate's underwater hull, top and freeboard. During inspections, as alleged by Claimant, it received information from the Venezuelan Navy indicating that paint did not contain toxic material and was maintained to military specifications, which means paint thickness of 25 mm.

871. Nonetheless, when Claimant began abrasive blasting operation, the hull paint was discovered to have dangerously high levels of lead and chrome, which required Claimant to set up extraordinary worker cleanliness and disposal precautions pursuant to U.S. Hazmat zone rules. Claimant reports that it discovered that, while the thickness was standard on the bottom of the hulls, the Frigates had approximately 100 mm of paint on their side shells in the boot top area. It then had to expend three times more labor than would have been the case had the paint conditions been as disclosed by the Ministry at the time of the Contract.

872. The Ministry also concluded that it was absolutely necessary for Claimant to blast and prime each Frigate's hull area twice due to significant steel deterioration found on the hulls after the paint was removed. Claimant claims a credit of US$ 1,242,057 before computing interest accruing thereon.

873. In Annex A, the Ministry avers that Claimant's description simply shows that it performed the works referred to in Specification C.47 since such works, as described by Claimant, were indicated therein, meaning there is no obligation on the Ministry's part to compensate Claimant. The Ministry further states that such works have been adequately settled by it following the requisite Perceptive Control.

874. The Ministry underscores that Claimant had sufficient time to determine the works that were necessary, to visit and inspect the Frigates in Puerto Cabello and to submit a bid proposal that considered all those aspects. Finally, the Ministry states that nowhere in Specification C.47 is

---

[217] See REA EXH. C.44 and Reference 1 thereto.

there a reference to paint thickness of 25 mm or anything to indicate that, should it be higher, the Ministry would compensate Claimant for such increased work.

875. Claimant claims that the paint thickness and hazardous material conditions were only discoverable upon beginning the abrasive blasting, and could not have been determined through pre-Contract inspections.

### Decision by the Arbitral Tribunal

876. The description of the paint thickness brought by Claimant in its Post-Hearing Brief and the one contained in REA EXH. C.44 do not match. While in the Post-Hearing Brief Claimant claims it was informed of the 25 mm paint thickness by the Venezuelan Navy during inspections, in the REA EXH. it is stated that "*[p]rior to Contract award, The Ministry provided no information or data relative to the existing paint system thickness, nor did The Ministry mention the fact that the ships were coated with paint which contained lead and chrome when Ingalls was preparing its Contract bid".*

877. Nonetheless, it also asserts that "*since any experience [sic] shipyard would reasonably expect to encounter normal hull paint thickness which did not exceed approximately 25 mils, the necessity to remove excessive quantities of paint, which was in many areas approximately 100 mils thick, increased both Ingalls' time and cost of completing the abrasive blasting work under Reference 1".* Hence, in the absence of any information and despite the visual inspection of the Frigates, Claimant assumed that the paint thickness was aligned with the standard practice adopted in the industry generally.

878. It is noteworthy mentioning that in this case there exists no exchange of correspondence or any other sort of written communication between the Parties, nor has Claimant evidenced that it had timely submitted OCRs and RAWs. The REA EXH. consists of the general description and one Reference which is the description of the works under Specification C.47.

879. It is striking that, in the presence of hazardous materials and contaminants which required Claimant to take special measures, Claimant did not notify the Ministry in writing. Moreover, Claimant does not dispute

that the Ministry has settled the work within the scope, nor has Claimant challenged the reference to the Perceptive Control. Thus, at the time of settling upon the agreed amount relating to this work, the reasons that gave rise to this claim already existed. Despite that fact, Claimant has not presented any evidence of discussions related to excessive paint thickness.

880. In this case, should any additional or extra work have been performed by Claimant, it should have produced evidence of the work performed in support of its claim. However, there is no evidence in the record of this being the case.

881. In view of the foregoing, and bearing in mind the parameters defined by this Arbitral Tribunal for the application of Clause 59, this Arbitral Tribunal is convinced that this claim lacks support and falls outside the scope of Clause 59.

882. Hence, the Arbitral Tribunal dismisses this claim.

## (68) REA-46 – Work Definition Conferences

883. Claimant claims[218] that following the execution of the Contract, the Ministry requested analysis on a change proposal but did not authorize the change it proposed. Claimant states that it should be entitled to compensation for its proposal preparation efforts. The request tendered by the Ministry was for the Parties to evaluate modifications to certain Specifications during the WDCs.

884. However, as Claimant reports, many of these Specifications were eventually left unchanged. Nevertheless, in order for the Ministry to properly evaluate the possibility of modifying these Specifications, it was necessary for Claimant to perform various engineering and feasibility studies, to develop proposals, and to revise its advance planning effort and production schedules. Despite the clear language of the Contract, however, Claimant was not compensated for this work. Claimant claims a credit of US$ 306,041 before computing interest accruing thereon.

---

[218] See REA EXH C.46 and References thereto

885. In Annex A, the Ministry states that should Claimant have determined that such work conferences would impose a cost on it, it should have claimed, at the appropriate time, a credit as extra or unforeseen work, and should have brought such claim to the attention of the Ministry for proper analysis and approval in accordance with Clause 8.

886. The Ministry also asserts that such Work Definition Conferences were held by mutual agreement of the Parties with a view to update the original technical specifications, for Claimant could not comply with some of them. The changes were designed to accommodate Claimant's inability to perform the duties as specified, which caused the Ministry to spend significant amounts of money in accordance with Clause 8.

### Decision by the Arbitral Tribunal

887. This claim is inadmissible. Claimant in submitting it refers expressly to Clause 8, Second Paragraph. The Ministry also alleges that such amount should have been claimed under the aforesaid Clause 8.

888. Indeed, in light of the description of the work performed by Claimant, it is indisputable that such work qualifies as extra or additional work. There are no grounds for accepting such claim under Clause 59 where the circumstances lead to a claim based on Clause 8.

889. Hence, the Arbitral Tribunal dismisses this claim.

### (69) REA-48 – Propeller Guard Replacement

890. Claimant claims[219] that Specification C.47 governed the work to be done in dry-dock. It did not include, however, any requirements for the replacement of propeller guard assemblies. After the Frigates were in dry-dock and the hulls were inspected, Claimant discovered that the propeller guard assemblies were severely deteriorated on both ships.

891. Claimant then issued a MSCR for the assemblies to be replaced. The Ministry, however, as Claimant avers, never responded to such MSCR.

---

[219] See REA EXH. C.48.

892. Nonetheless, Claimant replaced the propeller guard assemblies on both Frigates because doing so was absolutely necessary to the completion of the Contract, even though it was outside its scope. Claimant claims a credit of US$ 25,624 before computing interest accruing thereon.

893. In Annex A, the Ministry refutes the claim and states that it does not know why Claimant is pursuing such claim. As per the Ministry, the removal and replacement of such propeller guards was included in the other works performed and accounted for by Claimant. The Ministry says that Claimant would not have done such works if they had not been included in the Specifications of the Contract, or had been included within the replacement of dry-dock materials.

### Decision by the Arbitral Tribunal

894. This claim encompasses an alleged extra or unforeseen work and entails the discussion of this being in-scope or out-of-scope work.

895. Furthermore, this also brings into discussion the extent to which MSCRs constitute approval of expenses. In this case, the Ministry never responded, and its assertions do not operate, in principle, to disqualify the claim.

896. Clause 59, as defined by the Arbitral Tribunal, is an exceptional mechanism that may not be applied in all circumstances and requires that, if any work was absolutely necessary, proper evidence be submitted by Claimant.

897. In this case, given the Ministry's argument that such work was encompassed by other activities, Claimant has not complied with such standard of proof. The reference to an MSCR issued but not answered by the Ministry, with the consequences provided by Clause 17, Third Paragraph of the Contract, simply shows that the MSCR was deemed approved. Nonetheless, Claimant has not shown that such replacement was absolutely necessary for the fulfillment of the Contract, and that there existed no alternative to replacement. The Arbitral Tribunal finds that such claim falls outside the scope of Clause 59.

898. Hence, the Arbitral Tribunal dismisses this claim.

## (70) REA-51 – Power Factor Correction

899. Claimant claims[220] that Specification C.36 of the Contract required it to install a power factor correction system ("PFCS"). Despite an extensive search effort, no PFCS units conforming to the Specification were found to exist. Claimant then developed and proposed an alternative PFCS. The Ministry rejected the alternative proposal and requested a new option. After conducting additional research, Claimant could not find another alternative and therefore proposed to the Ministry that the PFCS requirement be canceled with a credit to the Ministry.

900. The Ministry rejected Claimant's recommendation and directed Claimant to provide technical data an engineering study results and to explain to the Ministry through meetings and correspondence why the PFCS could only be replaced using Claimant's alternative proposal.

901. Claimant claims that it was not compensated for its engineering efforts to research and investigate alternatives to the defective PFCS specification and for its performance of system testing. Claimant claims a credit of US$ 5,500 before computing interest accruing thereon.

902. In Annex A, the Ministry asserts that the specification under discussion has always been included in the Contract. However, in proposing to the Ministry to eliminate such obligation, Claimant failed to provide the appropriate technical elements that would have helped the Ministry to decide.

903. Moreover, the Ministry avers that no compensation is due to Claimant insofar as it was Claimant's obligation to install the PFCS and in attempting to exclude it, Claimant should have, of its own accord, supplied the Ministry with the technical information to show that no units conforming to the specifications were found to exist.

---

[220] See REA EXH. C.51.

**Decision by the Arbitral Tribunal**

904. Since the proposal submitted by Claimant to the Ministry contemplated the exclusion of the installation of the PFCS from the scope of its work for the reasons laid down by Claimant, it is obvious that such expenses incurred by Claimant fail to comply with the requirements for qualifying under Clause 59, *i.e.* they were not absolutely necessary for the fulfillment of the Contract.

905. Conversely, such expenses were incurred by Claimant to support the exclusion of the installation of the PFCS from the scope of the work. Since such obligation derived from a contractual obligation, any technical information and data should have been supplied. Claimant reports in REA EXH. C.51 the long discussions held and alternatives suggested to the Ministry due to the original specification being impracticable and the Ministry's insistence on its compliance by Claimant.

906. In other words, in spite of having offered a credit to the Ministry for not performing the works agreed upon, after producing evidence that the power measured complied with the required parameters, the Ministry did not change its views. Claimant then credited the full value of the estimated labor hours and materials that would have been required to install the alternative items so proposed.

907. Hence, the Arbitral Tribunal dismisses this claim.

**(71) REA-55 – Stack Closure Strip**

908. Claimant claims[221] that under Specification C.47 governing the dry-dock works, it was not required to repair the stack closure strip. However, while performing the dry-dock work, it discovered that part of F-22's stack was rusted through. It then prepared and issued a MSCR to furnish design and installation information necessary to correct this defect. The Ministry never responded to this MSCR.

909. However, Claimant corrected the defective stack closure strip in order

---

[221] See REA EXH. C.55.

to assure the watertight integrity and safety of F-22. Claimant claims a credit of US$ 3,661 before computing interest accruing thereon.

910. In Annex A, the Ministry alleges that Claimant never brought to its attention that works had to be done on the stack closure strip, and that the work was within the scope of its obligations.

911. In response, Claimant asserts that it has evidenced that it had submitted the relevant MSCR and that the added work was absolutely necessary and out-of-scope.

### Decision by the Arbitral Tribunal

912. The work reflected in the MSCR qualifies under the category of extra or unforeseen work on condition that Claimant is in a position to produce evidence as to such works not being captured by the applicable technical specifications.

913. The discussions between the Parties as to the MSCR lead to the conclusion that the problem was the interpretation of the scope of work provided by Specification C.47. While Claimant claims it was out-of-scope work, the Ministry takes the opposite position, stating that it was in-scope and all work done by Claimant was in accordance with the Contract.

914. The extra work claimed by Claimant was incidental to the performance of the overall dry-dock works, and the record shows no strong evidence has been presented showing that such work was actually out-of-scope.

915. Hence, the Arbitral Tribunal dismisses this claim.

### (72) REA-56 – 127/54-mm Gun Shroud Proposal Efforts

916. Claimant claims[222] that while it was performing dry-dock repairs, the Ministry instructed it to prepare an engineering design and price estimate for the fabrication and installation of a stainless-steel cap or shroud to cover the foundation of the 127/54-mm gun. Claimant completed the engineering work for the Ministry's proposed change. However, the Ministry then

---

[222] See REA EXH. C.56.

canceled its request for the added work, and Claimant was not compensated for its proposal efforts. Claimant claims a credit of US$ 1,940 before computing interest accruing thereon.

917. In Annex A, the Ministry asserts that it requested Claimant a solution to strengthen the foundation of the 127/54-mm gun. In turn, after submitting two OCRs, both similar in content, the Ministry avers that the proposed solution was far from matching what it had requested but was rather a cosmetic fix to embellish the structure of the gun without adding any structural strength or an operative advantage. To the contrary, the Ministry claims that the solution proposed by Claimant actually represented a future maintenance problem because the structure of the gun remained hidden but not free of corrosive effects.

### Decision by the Arbitral Tribunal

918. As a matter of fact, taking into account the arguments brought up by Claimant, it is clear that its claim would fall within the concept of extra works under the Contract.

919. Nevertheless, as previously defined by the Arbitral Tribunal, the metric for the award of claims in the context of this arbitral proceedings is that used for payments claimed relating to services deemed absolutely necessary for the fulfillment of the purpose of the Contract, as provided by Clause 59 thereof.

920. However, the cancellation of the OCR proved that the Contract could be fulfilled without such costs being absolutely necessary. Thus, Claimant failed to meet the requirement under Clause 59.

921. Hence, the Arbitral Tribunal dismisses this claim.

### (73) REA-57 – Air Conditioning System Motors (115v vs. 440v)

922. Claimant claims[223] that Specification A.13 called for the installation of air conditioning equipment manufactured by York. During the WDCs, despite Claimant's objections, the Ministry directed Claimant to install

---

[223] See REA EXH. C.57 and References 6, 8 and 9 thereto.

instead an air conditioning system manufactured by Carrier. The motors in the Ministry-chosen Carrier air conditioning units were rated at 115 volts rather than 440 volts.

923. At the Ministry's direction, Claimant installed the Carrier 115-volt equipment, and therefore had to replace all existing electrical cable for the air conditioning fan coil units, which was not in the scope of the Specification. Claimant claims a credit of US$ 930,494 before computing interest accruing thereon.

924. In Annex A, the Ministry summarizes the discussions held by the Parties with respect to the air conditioning system to be installed in the Frigates to conclude that the credit claimed by Claimant is not due.

925. The Ministry asserts that the Specification provided for the installation of 440v motors, but the request for changing from to 440v to 115v came from Claimant since Carrier only manufactured 115v motors for this type of equipment.

926. The Ministry further avers that the change of supplier of the air conditioning (substituting Carrier for York) was negotiated and accepted by both Parties and it is unacceptable that, three years after such change, Claimant claims that the York system would have been easier to install and that Claimant had to make changes to install the Carrier systems to the extent they were different from the York ones.

927. In response, Claimant asserts that it has demonstrated that the Ministry directed it to install Carrier equipment over Claimant's strong objections, resulting in the incompatibilities and added work discussed in this claim.

### Decision by the Arbitral Tribunal

928. The evidence brought by Claimant with respect to this claim clearly shows that it objected strongly to the change of the air conditioning system supplier from York to Carrier. Claimant timely submitted to the Ministry a presentation in which it highlighted the advantages and disadvantages of

using 120v motors[224]. Amongst the disadvantages listed by Claimant, it must be stressed that the use of 440v motors would require redesigning of the Fan Coil Units ("mobilettos") by increasing their size. Furthermore, the Carrier equipment was commercial, rather than MIL-SPEC (under U.S. Military Specifications).

929. In such presentation, Claimant also indicated that a supplier for 440v motors identified by Carrier does not maintain inventory of 440v motors and would have to set up a production line to manufacture 440v motors.

930. Such presentation clearly indicates Claimant's recommendation to install 120v motors as prescribed by Carrier, in which case installation would require only, as far as the voltage was concerned, the addition of a step-down transformer (440v to 120v) which was included as part of Claimant's installation.

931. For reasons that are mentioned briefly by the Parties but not fully developed, the Ministry opted to use 115v motors and Claimant had to replace all existing electrical cable for the air conditioning fan coil units that were not in the scope of the Specification.

932. Although the Ministry claims that this decision was made by the Parties jointly, it knew (or should have known), due to the extensive discussions in that regard provided by Claimant with the assistance of Carrier, that in light of the motors selected, the replacement of the fan coils would be necessary.

933. On the other hand, it is disputable the argument brought up by the Ministry whereby it asserts that it was Claimant who requested the change of the power of the motors since Carrier did not manufactured the ones that were contained in the Specification.

934. As a matter of fact, what really happened, in light of the evidence available to the Arbitral Tribunal, is that the Ministry selected the manufacturer of the air conditioning—Carrier in lieu of York—and Claimant, taking such decision into account, had to deal with the differences in the systems supplied by one and the other manufacturers. This imposed a duty

---

[224] See Reference 5 to REA EXH. C.57.

on Claimant to appraise both systems and to indicate the route to be followed in view of technical constraints.

935. Once the supplier of the system was changed, while the Specification referred to a replacement of York equipment, and the chosen manufacturer was Carrier, this required the change of the existing electrical cable in its entirety. This decision was made to secure compatibility of the electrical cable with the new equipment installed.

936. Furthermore, it is clear that the evaluation of the merits (or lack of it) by Claimant was based on the technical reports prepared by Carrier and its group of companies. The recommendation by Claimant was based on expert opinion.

937. The standard of proof required under Clause 59 was complied with in light of the evidence introduced into the record. Claimant would not be able to fulfill the contractual obligations with that respect without changing the electrical cables for the air conditioning fan coils. In sum, the change of supplier and consequent technical specifications determined such change. The fact that such decision was made jointly by the Parties does not exempt the Ministry from bearing the additional costs associated thereto.

938. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 930,494 plus interest accruing thereon.

### (74) REA-58 & 59 – Air Conditioning and Ventilation and Exhaust

939. Claimant claims[225] that Specification C.54 required it to renovate/upgrade the air conditioning system on Frigates F-21 and F-22. Claimant submitted two proposals to the Ministry (one from York and the other from Carrier). The Ministry decided to select Carrier as the supplier and the particulars of this choice have already been detailed in the preceding claim history.

940. Once Carrier was selected, it became mandatory for the discharge of such duty to relocate several air handling units and fan coil units because

---

[225] See REA EXH 58 & 59 and References thereto

the Carrier equipment did not fit in the planned spaces. As a consequence of such relocation, Claimant had to remove associated foundations, piping and cabling which work was not included in the Specification. In addition, although the Specifications required Claimant to replace 20% of the ventilation ducts in engine room spaces, it ultimately had to replace more— 510 ventilation ducts in F-21 and 560 ventilation ducts in F-22—due to excessive deterioration of the duct work and damage from Hurricane Georges.

941. Claimant also asserts that the Ministry required it to install remote A/C monitoring systems, which was also out of scope. Finally, because of the delays caused by the out-of-scope work, Claimant had to perform periodic and preventive maintenance. Claimant claims a credit of US$ 3,449,857 (priced collectively for both claims due to their interrelated nature) before computing interest accruing thereon.

942. In Annex A, the Ministry asserts that the negotiations were carried out by the Parties and the price and the equipment to be installed were also agreed upon. As a consequence, the technical specification was replaced by a new one with a view to reflect the changes produced. All those documents were approved by the Comptroller of the Army, and no further changes or payment claims may be accepted.

943. The Ministry claims that the costs being charged by Claimant are a result of the lack of planning, which imputes losses and delay to Claimant. This clearly shows that Claimant did not have a deep knowledge of the works to be performed at the time it submitted the price associated with the changes, which reinforces the argument of lack of planning. This has contributed to losses, delays and lack of control by Claimant.

944. As far as the damages caused by Hurricane Georges are concerned, the Ministry claims that part of such damages was covered by the insurance policy maintained by Claimant. Nonetheless, Claimant asserts that the insurance coverage was based on the value of the old ducts and it is entitled to an additional indemnification payment.

945. The Ministry also claims that the deterioration of the ducts that were

dismantled by Claimant was due to the improper conditions of storage for which Claimant bears responsibility. The ducts were left exposed to inclement weather, and the condition was aggravated by Hurricane Georges, which exposed them to wind and salt water. The Ministry finally states that such ducts were under the custody of Claimant and it had to replace them once it was indemnified by the insurer.

946. In its response, Claimant avers that it has provided testimony that it was not fully compensated for this work.

### Decision by the Arbitral Tribunal

947. Despite this extensive report by the Parties, two aspects have to be considered by the Arbitral Tribunal. As decided earlier, the change of supplier and the features finally chosen required certain replacements to make them compatible with the new system. The other aspect relates to the standard of proof required by Clause 59 of the Contract.

948. In this claim, the evidence produced by Claimant is far from making the facts indisputable. First, the photos of deteriorated ventilation ducts introduced into the record[226] are undated. The Arbitral Tribunal is not able to determine when they were actually taken. Their condition is controverted by an argument brought by the Ministry whereby the ducts were improperly stored and exposed to inclement weather conditions. Moreover, such condition might have been aggravated by the effects of Hurricane Georges. Claimant has not shown that the storage conditions were, in turn, proper for this kind of material.

949. Moreover, Claimant recognizes that it had to dismantle the ventilation ducts when it discovered the deterioration of the same. The Ministry claims that in dismantling the ducts, Claimant had decided to replace all of them with new ducts. There is no evidence that the condition may have been worsened upon dismantling the said ducts, nor has Claimant elaborated on such argument.

950. As aforesaid, under the original Specification, which Claimant

---

[226] See Reference 2 to REA EXH. C.59.

recognizes, Claimant was supposed to replace up to 20% of the ventilation ducts. Nonetheless, Claimant has not evidenced the amount of ducts that would make up the 20%, but only declared that it replaced a significant amount in each Frigate.

951. As far as the insurance coverage and Claimant's allegation that it had been partially reimbursed are concerned, Claimant did not bring any evidence in that regard. It remains as an unproved allegation although Claimant mentioned that it provided testimony with that respect.

952. In Annex A, the Ministry alleged that as a result of the change of supplier of the air conditioning system, it was credited by Claimant the total amount of US$ 99,535.

953. This allegation has not been contested by Claimant. If Claimant decided to credit such amount to the Ministry, it should have taken into account that additional services would be required and should have offset partially its credit against the total amount credited to the Ministry, but it did not.

954. The complexity of this claim would have required Claimant to be precise and complete in producing supportive evidence of the facts alleged by it.

955. In sum, Claimant's claim lacks supporting evidence.

956. Hence, the Arbitral Tribunal dismisses this claim.

### (75) REA 62 – Controllable Propeller Oil Distribution Boxes

957. Claimant claims[227] that the Specifications required it to repair the controllable pitch propeller oil distribution boxes ("OD") by, *inter alia,* providing new servo valves, (ii) repairing the tank return flow controls, and (iii) flushing and inspecting the control oil piping network to include command and control units.

958. In addition, Claimant reports, the Ministry authorized the removal of

---

[227] See REA EXH. C.62.

the shafting and OD boxes under RAW 970019 and related OCRs which covered the only structural work envisioned at that time. The removal process revealed structural deficiencies that also made it absolutely necessary for Claimant to install temporary steel support structures to facilitate the removal and reinstallation of the OD boxes. The structural deficiencies prevented Claimant from using its planned, normal, rigging procedures for handling and moving large components and the then-required services were not included in such RAW as they were unforeseen at the time the RAW was prepared. Claimant reports that the Ministry refused to authorize payment for the extra structural work. Claimant claims, therefore, a credit of US$ 89,699.

959. In Annex A, the Ministry confirms that it authorized under the aforementioned RAW all works related to the OD boxes and that at such time both the Ministry and Claimant were in agreement with the price offered by Claimant and the scope of the work contracted thereunder.

960. The Ministry claims that if Claimant has problems with the removal of the equipment, Claimant must be the one to bear the costs associated with the ongoing work. The Contract does not authorize adjustments to prices agreed by the Parties due to problems encountered by Claimant. The Ministry states that it must be assumed that a shipyard of the size and importance of Claimant must know in detail its naval business and, when it offers a price, it is implied that it has taken into account all problems that may arise and the difficulties that may be encountered.

961. Claimant, in its response, asserts that it has demonstrated that the RAW does not cover the structural deficiencies which were previously unknown to the Parties.

### Decision by the Arbitral Tribunal

962. The costs associated with the problems with which Claimant was confronted during the removal of the equipment should have been claimed to the extent to which Claimant could legitimately prove that such costs had not been considered upon proposing the price.

963. It is indisputable that problems occurred, but it is also indisputable

that the Ministry, in appraising Claimant's claim, refused to authorize it by stating that Claimant should have admitted that such costs might occur.

964. The reality is that those costs claimed by Claimant relate to problems encountered in its performing the works. Even if Claimant claims that the RAW did not cover structural deficiencies, it failed to evidence why such deficiencies were such that they could not have been previously determined when the Frigates were at the shipyard. Thus, Claimant failed to meet the requirements under Clause 59.

965. Hence, the Arbitral Tribunal dismisses this claim.

### (76) REA-64 – Flight Deck Modifications (Proposal Efforts)

966. Claimant claims[228] that Specification C.47 required it to remove, supply and reinstall "like new" the entire flight deck. During the Contract performance, Claimant concluded that it was absolutely necessary for it to provide two proposals/technical studies for extra out-of-scope work regarding the flight deck's safety, size, and stability.

967. Claimant then completed the research and studies, but the Ministry declined to order any work and did not compensate it for the expended labor costs. Claimant claims a credit of US$ 52,557 for its related proposal efforts.

968. In Annex A, the Ministry asserts that the first proposal referred to the expansion of the flight deck, but after analyzing the proposal it was decided not to proceed with the works due to the lack of technical data that would guarantee that the new supporting points were sufficiently rigid to support the weight of the flight deck and the efforts exercised by the helicopters. The Ministry further clarifies that at the time such proposal was requested, Claimant had not indicated that the Ministry would incur additional costs, and should have submitted an OCR prior to engaging in the preparation of such proposal.

969. In the case of lighting of the flight deck, there were several problems

---

[228] See REA EXH. C.64.

caused by Claimant not accepting that, under the relevant Specification, it was supposed to be responsible for replacing the existing lights with new lights in accordance with U.S. norms relating to flight decks. The Ministry reports that various correspondences were exchanged and, at a certain point, Claimant agreed to comply with the contractual obligations. This is why, having underscored that all services were contemplated by the Specification, the Ministry rejected the proposal.

970. In its response, Claimant asserts that, under Clause 8, Second Paragraph of the Contract, it should be entitled to compensation for its proposal efforts where the Ministry decided not to authorize a change proposed by Claimant.

### Decision by the Arbitral Tribunal

971. The Arbitral Tribunal has determined that Clause 8 claims and Clause 59 claims are not interchangeable. Each one follows the rationale that gave rise to its creation, and, at this juncture, the decisions are being made in light of Clause 59's requirements. The claim submitted by Claimant relates to proposal efforts to provide the Ministry with a technical solution that was, in the end, declined by the Ministry on grounds of lack of technical data. Claimant asserts that it is, regardless, entitled to be compensated for the related efforts expended.

972. In reality, this claim falls outside the scope of Clause 59 for failing to meet the requirements provided therein.

973. Hence, the Arbitral Tribunal dismisses this claim.

### (77) REA-65 – Submarine Telephone System Amplifier

974. Claimant claims[229] that during the WDCs, Work Item 123-11-001 was modified to require removal of the existing TUUM2D Submarine Telephone System and installation of the new TUUM4D model. During the WDCs, the Ministry added to the scope of work, stating that it wanted Claimant to add an amplifier to the new TUUM4D model by overhauling the old amplifier or

---

[229] See REA EXH. C.65 and References thereto.

purchasing and installing a new amplifier for the new system.

975. Claimant states that it explained that the new system was incompatible with an amplifier and that the Contract did not require its installation. The Ministry insisted on the installation of the amplifier in the new system, which forced Claimant to prepare an engineering evaluation to demonstrate the incompatibility of the amplifier in the new system. Claimant claims a credit of US$ 6,284 before computing interest accruing thereon.

976. In Annex A, the Ministry stated that the information received from Claimant was incomplete and that it received the first page only, and due to that it was impossible to understand the claim and respond to it.

## Decision by the Arbitral Tribunal

977. Claimant asserts this to be extra work and intends to be compensated for its efforts in producing evidence to the Ministry of the incompatibility of the new amplifier and the TUMM4D model.

978. Despite the discussions held by the Parties and memorialized in the References to REA EXH. C.65, the matter deals with the exact scope of work and possible elimination of overhaul works.

979. In sum, this claim failed to be accompanied by supporting evidence of the facts referred to by Claimant.

980. Hence, the Arbitral Tribunal dismisses this claim.

## (78) REA-66 – Aft Mast/Ship Vibration

981. Claimant claims[230] that under Specification C.47, it was required to accomplish maintenance to the main mast, which included inspection, removal, replacement of damaged parts, replacement of the top pole of main mast, and modifications to the mast for the installation of the EW equipment. Following the F-21's sea trials, Claimant identified vibration issues with items mounted on the aft mast and it performed an engineering

---

[230] See REA EXH. C.66 and References thereto.

analysis and a stress analysis using Ultrasonic Testing (UT) to verify the structural adequacy of an aft mast leg to the ship.

982. Claimant states that the Ministry alleged that the ships had been vibration free when they arrived at the shipyard and that Claimant was responsible for identifying and correcting all causes of objectionable vibration.

983. Claimant also states that the Ministry consistently pressed its position that Claimant was responsible under the Contract for any and all required corrective actions. Claimant contended by stating that none of its work had caused the observed vibration and the only way to identify and correct the causes of vibration was to conduct a complete engineering analysis which was not required under the Contract. References to the relevant REA EXH show exchanges of correspondence between the Parties.

984. Claimant states that the UT inspection then conducted would not have been necessary had the Ministry not failed to furnish technical data showing how the ships were originally constructed. Claimant claims a credit of US$ 6,515 before computing interest accruing thereon.

985. In Annex A, the Ministry alleges that it was not informed of the need for UT and was not present during any testing. The Ministry further states that the works necessary for the installation of the new radar antenna Elta 3D were contemplated by the Specification and there exist no additional costs to perform such works.

986. Claimant claims that the assertion by the Ministry is incorrect as it approved the MSCR and was aware of all work performed by Claimant on the Frigates.

### Decision by the Arbitral Tribunal

987. This claim and the discussions related to it clearly show a disagreement between the Parties as to the extent of the works required under the relevant Specification. The summary of the correspondences exchanged indicates the different positions assumed by the Parties. While the Ministry insisted on such works being covered by the technical

specifications, Claimant is adamant in stating that nothing could be extracted from their language to hold it responsible for any additional cost for repairing and eliminating the vibrations.

988. On the other hand, it is true that the Ministry approved in August 1999 a MSCR that dealt with the thickness reading[231] of F-21 and F-22.

989. Nonetheless, the vibration issues on F-21 were detected after its sea trial and the discussion took place between July 2001 and June 2002. This is, indeed, a different issue that appeared one year following the approval of the MSCR, and the Parties dispute the origin of such vibration issues.

990. In sum, this claim relates to extra work. Moreover, Claimant failed to meet the requirements to trigger the application of Clause 59, and has not shown that such works would be absolutely necessary for the fulfillment of its contractual obligations. The history underlying this claim shows that deficiencies and defects have appeared at a certain point, and no evidence has been produced as to such works being excluded from the technical specifications, but merely a discussion as to the construction of the language of the technical specification which read as follows: "*accomplish maintenance to the main mast which will include inspection, removal, replacing damaged parts and modifications to the mast for the installation of the EW equipment. Also, replace top pole of main mast*".

991. The Arbitral Tribunal finds that this claim is unsubstantiated and lacks proper evidence to qualify under Clause 59.

992. Hence, the Arbitral Tribunal dismisses this claim.

### (79) REA-67 – Ladder Relocation

993. Claimant claims[232] that under Work Item 113-32-001 it was required to inspect and repair the ships' internal and external ladders. Relocation and removal of the ladders was not included in the Specifications. The Ministry then concluded that it was absolutely necessary for Claimant to relocate two ladders and remove one ladder to suit the EW room modifications that the

---

[231] See Reference 1 to REA EXH. C.66 (pages 12 and 13).
[232] See REA EXH C.67 and References thereto.

Ministry had ordered.

994. Claimant completed the necessary modifications but was not compensated for such out-of-scope work. Claimant claims a credit of US$ 8,894 before computing interest accruing thereon.

995. The Ministry alleges that this claim is duplicative of REA-25. However, whereas REA-25 concerns the labor and material costs to install 7 new ladders and to remove non-repairable ladders, this claim relates to the Ministry-directed relocation of two ladders and removal of one ladder that were distinct from the ladders at issue in REA-25.

### Decision by the Arbitral Tribunal

996. As a starting point, this Arbitral Tribunal understands that the ladders referred to herein and the works done by Claimant are different from the ladders at issue in REA-25. Thus, there is no reason for the Ministry to state that this claim is duplicative.

997. In reality, the works discussed herein were approved by the Ministry and it stated that such relocation was necessary because of the work modification of the Electronic Warfare extension location and 03 deck stern destined to the launchers of the Seduction and Distraction ALEX carried out by Claimant, and, therefore, the relocation is under Claimant's exclusive responsibility.

998. Nonetheless, while the OCR was approved by the Ministry with a view to have the Ministry's consent to the implementation of the changes indicated by it, in a Memo dated June 6, 2000 on the subject matter of the OCR, the Ministry expressed it was not in agreement with any extra cost to be charged by Claimant in connection therewith. Claimant has not evidenced the sequence of discussions between it and the Ministry in that respect.

999. It is undisputable that the Ministry requested the relocation of the ladders and approved the technical aspects. Nevertheless, the extra cost has never been approved; to the contrary, the Ministry indicated that no extra cost would be acceptable in view of Claimant's exclusive

responsibility.

1000. This claim fails to meet Clause 59 requirements. The outcome of the discussions show that Claimant had to fulfill its contractual obligations as described in the technical specification, and the relocation was a measure to be taken in connection with a greater series of works under the Electronic Warfare and Seduction and Distraction system.

1001. Hence, the Arbitral Tribunal dismisses this claim.

### (80) REA-68 – Fuel Oil Coolers

1002. Claimant claims[233] that under the specifications it was required to replace the existing diesel engines with engines manufactured by MTU, and to install new fuel oil cooler heat exchangers. However, due to Ministry-responsible or otherwise compensable delays, Claimant was forced to rely on preliminary MTU specifications and engineering information for the development of the necessary working drawings. Using such data furnished by MTU, Claimant designed, fabricated, and installed foundations for the new diesel engines. This work included the foundations for the new heat exchangers.

1003. When Claimant received the heat exchangers, it found the equipment furnished by MTU would not fit on the foundations. Claimant then prepared an OCR as well as MSCR. Claimant claims that the MSCR was duly approved by the Ministry, and it then performed the work defined therein, but the Ministry did not authorize the payment for such work. Claimant claims a credit of US$ 15,007 before computing interest accruing thereon.

1004. In Annex A, the Ministry asserts that Claimant has no right to any reimbursement of costs. The works performed are part of the contractual scope. Claimant should have checked the technical data, and argues that the Ministry should not be liable for any deficiency in the MTU-supplied data and if any changes occurred this is a problem to be settled between MTU and the shipyard.

---

[233] See REA EXH. C.68 and References thereto.

1005. Claimant, in its response, says that the Ministry has not offered any support for its assertions.

## Decision by the Arbitral Tribunal

1006. This claim involves primarily Claimant and an unrelated third-party – MTU – the Ministry's designated engine supplier. Claimant claims that due to certain delays imputed to the Ministry, it had to rely on preliminary data supplied by MTU.

1007. The fact that the Ministry has specified the manufacturer of the engines, as it was the case of the air conditioning manufacturer – Carrier – does not place on the Ministry any responsibility for the conduct of negotiations between Claimant and such third-party manufacturer.

1008. Although Claimant does not specify the reasons nor how such alleged delays impacted the works underlying this claim, it states that it relied on preliminary specifications and engineering information provided by MTU, and on the basis of such preliminary information designed and fabricated the new foundations and installed them prior to receiving the heaters. Upon arrival, Claimant realized that the heaters would not fit into the foundations. Claimant removed the foundations and fabricated new ones to suit the equipment.

1009. Neither Claimant nor the Ministry explains why the information sought from MTU was supplied on a preliminary basis. Further, knowing that such information was preliminary, no information is available when final information and specifications would be available.

1010. It is not discussed, nor evidenced, why Claimant designed and fabricated the new foundations based on preliminary information without re-checking such information prior to moving into fabrication and installation.

1011. It is not comprehensible why Claimant, as a leading shipyard worldwide, did not update the specifications and engineering information. Moreover, there exists no information on when the definitive information would be available.

1012. This claim is not eligible for indemnification under Clause 59. The

extra work undertaken by Claimant did not derive from the Ministry's request but from a decision taken by Claimant knowing that it was relying on information that was preliminary.

1013. Hence, the Arbitral Tribunal dismisses this claim.

### (81) REA-69 – Additional Dogged Doors

1014. Claimant claims[234] that Specification C.47 included several items of work to be accomplished while ships were dry-docked. While performing the specified dry-dock work, the Parties concluded that it was absolutely necessary for the Frigates to have one additional door, which was not included in the Specifications or any other part of the Contract.

1015. The Ministry, Claimant reports, directed it to procure and install a standard, dogged, watertight door with all associated castings, gaskets, fittings, and hardware, after refusing to accept a recommended solution used by U.S. Navy ships (bolted access plate). The installation of the door was necessary due to the crowded conditions existing in fan rooms 6 and 7. Claimant issued an MSCR with engineering drawings, and the Ministry approved it. Claimant installed the additional door and relocated the existing starboard rope reel to make room for the new door, but the Ministry did not compensate Claimant. Claimant claims a credit of US$ 19,410 before computing interest accruing thereon.

1016. In Annex A, the Ministry blames Claimant for overcrowding of equipment that occurred in the bulkhead, but ignores the question of whether Claimant's installation of an additional dogged door and relocation was in-scope, but it was not.

### Decision by the Arbitral Tribunal

1017. Although the Ministry disputes Claimant's assertions, the evidence produced by Claimant[235] shows that the area of fan rooms 6 and 7 was crowded and there was no suitable access to it. Claimant submitted the MSCR to the Ministry with the engineering design, and Claimant claims that

---

[234] See REA EXH. C.69.
[235] See Reference 2 to REA EXH. C.69.

it was approved by the Ministry.

1018. This is, indeed, extra work that was not provided by the technical specifications, nor was there any work item to that effect. Some kind of solution (either the one recommended by Claimant or that directed by the Ministry) was necessary to allow access to the area for maintenance purposes.

1019. This claim deals with naval safety measures and conditions for proper operation and maintenance of the Frigates, and it was necessary for both Claimant and the Ministry to implement a solution. Despite the dispute between the Parties, the work performed was absolutely necessary not only for the fulfillment of the Contract but also for operation and safety of the Frigates.

1020. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 19,410 plus interest accruing thereon.

### (82) REA-70 – Aqueous Film Forming Fluid System

1021. Claimant claims[236] that the Specification D.2 required it to design and install an aqueous film forming Fluid firefighting ("AFFF") system with two stations on each Frigate. During the course of installing the required new firefighting system, Claimant states that the Ministry required it to perform several changes and modifications to the Ministry's previously approved design for the new system.

1022. Claimant reports that this changed and added work resulted in removal of other completed work, and it required additional material and labor to accomplish the Ministry-directed changes and modifications. The extra works performed by Claimant at the Ministry's direction exceeded, as per Claimant, the Contract requirements.

1023. The References to such REA EXH contain the various OCRs and MSCRs issued by Claimant and communicated to the Ministry. The issuance of such working documents was necessary to address the changes agreed

---

[236] See REA EXH. C.70 and References thereto.

by the Parties as to location and relocation of the AFFF and to address the concerns of the Ministry over the clearance in the passageways where the AFFF equipment was to be located. Claimant advised the Ministry that the Contract did not require further engineering studies, design changes, or other new work ordered by the Ministry for the AFFF system.

1024. However, the Ministry asserted that the added work to relocate the AFFF system was the responsibility of Claimant. Claimant did not accept the Ministry's position and reiterated its notifications that the original Ministry-approved installation satisfied all specification requirements, in particular the passageway clearance was within the military specifications invoked by reference in the Contract, but the Ministry insisted that Claimant had to comply with its new directions.

1025. Moreover, Claimant claims to have had to perform reworking as a consequence of the Ministry's directions. As it had already installed and welded the AFFF system tank on F-21, areas of bulkheads which Claimant had recessed to install the hose reels in accordance with the previous Ministry-approved drawings had to be removed. Claimant claims a credit of US$ 13,793 before computing interest accruing thereon.

1026. In Annex A, the Ministry disputes the alleged approval of the MSCRs issued by Claimant since such MSCRs were constantly changed in light of the deficiencies contained in the designs prepared by Claimant. Furthermore, the Ministry asserts that all MSCRs were in the English language while the contractual provisions required Claimant to submit documents with a translation into Spanish language.

1027. The main assertion made by the Ministry is that, despite the changes introduced by it with a view to correct errors in the design, some of them very serious, the work performed by Claimant may not be deemed extra work but rather the discharge of Claimant's obligation to design and install the AFFF system in the two units.

1028. In its response, Claimant states that the Ministry's factual assertion is entirely unsubstantiated.

**Decision by the Arbitral Tribunal**

1029. This claim relates to the non-payment by the Ministry of certain added work performed by Claimant at the Ministry's direction. In reviewing the References to such REA EXH, one is led to realize that the design of the AFFF system was modified several times due to the alleged requests by the Ministry.

1030. Upon being informed by Claimant that the works to be performed in accordance with its directions were not required by the Contract, the Ministry refuted such assertion and insisted that such work was aligned with the contractual obligations incumbent upon Claimant.

1031. This means that the Ministry never accepted its obligation to pay for such extra work. In reality, two aspects play a role in this case, *i.e.* the Ministry challenges the alleged approval by it of MSCRs issued by Claimant and also the sequence of facts show that the Parties never reached a common understanding as to such works being in-scope or out-of-scope.

1032. For the purposes herein, the argument made by the Ministry is not sufficient to vacate the claim for extra works. The Ministry has not challenged the need for Claimant to perform the works, but has simply alleged that they were in-scope.

1033. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 13,793 plus interest accruing thereon.

### (83) REA-72 – Equipment Damage

1034. Claimant claims[237] that because the actual Contract performance period was extended to 56 months due to the Ministry-responsible delays, Claimant had to perform extra work to maintain the equipment and ensure safe operation of the Frigates.

1035. After November 17, 1999, when the original Contract performance period was due to end, Claimant issued 676 repair bills. Of those bills, 119 related to missing or damaged parts, components, or equipment that would not have been necessary if the production period had not been delayed by

---

[237] See REA EXH. C.72 and References thereto.

the Ministry's actions and inactions; other bills were also repair-related due to the ships' long-term stay and were issued to correct damaged or missing components or equipment.

1036. Claimant also reports that, due to the extraordinary amount of additional work discovered and reported by OCRs during surveys, its planned production efforts could not be carried out in an orderly manner, nor could such work be done in the Ministry's allowed 20 months. Claimant blames the Ministry's lack of timely decisions and directions for adversely affecting the timing and sequencing of work operations in addition to other causes of delay beyond Claimant's control.

1037. Claimant alleges that, in order to effectively handle ship repair/modernization jobs of that magnitude, it was essential, and the Contract stated, that the Owner's representative should have had the authority and knowledge to make on-the-spot decisions regarding emergent work and promptly address the myriad other issues which required expedited resolution.

1038. Claimant recognizes that during performance of a renovation/overhaul contract of this size, there will be some damaged/lost components, but due to a combination of the Ministry's delays and the lack of timely decisions and responses to Claimant's requests and submissions, equipment and components often could not be closed or processed promptly after the issues were presented to the Ministry. While Claimant took normal and reasonable measures to protect such items pending the Ministry's decisions, it was not always possible to prevent damage or loss from occurring. Claimant claims a credit in the amount of US$ 592,877 which includes, *inter alia,* delay and disruption. Such credit amount is before Claimant computing interest accruing thereon.

1039. In Annex A, the Ministry asserts that, as per Clause 47 of the Contract, Claimant was responsible for the safety of the Frigates, materials, equipment and components. This means that all material to be removed from the Frigates must be stored in a safe place and protected from the outside weather conditions.

1040. As far as extra work is concerned, the Ministry avers that such matter was governed by Clause 8 of the Contract, but such circumstance does not affect the equipment under the custody of Claimant insofar as the large majority of them were removed for maintenance in accordance with the specifications.

1041. The Ministry also alleges that under Clause 12 of the Contract Claimant had to conduct an investigation of the Frigates upon arrival at the shipyard and provide the Ministry with a list of extra works that might be deemed necessary to be performed by applying the Clause 8 money reserve.

1042. The Ministry alleges that the extension of the contractual period to 25 months was granted at Claimant's request due to Force Majeure causes.

### Decision by the Arbitral Tribunal

1043. Firstly, it must be stressed that, in addition to what Claimant has claimed in its REA, in this arbitration Claimant separately claims entitlement to compensation for delay in completion of the Project, which will be analyzed later by the Arbitral Tribunal.

1044. This claim encompasses additional or extra work and a compensation for a longer contract performance, which Claimant claims to be due to the Ministry's delays in responding to Claimant's requests for decisions.

1045. It is not evidenced, at this stage, that all delays attributed by Claimant to the Ministry are indisputable, nor that other costs derived actually from the delays that would be imputed solely to the Ministry.

1046. Thus, this claim may be duplicative in light of Claimant's claim for compensation for losses. In sum, this claim, as submitted, is not aligned with other claims brought up by Claimant in this arbitration which will be addressed upon decision of the relevant claim for compensation for delays.

1047. Hence, the Arbitral Tribunal decides that the determination is deferred to the decision on the delay claim submitted by Claimant.

### (84) REA-74 – Low Pressure Air System – Foundations

1048. Claimant claims[238] that Specification C.19 required it to remove four existing Low Pressure Air Compressors ("LPACs") and to provide and install four new Ingersoll Rand LPACs to replace the removed compressors. Claimant states that the Specification expressly required it to "retain existing foundations for use with new LPACs".

1049. Upon arrival of the Frigates at the shipyard, Claimant inspected them and determined that the existing foundations were unusable and, therefore, their repair was absolutely necessary. To prepare engineering drawings for the foundations repair, Claimant had no choice but to rely on preliminary dimensions from the Ministry's LPACs manufacturer. Then, Claimant issued an OCR, an MSCR, and a RAW, which the Ministry approved. The new equipment that was supplied did not fit in the foundations because the Ministry-supplied data was inaccurate.

1050. After Claimant prepared the new foundations, the Ministry directed it to modify and relocate the foundations, but Claimant was not compensated for this out-of-scope work. As a result, Claimant claims a credit of US$ 15,711 before computing interest accruing thereon.

1051. In Annex A, the Ministry disputed that the work was not in-scope because such specification called for Claimant to modify the LPACs.

1052. Claimant asserts in its response that the Ministry did not require it to modify or relocate the existing foundations.

### Decision by the Arbitral Tribunal

1053. In its claim, Claimant states that it obtained preliminary LPAC foundation dimensions from the Ministry-specified manufacturer – Ingersoll Rand – and then prepared and issued MSCR to provide engineering drawings for repairing the existing foundations. The MSCR was approved by the Ministry, and Claimant performed the work.

1054. This decision has to take into account several aspects. First, as

---

[238] See REA EXH C.74 and References thereto

aforesaid, nothing forced Claimant to obtain and work on the basis of preliminary information. Nonetheless, while Claimant does not make any reference to why such information was obtained on a preliminary basis, it assumed the risk of preparing all designs on the basis of such information. There is no reference in the record to any check conducted by Claimant as to the actual dimensions of the new LPACs.

1055. It is true that the relevant specification provided for the replacement of the old LPACs by newly manufactured Ingersoll Rand LPACs. Nonetheless, the Contract distinguishes any selected manufacturers, as is the case hereunder, from the Ministry's Designated Subcontractors. In this latter case, the Contract adequately allocates the responsibility to the Ministry for any delays or similar problems.

1056. Clause 35 applies to this claim, and such clause gives Claimant the freedom to contract any suppliers or subcontractors while also stating that it shall remain responsible to the Ministry for any problems.

1057. Lastly, the problems that gave rise to the change of foundations were discovered upon the inspection of the Frigates on their arrival at the shipyard. Appropriate measures have been taken by both Parties, and it was decided that it was an extra work to be performed, as Claimant says.

1058. However, the Ministry states in support of its allegations that Specification C.19 provided in item (a) that Claimant had to retain existing foundations for use with the new LPACs but also it is clearly stated in item (b) thereof that it should install new LPACs on existing foundations, but also modify to suit.

1059. In sum, this was a discussion held by the Parties after the inspection of the Frigates by Claimant and the apparent reason for the Parties not having settled was the discussion of such work being in-scope or out-of-scope in light of the text of Specification C.19.

1060. Given that this was a discussion as to whether or not the works were contemplated by the technical specifications, Claimant should have produced evidence as to the facts reported, but it did not.

1061. Hence, the Arbitral Tribunal dismisses this claim.

### (85) REA-75 – 40/70mm Machine Gun Foundations

1062. Claimant claims[239] that, due the Ministry's extended delay in authorizing the work to be done on the foundations which had been requested by the Ministry, it is entitled to compensation for added administrative efforts to expedite Ministry action and for all impacts that were caused by the untimely Ministry responses and resolutions regarding such foundation repairs. Such impacts include, but are not limited to, delay and disruption. Claimant claims a credit of US$ 5,093 before computing interest accruing thereon.

1063. In Annex A, the Ministry explains that the delay, if any, was Claimant's fault because it had to revise the RAW three times until it was approved because it intended to charge the Ministry for the performance of works that were in-scope and which did not get the approval by the Ministry in the initial versions of the RAW.

1064. The Ministry asserts that all costs associated with materials and man hours applied by Claimant to perform the work were settled by it under RAW 970534 and RAW 970628. For those reasons, the Ministry avers that Claimant should not be entitled to any compensation for its administrative efforts.

### Decision by the Arbitral Tribunal

1065. This claim clearly does not fall within Clause 59 and, therefore, may not be admitted. Claimant was paid in accordance with the RAWs for materials and man hours applied to the performance of the work, and the discussion regarding delays and costs associated with it is totally foreign to the parameters defined by this Arbitral Tribunal for awarding claims under Clause 59.

1066. Hence, this claim is dismissed.

---

[239] See REA EXH. C.75.

### (86) REA-76 – Temporary Power Grid

1067. Claimant claims[240] that Specification C.36 required it to perform major maintenance on the main switchboards, which included the disconnection, removal, disassembly, repair, and cleaning of eight main circuit breakers. In order to perform such services, Claimant subcontracted the work to ABB, as directed by the Ministry. Because several existing breaker trip units would not trip in accordance with ABB's specifications, Claimant submitted MSCRs advising the Ministry that corrective action was absolutely necessary and suggesting the installation of a temporary power grid in the interim. The Ministry approved the work but did not pay for it.

1068. Claimant reports that on October 15, 1999 the Ministry authorized repairs to be accomplished on the discrepant breakers under RAW 970408. Such RAW authorized Claimant to procure and install 21 new trip elements in the seven main switchboard breakers that failed the initial trip tests.

1069. Claimant says that it ordered 21 of the KS trip units from ABB's Wichita subsidiary. However, the first shipment of replacement trip units was incorrect.

1070. Prior to re-ordering replacements for the unacceptable trip units, Claimant and the Ministry visited the ABB repair facility in Florida to re-test and verify the operation of the other existing units. During such test, nine switchboard breaker trip units that had initially passed the required tests failed to trip in accordance with the technical specifications. Another RAW was authorized by the Ministry in 2000 covering those breaker units. The new trip units were then procured from the original manufacturer – ABB SACE, in Italy. Claimant reports to have visited SACE in Italy to explain the urgency in completing the repairs and to enlist SACE support in providing the necessary material.

1071. MSCRs were then prepared and provided for the engineering design and planning for the essential temporary power supply. The Ministry objected to the installation of the temporary electrical power supply

---

[240] See REA EXH. C.76.

equipment[241] citing material safety concerns. On the basis of MSCRs prepared by Claimant and approved by the Ministry, Claimant performed the work defined therein but was not paid for the added and changed work on the Frigates. Claimant claims a credit for the work and related procurement in the amount of US$ 36,913 before computing interest accruing thereon.

1072. In Annex A, the Ministry asserts that no monies are due to Claimant. The extent of the works to be performed was described in the Specification and it was implicit that it should be incumbent upon Claimant to provide in the interim period of maintenance of the switchboard alternative sources of power. It was Claimant, as per the Ministry, who selected the subcontractor for such maintenance and it was clear that it should incur the costs associated with the temporary power supply equipment.

### Decision by the Arbitral Tribunal

1073. The technical specification is very detailed on the different works to be performed by Claimant during the maintenance period. It is indisputable that, for performing the system testing operations, electrical power to energize the equipment was necessary.

1074. Nonetheless, due to the late receipt of material to complete the unplanned repairs authorized by the Ministry, an alternative source of energy would be required to start testing activities. Without such temporary source of electric power, the testing would be impossible, and more extensive delays would be experienced.

1075. The Arbitral Tribunal notes that such problems occurred in May 2000. Claimant advised the Ministry accordingly[242], and this was the subject of a weekly progress meeting during which the matter was discussed by the Parties. Moreover, Reference 2 indicates credits have been given for certain jobs that were in the end found unnecessary in view of the replacement of components in the main switchboard of both Frigates.

---

[241] See Reference 8 to REA EXH. C.76.
[242] See Reference 5 to REA EXH. C.76.

1076. In light of the detailed description of the works to be performed, it is inadmissible to extract from such text any implicit obligation allocated to Claimant. Moreover, the need for using a temporary power source derived from problems related to late supply of replacement units. Thus, at the time the Contract was entered into by the Parties, the use of such temporary power was unforeseen.

1077. The Arbitral Tribunal admits the argument of Claimant that in proposing such temporary power it was actually mitigating any further delays. The Arbitral Tribunal also understands that performance by Claimant of the relevant works would not be possible without such power supply. Thus, the Arbitral Tribunal finds that Clause 59's requirements were met.

1078. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 36,913 plus interest accruing thereon.

### (87) REA-77 – Repair of Existing F-21 Deck – Completion of Unwelded Area

1079. Claimant claims[243] that Specification C.47 required it to perform work on the Frigates' decks. Following the ships' arrival at the shipyard, Claimant discovered that the underside of F-21's first platform deck had never been welded. Claimant issued OCRs, RAW and an MSCR to correct this condition. The Ministry asserted that work was in-scope. Claimant ultimately cancelled the OCR/RAW but had already expended out-of-scope administrative, engineering, and planning work to resolve the welding defect. Claimant claims a credit of US$ 2,259 before computing interest accruing thereon.

1080. In Annex A, the Ministry asserts that such work should have been performed as part of the works contemplated by the Specification, since it encompassed a significant amount of work during the dry-dock period. The Ministry states that such position was communicated to Claimant and that Claimant performed such works subsequent to such communication, leading the Ministry to conclude that in doing so Claimant accepted the answer provided by the Ministry.

---

[243] See REA EXH. C.77.

## Decision by the Arbitral Tribunal

1081. This claim clearly falls outside the scope of Clause 59 for failing to comply with the requirements defined by the Arbitral Tribunal for Claimant to resort to the exceptional mechanism provided by such clause.

1082. Hence, the Arbitral Tribunal dismisses this claim.

## (88) REA-78 – Batteries and Charges

1083. Claimant claims[244] that it was required, as per Specification A.11, to remove and replace up to[245] 715 emergency feed batteries with 715 Nickel-Cadmium batteries. The specifications did not require Claimant to do any repairs or replacements of the battery charges. As such battery charges needed maintenance, Claimant issued 16 OCRs requiring authorization to work on the battery charges, and RAW 970527, which incorrectly provided a credit to the Ministry. Claimant states that, regardless of the amount estimated in its bid for Contract Specification A.11, it was entitled to retain any savings, as the benefit of its bargain, if the number of existing batteries was less than the "up to" number of 715.

1084. Claimant asserts that it expended significant out-of-scope engineering effort to locate and substitute parts. In addition, Claimant incurred out-of-scope costs because the size of the required batteries did not exist in the market.

1085. As the Ministry refused to waive, Claimant avers, the requirement that identical batteries be installed, it had no choice but to install larger batteries of equal or superior electrical capabilities and incurred additional costs to install larger foundations that were not required by the Specifications.

1086. In addition, Claimant seeks reversal of the credit inadvertently given to the Ministry through RAW 970527. Claimant claims a credit in the

---

[244] See REA EXH C.78 and References thereto

[245] Claimant states that under standard customary practice in the shipyard industry, when a specification is written as an "up to" requirement, the shipyard is not entitled to a price increase unless more than the maximum ("up to") quantity is eventually required, nor is the owner entitled to a credit if less than the "up to" quantity is required to meet the job's needs.

amount of US$ 173,948 before computing interest accruing thereon.

1087. In Annex A, the Ministry asserts that Specification A-11 clearly indicates that Claimant had to supply and install 715 batteries and, further, that Claimant should produce the design and adjustment of the system as well as the containers to receive the new batteries. Thus, the Ministry asserts that the first part of the claim is unjustified, since Claimant claims that it had to produce additional engineering to determine the type of battery to be installed. The Ministry states that such jobs were part of the technical specification that indicated that Claimant had to identify the batteries that would replace the existing ones.

1088. As far as the reversal of the credit requested by Claimant is concerned, such claim may not be admitted, since this negotiation took place at an earlier stage and both Parties checked the number of batteries existing on board and, thereafter, Claimant raised no claim.

1089. In its response, Claimant states that the Ministry has not submitted any evidence to support its claims regarding the alleged records.

### Decision by the Arbitral Tribunal

1090. This claim deals with extra or additional work claimed by Claimant and disputed by the Ministry.

1091. Moreover, the Parties disagree as to the interpretation of the provisions of the relevant technical specification. This claim comes to this arbitration following a long discussion between the Parties during which the Ministry voiced its understanding as to such services being required under the technical specification, and Claimant saying they were not.

1092. The Arbitral Tribunal repeats that it has determined the requirements to be met by Claimant to obtain compensation under Clause 59, as an exceptional contractual mechanism. In this case, neither requirement has been met, nor has Claimant produced evidence that such costs were due because they were not included in the technical specification.

1093. As far as the reversal of the credit given to the Ministry is concerned, it is unclear from the record the methodology for its calculation, and the

allegation of a clerical error is insufficient to evidence that such credit did not actually exist when there is an assertion by the Ministry that it derived from the Parties' negotiations and mutual agreement.

1094. Hence, the Arbitral Tribunal dismisses this claim.

### (89) REA-79 – Fire Control System Cabling

1095. Claimant claims[246] that as part of the required upgrade of the Fire Control System, it estimated that 13,000 feet of new cable per ship were needed. Nonetheless, the Ministry insisted that Claimant reduce that estimate and that up to 5,784 feet of existing cable per ship could be reused. With that reduction, the revised baseline amount became only 7,216 feet of new cable, and Claimant then reduced its estimated price for the FCS cabling.

1096. Once the work began, the Ministry's subcontractor, IAI-MBT, determined that the 5,784 feet of existing cable could not be reused because it was incompatible with the upgraded system and required cabling with very specific, high-level electromagnetic shielding characteristics. At the same time, Claimant was able to determine more exactly the total amount of new cable required for the revised job, *i.e.* 16,050 feet per ship.

1097. In March 2000, Claimant submitted a RAW to the Ministry for action, but the Ministry refused to authorize it, and after three months, Claimant issued a stop-work order pending resolution of the problem. Claimant reports its exchanges of correspondence with the Ministry between December 2000 and March 2001 on that same subject. These exchanges of correspondences culminated with Claimant expressing its intention to submit such matter for Technical Arbitration under Clause 41 of the Contract.

1098. Claimant advised the Ministry[247] that failure to install the new cable would result in a non-operational Fire Control System as well as the lack of interfaced combat systems. At that time, Claimant also advised the Ministry

---

[246] See REA EXH. C.79 and References thereto.
[247] See Reference 4 to REA EXH. C.79.

that the delay in the installation of the cables and the associated delay impact to testing and ship redelivery was the sole responsibility of the Ministry.

1099. In response, the Ministry said that cabling was not a technical issue since the need for new cable had been established, and therefore the Technical Arbitration was not applicable. Hence, Claimant claims to have installed 15,900 linear feet of new cabling for the Fire Control System on F-21 and F-22 combined. Claimant claims a credit of US$ 430,783 before computing interest accruing thereon.

1100. In Annex A, the Ministry states that, upon receiving a RAW from Claimant whereby it requested the authorization for the acquisition of cabling for the Fire Control System, it expressed to Claimant that the acquisition of all material was included in the Specifications that had been established for this system and should be installed at no additional cost. The Ministry claims that later such RAW was resubmitted to it, and it was answered identically.

1101. The Ministry also reports that following long discussions held by the Parties, Claimant understood the reasons raised by the Ministry were correct and installed the cables, as indicated in the technical specifications[248].

### Decision by the Arbitral Tribunal

1102. It is undisputed that the existing cables could not be re-used due to their incompatibility with the new system. The re-use of the existing cables as directed by the Ministry would result in a non-operational Fire Control System as well as the lack of interfaced combat systems. This is uncontroversial in this case.

1103. It is true that the original amount of cables was greater prior to being reduced by virtue of the instructions given to Claimant by the Ministry due to the forecasted partial re-use.

---

[248] See item 2, numeral 14 of Technical Specification No. 123-05-001 dated July 3, 2000, expressly referred to in Reference 9 to REA EXH. C.79.

1104. Claimant asserts that in order to mitigate delays it purchased the new cables prior to getting the Ministry's approval. The Ministry, in turn, avers that, since Claimant had agreed that the Ministry's position was correct, it purchased the cables even though the resubmission of the RAW was pending.

1105. The core discussion on this claim, as in many other claims submitted to this Arbitral Tribunal, deals with the interpretation of the text of the technical specifications. The Ministry is adamant in stating that the supply and installation of the cables was incumbent upon Claimant. Claimant claims to have advised the Ministry that this was out-of-scope.

1106. One important element brought by Claimant to the record is the Request for Technical Arbitration submitted by Claimant to the Ministry[249]. The text sets forth the framework of such discussions, including the variation of prices quoted by Claimant for the entire system subcontracted to IAI-MBT that went from US$ 10,628,100 down to the accepted price of US$ 5,750,000. It remains clear that the price offered did not contemplate cables.

1107. Technically speaking, IAI-MBT recommended new cables because the new Fire Control System needed very specific, high-level electromagnetic shielding-type cable to operate. This was recognized by the Ministry and it finally rejected the Technical Arbitration by stating that there existed no technical problems.

1108. While it is true that the technical specification indicates that Claimant must supply and install the cables, the reality is that the amount being claimed by Claimant on account of cables and related efforts is due to the fact that the cable item was excluded from the agreed price.

1109. The Arbitral Tribunal understands that this claim meets the requirements under Clause 59 due to the change of cables being absolutely necessary to provide the Frigates with an operationally important system such as the Fire Control System and to secure its interface with the combat

---

[249] See Reference 8 to REA EXH. C.79.

system.

1110. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 430,783 plus interest accruing thereon.

## (90) REA-80 – Speed Log

1111. Claimant claims[250] that Specification AE-C14 required the replacement of the Speed Log System with digital equipment rather than analog equipment. The Ministry directed Claimant to provide and install a new Sperry Marine SRD.421 S Doppler Speed Log System.

1112. Based on the preliminary data provided by the Ministry and Sperry, Claimant and the Ministry included only 200 linear feet of new cable per ship in the agreed price. However, when Sperry provided full technical information, Claimant discovered that the new digital system required special cabling. Claimant had to then install 4,393 and 4,755 feet of new cable for F-21 and F-22, respectively.

1113. In addition, Claimant says, the new Speed Log's components could not be installed in the same locations as the old system's even though the revised Specifications stated that the new units would be installed in the spaces where the original Mark 4 mod. 2 speed log units were installed. Thus, Claimant performed out-of-scope work to relocate the units. Claimant claims a credit of US$ 514,220 before computing interest accruing thereon.

1114. In Annex A, the Ministry states that in accordance with the negotiations between the Parties during the WDCs, the technical specification was modified to modify the extent of the major overhaul of the system on account of installing the Sperry SRD.421 model. The original price for the performance of the maintenance was US$ 526,853 and the one for the installation the new equipment was US$ 280,102. Due to such reduction, a credit in the amount of US$ 246,751 was given to the Ministry.

1115. Following the negotiation, the new technical specification was executed by the Parties and it was established that Claimant was

---

[250] See REA EXH. C.80.

responsible for the design, procurement of services, equipment, software, interface with other systems and the delivery of the requisite technical documentation.

1116. The Ministry makes reference to the revised technical specification[251] to state that it is clear that Claimant was required to provide and install new multi conductor cabling in accordance with MIL-STD-2003. Item (b) refers to preparation of the spaces where the new speed log SRD.421 system equipment shall be installed.

1117. The Ministry rejects the assertion by Claimant that the new system was unknown to it since, at the time the WDCs took place, it offered a price of US$ 280,102 to install the system, which was accepted by the Ministry. Thus, the Ministry rejects the claim for additional compensation for other works that have not been taken into account in drawing up and preparing the original offer.

### Decision by the Arbitral Tribunal

1118. This claim relates to extra and additional services performed by Claimant in addition to those allegedly taken into account upon preparing the offer. The Arbitral Tribunal notes that, although the Ministry refers to a credit given to it by Claimant, such aspect is not referred to by Claimant in the REA EXH in question.

1119. Undoubtedly, the revised technical specifications confirm the allegations made by the Ministry as to the scope of the job.

1120. The Arbitral Tribunal further notes that, differently from other cases, Claimant has not issued any OCRs or RAWs to be submitted to the Ministry. Although Claimant claims that its offer was based on preliminary information provided by the Ministry and Sperry, the reality is that there is no evidence in this case of any action taken by Claimant upon complete technical information becoming available.

1121. Claimant has not met the requirements for such claim being eligible under Clause 59. The level of evidence provided by Claimant is not

---

[251] See item(b)(3)(m) as attached as Reference 2 to REA EXH. C.80.

compatible with the standard of proof applicable for a claim to be eligible thereunder.

1122. Hence, the Arbitral Tribunal dismisses this claim.

### (91) REA-81 – Increased Warranty Costs

1123. Claimant claims[252] that due to the delay in completion of the project, it incurred additional costs to comply with the warranty obligations beyond the period contemplated by the Contract.

1124. Claimant adds that the Contract's 12-month warranty period for each ship began immediately upon execution of the Act of Final Acceptance for each Frigate. Based on the redelivery dates of June 1, 2002 for F-21 and October 25, 2002 for F-22, Claimant's warranties were arguably extended through May 31, 2003 and October 24, 2003. Nonetheless, the warranty on some equipment/services furnished for such ships under Claimant's purchase orders/subcontracts expired prior to the end of such extended Warranty Periods. Thus, should any defects have occurred during the extended warranty period in the workmanship and/or materials provided by vendors or subcontractors, Claimant did not have recourse under the purchase orders and subcontracts.

1125. Claimant claims a credit of US$ 686,149 before computing interest accruing thereon.

1126. In Annex A, the Ministry states that, in reviewing the list of equipment and the expiration date of the warranty period provided by Claimant in REA EXH. C.81, it is clear that in certain cases, as it happened with the air conditioning system, the warranty negotiated with the vendor would have expired before the end of the contractually required 12-month warranty period even if the Frigates had been returned on the original dates (original return date: November 17, 1999; expiration date of the air conditioning warranty: August 4, 2000). As per the Ministry, this shows the inconsistency of the planning activities of Claimant related to the Contract in addition to the lack of legal support of the claim.

---

[252] See REA EXH. C.81.

## Decision by the Arbitral Tribunal

1127. This claim falls outside the scope of Clause 59 and Claimant failed to meet the requirements already defined by the Arbitral Tribunal. The extra costs claimed by Claimant relate to delays in the completion of the works. The Arbitral Tribunal will analyze and decide on the claim for losses derived from delays later in this Award.

1128. Hence, the Arbitral Tribunal decides that the determination of this claim shall be deferred to the decision on the delay claim.

### (92) REA-27 & 86 – Mooring Bitts and Mooring Bitt Back-up Structure

### REA-27

1129. Claimant claims[253] that Specification C.47 identified the work Claimant was required to perform in connection with the dry docking of the Frigates. The Specification did not include any work on the mooring bitts. However, Claimant discovered that the mooring bitts required repair and the replacement was absolutely necessary for mooring the ships when waterborne.

1130. The Ministry refused to authorize the first OCR that Claimant submitted, and directed it to prepare several additional proposals. Eventually, the Ministry authorized a new mooring system and, through RAWs, agreed to compensate Claimant for the work installing the mooring bitts, but refused to compensate it for its proposal and research efforts. Claimant claims a credit of US$ 6,321 before computing interest accruing thereon.

1131. In Annex A, the Ministry stated that, it is meaningless who had requested the change since both of them were authorized to do so under the Contract. Furthermore, the Ministry says that all administrative costs were contemplated by the execution and cancellation of the RAWs.

---

[253] See REA EXH. C.27.

**Decision by the Arbitral Tribunal**

1132. In order for a claim to be admitted, the Arbitral Tribunal shall base its decision in light of the supportive evidence available in the record. In reality, Claimant asserts that the Ministry paid the compensation for the installation of the mooring bitts. The discussion refers to whether or not the proposal-effort costs incurred by Claimant should be included within the administrative costs contemplated by the RAW, and the refusal by the Ministry to pay the proposal-effort costs.

1133. Claimant has not supported the facts it argued with sufficient evidence.

1134. Hence, the Arbitral Tribunal dismisses this claim.

**REA-86**

1135. Claimant claims[254] that Specification C.47 referred to above required it to perform repairs and modifications to the Frigates' mooring system. Claimant determined that the deck back-up structure would not be sufficiently strong to withstand the specified test strength of the new mooring bitts installed on F-21, and the RAW relating to such installation that the Ministry had previously approved did not cover such work.

1136. Claimant thus prepared an MSCR providing new engineering design for under-deck back-up structure below the new mooring bitts. The MSCR was approved by the Ministry, Claimant performed the work necessary to reinforce the deck but was not compensated. Claimant claims a credit of US$ 8,982 before computing interest accruing thereon.

1137. In Annex A[255], the Ministry states that Claimant used bitts existing in the shipyard which are used on other ships which it builds therein and they are bigger than those existing on the Frigates. For that reason, Claimant was obligated to adapt those in order to be able to install them, benefitting from not having to prepare engineering studies and procure other types of bitts. Such costs had been included in the RAWs.

---

[254] See REA EXH. C.86.
[255] See Ministry's commentaries to REA EXH. C.27.

1138. The Ministry states that it does not understand why Claimant would claim to have incurred the alleged extra costs, if all costs had been contemplated by the RAW and settled accordingly.

## Decision by the Arbitral Tribunal

1139. This claim relates to additional work expended by Claimant to provide engineering research, procure material, and plan, fabricate, and install the additional back-up structure.

1140. The Ministry argued that it paid Claimant for this work, but neither it nor Claimant introduced evidence into the record to support the facts each argued.

1141. Hence, the Arbitral Tribunal dismisses this claim.

## (93) REA-87 – Field Engineering Requests

1142. Claimant claims[256] that, because of the Ministry's excessive delay in responding to OCRs, it developed Field Engineering Requests ("FERs") to resolve production issues in an efficient and expeditious manner. Between June 1999 and October 2001, Claimant processed 1,769 FERs. Of these FERs, 125 resulted in out-of-scope work. The Ministry observed all FER work, never objected to Claimant's use of this procedure, and even issued 438 FERs itself requesting additional growth work. Claimant incurred performance costs for the research, development, issuance and resolution of the 125 FERs that involved out-of-scope work. Claimant claims a credit of US$ 837,840 before computing interest accruing thereon.

1143. In Annex A, the Ministry states that it is not familiar with FERs, which are internal documents of Claimant, and are not examined by the Ministry as being part of the Contract. The Ministry further states that those works that were performed by Claimant correspond to the fulfillment of Claimant's obligations through the performance of various technical specifications.

1144. The Ministry further asserts that Claimant was well aware of the contractual provision whereby any work it had to perform and that it deems

---

[256] See REA EXH. C.87.

is not contemplated by the Contract should have been processed as an extra or unforeseen work in accordance with the Contract.

## Decision by the Arbitral Tribunal

1145. Undoubtedly, FERs qualify as extra or unforeseen work, and were necessary for the fulfillment of the Contract. In reality, this claim refers to performance costs incurred in connection with 125 FERs that involved out-of-scope work.

1146. Despite the argument made by the Ministry that it was not familiar with FERs, Claimant stated that the FERs were shared with the Ministry and that the Ministry used 438 FERs to request additional growth work.

1147. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 837,840 plus interest accruing thereon.

## (94) REA-88 – Instrumentation List

1148. Claimant claims[257] that Clause 3 of the Contract provided that the Ministry should make available to it all original ship plans and technical instructional manuals within one month following the date Claimant requested such data. Following the Contract award, Claimant says, it asked the Ministry to provide a list of existing instrumentation for each ship. Although the Ministry has in its possession an instrumentation list, it did not provide a copy thereof to Claimant, even after Claimant repeatedly requested such information. Claimant asserts that failure by the Ministry to provide the technical information was a breach of the Contract which entitled it to recover for the resulting damages.

1149. The reason for such request was due to Claimant planning to use the existing instrumentation list for the Frigates, supplemented with information for instrumentation in new systems planned for installation and existing systems planned for replacement or deletion, to determine which of the existing instrumentation had to be retained.

1150. In view of the Ministry's failure, Claimant alleges it was forced to

---

[257] See REA EXH. C.88.

perform extra work to reconstruct a list of approximately 300 instruments per Frigate, including various meetings, ship-checks, drawing reviews, and conferences with instrument manufacturers. Claimant claims a credit of US$ 23,572 before computing interest accruing thereon.

1151. In Annex A, the Ministry states that it timely supplied all information available to it, even if there existed no contractual obligation. This would not relieve Claimant of its duties. Therefore, all claims submitted by Claimant in connection with supposed delays, inefficiencies and interferences as well as costs associated with the lack of information are under Claimant's exclusive responsibility.

1152. The Ministry further asserts that it was conveyed to Claimant at various junctures that no consolidated instrumentation list covering the technical information regarding all systems installed onboard the Frigates existed.

## Decision by the Arbitral Tribunal

1153. In reality, although the Ministry claims it had no contractual obligation to deliver the technical information, such assertion is inconsistent with Clause 3, Third Paragraph of the Contract.

1154. While the obligation existed, Claimant has not addressed the scope of such paragraph. Firstly, the contractual provision provides for the Ministry to make available to the Claimant technical information detailed therein which is available pertaining to the ships in order to facilitate the performance of the work by Claimant. Such information should be made available within one month following request by Claimant.

1155. In reality, the contractual provision referred to Original Ship Plans and Technical Instructional Manuals only. The Parties have not discussed whether the consolidated instrumentation list was encompassed by any of the two series of information to be made available by the Ministry.

1156. Assuming that it was, it must be stressed that the provision refers to information which are available pertaining to the ships. This does not mean any and all information but only those which were available. The Ministry

stated that no consolidated instrumentation list covering the technical information regarding all systems installed onboard the Frigates existed.

1157. Moreover, that same provision states that the non-delivery of these documents should not relieve Claimant of any obligations it might have under the Contract.

1158. The spirit of such provision was not a condition for the performance of the works but rather means to facilitate the performance of the works by Claimant. The assertion made by Claimant that the Ministry had breached the Contract is erroneous in light of the language of the Contract whereby Claimant would not be relieved of its obligations thereunder.

1159. In view of the foregoing, the Ministry's refusal to provide technical information that was not available to it cannot justify the indemnification of any extra or additional cost in which Claimant may have incurred for that reason. In sum, the costs accounted by Claimant, if any, must be borne by it, and are not susceptible to recovery under Clause 59, since they fall within the scope of the obligation assumed by Claimant under the Contract.

1160. Hence, the Arbitral Tribunal dismisses this claim.

### (95) REA-89 – Fuel Oil Transfer System

1161. Claimant claims[258] that Specification C.14 required it to perform specific work on the Fuel Systems and to inspect, test, and repair the fuel at sea piping system, including general piping replacement, *i.e.* pipe, fittings, gaskets, fasteners, etc.

1162. Claimant explains that "General Piping Replacement" meant that Claimant had to replace the piping necessary to reinstall the equipment referred to in the Specifications. Otherwise, the Specification would have instructed Claimant to "inspect, test, repair and replace general piping" and would have specified the amount of piping to be replaced as did Specifications C.4, C.13 and C.50.

1163. Specification C.14, however, did not specify the amount of piping to

---

[258] See REA EXH. C.89 and References thereto.

be replaced and Claimant was then only required to replace the amount of piping necessary to reinstall the equipment set forth in the Specification. Thus, Claimant's bid price accepted by the Ministry did not contemplate any piping replacement.

1164. After Contract award, Claimant discovered that certain piping and pipe fittings in the Fuel Oil Transfer System had to be replaced due to excessive deterioration. Claimant states that it issued eight OCRs and replaced 1,022 linear feet of piping and performed repeated piping flushes, which was out-of-scope work. Claimant claims a credit in the amount of US$ 856,098 before computing interest accruing thereon.

1165. In Annex A, the Ministry states that none of the eight OCRs referred to by Claimant have been received by the Ministry. The Ministry avers that such OCRs were processed by Claimant for internal use to organize the works internally since such works did not generate additional costs for the Ministry.

1166. The Ministry further states that since Specification C.14 did not provide for piping replacement, in April 1998 Claimant was instructed to take such piping replacement from Specifications C.51 and C.52. There existed reference to replacement of 80 meters and 60 meters, respectively, which was sufficient to cover all piping replaced by Claimant.

**Decision by the Arbitral Tribunal**

1167. This claim, as many other claims already analyzed by the Arbitral Tribunal, refers to extra or additional services performed by Claimant. In this case, Claimant interprets the work described in the relevant technical specification to conclude that it was not required to replace the deteriorated piping. Furthermore, as stated by Claimant, the price bid accepted by the Ministry did not contemplate such costs.

1168. The Ministry conceded that the technical specification did not provide for piping replacement. For that reason, the Ministry directed Claimant to use piping allocations contemplated by other technical specifications.

1169. In reviewing the OCRs[259], the Arbitral Tribunal has noticed that in the space allocated for special instructions, the OCRs refer to material to be installed and they also mention "in-scope base". This reference is not discussed by the Parties in their submissions, but it seems to be a result of the use of piping allocations from other works, as anticipated by the Ministry.

1170. The Arbitral Tribunal finds that this claim does not fall within the scope of Clause 59 for not complying with the requirements provided therein.

1171. Hence, the Arbitral Tribunal dismisses this claim.

### (96) REA-90 – Additional – Other Changes Required by the Ministry

1172. The claims under REA-90 are discussed individually although submitted collectively under the heading "Additional – Other Changes required by the Ministry". The Arbitral Tribunal will analyze and discuss REA-90 claim by claim since Claimant has attributed an amount to each of the works performed by it thereunder.

1173. In analyzing claims under REA-90, the Arbitral Tribunal will not include comments from the Ministry on each of them. The Ministry, in this case, provided only general comments, which are summarized below:

- ✓ On certain claims, Claimant asserts that it originally made bad estimates, covering both materials and manpower and, later, when it was performing the works, the necessary quantities proved to be greater than those estimated; the Ministry states that, in those cases, instead of claiming the associated costs from the Ministry, Claimant should have improved its system for providing estimates and planning, since it is inadmissible that the Ministry should have to assume costs after contracting the works due to bad estimates by Claimant; those claims are therefore unjustified.

---

[259] See References attached to REA EXH. C.89.

✓ On other claims, Claimant asserts that it submitted OCRs to the Ministry which were rejected on grounds of being contemplated by the works contractually agreed upon by the Parties; in such cases the Ministry reviewed all OCRs that it received and indicated in each case if the works were extra or additional or, to the contrary, if such works were covered by technical specifications, including, in such case, the relevant technical specification to identify where the works were described; the Ministry adds that during the performance of the services it had to review and revise a significant amount of OCRs and in many cases services could not be treated as extra but derived from an erroneous interpretation of the specifications or due to bad translations into English.

✓ In the case of the trip to Puerto Cabello to check how the command and control system operated, the Ministry claims that it was a decision made by Claimant, and the Ministry considers this to be a normal proceeding in the performance of contracts of this magnitude; if the contractor needs to find or verify data, it should do it as part of its work; during such trip Claimant had the full support of the Navy and the Frigates were made available and the equipment operated with a view to allow Claimant to have access to the information sought by it.

### (96.1)   REA-90.2.1 – Stern Tube Leak

1174. Claimant claims[260] there was no Contract provision requiring it to perform work on the port stern tube. When F-22 arrived at the shipyard, the port stern tube was leaking excessively and was causing flooding in the shaft alley. In order to make these repairs, Claimant had to run portable pumps 24 hours a day for several days until temporary packing could be installed inboard and outboard of the stern tube. Claimant claims a credit in the amount of US$ 11,220 before computing interest accruing thereon.

1175. In Annex A, the Ministry states that it did not know to what system Claimant was referring.

---

[260] See REA EXH. C.90 for any and all claims identified as individual items under REA-90.

### Decision by the Arbitral Tribunal

1176. Claimant is absolutely right when it states that such claim is compensable under the Contract.

1177. Moreover, the leakage referred to by Claimant was discovered upon arrival of F-22 to the shipyard. In such case, the Contract provided the measure to be taken by the Parties to properly address such extra or additional work.

1178. The Arbitral Tribunal finds that such claim meets the requirements imposed by Clause 59 inasmuch as such costs were absolutely necessary in the meantime to allow proper fulfillment of the Contract.

1179. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 11,220 plus interest accruing thereon.

### (96.2)      REA-90.2.2 – RAN 10S Radar System

1180. This claim is based on the additional use of cabling by Claimant in connection with the installation of the new radar system on both Frigates. Claimant claims to have included in its pricing the use of 10,000 linear feet of cable. As per Claimant, the estimate was made on the basis of information available prior to Claimant having started the design. Claimant states that it could only determine the exact footage of cable to be used upon receiving installation drawings from the supplier – Elta.

1181. Since the decision to install the new radar system was made in the context of WDCs, Claimant explains that its proposal contemplating 10,000 linear feet of cable was a change, but it also states that it has not made any representation as such quote being a firm fixed price. Claimant claims a credit of US$ 427,557 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1182. This claim does not involve any discussions between the Parties as to the extra or additional nature of the installation of new cable by Claimant in connection with the radar system. Decided by the Parties during the WDCs, Claimant submitted a price proposal which was approved by the Ministry. The main discussion now is the amount of cable required to be installed

upon Claimant receiving the installation designs.

1183. The fact that Claimant had to estimate the total amount of cable to be installed prior to receiving the installation designs would have created, as it actually did, a shortfall of cable in such estimate. The important aspect related to such claim is that the Ministry approved the change following the WDC and recognized that it derived from the decision then made. Thus, the additional amount of cable, as a complement of the initial change and once aligned with the elements decided at such time, must be compensated.

1184. The Arbitral Tribunal takes into account the decision made by the Ministry when it recognized that such cable supply was an extra work and paid for the estimate by Claimant. Consequently, the Ministry accepted Claimant's arguments and authorized the installation of cables necessary in light of the installation of the new radar system. One could not imagine that a radar system of vital importance for any ship, especially of the kind of the Frigates, would be operative if not totally connected to other systems where cable was the means to secure such connection to allow an operational system.

1185. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 427,557 plus interest accruing thereon.

### (96.3)    REA-90.2.4 – Centralized Communications System

1186. Claimant claims that the original specifications required it to install a new Digital Centralized Communications System – SPAR. As a result of the WDCs, the Specification was revised to provide for the installation of another digital system – SHINCOM. Claimant states that it estimated in its original bid that 12,000 linear feet of cable would be required to install SPAR, and the Parties saw no reason to modify that estimate when the specification was amended since no information was available at the time of the bid that indicated that the amount of cabling would need to be increased.

1187. Claimant reports that later, the vendor for SHINCOM revised the plans applicable to the system. Thus, Claimant had to install 34,842 more linear feet of cable than was originally estimated. Claimant claims a credit of

US$ 1,732,177.

## Decision by the Arbitral Tribunal

1188. This claim does not involve any discussions between the Parties as to the extra or additional nature of the installation of new cable by Claimant in connection with the radar system. Decided by the Parties during the WDCs, Claimant submitted a price proposal which was approved by the Ministry, and the Parties agreed that no increase of cable would be necessary. The main discussion now is the amount of cable actually required to be installed upon Claimant receiving the information from the vendor of SHINCOM.

1189. The fact that Claimant had to estimate the total amount of cable to be installed at the time of the bid and again following the decision to change the system but prior to receiving all the information from the SHINCOM system vendor would have created, as it actually did, a shortfall of cable in such estimate. The important aspect related to such claim is that the Ministry approved the change following the WDC and recognized that it derived from the decision then made. Thus, the additional amount of cable, as a complement of the initial change and once aligned with the elements decided at such time, must be compensated.

1190. The argument made by the Ministry, that it might have been a bad estimate by Claimant, may not prevail. The Parties revised jointly the technical specification and their conclusion on the basis of the information available was that no increase was necessary. Since Claimant installed more than 34,000 linear feet than estimated cannot be due to a bad estimate. It certainly derived from the lack of information which was only released by the vendor at a later stage.

1191. The amount of additional cable speaks for itself in terms of the increase being necessary to allow the proper operation of the system. Thus, the Arbitral Tribunal finds that such claim must be treated and decided in light of the provision contained in Clause 59.

1192. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 1,732,177 plus interest accruing thereon.

**(96.4)      REA-90.2.5 – List of Transducers and Pressure Switches**

1193. It is a standard practice for operating ships to carry a list of transducers and pressure switches onboard. However, upon arrival, the Ministry did not provide such lists. As a result, Claimant had to produce such a list for both ships. This out-of-scope work required a significant amount of extra labor to check system installations, review as-built and new installation drawings, analyze OCRs and RAWs, and confer with the vendor and the Ministry representatives. Claimant claims a credit in the amount of US$ 13,239 before computing interest accruing thereon.

1194. In Annex A, the Ministry argues that this claim is identical to REA-88. Claimant responds that, while in REA-88 the list contemplated approximately 300 instruments on each frigate, in this REA only transducers and pressure switches are listed.

### Decision by the Arbitral Tribunal

1195. The supply of technical information and manuals by the Ministry to Claimant is governed by Clause 3, Third Paragraph. The Arbitral Tribunal has had the opportunity to analyze such provision in discussing REA-88. The Ministry stated that this claim was identical to that one. It did not say that it was duplicative, but should be treated as the other was.

1196. Indeed, the Ministry was required to supply Claimant with information available to facilitate the performance of the works. Nonetheless, such contractual provision also stated that, in the lack of information being supplied, Claimant would not be relieved of its obligations.

1197. In this case, Claimant alleges that carrying such lists is a normal practice. It did not state that it is an obligation imposed on the ship owner. In this case, such lists were not carried by the Frigates. This, however, did not relieved Claimant of its work. If costs were incurred thereby, such costs should have been estimated by Claimant in submitting its bid as an obligation imposed on it that might be facilitated should such lists exist. But they did not.

1198. Hence, the Arbitral Tribunal dismisses this claim.

### (96.5)        REA-90.2.6 – Portable Stanchion

1199. Claimant claims that there was no Contract provision requiring it to modify stanchions by making them portable. Nevertheless, the Ministry directed it to modify the existing stanchions located at Frame 70 on both ships into portable stanchions in order to allow servicing of air conditioning units. Because there was no specification calling for such work, Claimant issued an MSCR and OCR, which were approved by the Ministry.

1200. Claimant claims that the Ministry refused to compensate it. Claimant claims a credit in the amount of US$ 4,770 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1201. This claim refers to a request for additional work placed by the Ministry. MSCR and OCR were approved but the Ministry failed to compensate Claimant for the costs incurred. The modification of stanchions, as requested, was absolutely necessary for Claimant to fulfill the Contract. Clause 59 requirements have then been met.

1202. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 4,770 plus interest accruing thereon.

### (96.6)        REA-90.2.7 – F-25 and F-26 Shipchecks

1203. Claimant invokes Clause 3, Third Paragraph of the Contract to spell out the obligation imposed on the Ministry as to the supply of technical information. Claimant says that due to the failure by the Ministry to comply with its contractual obligations, it had to organize a trip to Puerto Cabello in Venezuela to get such information from F-25 and F-26, sister ships of the Frigates.

1204. Claimant states that the Ministry contends that Claimant was required to expend any efforts to obtain or confirm data it needed, and that the Navy sufficiently supported it by making F-25 and F-26 available to it.

1205. Claimant asserts that the Ministry did not dispute that it failed to satisfy its contractual obligation. Claimant claims a credit in the amount of US$ 23,187 before computing interest accruing thereon.

**Decision by the Arbitral Tribunal**

1206. In reality, in Annex A the Ministry stated that engaging in such trip was a decision made by Claimant, and the Ministry's view was that on projects of this magnitude it is normal for the contractor to seek whatever data it may need to perform its works, all initiatives related therein being part of the work contracted.

1207. The Arbitral Tribunal has already analyzed the letter and spirit of Clause 3, Third Paragraph and could not find that the lack of supply of technical information by the Ministry would lead, as Claimant asserts, to a breach of the Contract. This is clearly contained in the provision and the failure to supply would not relieve Claimant of its obligation. Therefore, this trip to Venezuela is one of the initiatives that Claimant decided to explore.

1208. Hence, the Arbitral Tribunal dismisses this claim.

## (96.7)    REA-90.2.8 – Shaft Alignment

1209. Claimant explains that no Contract provision required it to perform shaft alignment. After completing various Ministry-responsible structural plating replacements on the Frigates, Claimant conducted alignment verification checks, which revealed misalignment in the stern tube and strut bearing areas caused by the added structural plating replacement.

1210. Claimant had to weld and re-machine several bearing lands and grooves before shaft alignment could be completed, which it claims was out-of-scope work. Claimant claims a credit of US$ 306,846 before computing interest accruing thereon.

1211. In Annex A, the Ministry stated that such work was contracted as part of the dry-dock extra works, and RAW 970019 clearly identifies that upon completing the structural works on the Frigates, Claimant was required to align the shaft and was therefore responsible for it.

**Decision by the Arbitral Tribunal**

1212. This claim involves the alleged performance of extra and additional works by Claimant even though the Ministry states that they were contracted under a certain RAW that was not brought as evidence, nor has

Claimant challenged the Ministry's assertions as to such work having been contracted as part of the dry-dock works. This claim is uncertain and lacks substantiation and evidence of the facts referred to therein. The Arbitral Tribunal finds that this claim fails to meet the requirements provided by Clause 59.

1213. Hence, the Arbitral Tribunal dismisses this claim.

### (96.8)      REA-90.2.9 – Added Plumbing Fixtures in Crew Pantry and Café

1214. Claimant states that no Contract provision required it to provide and install extra plumbing fixtures. Nevertheless, the Ministry concluded that it had to provide (i) a deck drain near the serving line food warmers in the crew pantry, and (ii) a faucet near the ice cream machine in the crew café. Claimant reports to have issued FERs covering the required work. Claimant claims a credit of US$ 20,806.

### Decision by the Arbitral Tribunal

1215. This claim fails to meet Clause 59 requirements and this Arbitral Tribunal has already decided that a FER is an internal document that is not mandatorily submitted to the client (read: the Ministry) and reflects recommendations from the engineering department of Claimant to those areas engaged in the performance of the works.

1216. Unlike other cases in which extra or additional works were deemed necessary, Claimant did not issue any OCR or RAW in connection with these works. The Arbitral Tribunal finds that this claim fails to meet the requirements under Clause 59 for not evidencing that such services were absolutely necessary for the fulfillment of the Contract.

1217. Hence, the Arbitral Tribunal dismisses this claim.

### (96.9)      REA-90.2.10 – Reach Rods for Valves

1218. Claimant states that no contractual provision required it to manufacture and install reach rods for valves, but that the Ministry, during the performance of the works, concluded that Claimant had to add damage

control lockers to the Frigates.

1219. Such additional control lockers caused valves to become inaccessible, and Claimant had to fabricate and install reach rods to restore access. Claimant submitted an MSCR for this work, which was approved by the Ministry. The Ministry did not pay for the reach rods. Claimant claims a credit of US$ 10,236.

### Decision by the Arbitral Tribunal

1220. The approval of an MSCR does not necessarily mean that the Ministry approved the costs associated with the performance of works. The approval of the MSCR meant that the Ministry had reviewed and authorized the installation of equipment or parts.

1221. It is not incumbent upon the Arbitral Tribunal to infer from the Ministry's assertions any consequences for its not paying for the works as allegedly due. The Arbitral Tribunal simply takes note of the Ministry's comments in Annex A, which were transcribed above and which indicate that RAWs, after review, were not approved and the Ministry indicated under which specification the work was due.

1222. For the purposes of the decision, the important aspect is that such claim fails to meet the requirements provided by Clause 59 as absolutely necessary for the fulfillment of the Contract.

1223. Hence, the Arbitral Tribunal dismisses this claim.

### (96.10)    REA-90.2.11 – Anchor Windlass Piping

1224. Claimant states that Specification C.29 required it to perform major maintenance to the Capstan and winch systems. However, no contractual provision required Claimant to hot-oil flush the anchor windlass hydraulic piping. Due to its poor condition on F-21, Claimant submitted an OCR to the Ministry, who agreed that such work should be performed but refused to concede that it was out-of-scope. Claimant, however, performed the work notwithstanding the Ministry's unreasonable position. Claimant claims a credit of US$ 13,727.

**Decision by the Arbitral Tribunal**

1225. Despite submitting this claim, it is Claimant who stated that the work was required but, upon submitting the OCR, the Ministry agreed but denied approval to the funding. Notwithstanding being fully aware of the Ministry's refusal, Claimant states that it went ahead and performed the work. Thus, Claimant knew that it might not be compensated by the Ministry and decided to assume the risk.

1226. This claim does not meet the requirements imposed by Clause 59 to allow compensation thereunder.

1227. Hence, the Arbitral Tribunal dismisses this claim.

### (96.11)   REA-90.2.12 – Electrical distribution (Lighting)

1228. Claimant claims that Specification C.45 required it to perform major maintenance to the lighting system, which included the removal, repair, and reinstallation of lighting distribution panels. While performing the authorized work, Claimant discovered that three panels were deteriorated beyond repair and had to be replaced.

1229. Claimant submitted an OCR for the work, but the Ministry insisted that the panels were repairable. Claimant could not repair them and had to proceed with their replacement. Claimant states that the Ministry required it to perform the maintenance and argued that the panels were in repairable condition. The Ministry also stated that the specification provided for the replacement of the material that is damaged. Claimant claims a credit of US$ 2,512 before computing interest accruing thereon.

**Decision by the Arbitral Tribunal**

1230. In light of the decision by the Ministry to not compensate Claimant for such work as if it were an extra work, and having required Claimant to repair the panels because, in its view, they were repairable, Claimant did not succeed with the repair, and decided to replace them. Moreover, the position assumed by the Ministry as to refusing the replacement and determining to Claimant to stick to the line item in the relevant specification eliminates any possible allegation that the work engaged into by Claimant

would be absolutely necessary to fulfill the Contract. Hence, this claim is dismissed by the Arbitral Tribunal.

### (96.12)    REA-90.2.13 – Electrical Commutators

1231. Claimant states that Specification C.39 required it to provide repair and maintenance services for specified electrical commutators, but its tasks did not require any component replacement. However, in performing the works, Claimant discovered that several electrical commutator assemblies on F-21 were deteriorated beyond repair or were missing internal parts.

1232. Claimant then submitted four OCRs detailing the problems with the commutator assemblies and making clear that it had to replace them.

1233. The Ministry agreed the work had to be performed but insisted that it was in-scope and did not authorize payment. Claimant claims a credit of US$ 255,437.

### Decision by the Arbitral Tribunal

1234. In light of the decision by the Ministry of not to compensate Claimant for such work as if it were an extra work, Claimant knew that the Ministry had asserted that the specification provided for the replacement of damaged material. Even so, Claimant decided to replace the electrical commutators without having obtained the Ministry's approval to be compensated thereunder.

1235. This claim, as detailed, fails to meet the requirements under Clause 59.

1236. Hence, the Arbitral Tribunal dismisses this claim.

### (96.13)    REA-90.2.14 – Steering Gear System Commutator

1237. While performing work on F-21, Claimant concluded that a circulating telemotor commutator had to be refurbished. Claimant submitted an OCR to the Ministry to report the need for such extra work. The Ministry agreed that the commutator should be refurbished but disputed that such work was out-of-scope.

1238. The Ministry considered the maintenance work on the commutator to be covered by the specification and directed Claimant to perform the alleged extra work without compensation. Claimant claims that the specification dealt with the rudder control system and did not include maintenance on the steering gear system commutator. Claimant claims that it made sure that the work on the commutator was properly computed. Claimant claims a credit of US$ 13,727 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1239. In light of the decision by the Ministry to not compensate Claimant for such work as if it were an extra work, Claimant knew that the Ministry had asserted that the specification provided for the replacement of damaged material. Even so, Claimant decided to replace the commutator without having obtained the Ministry's approval to be compensated thereunder.

1240. This claim fails to meet the requirements under Clause 59.

1241. Hence, the Arbitral Tribunal dismisses this claim.

### (96.14)    REA-90.2.15 – Reduction Gears

1242. Claimant discovered during the performance of the work on gages and thermometers that it had to remove, calibrate and reinstall 80 gages and thermometers (40 per ship) in the main propulsion reduction gear systems.

1243. Claimant states that inexplicably the Ministry would not accept the financial responsibility for the work. Claimant claims a credit of US$ 16,309 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1244. In light of the decision by the Ministry to not compensate Claimant for such work as if it were an extra work, Claimant knew that the Ministry had asserted that the specification provided for the work Claimant indicated had to be done. Even so, Claimant decided to remove, calibrate and reinstall 80 gages and thermometers (40 per ship) in the main propulsion reduction gear systems without having obtained the Ministry's approval to be compensated under Clause 8.

1245. This claim, as detailed, fails to meet the requirements under Clause 59.

1246. Hence, the Arbitral Tribunal dismisses this claim.

### (96.15)      REA-90.2.16 – Pneumatic System

1247. As per Claimant, Specification C.23 described the work to be done on the Arms and Electronics System, but it did not require any work on the existing pneumatic system. However, the Ministry contended that Specification C.23 required Claimant to inspect and report on the pneumatic message system.

1248. Claimant asserts that such Specification did not contain any provision along the lines indicated by the Ministry since it deals with arms and electronics. Based on its understanding, Claimant issued an OCR for the inspection. Once the inspection was performed, it issued OCRs for the work itself. Because the work was out-of-scope, Claimant claims it is entitled to compensation in the amount of US$ 5,504 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1249. In light of the decision by the Ministry of not to compensate Claimant for such work as if it were an extra work, Claimant knew that the Ministry had asserted that the specification provided for the work Claimant indicated had to be done. Even so, Claimant decided to inspect and report on the pneumatic system without having obtained the Ministry's approval to be compensated therefor.

1250. This claim, as detailed, fails to meet the requirements under Clause 59.

1251. Hence, the Arbitral Tribunal dismisses this claim.

### (96.16)      REA-90.2.17 – Steering Gear System

1252. While performing the work under Specification C.44, Claimant determined that eight disconnect switches in the steering gear system needed repair. Claimant prepared an OCR for the work, and although the

Ministry agreed that such work was necessary to be performed, it inexplicably refused to accept responsibility and compensate Claimant for the out-of-scope work. Claimant claims a credit of US$ 15,540 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1253. In light of the decision by the Ministry of not to compensate Claimant for such work as if it were an extra work, Claimant knew that the Ministry had stated that it would not accept financial responsibility and compensate Claimant. Even so, Claimant decided to proceed with the work without having obtained the Ministry's approval to be compensated therefor.

1254. This claim, as detailed, fails to meet the requirements under Clause 59.

1255. Hence, the Arbitral Tribunal dismisses this claim.

### (96.17)      REA 90.2.18 – Engine Cooling System

1256. During the performance of the work, Claimant concluded, although there was no contractual provision that requires it to perform any works on the engine cooling system, that the rotating assembly for two motors in the engine cooling system for F-22 should be repaired. Inexplicably, the Ministry refused to accept responsibility for the work. Claimant had its subcontractor do the essential work, which is compensable as a Contract change. Claimant claims a credit of US$ 15,540 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1257. In light of the decision by the Ministry of not to compensate Claimant for such work as if it were an extra work, Claimant knew that the Ministry had stated that it would not accept financial responsibility and compensate Claimant. Even so, Claimant decided to proceed with the work without having obtained the Ministry's approval to be compensated therefor, and, further, had its subcontractor do the essential work on the assumption that such expenses and costs would be eligible for compensation under a Contract change. However, this did not occur.

1258. This claim, as detailed, fails to meet the requirements under Clause 59.

1259. Hence, the Arbitral Tribunal dismisses this claim.

### (96.18)      REA 90.2.19 – JP-5 – Fuel System

1260. There was no contractual provision requiring Claimant to perform any work on the JP-5 Fuel System. A Ministry representative requested such work (the repair of sight flow indicator from the hand stripping Pump to the Pot Belly tank on F-21), and Claimant documented such request in OCR 14603, which the Ministry refused to approve.

1261. Claimant completed the Ministry representative-directed repairs and is then entitled to be compensated for the amount of US$ 832 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1262. Claimant knew beforehand that the Ministry had refused to approve the OCR. The OCR was prepared in light of the request submitted by a Ministry representative for Claimant to do the work, even in the absence of a contractual provision that required any services on the JP-5 Fuel System, but Claimant completed the underlying work.

1263. This claim, as detailed, fails to meet the requirements under Clause 59.

1264. Hence, the Arbitral Tribunal dismisses this claim.

### (96.19)      REA-90.2.21 – Fire System Pumps

1265. Specification A.4 required Claimant to remove and replace five existing fire main pumps with new pumps, control panels and cable. At the outset, the Specification provided that the new fire pumps had to be Carver model. During the WDCs, the Ministry requested that Arturia pumps be used in lieu of Carver pumps.

1266. Claimant issued a RAW revising the Specification A.4 accordingly. As the Arturia pumps were similar in size and function to the existing pumps,

the installation should have required only minor modifications to the existing piping system.

1267. However, due to the deteriorated condition of the existing piping system, Claimant determined that a significant and unanticipated amount of piping had to be replaced. Claimant states that the Parties had not anticipated the replacement of piping when they agreed on the terms of the RAW. Claimant claims that such work is an extra work and that it should be entitled to be compensated therefor, claiming a credit in the amount of US$ 677,367 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1268. While the Parties agreed on the terms of the RAW to revise the technical specification to reflect that Arturia pumps should replace the existing ones, that RAW did not provide for any price increase. The reality, however, is that in performing the work, Claimant realized that the anticipated minor modifications to the piping system would require a significant amount of piping to be replaced due to the alleged deterioration condition.

1269. In this case, Claimant does not indicate any attempt by it to get the Ministry's approval for this unanticipated work that Claimant claims was extra. Claimant determined that the piping condition required replacement and proceeded with the work even though Claimant knew that under the Contract there existed certain requirements to be complied with for being properly compensated. However, Claimant did not follow such rules. It is not a simple failure to comply with a formal requirement. The concept of a work being absolutely necessary imposed on the Parties certain adjustment for its performance.

1270. The approval of the RAW by the Ministry to revise the technical specifications would not allow Claimant to rely on it to incur such additional costs on the assumption that it would be compensated thereunder. Claimant knew how it should proceed contractually but decided to assume the risk and claim at a later stage. This claim fails to comply with the requirements contained in Clause 59 to be compensated thereunder.

1271. Hence, the Arbitral Tribunal dismisses this claim.

### (96.20)   REA-90.2.22 – Bailing System, Pump Replacement

1272. Specification A.6 required Claimant to remove and replace the existing bailing pumps with new pumps and to remove piping necessary for the pumps' removal. During the work, Claimant determined that a significant amount of existing piping was deteriorated and needed replacement.

1273. In order to complete the pump replacement work, Claimant states that it had to replace more piping than required by the technical specification. Based on such specification, Claimant had intended to replace the piping in an amount necessary to enable it to remove the existing pumps. Claimant asserts that it was unaware as to the condition of the piping and, in sum, Claimant states that the labor required was more than ten times when compared with the amount of labor quoted upon presentation of the price bid. Claimant asserts that such extra work is compensable under a Contract change. Claimant claims a credit in the amount of US$ 179,641 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1274. This claim fails to comply with the requirements imposed by Clause 59 to enable Claimant to be compensated for the alleged extra work. The Contract had special provisions governing the mechanism for compensation of extra or unforeseen work. The Clause 59 mechanism also required evidence that such work being claimed as extra was not contemplated by jobs under any technical specifications.

1275. In this very case, the specification provided already for the replacement of piping. Claimant claims that such replacement exceeded what had been agreed by the Parties but failed to evidence that such replacement was absolutely necessary for fulfillment of the Contract.

1276. Hence, the Arbitral Tribunal dismisses this claim.

### (96.21)   REA-90.2.23 – Bailing System Ejectors

1277. Specification A.8 required Claimant to replace sixteen Bailing System ejectors and further stated that the existing piping system will be modified to accommodate new ejectors, feed valves and suction strainer. In preparing its price bid, Claimant took into account the piping labor needed to accomplish the Contract requirements.

1278. When the work began, Claimant discovered that a significant amount of existing piping was severely deteriorated and it had to replace more piping than called for by the Contract. Claimant asserts that it could not have known the piping condition since it could not have dismantled the closed bailing system and related systems to examine the piping condition. Claimant claims a credit in the amount of US$ 661,143 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1279. This claim fails to comply with the requirements imposed by Clause 59 to enable Claimant to be compensated for the alleged extra work. The Contract had special provisions governing the mechanism for compensation of extra or unforeseen work. The Clause 59 mechanism also required evidence that such work being claimed as extra was not contemplated by jobs under any technical specifications.

1280. In this case, the specification provided already for the replacement of piping. Claimant claims that such replacement exceeded what had been agreed by the Parties but failed to evidence that such replacement was absolutely necessary for fulfillment of the Contract.

1281. Hence, the Arbitral Tribunal dismisses this claim.

### (96.22)   REA-90.2.24 – Shaft and Stern Tube Removal

1282. Claimant alleges that Specification C.17 required maintenance of the propeller shafts and the stern tube shafts, but did not require their removal from the Frigates. Thus, the price bid submitted by Claimant did not take into account such removals.

1283. During the Contract performance, the Ministry argued that the

Spanish version of the Specification stipulated the removal of both the propeller and the stern tube shafts. This led to several meetings between the Ministry and Claimant, and the Ministry demanded that the shafts be removed from the ships. However, the Ministry refused to take responsibility to fund such work.

1284. Claimant states that it performed such work and is entitled to be compensated as a Contract change. Claimant claims a credit in the amount of US$ 1,826,520 before computing interest accruing thereon.

**Decision by the Arbitral Tribunal**

1285. This claim fails to comply with the requirements imposed by Clause 59 to enable Claimant to be compensated for the alleged extra work. The Contract had special provisions governing the mechanism for compensation of extra or unforeseen work. The Clause 59 mechanism also required evidence that such work being claimed as extra was not contemplated by jobs under any technical specifications.

1286. Claimant knew that the Ministry had refused to accept responsibility for funding the alleged extra work, and claimed that it was in-scope work which was stipulated in the Spanish text of the Specification. Even so, Claimant decided to move on with the performance of the works without securing the Ministry's approval. Thus, Claimant assumed the risk of not being compensated and deferred discussion into a later stage.

1287. In light of the dispute between the Parties as to whether such removal was or was not provided by the technical specifications, Claimant should have evidenced that the alleged discrepancy between the two versions of the specifications did not exist. Claimant has thus failed to produce evidence that such services were out of scope and, further, that they were absolutely necessary for the fulfillment of the Contract.

1288. Hence, the Arbitral Tribunal dismisses this claim.

**(96.23)      REA-90.2.25 – Automatic Air System**

1289. Under Specification C.13 Claimant was required to replace 25 feet of piping upon repairing the automatic air system. During the work on the

Frigates, Claimant discovered significant problems with such system, which required ten times more piping replacement than planned. Claimant issued an OCR to the Ministry and accomplished the work. Claimant claims a credit in the amount of US$ 523,269 before computing interest accruing thereon. Claimant claims that such extra work is compensable under a Contract change.

### Decision by the Arbitral Tribunal

1290. This claim fails to comply with the requirements imposed by Clause 59 to enable Claimant to be compensated for the alleged extra work. The Contract had special provisions governing the mechanism for compensation of extra or unforeseen work. The Clause 59 mechanism also required evidence that such work being claimed as extra was not contemplated by jobs under any technical specifications.

1291. In this case, the specification already provided for the replacement of piping. Claimant claims that such replacement exceeded what had been agreed by the Parties but failed to evidence that such replacement was absolutely necessary for fulfillment of the Contract.

1292. Hence, the Arbitral Tribunal dismisses this claim.

### (96.24)   REA-90.2.26 – Air Starting System

1293. Specification C.34 required Claimant to perform specified maintenance to the air starting system for the diesel generator. With respect to the system piping, Claimant had to accomplish maintenance to the air starting system piping network to include hydrostatic testing, inspection for leakage, damaged and deteriorated piping, and replacement of gaskets, O-rings, and the flex gaskets at mechanical joints.

1294. Due to the Ministry's failure to provide accurate technical information on the system, Claimant had to install five times more piping than originally planned. Claimant claims a credit in the amount of US$ 265,299 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1295. This claim fails to comply with the requirements imposed by Clause

59 to enable Claimant to be compensated for the alleged extra work. The Contract had special provisions governing the mechanism for compensation of extra or unforeseen work. The Clause 59 mechanism also required evidence that such work being claimed as extra was not contemplated by jobs under any technical specifications.

1296. In this case, the specification provided already for the replacement of piping. Claimant claims that such replacement exceeded what had been agreed by the Parties but failed to evidence that such replacement was absolutely necessary for fulfillment of the Contract.

1297. Hence, the Arbitral Tribunal dismisses this claim.

## D.   3rd Category of Claims – The Ministry's Responses to Claimant's Remaining Claims Fail on the Merits

1298. Claimant asserts that the Ministry chose to address only 24 of its 157 claims in a manner beyond a simple reference to Annex A. However, even with respect to these claims, the Ministry has failed to submit persuasive evidence or testimony to support its assertions at the Hearing or in its memorials. In fact, the Ministry continues to rely on the Del Rosario Memorandum as support for the factual assertions in its discussion of these claims.

1299. Therefore, the Arbitral Tribunal will analyze the remaining claims[261] and will decide.

## (97)  REA-4 – Fire Control System

1300. Claimant claims[262] that, as originally stipulated by the relevant technical specification, the Ministry did not foresee to upgrade the fire control system. Following several discussions and meetings between 1998 and 1999, the Ministry finally decided to request that Claimant proceed with the upgrade on March 8, 1999 when it approved an increase of the incremental base price of up to US$ 5,750,000.

---

[261] Claim REA 27 was already analyzed in conjunction with Claim REA 86.
[262] See REA EXH. C.4 and References thereto, particularly the discussion by Claimant on the chronological events that preceded the decision by the Ministry to upgrade the Fire Control System.

1301. The decision covered the replacement of the NA-10 system with a new IAI-MBT system, and Claimant states that it agreed to make the change. However, after the work began, Claimant and the Ministry-selected contractor determined that it was necessary to fundamentally amend the scope of work on the new fire control system ("UFCS", meaning the system, as upgraded), including requiring increased direct labor and testing as well as additional subcontractor resources. Even if the changes to the scope were unforeseen and absolutely necessary, the Ministry refused to pay for the additional out-of-scope work. Claimant claims a credit in the amount of US$ 1,664,500 before computing interest accruing thereon.

1302. The Ministry asserts that the change accomplished on the control fire system was authorized and implemented by means of a revised technical specification for the fire network, and it was accepted by both Parties. The Ministry confirms that the cost for such work was an additional payment of US$ 5,750,000. This amount was incremental and in addition to those that were reflected in the Contract for the maintenance of the fire control system. The Ministry claims that such change was necessary because Claimant was unable to do the maintenance of the system that was installed on both ships.

1303. The Ministry, further asserts, that when such change was agreed upon by the Parties, a new technical specification was drawn up, prepared and executed which provided for the installation of the UFCS, the price agreed upon by the Parties, the scope of the work and that such change did not have any impact on the redelivery date of the Frigates. Those changes were reviewed and approved by the Comptroller General of the Armed Forces.

1304. The Ministry states that Claimant has not done any works different from those that had been agreed upon the execution of the technical specification, nor has the Navy ordered any additional works. Therefore, the Ministry asserts that there do not exist any amounts to be paid to Claimant, and any costs that Claimant may have incurred with delays must be under Claimant's responsibility.

1305. In reply, Claimant avers that the Ministry's unsubstantiated position

flies in the face of the express language of the Specification.

## Decision by the Arbitral Tribunal

1306. This claim is by far the most detailed one among those submitted by Claimant. Claimant claims to have incurred costs related to direct-charge labor efforts by its engineering, program support and change order personnel, which efforts were not reasonably foreseeable in March 1999.

1307. Notwithstanding the arguments tendered by Claimant, the repetitive requests for compensation based on extra work allegedly done following such a thorough revision of a technical specification is incompatible with the fixed price nature of the Contract.

1308. Upon agreeing on the terms applicable to the upgrade of the fire control system, the Parties had had long discussions and meetings on that specific topic, including with the assistance and participation of the selected provider IAI-MBT.

1309. The assertions made by the Ministry, although challenged by Claimant, make sense in the context that surrounded the revision of the technical specification. Some of the additional costs claimed, which Claimant claims were unforeseen, such as the HAT/SAT, could have been estimated based on the experience of both Claimant and IAI-MBT in similar cases. References to deterioration of cable and replacement thereof have already been addressed by the Arbitral Tribunal in appraising REA-79.

1310. The replacement of a fire control system, as explained by Claimant, is, *per se*, a very complex job, and any estimate as to the incremental price should have been taken into account with a view to avoid the current discussion of a claim for extra services and works.

1311. Claimant also states that it proceeded with the Act of Final Acceptance without the Ministry settling those extra costs and failing to fulfill its obligations.

1312. The Arbitral Tribunal finds that the aspects related to this case do not authorize the application of a compensation to Claimant under Clause 59. It is not a matter of simply verifying the compliance with the requirements for

such intended application, but rather there exists a lack of evidence that such costs were not actually included in the incremental price and in the base price agreed upon by the Parties for the upgrade of the control fire system. This REA follows an attempt by Claimant to be compensated under Clause 8 which failed.

1313. The Arbitral Tribunal also finds that an estimate that failed to take into calculation such a significant amount of money, especially when Claimant was assisted by the subcontractor, which is an expert on those technical aspects, leads to the dismissal of the claim for lack of substantiation.

1314. Hence, the Arbitral Tribunal dismisses this claim.

### (98) REA-5 – Missing Electronic Components

1315. Claimant claims[263] that when work began in 1998, it discovered that the Ministry had removed electronic parts prior to the ships' arrival at the shipyard, making systems inoperable that had been operable during the shipchecks. Claimant then submitted 35 OCRs requesting the replacement of the missing components. The Ministry agreed to compensate Claimant for the material costs of some components but for the administrative, clerical, and research costs and for worked performed by a certain company named Prisma, a Venezuelan subcontractor hired to procure or manufacture replacement s for the missing components, Claimant claims a credit of US$ 521,906 before computing interest accruing thereon.

1316. The Ministry states that it is surprising the inexact and general form that Claimant utilizes when it is to its own convenience. The Ministry avers that each one of the technical specifications of such systems included a paragraph that stipulated that missing parts and components must be supplied by Claimant.

1317. The Ministry further asserts that there does not exist any contractual obligation whereby the Ministry would be required to compensate Claimant for missing components, not even for Claimant having removed components

---

[263] See REA EXH. C.5 and References thereto.

from one ship and transferred them to the other. This was a decision made by Claimant as a means to perform the maintenance. The Ministry says that it refused to accept equipment that had already been tested due to changes of electronic components that occurred later. In such cases, the Ministry ordered new testing.

1318. Claimant states that the Ministry contended that it was required to replace missing parts under the relevant specifications. Nonetheless, Claimant submitted the bid and signed the Contract under the expectation that the Frigates would be maintained in working condition. Its bid, Claimant says, could not have assumed that it would be necessary to replace parts essential to the proper operation of the Frigates, or that it would be necessary to replace other parts that the Ministry admitted it removed after the ships arrival.

1319. As a result, this work which was fundamental for the completion of the Contract work, was out-of-scope. Claimant states that the Ministry implicitly acknowledged this when it agreed to pay for the parts. Nonetheless, it refused to pay for the work associated with the replacement of the parts.

### Decision by the Arbitral Tribunal

1320. One important aspect to be highlighted is that the Ministry has settled the compensation due in connection with the works under the technical specification and provided for procurement of replacement electronic parts/components themselves.

1321. Nevertheless, the Ministry still owes Claimant the administrative, clerical, and research costs and for worked performed by Prisma, which is the subject of this claim.

1322. Notwithstanding the assertions made by the Ministry for not paying Claimant the credit referred to herein, the Arbitral Tribunal finds that the behavior of the Ministry with respect to accepting to pay for the materials and, further, for procuring the replacement parts/components, indicates that such behavior is inconsistent with the allegations. If the Ministry recognized as due certain amounts in contradiction with its asserted

reasons, it may not assert that such services were not due and payable.

1323. In the Arbitral Tribunal's view, the costs incurred by Claimant related to out-of-scope works. Furthermore, once the replacement of parts and components were assumed by the Ministry, it may not be said that the services would not be. The works and services, as detailed herein, were absolutely necessary for rendering systems fully operable. The Arbitral Tribunal is satisfied that Clause 59's requirements have been complied with.

1324. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 521,906 plus interest accruing thereon.

### (99)  REA-16 – Designated Subcontractor ELISRA

1325. Claimant claims[264] that, pursuant to Clauses 1, 2, 3, 36 and 37 and Annex T, it was required to procure the electronic warfare system through the Ministry's Designated Subcontractor, ELISRA, and to effectuate the work in ELISRA's factories in Israel prior to installing the system aboard the Frigates.

1326. However, due to delays attributable to the Ministry, Claimant had to perform additional engineering, planning and program labor to administer the ELISRA subcontract for longer than the contractually required 20-month period. Claimant had to provide additional production and support labor to work around ELISRA's incomplete work during testing and trial work on the Frigates. Claimant claims a credit of US$ 79,801 before computing interest accruing thereon.

1327. The Ministry stated that the original date for the redelivery of the Frigates was July 1, 2000, following the extension granted at the request of Claimant. From that date, the redelivery was delayed. The Ministry invokes Clause 36 of the Contract to say that such provision placed on Claimant the obligation to execute a subcontract with each one of the subcontractors for the performance of the works required by the Ministry under Annexes T and U.

---

[264] See REA EXH. C.16 and References thereto.

1328. The Ministry did not change the works to be performed by ELISRA, and for that same reason there exist no works for which the Ministry owes compensation. The costs associated with the administration of the subcontract should have been included in the amount that the Ministry paid as an advance for support services to the designated subcontractor, which, in such case, amounted to US$ 700,000.

1329. In response, Claimant says that it included administrative charges in its supplier support charge, but only for the anticipated schedule. All additional costs were out-of-scope.

### Decision by the Arbitral Tribunal

1330. The main motivation claimed by Claimant is the extended period for the redelivery of the Frigates to the Ministry, which delay, according to Claimant, was the fault of the Ministry.

1331. It is disputed whether such costs were really extra costs or were (or should have been) included in the amount paid by the Ministry as administrative charges, meaning the administration of the Contract.

1332. The claim falls outside the scope of Clause 59 for Claimant not having evidenced strict compliance with the requirements for operation of such provision.

1333. Hence, the Arbitral Tribunal dismisses this claim.

### (100) REA-26 – Additional Structure

1334. Claimant claims[265] that Specification C.47 listed 8 types of repairs it was required to perform on the Frigates' underwater hulls, but did not require it to perform any work on the Frigates' seachests. Specifications C.14, C.52, C.60 and Contract Annex C, Appendix X required Claimant to open, clean, inspect, repair, and re-preserve various shipboard tanks, but did not require it to perform any structural repairs on the tanks.

1335. Three seachests on F-21 and four seachests on F-22 were found to be

---

[265] See REA EXH. C.26 and References thereto.

deteriorated, and the Parties agreed for them to be replaced. The Ministry directed Claimant to perform the necessary replacements using the 66 tons of steel budgeted for replacing portions of the underwater hull, despite the additional labor and cost required to manufacture and install a formed seachest, which was not required by Specification C.47 and was not covered in Claimant's bid to replace the flat pieces of hull plating.

1336. Claimant was also required to perform certain structural repairs to the shipboard tanks, such as building and inserting new structural materials, in order to make the Frigates seaworthy. Claimant claims a credit of US$ 1,448,307 before computing interest accruing thereon.

1337. The Ministry states, in appraising the claim, that Clause 8 is the only provision related to the performance of additional works. Such provision contains the detailed requirements for its operation. The Ministry claims that in such case, Claimant performed the works required under the Specification C.47, and the removal and replacement of additional steel, which was performed by Claimant and paid for by the Ministry was contracted in accordance with such clause. Thus, the Ministry claims that there are no payments owed to Claimant under this claim.

1338. In response, Claimant states that the Ministry argues that this claim is duplicative of REA-61. Claimant asserts that in REA-61 it seeks compensation related to the quantity of steel while this claim seeks compensation related to the added requirement to manufacture and install a formed seachest rather than a flat piece of hull plating as specified in Specification C.47.

### Decision by the Arbitral Tribunal

1339. Firstly, the Arbitral Tribunal finds that the assertion made by the Ministry as to this claim being duplicative of REA-61 is groundless. As explained by Claimant, REA-61 deals with the quantity of steel. In this case, evidence shows that it deals with the manufacture and installation of a formed seachest. Thus, there is no room for the Ministry to argue the duplicative nature of this claim.

1340. Furthermore, following its analysis of Specification C.47, the Arbitral

Tribunal finds that the scope of this claim is different from the works required from Claimant thereunder. In this case, Claimant is claiming the extra works that it was required to perform were to provide the manufacture and installation of a formed seachest. The nature of such works may not be comingled with the scope of work under the Specification. Claimant performed the replacement of 66 tons of steel plating on the hulls, this meaning flat pieces.

1341. It makes sense when Claimant states that costs could not have been included in its bid price insofar as such requirement did not exist at such time. Moreover, the Parties agreed on the replacement of the seachests following the commencement of the works, at which time Claimant was directed by the Ministry to perform such replacements. Thus, the Arbitral Tribunal finds such works to be extra works.

1342. The question that remains to be answered is whether those extra works are eligible for compensation under Clause 59 of the Contract or, conversely, under Clause 8.

1343. The Arbitral Tribunal has explained repeatedly that application of Clause 59 must abide by certain requirements due to the fixed price nature of the Contract and the exceptionality of such mechanism.

1344. It must be stressed that Clause 59 introduced a requirement as to the work being absolutely necessary for the fulfillment of the Contract. Fulfillment of the Contract means that the Frigates upon redelivery were retrofitted, with their systems upgraded or in full operational condition.

1345. The main purpose of the replacement of the seachests was to make the Frigates seaworthy. The Parties agreed that it was necessary, and the excuse made by the Ministry was that a provision in the technical specifications supposedly contemplated such works. Had that been the case, the Parties need not have agreed on the performance of the works.

1346. The Arbitral Tribunal finds that such claim meets the requirements to trigger the operation of Clause 59 since such works were actually absolutely necessary for the fulfillment of the Contract.

1347. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 1,448,307 plus interest accruing thereon.

### (101)REA-29 – Deck Grating and Floor Plates

1348. Claimant claims[266] that the Specifications did not include any requirement for it to repair and replace deck grating or floor plates on the Frigates. Nevertheless, after work began, Claimant discovered that in many places the deck grating, floor plating, and/or support structures were deteriorated to the point of being unsafe to stand upon. The repair of these deck grates, floor plates and/or support structures was required, and it was demonstrably outside the scope of the Contract.

1349. Nevertheless, the Ministry argued that the cost of repairing those areas of the Frigates was implicitly included in the price Claimant agreed to charge for the installation of whatever equipment was adjacent to the grates and plates and support structures in question[267]. However, such argument was flawed. The Specifications are very precise about the work required for their completion, and the replacement of worn or rusted deck grates and floor plates was not included in the bid price. Claimant claims a credit of US$ 1,734,205 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1350. Claimant states that the Ministry received all MSCRs and OCRs issued by it in connection with these works. Thus, the Ministry was aware of the works that were being performed by Claimant. The record shows no document evidencing that the Ministry refused to agree with the performance of the works. The point of disagreement between the Parties was whether or not such works were included in the applicable technical specifications.

1351. The Arbitral Tribunal finds that such works were not contemplated by the specifications as the need for them to be performed only arose after the

---

[266] See REA EXH. C.29 and References thereto.
[267] See the Ministry's Rejoinder ¶¶ 205-07.

work began. By that same token, the costs associated with such works were not reflected in the bid price. The Arbitral Tribunal finds that such works, as described herein, were extra works.

1352. However, the point pending decision relates to whether or not such works trigger the application of Clause 59. The Arbitral Tribunal finds that such requirements have been complied with due to such works being absolutely necessary for the proper fulfillment of the Contract. The condition of deterioration of deck grates, floor plates and support structures rendered such areas unsafe which contradicted the spirit of the major overhaul and retrofitting contracted by the Parties.

1353. Hence, the Arbitral tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 1,734,205 plus interest accruing thereon.

## (102)REA-31 – Watertight Doors and Scuttles[268]

1354. Although Specification C.47 called for maintenance to all hatchways, the Ministry's solicitations called only for repair and maintenance of an unspecified number of hatches, doors, external and internal scales, hatchways, and hatchdoors, without indicating that maintenance would be required on all.

1355. Based on the Ministry's solicitations and past experience, Claimant's original bid estimate explicitly included maintenance work for only 56 closures per ship, and included allowances for the transfer of 25% of the units to the workshop for maintenance. Once the Contract performance began, the Ministry concluded that more than 56 closures per ship needed to be maintained and repaired. The Ministry also demanded Claimant remove and transfer 100% of the closures to the shop for the maintenance and repair work, which was beyond the 25% contemplated.

1356. In addition, even though Claimant had installed new steel cotter pins in the closures hinges, the Ministry demanded that Claimant replace the new steel cotter pins with more expensive brass cotter pins.

---

[268] See REA EXH. C.31 and References thereto.

1357. The Ministry stated that all works relating to the new watertight doors were not without cost. Claimant prepared the studies and charged for the performance of the works, which were paid for by the Ministry. Moreover, the works performed by Claimant were covered by the Contract and relevant Specification C.47, and those which were not covered by the Contract were paid in accordance with the respective RAWs.

1358. Claimant asserts that the Ministry's approach to this claim was inconsistent. It approved some work through RAWs with respect to 18 closures, but refused to compensate Claimant for work on the other closures. Claimant claims a credit of US$ 1,084,033 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1359. Although Claimant demonstrated that it has performed more work than it had estimated upon preparing its bid, it is certain that during the performance of the work it submitted various OCRs and RAWs to the Ministry for its approval, with the Ministry authorizing some of them while rejecting others.

1360. Claimant believes the Ministry's approach was inconsistent for approving some requests but rejecting others. The Ministry's position, however, was based on the fact that some works claimed as extra were, in its view, covered by the Specification.

1361. In reality, the Ministry avers that a portion of the works was contemplated by the Contract, but the Ministry failed to produce sufficient evidence in that respect, leaving only arguments not supported by factual evidence which are insufficient to defeat the claim submitted by Claimant. Thus, the Arbitral Tribunal finds that such claim meets the requirements that trigger the operation of Clause 59.

1362. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 1,084,033 plus interest accruing thereon.

### (103) REA-43 – Fin Stabilizer

1363. Claimant claims[269] that Specification C.18 required it to make a limited number of repairs to the fin stabilizer. In particular, the Specification required: (i) removal, disassembly. Repair, and installation of the stabilizing fins; (ii) inspection, cleaning, and testing of hydraulic tanks and piping; (iii) removal, repair, testing, and reinstallation of hydraulic and sea water valves; (iv) replacement of hydraulic motors; (v) removal, repair, testing, and reinstallation of hydraulic brakes; (vi) repair of controls and replacement of up to 8 gages and 4 thermometers, and (vii) system hydrostatic and operational testing.

1364. Upon the arrival of the Frigates at the shipyard, Claimant's subcontractor found the fin stabilizers to be extremely corroded and inoperable. As a result, Claimant identified the changes to the scope of work to be performed. These included replacement of all electrical wiring, the fin stabilizer and control unit, the rudder angle indicating needle, a main stabilizer circuit breaker, the hydro pump, and the main stabilizers axle.

1365. Claimant claims that the Ministry agreed that the work had to be performed but refused to concede that it was outside the scope of Specification C.18[270].

1366. Claimant claims a credit of US$ 1,917,027 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1367. The intention of the Parties in entering into the Contract has to be duly observed and must be an important source of interpretation of provisions inserted into the Contract. The Ministry was seeking for a major overhaul of its Frigates, and Claimant was prepared to perform the works and services based on its experience in the area.

1368. The Parties were careful enough to establish a system of works to be performed under the major overhaul of the Frigates, primarily the technical

---

[269] See REA EXH. C.43 and References thereto.
[270] See Respondent Rejoinder ¶¶ 265-66.

specifications divided into work items. It is true that, in certain instances, the letter of the specifications may be ambiguous. In order to settle and clear any doubts, one has to resort to the intention of the Parties in entering into the Contract. It is clear that the Parties were willing to have a clear definition of the works to be performed. From the Ministry's standpoint to enable it to follow up the development of the overhaul; from Claimant's standpoint to enable it to secure that its obligations were properly performed and that any works it had to perform were contemplated by its bid price. This was of fundamental importance due to the fixed-price nature of the Contract and very limited possibility for any price increase.

1369. The problems with this system were discovered by Claimant's subcontractor upon arrival of the Frigates at the shipyard. Those problems had not been foreseen upon the Parties drawing up and preparing the technical specification. The Ministry agreed that such works were necessary under the overhaul but refused to pay. Thus, the Arbitral Tribunal finds that such works are extra works for the purposes of the Contract.

1370. The performance of the services was indeed of major importance for the operation of the Frigates and to make them seaworthy. The target with those services was to make an inoperable system operable to allow safety requirements to be complied with. The Arbitral Tribunal further finds that such extra works do actually match Clause 59's requirements and are therefore eligible for compensation thereunder.

1371. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 1,917,027 plus interest accruing thereon.

### (104) REA-45 – Second Dry Docking on F-22

1372. Claimant claims[271] that Specification C.17 provided the repairs that it would perform on the two axle line systems of the propulsion system. It did not require Claimant to perform any work on the Frigates' propeller hubs or blades. During the first dry dock, Claimant discovered that a propeller blade

---

[271] See REA EXH. C.45.

had to be replaced because it had been cut shorter than the manufacturer's specifications and could not rotate properly. The Ministry authorized the performance of the works under approval of RAWs that were submitted to it by Claimant.

1373. Since the new propeller blade required a 15-week lead time, it was more cost efficient for both Parties to undock F-22 to complete other work while waiting for the new propeller blade to arrive.

1374. However, the Ministry did not take responsibility for the costs or delays associated with the second dry docking of F-22, which was needed only to replace the defective propeller blade.

1375. The Ministry states that the works for replacement of the new propeller blade were not completed during the first dry docking due to Claimant's fault. Furthermore, the Ministry states that Claimant had decided to absorb the costs associated with the second dry docking, and had expressed that the Ministry would not run any additional costs therefor. Claimant states that the Ministry has not submitted any evidence in support of its assertion.

1376. Claimant claims accredit of US$ 557,800 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1377. It is undisputed that the propeller blade had to be replaced and this was an extra work which was covered by a RAW and paid accordingly.

1378. The contentious aspect relates to the costs associated with the second dry docking of F-22 and who should bear them. It makes total sense in the context of the major overhaul not to have a frigate dry docked for 15 weeks when Claimant could perform other services in the meantime. The decision by Claimant to undock and have a second dry docking was made for the benefit of the Parties.

1379. The Arbitral Tribunal finds that the costs associated with the second docking must be borne by the Ministry. The second docking is a consequence of the works being performed by Claimant, and it would have

been more burdensome for the Ministry to keep the Frigate dry-docked for a long time, not to mention that it would have meant further delay.

1380. The replacement of the propeller blade was absolutely necessary to secure proper rotation. The costs being discussed are directly linked to such replacement and to make it viable. Thus, the Arbitral Tribunal finds that such costs are eligible for compensation under Clause 59.

1381. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 557,800 plus interest accruing thereon.

### (105)REA-50 – Machinery Command and Control System

1382. Claimant claims[272] that work item 121-01-001, as modified during the WDCs, provided requirements for the MCS-5 Command and Control System. The requirements assumed that the new command and control system would be compatible with the existing twisted-strand cabling on the Frigates. Claimant's bid for the specified work anticipated only replacement of damaged cabling. Claimant's price for the work included an allowance of up to 21,000 linear feet of cabling on the two ships that may need replacement.

1383. After construction began, the manufacturer for the first time advised Claimant that the system selected by the Ministry was not compatible with twisted-strand cable. Claimant had to then replace all 214,740 linear feet of cable. The Ministry argued that the replacement of cabling was covered by the Specification that required Claimant to install the new cabling and connectors[273].

1384. Claimant asserts that the Ministry does not dispute that, at the time Claimant agreed to the Ministry's change to the Specifications, there was no information indicating that the MCS-5 would be incompatible with the existing cables on the Frigates. The Specifications envisioned the installation of some new cable in the context of the installation but clearly did not provide for the wholesale replacement of all ships' cables.

---

[272] See REA EXH. C.50 and References thereto.
[273] See Respondent Rejoinder ¶¶ 198-204.

1385. In addition, when the new Command and Control System was selected, the Parties agreed that Claimant would centralize various local system alarms into the system. This work was priced on the basis that Claimant would not then have to repair the local alarm systems as originally envisioned. However, after agreeing to the price, the Ministry concluded that Claimant was required to repair the local alarm systems as back-up.

1386. Finally, the Ministry required relocation of several alarm sensors and readouts, which were not contemplated in the Specifications. Claimant claims a credit of US\$ 4,173,074 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1387. Due to the straightforward description of this claim, the Arbitral Tribunal finds that the works referred to herein do qualify as extra works. It is unacceptable to allow that, having estimated the replacement of 21,00 linear feet of cables, Claimant be held responsible for a work allegedly under the technical specification when it had to replace 214,000 linear feet due to the incompatibility of the twisted strand cable that came to Claimant's knowledge only after the commencement of the works.

1388. This is not the first time that Claimant claims compensation for extra cabling costs in the context of this arbitration. In the vast majority of the preceding cases, the Arbitral Tribunal found that the corresponding claims did not meet the requirements imposed by Clause 59.

1389. In this case, the circumstances differ substantially from the other cases. While the fundamental reason of this claim is the cable replacement, the question is not a greater amount of cable replaced vis-à-vis what had been estimated. In this case, an agreed upon activity had to be entirely reversed in light of the incompatibility of the cable originally designed with one of the most important systems of any frigate – the command and control system. Moreover, the failure by Claimant to replace the 214,000 would render the MCS-5 inoperable.

1390. With respect to the alarm system and the works required by the Ministry from Claimant, the Arbitral Tribunal finds that such works are extra

works and must be compensated within the context of Clause 59.

1391. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 4,173,074 plus interest accruing thereon.

### (106)REA-54 – Air Conditioning Plant Failure

1392. Claimant claims[274] that during the WDCs, despite Claimant's strong objections, the Ministry changed its requirements and insisted upon the cheaper, less reliable, commercial-grade air conditioning system manufactured by Carrier instead of the MIL-SPEC York system. Although Claimant agreed to install the Carrier units, it did not waive its right to compensation for the problems created by this choice. The Ministry further directed it to revise the Carrier air conditioning system's design in a way that both Claimant and Carrier indicated could cause erosion in the system.

1393. During and shortly after the Sea Trials in June 2001, the air conditioning plants in both Frigates failed, as Claimant had warned. Claimant performed the required work to remedy the failure of the air conditioning plants (including the lease of temporary dockside air conditioning plants), which it claims was out-of-scope.

1394. During the repair process, Claimant found that Carrier, the Ministry-selected manufacturer, made several errors in designing and procuring equipment that it provided, including misaligned baffles and a miscalculation of the seawater pump capacities, resulting in additional out-of-scope work.

1395. The Ministry argued[275] that Claimant accepted the installation of the Carrier-brand air conditioning system and thereby accepted financial responsibility for any failures of that system.

1396. Claimant states that the Ministry provided no evidence that it had waived its right to seek compensation due to problems arising out of the Ministry's decision to use the Carrier units. Claimant claims a credit of US$

---

[274] See REA EXH. C.54 and References thereto.
[275] See Respondent Rejoinder ¶¶ 209-216.

3,453,242 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1397. The Arbitral Tribunal has found that the installation by Claimant of the Carrier-manufactured air conditioning system was a decision made by the Ministry and strongly objected to by Claimant. In any event, by abiding by the decision made by the Ministry, Claimant may not be held responsible for any problems that might arise therefrom, nor may this be construed as a waiver by Claimant to exercise its rights. Claimant made its best efforts to show to the Ministry that such change (from York to Carrier) would cause problems in the future.

1398. Thus, the Arbitral Tribunal finds that the Ministry shall be held responsible for the costs incurred by Claimant in repairing the system. Those costs derive from extra works which Claimant did not cause.

1399. There is no doubt this claim meets the requirements for compensation under Clause 59.

1400. Hence, the Arbitral Tribunal awards this claim and orders the Ministry pay Claimant the amount of US$ 3,453,242 plus interest accruing thereon.

### (107)REA-61 – Steel Plate (Metric Ton. vs. U.S. Ton)

1401. Claimant claims[276] that the Ministry's solicitation asked for bids to replace up to 20% of the area of the underwater hull plating on each Frigate. Claimant therefore based its bid on the cost of replacing 20% of the area of underwater hull plating. Computed in an industry-standard manner, this calculation resulted in a bid to replace 33 U.S. tons of steel. The Ministry was aware of Claimant's methodology for calculating the estimate. During the WDCs, the Parties agreed to double the maximum amount of hull steel that Claimant would replace.

1402. After Contract performance began, however, it became clear that far more steel would need to be replaced than had been budgeted during the WDCs. The Ministry insisted that the reference in the Specifications to 66

---

[276] See REA EXH. C.61 and References thereto.

tons was a reference to metric tons. The Ministry argued that metric tons were the appropriate unit of measurement because inspections and measurements were conducted in Venezuela, where the metric system is used and because Claimant eventually acceded to the Ministry's position.

1403. However, Claimant states, the Ministry acknowledged that the 33 tons in the Specification derived from Claimant's use of U.S. tons in preparing a bid to respond to the Solicitation. Claimant states that it agreed under duress to use metric tons to measure steel plate replacement when the Ministry acted in bad faith by withholding payment but did not waive its right to compensation in the event the total amount of steel replaced exceeded 66 U.S. tons.

1404. Claimant claims a credit of US$ 1,772,749 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1405. The disagreement between the Parties with respect to Metric or U.S. tons is at the heart of this claim. Claimant asserts, and is adamant, that it based all of its calculations on U.S. tons, and for that reason claims to be entitled to a credit for the excess quantity of steel beyond 66 U.S. tons.

1406. Nevertheless, there is no evidence that the Parties agreed to the methodology applied by Claimant, or to the consequences in case of use of steel in excess of Claimant's parameters.

1407. While Claimant cites a certain standard industry practice in support of its methodology for calculation, the Ministry has strong arguments in defending the use of metric tons. First, Venezuela is a country that uses the metric system, as is Italy, where the Frigates were originally built. Nothing prevents users of the metric system to opt, in given circumstances, for using other measurement systems. Nonetheless, it is expected that when the user of a system opts for altering its use to different one, it has to highlight such option. The normal tendency is for one to construe any measurement references to the system prevailing in such user's country.

1408. Thus, the Arbitral Tribunal finds that the 66 tons referred to in the

Specification, for the reasons analyzed above, shall mean 66 metric tons.

1409. However, one system or the other, the claim does not meet the requirements for compensation under Clause 59.

1410. Hence, the Arbitral Tribunal dismisses this claim.

## (108) REA-71 – Stanchion Relocation (Frame 79)

1411. Claimant Claims[277] that Specification C.47 specified the work it was required to perform while the Frigates were in dry-dock, but it also says that it did not include any work on the stanchions. To alleviate an alleged interference with the operation of the damage control console, the Ministry directed Claimant to move the existing stanchion located at Frame 79, Main Deck, Centerline, to a new location ten inches forward of its original position, notwithstanding the absence of any requirement for such relocation in the Specifications.

1412. Claimant developed an MSCR providing for the design, material requirements, fabrication and installation instructions and performed the additional work. The Ministry refused to compensate Claimant for the direct modification, arguing that it was in-scope. Moreover, the Ministry argued without support that it never authorized the additional work. Claimant claims a credit of US$ 6,937 before computing interest accruing thereon.

## Decision by the Arbitral Tribunal

1413. The discussion between the Parties in connection with this claim clearly indicates that they were not able to agree on whether works were in-scope or out-of-scope. As on many other occasions, each Party has assumed a position opposed to the other's.

1414. In any event, even if those works qualified as extra works, Claimant has not produced factual evidence in support of its assertion.

1415. The Arbitral Tribunal finds that this claim does not meet the requirements for eligibility under Clause 59.

---

[277] See REA EXH. C.71.

1416. Hence, the Arbitral Tribunal dismisses this claim.

## (109) REA-73 – Asbestos Removal

1417. Claimant claims[278] that the Ministry executed a pre-Contract written guarantee representing that the Frigates were asbestos-free. After the Frigates' arrival at the shipyard, Claimant discovered that both Frigates contained asbestos. The Ministry argued that it compensated Claimant for direct subcontractor costs related to the removal of asbestos[279]. However, Claimant was not compensated for its expenditure of 502 man-hours to collect and analyze 251 bulk samples, and 351 man-hours to collect and analyze 117 airborne samples. Claimant claims a credit of US$ 45,985 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1418. Indeed, one of the representations made by the Ministry related to the Frigates being asbestos-free. Nonetheless, as reported above, they were not, and this made the Ministry responsible for compensating the work performed by the subcontractor of Claimant to remove the asbestos.

1419. This, however, did not contemplate the expenditures incurred by Claimant to analyze samples collected from the Frigates prior to determining the amount of asbestos in each of them.

1420.  In light of the toxic nature of asbestos and the extreme care required from Claimant to handle the collection of samples and, further, the existence of the Ministry's representation that proved to be inaccurate, the Arbitral Tribunal finds that Claimant's costs must be compensated, and it is not imaginable that they were included in the subcontractor's fees. The Arbitral Tribunal then finds that the nature of the facts that gave rise to Claimant incurring such costs for extra works meet the requirements of Clause 59.

1421. The Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 45,985 plus interest accruing thereon.

---

[278] See REA EXH. C.73.
[279] See Respondent's Reply ¶¶ 233-36, 256.

### (110)REA-82 – Live Ammunition Aboard Ship

1422. Claimant claims[280] that Clause 3 of the Contract specifically required the Ministry to make the ships available to Claimant free of ammunition. During gas torch-burning operations on F-21, two 308 NATO-caliber cartridges exploded. Claimant dispatched a team to search adjacent areas, and they located two additional rounds of ammunition on F-21.

1423. This work was obviously required for the safe completion of Contract work. At the Hearing, the Ministry argued without any support that the ammunition was not from the ship and may have been placed in those locations by someone attempting to steal it[281]. Claimant argues that the Ministry did not provide any evidence to support either position.

1424. Claimant asserts that, in any event, this spurious allegation does not change the fact that the Ministry breached the Contract by not providing the vessels free of live ammunition and is thus responsible for Claimant's extra safety inspections and searches. Claimant claims a credit of US$ 64,012 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1425. This claim is based on the failure by the Ministry to deliver the Frigates at Claimant's shipyard free of live ammunition. The event certainly gave rise to Claimant searching and inspecting the Frigate to ascertain that there did not exist any other live ammunition onboard.

1426. The Ministry's allegation that such ammunition might have been put there by someone who was willing to steal it lacks evidence to support it. Indeed, the Contract provided that the Frigates had to be free of live ammunition, and they were not.

1427. This claim might have been discussed in the context of Clause 8. Nonetheless, since the expenditures refer to an extra work that, in light of the contractual provision, need not be foreseen and, further, due to such expenses referring to safety measures implemented by the shipyard, it

---

[280] See REA EXH. C.82.
[281] Eng. Tr. 228:20-229:14.

certainly meets the requirements of Clause 59.

1428. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 64,012 before computing interest accruing thereon.

## (111)REA-83 – New Blackwater Tanks

1429. Claimant claims[282] that Specification C.51, Appendix X-C required Claimant to perform eight categories of specified maintenance of the blackwater system, including eight specific repairs to the blackwater tanks, but did not call for the replacement of the tanks.

1430. While performing the specified repairs, Claimant discovered that the blackwater tanks were extremely deteriorated and had to be replaced rather than repaired. Claimant replaced the tanks after the Ministry approved the additional work detailed in Claimant's MSCRs.

1431. However, the Ministry later refused to execute a RAW for the replacements. The Ministry argued that Claimant decided to replace the tanks unilaterally without consultation with the Ministry[283]. This argument, which was not supported by any evidence, ignores the fact that the Ministry received four MSCRs regarding the change and was present during the work. Claimant claims a credit of US$ 117,016 before computing interest accruing thereon.

## Decision by the Arbitral Tribunal

1432. The Parties' differing interpretations given to the role played by the MSCR has been a constant aspect in the appraisal of this case. While Claimant assumes that the approval of an MSCR would entitle it to produce evidence that the Ministry knew that the works were being performed and render it impossible for the Ministry to deny the works were performed (since the VIC was the *longa manus* of the Ministry at the shipyard) and to refuse to compensate for such works performed, the Ministry apparently only approved the technical aspects of the works addressed by the MSCR. It

---

[282] See REA EXH. C.83.
[283] See Respondent's Rejoinder ¶¶ 56-59.

seems that the Ministry's approval never involved any commitment to make any further payment since the question of whether the works were in-scope or out-of-scope was not contemplated by the MSCRs. This is probably the reason why the Ministry refused to execute the RAW.

1433. This claim falls under Clause 8 and fails to meet Clause 59's requirements.

1434. Hence, the Arbitral Tribunal dismisses this claim.

### (112) REA-85 – Ship Condition

1435. Claimant claims[284] that, upon their arrival at the shipyard, the Frigates were found to have highly unhygienic conditions, high levels of harmful bacteria, and massive sanitation problems. The Ministry's witnesses improbably contested at the Hearing that the conditions were the result of the journey from Venezuela to Pascagoula[285].

1436. This contradicted the testimony and documentation from Claimant, indicating that the condition of the ships prevented it from allowing personnel on board for the journey to Pascagoula. Claimant hired subcontractors to properly clean and sanitize the ships. Due to the shipboard conditions, Claimant personnel also had to wear hazmat protective gear, and Claimant had to rent a shower decontamination trailer for personnel from February-April 1998.

1437. Although the Ministry compensated Claimant for the subcontractor cleaning costs, it did not pay for the additional efforts such as the decontamination trailer and insect and vermin removal. The Ministry argued that it authorized Claimant to clean and disinfect certain areas, and that Claimant simply underestimated its costs[286].

1438. However, Claimant specifically requested funding for these additional costs, which the Ministry refused to grant. Claimant claims a credit of US$ 41,332 before computing interest accruing thereon.

---

[284] See REA EXH. C.85.
[285] Eng. Tr. 643:23-644:21.
[286] Respondent Rejoinder ¶¶ 282-83.

**Decision by the Arbitral Tribunal**

1439. The report above demonstrates that such decontamination and cleaning works were out-of-scope work. It is Claimant who explains that it requested additional funding for the works under this claim and that the Ministry refused to grant such request. In other words, it means that such claim was not considered under Clause 8. The reason why that was not the case comes from the Ministry, when it claims that Claimant underestimated its costs.

1440. Certainly, this claim falls outside the scope of Clause 59 and it fails to meet the requisite requirements.

1441. Hence, the Arbitral Tribunal dismisses this claim.

## (113) REA-90.2.3 – Radio Power Supply

1442. Claimant claims[287] that Specification C.6 required it to perform general maintenance to the radio power supply, and specified that it was to perform the repairs necessary to bring the equipment to operational level and original service. The Ministry orally instructed Claimant to perform the equivalent of a Class A Overhaul on the radio power supplies to restore this equipment to like-new condition, which caused Claimant to expend extra electrical labor hours without compensation.

1443. The Ministry did not directly dispute that it made this oral request. Rather, it claimed that Claimant is not due compensation because it performed the work without obtaining prior approval[288]. Claimant asserts this is untrue and unsubstantiated and that this argument is irrelevant. Claimant claims a credit of US$ 238,173 before computing interest accruing thereon.

**Decision by the Arbitral Tribunal**

1444. This claim should have been submitted for consideration under Clause 8. This may be the reason why the Ministry, in refusing to pay, argued that Claimant had not obtained prior approval.

---

[287] See REA EXH. C.90.
[288] Eng. Tr. 475:19 – 477:11.

1445. Certainly, this claim does not meet the requisite requirements for compensation under Clause 59.

1446. Hence, the Arbitral Tribunal dismisses this claim.

## (114)REA-90.2.20 – 5-inch Gun

1447. Claimant claims[289] that it submitted an OCR to the Ministry requesting additional funds to blast and prime the 5-inch gun mount, sliding ring, and gun stops prior to the installation of new seals because the Parties agreed that it was required to do so. The Ministry claimed that this work was contemplated in the Base Contract and did not generate any additional cost. However, no part of the Contract requested Claimant to perform such work.

1448. Claimant performed sandblasting and priming work on the 5-inch gun mount, which was required for the operation of the weapon system. Claimant claims a credit of US$ 4,494 before computing interest accruing thereon.

## Decision by the Arbitral Tribunal

1449. Claimant should have submitted this claim in the context of Clause 8. It certainly fails to meet the requirements provided by Clause 59. Claimant has not shown that this work was absolutely necessary for the fulfillment of its obligation under the Contract due to the exceptional nature of such clause and the very nature of a fixed-price contract.

1450. Hence, the Arbitral Tribunal dismisses this claim.

## (115)REA-91 – Gas Turbine System Design Defect

1451. Claimant claims[290] that after the gas turbine engines were reinstalled, Claimant discovered that the gas turbines' exhaust damaged the radar cables and antennae. Claimant submitted an OCR and notified the Ministry that the damage to the antennae was the result of a pre-existing original

---

[289] See REA EXH. C.90.
[290] See REA EXH. C.91.

design conditions[291].

1452. Thus, Claimant was required to (i) hire Davis Engineering and GE to conduct research and studies regarding a potential solution to the defect, (ii) evaluate multiple potential solutions, and (iii) send representatives to Venezuela to present the corrective work requirements to the Ministry.

1453. The Ministry refused to authorize or pay for such work and argued that all associated costs were included in the Specifications. Claimant established that the problems with the radar antenna was a result of a design defect in the exhaust of the gas turbines, which had apparently affected the Ministry's entire Lupo fleet. Claimant reached such conclusion because the Ministry did not allow it to observe how other frigates accounted for the issue.

1454. Moreover, the Ministry did not compensate Davis Engineering for some studies, implicitly acknowledging responsibility for the work. Claimant claims a credit of US$ 3,606,375 before computing interest accruing thereon.

## Decision by the Arbitral Tribunal

1455. Claimant's actions were appropriate and necessary to determine the causes that interfered with the antennae. It also submitted an OCR to demonstrate the work that was deemed necessary to correct a defect in such an important system for the Frigates seaworthy condition.

1456. The Ministry failed to produce strong evidence for not authorizing the work and pay for it, simply arguing that it was contemplated in the Specification. The Arbitral Tribunal finds that such a defect that was until then unknown could not have been foreseen at the time the specifications were drawn up and prepared by the Parties. The issue arose after the reinstallation of the gas turbines.

1457. Thus, due to the fact that such works were absolutely necessary for the proper operation of the Frigates, the Arbitral Tribunal finds that this claim meets the requirements defined for the operation of Clause 59.

---

[291] Eng. Tr. 480:2-4.

1458. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 3,606,375 plus interest accruing thereon.

### (116)REA-105 – 3D-STAR Radar System Cooling Water Modification

1459. Claimant claims[292] that Specification A.1 provided that it would perform certain work on the existing RAN-10S radar. After the new radar system was installed and hooked up to the existing water cooling system, condensation started forming in the radar transmitter because the temperature of the existing chilled water supply was significantly lower than IAI/Elta's recommended temperature.

1460. IAI/Elta proposed a modification to the radar system to remedy the problem, and Claimant incorporated the modifications into an OCR and MSCR. Claimant also required the services of an IAI/Elta technician to accomplish the proposed modifications to the radar cooling system.

1461. The Ministry argued that Claimant bears financial responsibility for remedying the compatibility problems between the IAI/Elta system and the ships' water-cooling system because it undertook to install the IAI/Elta system[293]. However, the Ministry selected the IAI/Elta system. Claimant performed all work contemplated in the Specifications, and the additional work was both required and out-of-scope. Claimant claims a credit of US$ 62,503 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1462. The argument developed by the Ministry lacks consistency with the factual scenario. The problem arose after the installation of the new radar system, and could not, due to its very nature, to have been foreseen upon the drawing up and preparation of the relevant specification.

1463. In any event, the defect interfered with the operation of an important system of the Frigates, and Claimant had to remedy it.

---

[292] See REA EXH. C.105.
[293] Respondent Rejoinder ¶¶ 273-281.

1464. The Arbitral Tribunal finds that such work was absolutely necessary to make the Frigates seaworthy.

1465. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 62,503 plus interest accruing thereon.

## (117) REA-108 – DARDO Fire Control System

1466. Claimant claims[294] that Specification Work Item 123.06.001 required it to perform 15 general maintenance tasks and 7 categories of specific maintenance tasks on the DARDO Fire Control System. After ships arrived at the shipyard, Claimant discovered excessive deteriorations and missing material and components. When Claimant tried to obtain repair and replacement materials, it learned that the existing DARDO system installed on the Frigates was obsolete, requiring custom manufacture of replacement parts.

1467. Claimant submitted 439 OCRs, which, *inter alia,* included work to procure and install (i) necessary replacements for missing circuit cards and module assemblies, (ii) replacements for connectors for the DARDO converter/motor generators, and (iii) missing servo transistor bridge modules.

1468. Although the Ministry accepted all of Claimant's DARDO system work and authorized procurement of missing electronic components, it was inconsistent in its approach, only compensating Claimant for material costs and refusing to pay for the additional labor costs necessary to locate, manufacture, install, and test the missing components.

1469. The Ministry argued that Claimant was not entitled to compensation because it did not perform any work other than that in the Specifications, including the replacement of parts that were damaged/or missing[295]. However, the Specifications did not require Claimant to replace all missing and damaged parts, simply those that were missing or damaged upon inspection, and a reasonable estimate of other missing and damaged parts.

---

[294] See REA EXH. C.108.
[295] Respondent Rejoinder ¶¶ 221-32.

This is why, Claimant explains, the bidders were requested to perform an inspection and were requested to be specific.

1470. The fact that Claimant agreed to replace missing parts did not give the Ministry authority to remove parts as it desired. The Ministry implicitly acknowledged as much when it agreed to compensate Claimant for missing parts, including those related to DARDO. Contrary to the Ministry's suggestion[296], the use of Hurricane Georges funds for procurement of Missing Electronic Parts was not related to parts that went missing from such hurricane. Claimant claims a credit of US$ 701,446 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1471. The approach adopted by the Ministry as to compensation claimed by the Claimant lacks consistency. Indeed, the partial compensation for certain, but not all parts, makes the allegations of the Ministry groundless.

1472. The refusal by the Ministry to compensate for missing/damaged parts was also inconsistent with the procedures adopted for the presentation of bid offers by bidders.

1473. Undoubtedly, the DARDO system is a very important one for the seaworthiness of the Frigates and Claimant could not have performed its obligations under the major overhaul of such Frigates without replacing all the missing parts.

1474. Thus, the Arbitral Tribunal finds that the replacement of such missing/damaged parts was absolutely necessary, meeting, therefore, the requirements under Clause 59.

1475. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 701,446 plus interest accruing thereon.

---

[296] Respondent Rejoinder ¶ 229.

### (118)REA-114 – Sea Trial Deficiencies

1476. Claimant claims[297] that the dock and sea trials revealed numerous latent deficiencies in the Frigates, which were previously unknown to the Parties and not addressed in the Contract. The Parties entered into an agreement for Claimant to repair or replace the deficiencies as necessary, and the Ministry authorized a block of 190 man-hours to be applied to correct these deficiencies.

1477. As greater numbers of deficiencies were discovered, Claimant provided a total of 3,923 man-hours of labor in order to correct them, all with the Ministry's presence and awareness. The Ministry held the position that 190 man-hours was the agreement between the Parties and that Claimant waived its right to seek further compensation[298]. The Ministry does not appear to dispute that the correction of the deficiencies was absolutely necessary, unforeseeable and out-of-scope, or that it took 20 times the number of hours than had been approved. Claimant claims a credit of US$ 456,218 before computing interest accruing thereon.

### Decision by the Arbitral Tribunal

1478. This claim should have been discussed and settled in the context of application of the earmarked money reserve provided by Clause 8, but it was not. The record does not show why Claimant failed to request an increase of man-hours to the Ministry when it realized that the ceiling agreed upon by the Parties would not suffice to complete the works. Apparently, since the Ministry was aware of the deficiencies discovered and the presence of its representatives following up the works, Claimant may have concluded that an additional authorization for funding would not be necessary. However, Claimant should have proceeded in accordance with the Contract. This procedure would have contributed to a soft settlement.

1479. Notwithstanding the foregoing, the Arbitral Tribunal finds that the Ministry was aware of the deficiencies detected, and also knew that their correction was absolutely necessary for the purposes of the major overhaul

---

[297] See REA EXH. C.114.
[298] Respondent Rejoinder ¶ 285.

being accomplished.

1480. Thus, the Arbitral Tribunal finds that the requirements of Clause 59 have been properly met.

1481. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the amount of US$ 456,218 plus interest accruing thereon.

## (119)REA-131 – Lighting System

1482. Claimant claims[299] that Specification C.47 requires it to replace up to 30% of the damaged lenses and light fixtures. Claimant discovered that more than 30% of the lighting system required replacement and proposed to supply a fully operational system. The Ministry refused Claimant's proposal, and the Specification's 30% limit remained in place. After Claimant had replaced 30% of the lighting system, it submitted a RAW for replacement of additional lighting, agreeing to split the cost with the Ministry, which the Chief of the VIC orally accepted.

1483. Claimant installed replacement lighting beyond the 30% required in the Specifications, but the Ministry did not honor the agreement. The Ministry did not dispute that the oral representation was made, that the work was out-of-scope, or that the work was not absolutely necessary, but instead indicated that Claimant was not due any compensation because the work was not formally approved by the Ministry's representative[300]. Claimant claims a credit of US$ 1,252,149 before computing interest accruing thereon.

## Decision by the Arbitral Tribunal

1484. Undoubtedly, an operational lighting system on the Frigates was absolutely necessary for fulfillment of the major overhaul, as designed and required by the Ministry, but also to secure full seaworthiness of the ships.

1485. Although Claimant and the Ministry did not reach a formal agreement as to the proposal for the split of costs, as provided by the Contract, the

---

[299] See REA EXH. C.131.
[300] Respondent Reply ¶259, 266.

reality is that they had reached an oral agreement with that same respect, and Claimant proceeded on the assumption that such oral agreement would be finally honored.

1486. In extensive works like the major overhaul, especially when the owner was present at the site, it may happen that certain agreements may be reached. It might be questioned whether the Chief of the VIC had sufficient authority to agree orally and make that oral agreement enforceable in light of his/her power and authority under the rules by which he/she was bound. But this is irrelevant for the decision. The Chief of the VIC, in his/her capacity as representative of the Ministry, allowed Claimant to believe that he/she had sufficient power and authority to do so, especially in light of the provisions contained in the Contract governing the role of the VIC, as the Ministry's representative at the sight. The theory of apparent authority allowed Claimant to rely upon the oral agreement. Thus, the Arbitral Tribunal finds that any allegation of lack of authority to agree on the terms orally without a formal authorization may not survive, nor may that circumstance serve as an excuse not to honor what was agreed.

1487. By that same token, since Claimant had agreed to split the costs, there is no reason why this Arbitral Tribunal should award this claim for its full amount.

1488. Hence, the Arbitral Tribunal upholds the oral agreement between the Parties, awards this claim of Claimant in part and orders the Ministry to pay Claimant the amount of US$ 626,074.50 plus interest accruing thereon.

## E.   Delay Damages and Disruption

1489. In addition to the so-called Constructive Claims, which have been analyzed and decided hereinabove, Claimant also claims to be entitled to an indemnification for the delay in completing the works due to reasons attributable solely to the Ministry, and not to Claimant itself.

**Position of the Claimant**

**Legal Arguments**

1490. In order to adequately summarize Claimant's submissions throughout

these arbitral proceedings, the Arbitral Tribunal has reviewed all submissions filed by it and arrived at the conclusion that the Post-Hearing Brief fairly represents the facts and arguments Claimant brought to the attention of the Arbitral Tribunal, with the added benefit of containing Claimant's position following the holding of the evidentiary hearing on the merits of the case.

1491. Although the Arbitral Tribunal opted for quoting the arguments as reflected in the Post-Hearing Brief, this does not mean that it has not analyzed the arguments as they were submitted at different phases of the proceedings.

1492. The first argument Claimant raises relates to the contractual support for its claim for damages. Pursuant to Claimant, while Clause 9 of the Contract governs the consequences derived from a delay caused by it, Clause 3, Fifth Paragraph instead mandates an extension of the contractual deadlines for project delays not attributable to Claimant, such as (i) *force majeure* events, (ii) additional and unforeseen work under Clause 8, (iii) the failure of the Ministry or its subcontractors to make available equipment and material, and (iv) delay in delivery of the ships to the shipyard.

1493. Claimant also says that the list of events contained in Clause 3, Fifth Paragraph was not meant to be exhaustive, since the language of the caption of such paragraph clearly indicates that the reasons (or causes) listed thereunder shall be contemplated "*among other reasons*" that may occur and give rise to delays.

1494. For delays caused by these and other like events, Claimant continues, Clause 3, Fifth Paragraph provided that the Ministry would compensate Claimant for damages resulting from these delays. Claimant argues that the language of this provision is clear and that the Ministry has not contested this point.

1495. Claimant concludes by stating the following principle which, in Claimant's view, is broad and leads to the following conclusion: if Ministry-directed delays are subject to compensation and force majeure events are also subject to compensation by the Ministry – it is obvious that unforeseen

problems that are not acts of God but also not attributable to Claimant must identically be subject to compensation.

1496. Claimant alleges that its interpretation of Clause 3 is consistent with the industry practice and Venezuelan law. With respect to industry practice, Claimant asserts to have proven that, in the shipbuilding industry, it is generally expected that the owner of the ship bear the financial risk for delays not attributable to the Contractor[301].

1497. Claimant avers that under article 1.160 of the Venezuelan Civil Code, Article 33(3) of the UNCITRAL Rules of 1976, and Article 8 of the Venezuelan Arbitration Act, custom and usage are of direct relevance and should be taken into account when interpreting the Parties' obligations under the Contract. Hence, Claimant emphasizes that the Arbitral Tribunal should look to the custom and usage to the extent necessary to interpret the language of Clause 3.

1498. Moreover, Claimant asserts that, even if the Arbitral Tribunal were to conclude that the Contract does not expressly deal with the question of whether the Ministry must compensate it for delays not attributable to Claimant, Venezuelan law would require the Ministry to compensate Claimant for damages resulting from those delays.

1499. In making such statement, Claimant invokes Article 140 of the Venezuelan Constitution under which it would be entitled to compensation for any damages it suffers that are "imputable to the functioning of Public Administration"[302].

1500. Claimant asserts that the legal experts confirmed that the Contract between Claimant and the Ministry was a public administration contract, and to the extent there is any ambiguity in the language of Article 140, public administration law principles are interpreted and applied *pro cives* under Venezuelan jurisprudence[303]. Therefore, the Ministry is financially

---

[301] Tr. 1064:16-1065:19 (Cheryl Lee Van).

[302] Article 140 of the Venezuelan Constitution states that "El Estado responderá patrimonialmente por los daños que sufran los o las particulares em cualquiera de sus bienes y derechos, siempre que la lesión sea imputable al funcionamiento de la administración pública". Sp. Tr. 1057:25 -1058:24 (Ortiz).

[303] Sr. Tr. 1057:25 – 1058:24 (Ortiz).

liable for the delay damages suffered by Claimant as a result of delays in the completion of the work under the Contract not attributable to Claimant.

1501. Second, under the economic equilibrium principle, when the financial equilibrium in a contract involving Public Administration is disrupted (i) for reasons not attributable to the contractor and (ii) as a result of reasonably unforeseeable circumstances, the contractor is entitled to compensation.

1502. Claimant claims that the delay costs suffered by it amounted to approximately US$ 75 million, which amount is slightly less than a quarter of the total value of the Contract.

## Events that Caused Project Delays

1503. In addressing the events that allegedly caused project delays, Claimant substantiates its claim on the findings of its expert, Mr. George Householder, who has decades of experience in the shipbuilding industry and is an expert in schedule analysis on shipbuilding and repair projects. Claimant highlights that Mr. Householder's expertise was not questioned during the arbitration.

1504. Claimant asserts that using industry-standard methods and software, the expert ran a critical path analysis on the Contract performance to identify the events that ultimately drove the delay in completion of the project[304].

1505. According to Mr. Householder, the following events were on the critical path and caused the entirety of the 1,095 days of delay calculated on the project: (i) the WDCs (which delayed the start of the project and pushed the schedule completion date a total of 90 days, (ii) force majeure events, such as export restrictions related to ITAR and Hurricane Georges, (iii) out-of-scope work performed on the gas turbines, including work related to a design defect in the placement of the gas turbine exhaust plume and (iv) out-of-scope work related to obtaining missing and damaged parts for the DARDO system on the F-22[305].

---

[304] Eng. Tr. 974: 6-24 (Householder).
[305] Eng. Tr.979:14-22, 979:23-981:11, 981:12-983:7, 984:23-985:24 (Householder).

1506. Claimant asserts that the Ministry chose not to present a competing critical path analysis and did not challenge the analysis performed by Claimant's expert or assert that other events actually caused the critical path delays in the project. Claimant concludes that the well documented analysis of its expert stands as the only delay analysis presented in the arbitration. Claimant also refers to the allegation brought by the Ministry's counsel during his closing remarks that the Ministry was forced to acquire its own software and keep the schedule on its own. Thus, Claimant asserts that if this is to be believed, it is unclear why the Ministry could not have and did not perform any analysis using that information.

1507. Claimant argues that the Ministry, instead of challenging the expert's findings or presenting a competing analysis, resorted to unsupported or irrelevant arguments, each of which, in Claimant's opinion, can be easily dismissed.

1508. As per Claimant, those arguments are: (i) lack of independence of the expert, (ii) the expert's critical path analysis is invalid because Claimant was in control of the Schedule, (iii) the schedule was not delivered to the Ministry during the performance of the Contract and (iv) the critical path methodology suffers because it was conducted after the occurrence of the events. Claimant also underscores that each of those arguments was raised for the first time at the Hearing, was not part of the Ministry's written submissions and is unsupported by testimony or documentation.

1509. Claimant is adamant in refusing to accept the argument brought up by the Ministry as to the lack of independence of its expert. It notes that the expert confirmed that he had been retained by Claimant to assist it in the preparation of the REA. It was fair to have his assistance since Claimant wanted to be sure that the REA it submitted was reasonable. At that juncture, the expert provided Claimant advice concerning the original project schedule, various delay events that affected that schedule, and the identification of which delay events resulted in a delay along the project's critical path. In the arbitration, the expert offered his expert opinion on the same issues. He was not, however, engaged in the preparation of the legal strategy for Claimant, since he is not a lawyer.

1510. Claimant quotes the expert to affirm that that the critical path analysis he performed was a "*fact-based*" analysis designed to simply identify the events that caused the project delay without regard to who was ultimately legally responsible for those events. He used industry-standard methods to evaluate the schedule, a task he has performed using Primavera software on more than 30 projects. Claimant's conclusion is that the Ministry failed to put forth any coherent argument as to why the expert was not independent.

1511. The Primavera scheduling software was licensed to Claimant, and Claimant was in charge of introducing scheduling information into the system as part of its contractual obligations. Claimant claims that the fact that it developed the schedule does not have anything to do with the accuracy of the expert's critical path methodology. In fact, Claimant developed a schedule that would have completed the project within the prescribed 20-month execution period. The expert reviewed the schedule and the software used to prepare it and agreed that, but for the various delay events he identified, the project would have been completed within the timeframe set forth in the Contract. In sum, repeating the expert's statement, Claimant avers that the critical path analysis is an objective fact-based analysis that identifies the events that caused delay on the project and the extent of such delays.

1512. Claimant analyses in detail its obligations under the Contract to share information with the Ministry by means of monthly reports contemplating the work to be done. Claimant questions the accuracy of the argument raised by the Ministry's counsel during the cross-examination of Claimant's expert that certain Ministry witnesses told the Ministry counsel that the schedule was never delivered in communications that took place outside of the Hearing, which were unrecorded and unsworn. Claimant avers that such a desperate attempt to introduce hearsay evidence through counsel in the closing should not be countenanced, since all available evidence suggests the opposite. Claimant highlights that correspondence on the record from the VIC demonstrates that the VIC did, in fact, receive what the Ministry witnesses now apparently assert was never provided; monthly work schedules, including the critical path.

1513. Claimant concludes its reasoning by stating that for purposes of identifying the events that delayed the project execution, whether the schedule was shared with the Ministry is irrelevant. The expert's report was supported by thousands of pages of printed schedules, tables, float reports and other documents directly from the Primavera software. Thus, the fact-based inquiry was not impacted by whether the schedule was provided to the Ministry.

1514. Claimant rejects the Ministry's argument that the expert's report was flawed because it shows the critical path as viewed from the end of the project, rather than from Day 1. Claimant argues that the expert goal was not to schedule the project. This was, as per Claimant, done by the project team and submitted to the Ministry prior to the start of the work. The critical path analysis conducted by the expert used the schedule required by the Contract as a base and incorporated known changes and delays occurred during the project. This analysis would look backward rather than forward. It is unclear, Claimant then underscores, how this was in any way improper. Indeed, it is consistent with how any independent expert would have performed a critical path analysis.

1515. Claimant then analyses several distinct critical path events that ultimately drove the delay in delivery of the Frigates, and it asserts that none of these events is attributable to Claimant.

1516. Those events analyzed by Claimant, as the expert identified them, are made part of Claimant's Post-Hearing Brief. In addressing the arguments put forth by Claimant, the Arbitral Tribunal will mention each one of them and will briefly summarize the most important features in such analysis. The Arbitral Tribunal bases its summary on arguments brought up by Claimant[306].

1517. The first critical path event identified by the expert was the Work Definition Conferences, which were designed to allow the parties to update the Ministry's Technical Specifications, which had become outdated as a result of elapsed time between the bid and Contract signing.

---

[306] See paragraphs 89 through 105 of Claimant's Post-Hearing Brief.

1518. Claimant avers that WDCs delayed the anticipated project start date by 76 days, which delayed the planned project completion by 90 days, *i.e.* from Nov. 16, 1999 to February 15, 2000. During WDCs, 79 of the Ministry's 135 Technical Specifications were revised. Delays caused by a need to revise those Specifications could not be described as attributable to Claimant, as the Ministry had responsibility for drafting the original Technical Specifications and the Ministry had responsibility for maintaining the Frigates in the interim between the bid and the Contract signing.

1519. The second critical path event identified by the expert were two *force majeure events* – Hurricane Georges and license requirements under the International Traffic in Arms Regulations ("ITAR") – whose impact on the February 12, 2000 scheduled completion date was 235 calendar days. The Ministry expressly granted Claimant a schedule extension for the ITAR-related delay in the amount of 118 days and for the Hurricane Georges in the amount of 9 days, and the Ministry also granted Claimant an extension of 23 days for the labor strike. In total, the Ministry granted a schedule extension of 150 days. Nonetheless, the expert's critical path analysis shows that the actual delay caused by these events was 235 days. Based on Clause 3 of the Contract, Claimant claims to be entitled to compensation for any damages resulting from delays attributable to *force majeure* events that affected the production schedule.

1520. The third critical path event identified by the expert relates to unforeseen repairs and modifications to the gas turbines, followed by the gas turbine exhaust plume design defect, led to an adjusted scheduled completion date of July 18, 2002.

1521. However, because the Ministry ultimately accepted the Frigates without authorizing the necessary work to remedy the defect, the gas turbine work produced a delay in delivery of the Frigates until May 16, 2002, a total of 587 days. Claimant discusses at length the problem related to the defect identified by GE engineers, the communications exchanged between the Parties, the position assumed by each of them with respect to the responsibility and extent of inspection by Claimant. After Claimant discovered the defect during sea trials, it spent the next eleven months

exploring options to correct the defect. The fact that Claimant worked tirelessly to address the problem in no way constitutes an admission that the problem was the fault of Claimant, and the correspondence exchanged with the Ministry clearly reflects this[307]. Claimant reports that the Ministry ultimately determined not to correct the defect and absolved Claimant's responsibility for the work[308]. Thus, the F-21 was then delivered on May 16,2002.

### Position of the Ministry

1522. In its Memorials[309], the Ministry argues that Claimant may not claim any indemnification for the delays it claims occurred. The Ministry asserts that Claimant's claims were designed as a strategy to hide Claimant's defaults under the Contract.

1523. The Ministry claims that, as per Claimant, the delays were due to (i) the condition of the ships, (ii) technological obsolescence, (iii) the failure by the VIC, as the representative of the Ministry at the site, to manage the Contract.

1524. The Ministry analyzes the strategy followed by Claimant in presenting its case. It points out the changes in the legal foundation and also on the report of factual framework. The Ministry states that in its Statement of Defense, it was proved that (i) Claimant had the obligation to inspect the Frigates, (ii) Claimant actually conducted multiple inspections throughout the entire chronology of the facts, (iii) the Ministry has never created any sort of impediment to the access of Claimant to the Frigates and the conduct or expansion of new inspections, and (iv) Claimant formally confirmed at different junctures the contractual conditions, the fixed price and the condition of the Frigates. On a subsidiary basis, the Ministry reiterates that there are no valid reasons that exempt Claimant from the effects of the investigations carried on by it.

1525. The Ministry states that Claimant was forced to admit that it was not

---

[307] See J1682 – November 7,2001 letter from Ingalls.
[308] See J1897 – October 14, 2003 Memorandum of Agreement.
[309] See Statement of Response pages 91-97; Rejoinder pages 106-141.

in any way prevented from the access to the Frigates. Claimant conducted several inspections during the years 1991, 1992, 1996 and 1997 (prior to the execution of the Contract) and in 1998 (prior to executing without any objection or reservation the Act of Initiation of Works). Moreover, the Ministry avers that Claimant admitted that it was Claimant who refused other onboard inspections while the Frigates were operated due to the alleged deteriorated condition of the ships.

1526. The inspections, as confirmed by Claimant, are a critical element of the overhaul process[310], and the Ministry's statements[311] contradict Claimant's witnesses who restricted the inspections to visual ones. The Ministry's witnesses confirm that inspections covered all areas of the ships insofar those were the instructions the Frigates' personnel had from the Ministry. Notwithstanding the inspections and the statements by its witnesses, Claimant claims that the conditions of the ships were worse than those any reasonable inspection could identify.

1527. Following the discussions of statements made by Claimant's personnel and finding them contradictory, the Ministry claims that Claimant had to conduct the inspections and actually conducted them at different junctures before the execution of the Contract and even before the commencement of the works. On the basis of such inspections, Claimant agreed repeatedly with the contractual term within which had to perform the works.

1528. The Ministry claims that Claimant, far from requesting an extension due to delays, accepted the term established by the bidding documentation, submitted a price offer that was based on the general contracting conditions provided by the documentation and obtained all information it needed to evaluate the request for proposal.

1529. Claimant negotiated in detail the extent of the technical specification, which was ratified by both Parties in 1993. Inspections in 1997 and finally the execution of the Contract and that of the Act of Initiation of Works

---

[310] See Statement of Claim, page 12.
[311] See Second Witness Statement by CN Jorge Gutiérrez González, page 1.

followed such negotiations. The Ministry states that Claimant promised to redeliver the Frigates on the different dates in 2000 and 2001, while the Frigates were only redelivered in 2002.

1530. The Ministry's main argument is that Claimant has not performed any works that would entitle it to an extension of the term for redelivery of the Frigates, nor has Claimant requested any extension of time. In any event, the Ministry claims, the term for the performance of the works spelt out in the technical specifications was included in the total term of the Contract. The Ministry avers that the technological change, if any, does not give rise to any indemnification rights in favor of Claimant.

1531. While Claimant claims that the delays were also due to the problems generated by the VIC in managing the Contract, the Ministry states that Claimant's arguments actually contradict one another. On the one hand, Claimant underscores that works to be performed were absolutely necessary and could not wait for the approval process under Clause 59. On the other hand, Claimant also claims that the delays were due to the VIC's delays in responding to the OCRs, RAWs and other documents. Thus, the Ministry states that both arguments are in contradiction and may not coexist simultaneously. The reality, the Ministry states, is that neither the VIC, nor the Ministry has delayed the performance of the works, and such arguments show the lack of good faith by Claimant in defending its claims and placing the burden on the Ministry.

1532. The other aspect raised by the Ministry in its Memorials deals with the valuation submitted by Claimant together with its claims, which was prepared by Ms. LeeVan.

1533. The Ministry avers that, due to its condition as a publicly held corporation, Claimant has to file with the U.S. Securities and Exchange Commission its annual reports and other forms adopted by such agency. Such reports have to be integral, complete and must reflect the reality of Claimant's businesses and operations in the preceding fiscal year. The Ministry asserts that the annual report for the year end 2003 shows data and information that are of significant importance in that they contradict the information provided by Claimant in this arbitration.

1534. In one of its Exhibits called "Legal Proceedings", Claimant reports that, at such time, it was confronted with various disputes as a result of the normal conduct of its business operations. With surprise, the Ministry avers to have discovered that the Claimant has not made any reference to the dispute with it that lasted, at such time, for more than a decade.

1535. Taking into account the accounting results posted by Claimant, the amount related to the dispute and claimed by Claimant is greater than its free annual cash flow, and could not be omitted from the information provided to the SEC. The Ministry states that the only reason that could justify the omission of relevant information from the SEC and Claimant's investors is because it knew that such claim was a strategy to evade its responsibility for its default under the Contract. The foregoing notwithstanding, Claimant felt obligated to disclose the dispute with the U.S. Navy and U.S. Homeland Security, including the U.S. Coast Guard, in the amount of US$ 24 million due to alleged manipulation of prices under mischarging of prices for hourly charges.

1536. The Ministry asserts that its appointed expert, Mr. Fabian Bello[312], argued that the cost accounting system handled by Claimant lacks the accuracy attributed to it by Ms. LeeVan in her reports. Ms. LeeVan states that the U.S. Government audits the cost accounting systems[313], which are tested and approved. Those were the same that were applied by Claimant in the performance of the Contract. The Ministry further asserts that Claimant and Ms. LeeVan state in their presentations that the experience, knowledge and compliance with the practices of the industry are confirmed by the performance of work by Claimant to the U.S. Navy, which represents roughly 97% of the income of Claimant in the last years.

1537. The Ministry also asserts that Claimant, for the third consecutive time, substantially modifies the amount of its frivolous claims. Claimant changed the methodology of valuation to attempt to justify its claims. This would mean, the Ministry avers, that not even Claimant trusts its own positions.

---

[312] See Second Report of Mr. Fabian Bello, ¶ 29.
[313] See ¶ 29 and 30 of Ms. LeeVan's Expert Report dated September 19, 2014.

1538. The Ministry states that the contradictions of the professionals assisting Claimant in this arbitration and the justified and grounded position of the Ministry's expert led Ms. LeeVan to recognize her errors, change her methodology, alter calculations and reduce the amount claimed by more than US$ 77 million, of which US$ 56 million was exclusively due to the rate adopted for updating the amount claimed.

1539. In his first report, the Ministry's appointed expert criticized and challenged the use of the 12% interest rate adopted by Ms. LeeVan without any analytical reasoning, which is applied to amounts that she failed to analyze. The Ministry highlights that Ms. LeeVan stated that counsel to Claimant had indicated to her that such was the applicable interest rate. Nonetheless, Claimant's counsel stated on their end that Claimant's legal expert, Mr. Manuel Gómez, had established the interest rate.

1540. The Ministry further asserts that, in addition to mentioning the existing contradiction within Claimant's appointed professionals, the 12% interest rate was not more than a ceiling rate in local currency denominated transactions with an associated risk. Thus, its application in this case would be illegal.

1541. Furthermore, the Ministry claims that in calculating the new interest rate, Ms. LeeVan made several conceptual errors. In this new calculation, Ms. LeeVan applies a disputable average of coupon rates of the issuances of bonds by the Bolivarian Republic of Venezuela between 2003 and 2011. The Ministry's expert challenged the accuracy of such calculations on grounds of (i) the use of an average of average rates, (ii) the use of coupon rates rather than income rates, (iii) the failure to consider the term of such issuances, and (iv) the omission of the existence of the purchase option attached to certain of the selected bonds. The resulting interest rate of 8.981% lacks a minimum reliability.

1542. Ms. LeeVan, in order to arrive at such interest rate, would have calculated an average rate. In using the average of the average rates, the expert distorts the real result of her new methodology for calculation of interest rate. Had Ms. LeeVan made her calculations correctly, the result would have been 8.713%, and not 8.981%. The indemnification effect of

the difference is an artificial and unjustified increase of millions of dollars in favor of Claimant.

1543. Finally, the Ministry claims that, in light of the several mistakes made by Ms. LeeVan, the Arbitral Tribunal should not take into account the interest rate offered by Ms. LeeVan.

### The LeeVan Valuation from Claimant's Perspective

1544. In its Post-Hearing Brief, the Ministry analyzes in detail the evidence that it produced in the Hearing and is adamant in stating that the claims posted by Claimant lack reasonable grounds in light of the applicable law and the Contract. The Ministry also asserts that it has proved that it did not default under the Contract, nor contribute to the delays claimed by Claimant.

1545. One of the most contentious aspects raised during the Hearing was the valuation reports of Ms. LeeVan. The Ministry alleges that in light of the evidenced produced during the Hearing, Ms. LeeVan's calculations may not be taken into account since they are based on estimations that are not part of the record. Moreover, the Ministry draws the attention of the Arbitral Tribunal to the fact that Ms. LeeVan based her calculations on a draft version of the Contract and conceded that she never saw the original Contract. The Ministry avers that the differences between the draft used by Ms. LeeVan and the original Contract are extremely significant, and the reports of Ms. LeeVan are based on false factual premises. On the other hand, Ms. LeeVan based all her work on REA, and has not used any additional evidence to support her work.

1546. In its final Memorial, the Ministry reproduces the statement made by its appointed expert during the Hearing whereby it was stated that the only interest rate that may be applied to this case is the U.S. Treasury Bills which is a risk-free rate.

1547. In its Post-Hearing Brief, Claimant discusses the calculations made by Ms. LeeVan as to delay and disruption damages to conclude that they are reasonable and industry-standard.

1548. Claimant also avers that the Ministry's expert failed to provide any alternative calculation to that submitted by Ms. LeeVan, and that Claimant's calculations are the only ones available to the Arbitral Tribunal.

1549. Claimant explains and details Ms. LeeVan's methodology for calculation and any and all elements computed by her[314] in her analysis to conclude that Claimant is entitled to a compensation of US$ 36,513,003 in direct project specific damages as a result of the delay, which corresponds to US$ 33,345 per day over a total period of 1,095 days.

1550. Furthermore, based on Ms. LeeVan's calculations, Claimant claims that as a result of the delays, the shipyard incurred additional damages, namely the indirect fixed overhead component. In order to determine it, Ms. LeeVan used the industry accepted Eichleay method to allocate shipyard overhead to the project for the purposes of calculating damages. Ms. LeeVan calculated a fixed overhead allocation of US$ 31,600,479 over the course of 1,095 days of delay. Claimant claims that the project should have absorbed an additional US$ 28,860 of fixed overhead per day during the delay period.

1551. The last element taken into account by Ms. LeeVan relates to the disruption, also referred to as Cross Contract damages. These damages as explained by Claimant refer and represent the impact that the extended performance period of the Contract had on other ongoing Contracts in the shipyard. Claimant claims that, based on Ms. LeeVan's calculations, the disruption damages amount to US$ 6,921,497.

1552. In its Post-Hearing Brief, the Ministry rejects the claim brought by Claimant with respect to the indemnification of delay and disruption damages. As the Ministry had already sustained during the course of this arbitration, it claims that the reasons brought by Claimant that allegedly supported the delay may not be accepted.

1553. The Ministry asserted that in the Hearing it showed that, despite the Claimant's delay claim, in roughly 90% of OCRs and RAWs issued by

---

[314] Claimant's Post Hearing Brief, pages 83 to 92.

Claimant, there was no reference to any delay triggered by the work, and in some of them such reference was "zero".

1554. With respect to Ms. LeeVan's calculations, the Ministry uses the joint examination of Ms. LeeVan and Mr. Bello, as determined by the Arbitral Tribunal, to highlight that Ms. LeeVan's opinions lack consistency and may not be relied upon by the Arbitral Tribunal to award the damages claimed by Claimant. The Ministry points out that the documents that would support such claim for delay and disruption damages are Excel spreadsheets attached to Ms. LeeVan's reports and identified as Documents TMF 50, 53 and 53.1. The Ministry also states that Doc. 53.1 was prepared on August 8, 2013, roughly ten years following the completion of the works. The Ministry then concludes that Ms. LeeVan's calculations were based on documents prepared for this arbitration without any examination of the shipyard's books and records. Thus, the Ministry asserts that Ms. LeeVan's reports and calculations lack consistency and are groundless.

### Decision by the Arbitral Tribunal

1555. Firstly, it is undisputed that the redelivery of the Frigates by Claimant to the Ministry suffered delays. This does not mean that all such delays are eligible for indemnification, nor that all such delays may be allocated to only one of the Parties' responsibility.

1556. The decision by the Arbitral Tribunal in connection with this claim requires that it determine (i) the number of days of actual delay, (ii) whether all such days of delays are eligible for indemnification, (iii) the causes of the delays and their allocation between the Parties, (iv) the amount of the indemnification per day and (v) the determination of interest.

1557. However, in order for the Arbitral Tribunal to be able to decide, certain aspects related to the contractual arrangements between the Parties must be examined and analyzed.

1558. As aforesaid, the granting of the Contract to Claimant by the Ministry has its origin in a request for proposal launched by the Ministry with a view to contract the major overhaul of the Frigates. While this Arbitral Tribunal has already decided that such Contract is a commercial contract entered

into by the Ministry and Claimant, the Arbitral Tribunal having rejected it that it is an administrative contract, certain remarks have to be made for the benefit of clarity of the Arbitral Tribunal's decision.

1559. The Contract was a fixed-price contract with allowance to cover certain unexpected and unforeseen costs associated with extra and additional costs that might arise during its performance. The magnitude of the works required under the major overhaul justified the Parties creating an earmarked reserve amount in addition to the Contract value to allow the Ministry to settle such additional and unforeseen expenses and costs. The Arbitral Tribunal makes no additional comment on the scope of Clause 59 of the Contract since this has been discussed at length at the appropriate time and throughout the analysis of the so-called Constructive Claims.

1560. It is important to highlight that the Ministry, upon launching the request for proposals, expected to receive bid offers that proposed a competitive price for the performance of the works, but it also established that the Frigates were to be redelivered within the period of twenty (20) months following the execution of the Act of Commencement of the Works. The Ministry certainly had its own reasons to establish such term. On the other hand, this has always been a condition known to the bidders who, in drawing up and preparing their bid price offers, should have considered the feasibility of performing all works required within the agreed upon period of time. Moreover, in submitting a bid offer, each bidder accepted to abide by that period of time for the redelivery.

1561. As a means to allow the bidders to evaluate the terms of the request for proposal, the Ministry offered to make the Frigates available for inspection by the prospective bidders. It is also undisputed that Claimant had several opportunities to inspect the ships, under the period of the initial launch of the request for proposal as well as during the subsequent period, in 1992, when the second request was launched by the Ministry.

1562. Nonetheless, there was a gap between the award of the Contract and its execution by the Parties. The Contract was finally executed in December 1997 and the Act of Commencement of Works was only executed in June 1998. The Frigates had to be redelivered in 1999 and the redelivery only

occurred in 2002.

1563. Thus, it is undisputed that a significant delay has occurred. The Parties discussed at length the reasons for the delay and each one placed on the other the exclusive responsibility for such delay.

1564. Claimant brought up to the record several reasons that, in its view, definitely contributed to such delay period.

1565. The Arbitral Tribunal will make certain remarks regarding the contractual provisions with a view to determine whether such Contract was balanced with respect to the obligations of the Parties and, further, to determine the financial-economic equation of the Contract.

1566. As aforesaid, the Contract contemplated an earmarked money reserve to face unexpected and unforeseen services. The Arbitral Tribunal had the opportunity to conclude that such Contract, in spite of being very detailed, was deliberately incomplete. Such incompleteness is intrinsic to contracts of the kind, and the solution of any problems that may arise relies on the negotiation of such unforeseen problems between the Parties.

1567. From that standpoint, the Contract provided for the existence of the VIC, this being a *longa manus* of the Ministry at the site of the shipyard. The purpose of the creation of the VIC was to have a sort of the owner's engineer within the site, not only to supervise and follow the works being performed but also to give flexibility and gain time, avoiding that any discussions had to be held in Caracas.

1568. Apparently, the operation of the VIC, although important under the Contract, proved to be less effective than imagined. Difficulties in communication between the members of the VIC and the personnel at the shipyard were to a certain extent an important barrier to be overcome by both Parties.

1569. The cultural differences may not be minimized. It has to be taken into account that Claimant was, and actually is, one of the most reputable and known shipyards in the world. In fact, Claimant is accustomed to the practices of the shipping construction industry. Although having a long-term

experience with the U.S. Navy, the Ministry did not share the same knowledge of Claimant, and it was not expected to have it, as to such industry practices.

1570. While, in reviewing the voluminous number of constructive claims under the REA, the Arbitral Tribunal could realize that certain actions taken by Claimant might make sense under a contractual arrangement that was framed by the industry's practice, the resort to actions based on such practices was not always consistent with the structure and fundamentals of the Contract. This is where the fixed-price arrangement comes into play. Such arrangement limited the freedom of Claimant to apply the industry practices since they involved cost increases that were not necessarily aligned with Clause 8.

1571. On the other hand, the shipyard personnel were extremely well acquainted in dealing with MSCRs, OCRs, FERs and RAWs. In this case, it seems clear that the Parties did not share the same views as to the use and application of such documents. Whether or not the approval of an MSCR or OCR implied the approval of the related cost caused several problems. While Claimant (as this is clear when appraising the constructive claims) took for granted that such approval also implied an incurred cost, the Ministry had a different understanding and expected to review any claims for increase in price. The length and extension of the REA is a significant expression of this major difference of understanding between the Parties.

1572. Furthermore, Claimant may have underestimated the condition of the ships. The Ministry has been adamant in stating that Claimant had every opportunity to inspect the ships and that it knew (or should have known) the exact condition of the Frigates when it submitted its bid price. Nevertheless, there were five (5) years between the bid price date and the arrival of the ships at the shipyard.

1573. The Ministry claimed that Claimant should have taken into account normal wear and tear, but Claimant claims that this would not have solved the problem because the bid price had already been submitted and Claimant's bid awarded. In turn, the Ministry claims that Claimant's inspection upon arrival of the ships should have been a good opportunity for

Claimant to determine the actual condition of the Frigates, but the Ministry claims that it failed to conduct such inspection properly. Claimant claims that it did conduct the inspection in a proper and orderly fashion and could ascertain the deterioration and cannibalization of the ships. In no event, could it determine what was going on behind the walls.

1574. Another important factor that may have caused delays was the need to review and revise the technical specifications. Claimant claims that the WDCs contributed negatively for such delays and had an impact on the work schedule. The Ministry, on its end, denies that such WDCs had such a significant impact.

1575. Those facts clearly indicate the difficulties that the Parties had to overcome. Moreover, there also occurred certain force majeure events, primarily Hurricane Georges, but the Ministry granted an extension of time due to that.

1576. On a different note, the Contract was well balanced as far as the Parties' obligations are concerned. In dealing with the term for completion of the works by Claimant, the Contract contained certain events that operated as excusable delay, such is the case of force majeure.

1577. Notwithstanding the foregoing, two other excusable events need to be analyzed, *i.e.* (i) extra and additional works whenever the Parties agreed on the impact on the schedule derived therefrom, and (ii) repeated trials when not attributable to Claimant, its subcontractors and the Ministry's Designated Subcontractors, provided, however, that such delay is duly reflected in minutes signed by both Parties.

1578. After deciding on the constructive claims and having analyzed the supporting materials, the Arbitral Tribunal finds that in the vast majority of the cases supported by MSCRs, OCRs and RAWs as to extra and additional works, such instruments did not reflect any reference to any impact on time, nor did they show that an expected delay had been communicated and approved by the Ministry. Thus, during the performance of the works Claimant has not clearly indicated to the Ministry that the performance of the work, as then revised, would trigger a delay.

1579. The record shows that, at different junctures, the dry dock period had to be extended and sea trials repeated for different reasons. Nonetheless, such events are not reflected in the proper instruments provided by the Contract.

1580. This leads the Arbitral Tribunal to conclude that, at the site, the Parties disregarded certain formalities, moving forward informally one and the other. Moreover, neither Claimant nor the Ministry notified the other on the intention of submitting a claim to recover the alleged damages. This only came up with the REA submitted by Claimant, and the counterclaim by the Ministry was only filed in the context of the arbitration.

1581. Another important aspect that derives from the Contract was the possibility for the Ministry to terminate the Contract should the delay be longer than six (6) months. Claimant knew that and never sought relief to avoid termination. The Ministry, in turn, never notified Claimant of its ability to terminate the Contract, and the record does not show any evidence with that specific respect.

1582. The Ministry knew that in case Claimant delayed the redelivery of the ships, penalties could be imposed on it, at percentages that varied depending of the increase of the number of days of delay as per the brackets provided by the Contract. Nevertheless, the amount of penalties was capped at a maximum 10% of the Contract value, even if the penalties were to be calculated on a cumulative basis. The record does not show any evidence that the Ministry has ever notified Claimant of any imposition of penalties, which were the only means available for indemnification.

1583. Hence, the Arbitral Tribunal finds that there is a gap with respect to the Parties' behavior during the performance of the works and their more aggressive behavior with a view toward prospective results of dispute resolution, following the redelivery of the Frigates.

1584. Lastly, it is worth mentioning that Clause 23 of the Contract states that, upon the execution of the Act of Final Acceptance, and save for the guarantee period and for the remediation of items detailed on the punch list prepared by the Parties, the purpose of the Contract shall be deemed

fulfilled by Claimant.

1585. Thus, this claim by Claimant arises following the fulfillment of the Contract. The Arbitral Tribunal finds that such claim deserves to be reviewed and a decision passed by the Arbitral Tribunal. This requires that the applicable terms are reasonably established, and the preceding description was designed to put all aspects in context.

1586. Again, the Arbitral Tribunal finds that the delay is undisputed. Claimant provided the Arbitral Tribunal and the opposing party with a technical report prepared by Mr. Householder, Claimant's expert, who used the Primavera software to analyze the Contract's critical path and determined that the delay amounted to 1,095 days, say 3 full years.

1587. In preparing his report, Mr. Householder based his calculations on very technical methodology, which had as its starting point the analysis of the critical path by using the very sophisticated Primavera software, which is widely used to determine the critical path and events that affected it.

1588. Nonetheless, in preparing his report, Mr. Householder assumed that any and all delays derived, as claimed extensively by Claimant, from Ministry-related delays and other delays outside of Claimant's control. In any event, the summaries of the facts contained hereinafter clearly show that this assumption is incorrect and not precise. There has been a succession of events that interfered with the completion of the works, attributable at certain times to the Ministry and at others to Claimant.

1589. Despite Mr. Householder arriving in his research and analysis to a delay of 1,095 days, not all of those days are eligible for indemnification. In view of such delays being caused by acts and/or omissions of both Parties, the number of days eligible for indemnification might be determined on the basis of the application of a weighted average formula.

1590. Mr. Householder's report was divided into three (3) different delay periods, each of which having a dominating delay factor. The Ministry has challenged the conclusions offered by Mr. Householder in his report but has not offered a report that could affect the credibility of Mr. Householder's technical evaluation of the delays and the number of days involved.

1591. While the Arbitral Tribunal finds that the duration of the initial period of delay of 90 days, as proposed by Mr. Householder's report, failed to be determined on the basis of proper interpretation of the factual framework, there are no valid reasons to disregard the conclusions of Mr. Householder with respect to the other two periods, which, altogether, amount to a delay of 1,005 days.

1592. The Arbitral Tribunal thus finds that the number of days of delay to be taken for calculation of the indemnification claimed by Claimant shall be 1,005 days. The indemnification of the entire period of 1,005 days, however, would be the case should the Arbitral Tribunal could have concluded that causes for the delay derived exclusively from the Ministry. The delay, as determined by the Arbitral Tribunal, was the result of actions and/or omissions of both Parties.

1593. This means that the number of delay days accepted by the Arbitral Tribunal as the basis for calculation of the indemnification has to be weighted by the percentage participation of Claimant in the delay. Under the civil liability regime prevailing in the Venezuelan Civil Code, more precisely, as spelt out in Article 1189, whenever the claiming party has contributed to the occurrence of the damages, the obligation to indemnify shall be reduced in proportion to such party's contribution to the occurrence of the event. In other words, the general principle applicable under Venezuelan law is that the indemnification shall be limited to the actual damage suffered by the claiming party. In case of causation by both parties, the damage shall still be the basis for the calculation of the applicable indemnification payment, but it shall only be deemed eligible for indemnification that portion of the damages that results from the application of the reduction percentage rate attributable to such claiming party's contribution to the damage over the total amount evidenced, as determined by the judge or, should it be the case, the arbitral tribunal.

1594. It is undisputed the complexity of this case and the underlying factual framework. Despite the analysis of the voluminous number of documents introduced into the record, the Arbitral Tribunal has not been able to determine the percentage participation of each Party in the delay.

1595. The determination of the payment of an indemnification to a Party without taking into consideration the impact of its acts and/or omissions in the causation of the delay would not be aligned with the principle that the indemnification shall be limited by the actual damage suffered by the Party.

1596. Since it is not possible to determine with certainty the percentage participation of each Party in the delay, the Arbitral Tribunal decides to allocate the participation of the Parties on a parity basis, determining that the percentage participation of each Party in the delay is 50 percent. Hence, in determining the indemnification due by the Ministry to Claimant, the final amount shall reflect the reduction determined herein.

1597. The Parties discussed at length the valuation conducted by Ms. LeeVan. The Ministry challenged her calculations but failed to provide the Arbitral Tribunal with any alternative calculations. In doing so, the Ministry consciously ran the risk of having Ms. LeeVan's calculations adopted by the Arbitral Tribunal.

1598. Thus, the Arbitral Tribunal finds that the 1,005 days' indemnification by the Ministry to Claimant shall be calculated at a value of US$ 33,345 per day and reduced by 50 percent. Hence, the original amount of the indemnification owed by the Ministry to Claimant is US$ 16,755,862.50 plus interest accruing thereon, as provide later in this Award.

1599. The Arbitral Tribunal also notes that Claimant has applied for an indemnification for unabsorbed overhead and cross contract claims.

1600. In construction contracts generally, it is normally provided by the Parties that only direct damages are indemnified, and they do exclude indirect and consequential damages and loss of profit.

1601. In reality, this Contract does not contain such provision explicitly. However, it may not be stated that the Contract is silent as to such circumstance. In ruling on the application of penalties by the Ministry for the delays of Claimant, the Contract[315] states that the payment of such penalties, as capped at 10% of the Contract value shall be deemed full and

---

[315] Clause 9, Seventh Paragraph of the Contract.

final indemnification and settlement owed by Claimant to the Ministry.

1602. The concept of exclusion of indirect and consequential damages is embedded into such paragraph of the Contract and shall prevail. This is indeed a cardinal principle of the Contract and it shall at all times prevail.

1603. Hence, the indemnification owed by the Ministry to Claimant shall be limited to the original amount of US$ 16,755,862.50 plus interest accruing thereon. On the other hand, for the reasons described above, the Arbitral Tribunal finds that only direct damages, as determined, are eligible for indemnification, indirect and consequential damages being dismissed. Then, Claimant's claim is partially awarded.

## F.   Claimant's Credit for Outstanding Payments under the Fixed-Price Portion of the Contract

1604. In its Statement of Claim, Claimant asserted that it was entitled to the payment of US$ 3,951,341 for contractually specified work for which the Ministry did not pay ("Contract Balance Claim"). As per Claimant, such amount represents the net balance that remains owed and unpaid to Claimant, *i.e.* the difference between the adjusted Contract value and the total of all payments Claimant received from the Ministry.

1605. In its Post-Hearing Brief[316], Claimant asserts that the Ministry appointed expert, Mr. Bello, erroneously stated in his report that Ms. LeeVan did not account for work items that it did not perform in the calculation of the Contract Balance Claim. However, Ms. LeeVan clearly stated in her first expert report that the approved Contract value used in her calculations include approximately US $2.4 million in credits for work not performed. Ms. LeeVan, Claimant states, reiterated the basis for this credit to the Ministry for unperformed work and undelivered spare parts in her second expert report and in her testimony.

1606. According to Ms. LeeVan, the Contract value of US$ 315,000,000 was adjusted by the Parties, and the approved Contract value is of US$ 314,136,055. However, Ms. LeeVan also stated that payments made by the

---

[316] Claimant Post-Hearing Brief ¶¶ 146-148.

Ministry to Claimant amounted to US$ 310,184,714. Hence, based on her calculations, the Ministry owes Claimant the amount of US$ 3,951,341[317].

1607. Claimant asserts that, notwithstanding Mr. Bello's inaccurate critique of Claimant's Contract Balance Claim calculations, the Ministry chose not to contest Claimant's Contract Balance Claim in its written submissions, during its cross-examination of Ms. LeeVan, or through the testimony of its financial expert, Mr. Bello. Claimant then concludes that evidence and testimony demonstrate that it is entitled to compensation of US$ 3,951,341 for outstanding payments under the fixed-price portion of the Contract.

### Decision by the Arbitral Tribunal

1608. Indeed, despite the claim filed by Claimant as to the unpaid portion of the Contract value, the Ministry has not contested, nor has the Ministry made any remarks as to, such claim, save for the assertions made by Mr. Bello, which were rebutted by Ms. LeeVan, who identified the credit by Claimant to the Ministry in the amount of approximately US$ 2.4 million, which was reflected in her calculations.

1609. The Ministry' choice not to discuss such claim during this arbitration makes not only the existence of the credit claimed, but also its relevant amount, uncontested. The challenge by Mr. Bello as to the errors made by Ms. LeeVan in her calculations for not computing the Ministry's credits for unperformed works and undelivered spare parts was cleared to the Arbitral Tribunal's satisfaction by showing that, to the contrary, such credits had actually been taken into account by Claimant's expert.

1610. Hence, the Arbitral Tribunal awards this claim and orders the Ministry to pay Claimant the balance of the Contract value, which amounts to US$ 3,951,341 plus interest accruing thereon.

### XIII. The Ministry's Counterclaim

### Position of Respondent-Counterclaimant

1611. Upon submitting its Statement of Defense, the Ministry also

---

[317] See LeeVan's First Expert Report dated March 6, 2014, ¶ 94 and Table 15.

submitted its Counterclaim against Claimant[318]. The Ministry defended its right to file a counterclaim under Clause 42 of the Contract but stated that doing so may not, in any way, be deemed as the Ministry recognizing the jurisdiction of the Arbitral Tribunal.

1612. As a matter of introduction, the Ministry claims that the counterclaim is based on significant defaults by Claimant, which are summarized as follows: (i) the late redelivery of the Frigates almost two years following the original due date, (ii) failed significantly to perform certain works which were encompassed by the purpose of the Contract, (iii) failed to maintain the insurances provided by the Contract and (iv) failed to abide by the technical warranty in connection with the works performed by it.

1613. The Ministry asserts that the Contract was executed by the Parties on December 17, 1997, and its main contractual obligation was to make different payments, which were scheduled to occur in accordance with the verification of seven (7) milestones representing the physical advance of the works. The Ministry timely met all of its payment obligations under the Contract, and the funds were deposited since its inception under the trust arrangement established for that specific purpose.

1614. The Ministry asserts that Claimant was responsible for the performance of the works associated with the major overhaul of the Frigates in accordance with the requirements of the relevant Technical Specifications. The works had to be performed by Claimant using first-class materials and, to ensure reliability as well as the workmanship to be applied, in accordance with the norms identified as MIL-I-45208, of the U.S. Defense Department. Claimant had to redeliver the ships with spare parts and technical manuals of equipment and systems.

1615. The Ministry avers that the term for the redelivery of the ships was twenty (20) months following the date of execution by the Parties of the Act of Commencement of Services. Any extension of time for such redelivery could only occur in compliance with Clause 3, Third Paragraph of the Contract and upon the occurrence of any of the events referred to therein.

---

[318] Respondent Counterclaim, ¶¶ 296 through 445.

1616. Furthermore, in accordance with the applicable contractual provisions, Claimant was obligated to draw and maintain the following insurance policies: (i) in the amount of US$ 57,640,000 to cover the advance down payment to be made by the Ministry, (ii) in the amount of US$ 63,000,000 as performance bond and (iii) two in the amount of US$ 15,750,000, corresponding to each of the Frigates.

1617. Finally, the Ministry avers that Claimant had to extend a 12-month warranty period from the date of the Act of Final Acceptance of the Frigates. While the Ministry states that it fulfilled its obligations, it also says that Claimant did not fulfill its obligations.

1618. As far as the redelivery dates of the Frigates are concerned, the Ministry states that Claimant should have redelivered them on February 1, 2000, i.e. twenty (20) months following the date on which the Act of Commencement of Works was executed, more precisely on June 1, 1998. Hence, as per the Venezuelan doctrine, should contractor fail to comply with its obligations timely, it shall be deemed delayed ("mora"), but if such delay is essential, it is deemed in default.

1619. The Ministry reports the events that occurred during the period of performance of the works, which characterized force majeure events, pointing out that it, in good faith, granted a total extension of 150 days. Due to such extension, the redelivery date was then postponed into July 1, 2000.

1620. The Ministry brings to the attention of the Arbitral Tribunal a detailed description of events that delayed the redelivery of the ships, including the presence in the shipyard of a military crew of 400 members to sail the Frigates back to Venezuela, and despite its efforts, those were in vain and Claimant was not, despite its promises, able to redeliver the ships.

1621. In summary, the Ministry asserts, due to Claimant's faults and extended delay, F-21 was only delivered on May 16, 2002 after 685 days of delay; F-22 was redelivered on October 25, 2002, following an 845-day period of delay. Even with the extended delay, the Ministry realized that Claimant had not performed a significant amount of work under the

contractual scope.

1622. The Ministry asserts that the Parties agreed upon a penalty clause as an exclusive mechanism to indemnify the damages suffered in case of delays in the redelivery schedule of the Frigates. The penalty clause may be applied without the need for the Ministry to produce any evidence of the damages suffered due to such delay and its operation is triggered by the mere delay.

1623. The foregoing notwithstanding, the Ministry avers that due to such delay the Bolivarian Republic of Venezuela was seriously deprived of its naval equipment and, generally, of its military potential. This led the Ministry to restructure its military strategy for domestic and international defense.

1624. The Ministry further reports on the costs incurred by it in maintaining active at the site the VIC. This required the payment of wages and the impossibility of having its military personnel allocated to the VIC engaged in other regular activities in Venezuela, which represented a diminution of its troops. Moreover, due to the trip engaged by the troops for sailing the Frigates back to Venezuela, which did not occur, it also incurred substantial costs associated with a 400-person troop.

1625. Following the analysis of the penalty clause, as detailed in the Contract, the Ministry avers that the works that Claimant failed to fulfill have never been solved, including not only the works that failed to be performed, but also pending trials and tests, and the failure to deliver the technical manuals and tooling and other items that were listed when the Frigates were redelivered upon the execution of the Act of Final Acceptance.

1626. In light of such damages allegedly caused by Claimant to the Ministry, the Ministry claims an indemnification of US$ 75.9 million, as determined with interest accruing thereon as of July 4, 2014. The indemnification amount claimed by the Ministry is broken down into a principal amount of US$ 61.3 million and US$ 14.6 million as interest.

### The Response of Claimant to the Counterclaim

1627. In its Reply and Answer to the Counterclaim[319], Claimant asserts that the Ministry apparently decided to avoid discussing its own failure to perform on the Frigate project by leveling unfounded accusations against it. Claimant states that the Ministry's claims must be dismissed outright for a variety of reasons.

1628. Claimant claims that the Arbitral Tribunal should refuse to give any consideration to the Ministry's counterclaims due to the Ministry's failure to comply with two procedural orders requiring it to pay arbitration fees. The only reason why this proceeding has gone forward is because Claimant paid the Ministry's share of the fees. The Ministry should not be allowed to seek affirmative relief. Moreover, Claimant states that the 10-year limitations period provided by the Venezuelan Civil Code bars any attempt by the Ministry to submit its counterclaims.

1629. Claimant's main argument against the Ministry's counterclaims is based on the operation of the statutes of limitation. As per Claimant, the statutes of limitation would bar the Ministry's counterclaim on delay where the penalty clause would no longer be applied due to the passing of time; identically, the limitations would bar the counterclaim on unfinished work and warranty.

1630. Claimant also states that the Ministry is not entitled to recover on its delay counterclaim because the delay at issue is not attributable to Claimant. Thus, as per Claimant, Clause 9 cannot apply because its operation requires that delays were attributable to Claimant. Claimant supports its assertion on grounds of its argument that the delays occurred due to the Ministry's faults.

1631. Generally, Claimant asserts that the Ministry failed to produce sufficient evidence that it was damaged by unfinished Frigate work for which Claimant was responsible. Claimant says that such counterclaim is based on misstated facts and unsubstantiated damages. Claimant states that there is nothing unusual about the fact that it redelivered the Frigates

---

[319] See Reply to the Statement of Defense and Answer to the Counterclaim, ¶¶ 205 to 238.

to the Ministry before each and every item of work was completed, and the existence of open items did not place it in breach of the Contract, since open items always exist at the end of any construction projects. Claimant also stated that open items did not impair the vessels' operation.

1632. Finally, Claimant asserts that it fulfilled its warranty obligations under the Contract. Claimant claims that although the Parties were unable to agree on the language of the warranty bond, Claimant arranged for a letter of credit against which the Ministry could draw for incomplete warranty work and kept performance and advance payment in place. Furthermore, Claimant states that its warranty engineers were in place in Venezuela as required by the Contract, and they performed all warranty work on the Frigates.

### The Parties' Views on the Counterclaim in other Memorials

1633. In its Rejoinder and Reply to the Counterclaim, the Ministry asserts that the Arbitral Tribunal may not refuse to admit its counterclaim since the failure by a party to pay the advance on costs in any juncture prior to the submission of the counterclaim is not a requirement for its admission in an arbitration subject to the rules applicable to it. It also states that a party may not be prevented from submitting its claim for the mere fact that it has not paid its share on the advance on costs, especially when the Arbitral Tribunal lacks jurisdiction, as is the case here. In admitting the counterclaim, the Arbitral Tribunal will avoid deciding on Claimant's claim only when the counterclaim has to be analyzed and decided. The Ministry elaborates on its assertions and supports its position on the case law referred to therein.

1634. Moreover, the Ministry rejects Claimant's allegations as to the operation of the statutes of limitation as to its claims. The Ministry recalls the facts occurred since 2004 and is adamant in stating that the actions taken by it since the beginning of the case to seek appropriate indemnification from Claimant makes it impossible to accept that statutes of limitation operated to bar its claims. The Ministry also states that the periods of time claimed by Claimant to defend the limitations barring its claims are hypothetical and erroneous.

1635. In sum, the Ministry dismisses any and all arguments raised by Claimant and also asserts that it failed to demonstrate that the Ministry's allegations were inappropriate by opting not to reject the arguments of the Ministry. Generally, the Ministry reiterates the description of facts and its arguments with a view to reiterate its indemnification claim for US$ 75.9 million.

1636. In its Rejoinder to the Counterclaim, Claimant reiterates its arguments emphasizing that (i) the Ministry's continued refusal to arbitration fees precludes it from a hearing on its counterclaim and (ii) the statutes of limitations bar the counterclaim, and the Ministry's 2004 filing did not toll the statutes of limitation in addition to the Ministry using the wrong accrual dates. Based on those arguments, Claimant claims that the Counterclaim must not be admitted.

1637. Claimant also asserts that the Counterclaim must be reject on its merits since (i) it is Claimant's understanding that the delays experienced with the redelivery of the Frigates are not attributable to it but rather to the Ministry, (ii) the Ministry has not proven its entitlement to its requested damages for unfinished work, (iii) the Ministry may not recover on its warranty counterclaim since the Ministry conceded that Claimant performed warranty work after October 2002 and its removal of the warranty engineer did not constitute a breach of Claimant's warranty obligations, (iv) the Ministry failed to indicate what warranty work Claimant failed to perform.

## Decision by the Arbitral Tribunal

1638. This Arbitral Tribunal already decided at the appropriate time on its jurisdiction to hear the claims by the Parties, and this aspect has also been analyzed earlier in this Award. Thus, this matter is settled, despite discussion being renewed by the Ministry in its Memorials.

1639. It is true, as shown by the information conveyed by the administrator and collection and paying agent appointed by the Arbitral Tribunal – the International Court of Arbitration of the International Chamber of Commerce – ICC – that the Ministry has failed, at a certain juncture, to pay its share in the advance on costs. Nonetheless, the information released to

the Arbitral Tribunal indicates that the Ministry paid off certain amounts that have been received by the agent with respect to the costs associated with the holding of the Hearing, in Rio de Janeiro. In sum, it is true that the Ministry failed to pay its share in the advance of costs related to the arbitral proceeding, Claimant having paid the missing amounts. This is why Claimant asserts that the Ministry's counterclaim should not be heard.

1640. In any event, and with a view to securing that the principles of access to justice and equal treatment of the parties are duly respected, the Arbitral Tribunal finds that the Ministry has the right to have its counterclaim heard and decided in this arbitration, but its right shall be limited to the claim for indemnification for delay damages by operation of the penalty clause, which is inseparable from Claimant's respective delay claim. In other words, both claims are based on the same factual framework. Hence, all other claims by the Ministry under its counterclaim are inadmissible.

1641. Due to the winding route followed by the Parties to proceed with this arbitration and the extensive litigation that took place in the Courts of the United States, the Arbitral Tribunal finds that it would be unreasonable to admit the operation of the statutes of limitation to bar the counterclaim since there exist reasonable doubts as to the starting dates for computing the running of the time period to determine the effect, if any, of the statutes of limitation. Both Parties have brought up their own arguments and views on that, and the matter remained unsettled. In the Arbitral Tribunal's view, the strength of the arguments brought by the Parties and the litigation aspects that preceded this arbitration make the matter unclear, both Parties having good arguments to support their positions.

1642. In view of the foregoing, and given the exceptional nature of the operation of the statutes of limitation as a means to bar the admission of a party's claims (or counterclaims), the Arbitral Tribunal finds that in order to avoid that any decision in that respect might jeopardize the rights of one of the Parties, it decides to admit the counterclaim by dismissing the claim by Claimant that its analysis and decision are time barred.

1643. Since those aspects are now properly addressed and finally decided, the Arbitral Tribunal will proceed with the decision on the merits of the

counterclaim.

1644. Following a long discussion between the Parties during this arbitration and a thorough review of the record and the myriad of documents contained therein, the Arbitral Tribunal decided over one hundred claims brought by Claimant under the REA, and, to that end, had to discuss every single aspect associated with the performance of the Contract and the behavior of the Parties.

1645. Furthermore, the Arbitral Tribunal has already analyzed and decided the indemnification claim submitted by Claimant. It is worth mentioning that although the Parties' claims and counterclaims may vary when compared one to another, the factual background is the same and the basis for the claims or counterclaims are very similar, one being to a certain extent the mirror image of the other.

1646. In that regard, there is an aspect that is present in both the indemnification claim and counterclaim. Each Party assumes and alleges that the delay is attributable exclusively to its opposing party, and that such Party should exclusively bear the indemnification payment.

1647. With that respect, the Arbitral Tribunal invites the Parties to revisit its findings in analyzing the claim for indemnification by Claimant. The Arbitral Tribunal reviewed the claims and went through the Contract provisions applicable to the decision on the relief sought by Claimant.

1648. On solid grounds, the Arbitral Tribunal found that both Parties contributed for the delay in connection with the redelivery of the Frigates and explained and detailed its findings.

1649. The most important aspect to have an impact on the decision of the claim and the counterclaim is the fact that delays were caused by both Parties, as the Arbitral Tribunal so concluded. Thus, the argument by the Ministry that Claimant was solely responsible for such delay may not be upheld. The factual framework and the position assumed by the Parties clearly show that each Party shall be held responsible in part for the delays. As aforesaid, the existence of the delay is undisputed, and it amounted to a significant number of days.

1650. The counterclaim brought by the Ministry is in a significant extent unsubstantiated and lacks proper evidence. Although the narrative of facts is rich in details, such details have not been accompanied by evidence to prove them.

1651. The counterclaim contains allegations of a general nature where it should contain a detailed explanation of, for instance, incomplete works. The Ministry preferred to state that Claimant failed to comply with its contractual obligations but has not been specific on which obligations those would be and on how the failure damaged the Ministry's interests and the operation of the Frigates.

1652. The Arbitral Tribunal emphasized in its analysis of the indemnification claim by Claimant the role played in Claimant's arguments of the application of the shipping construction industry practices to its relationship under the Contract. While their application was incompatible with the nature of the Contract, it may not be disregarded that the alleged incomplete works follow such practices.

1653. It is not unusual under any contract of the nature of the major overhaul of the Frigates that, upon acceptance and as a condition for that, the Parties prepare a sort of a punch list contemplating any and all works to be completed, corrections deemed necessary and even reworks. The existence of a punch list does not impair the operation of the subject object of the Contract, in this case the Frigates, nor shall it be deemed an impediment for the redelivery and acceptance. And the Frigates sailed back to Venezuela seaworthy and in safe conditions.

1654. Another default claimed by the Ministry relates to the maintenance of the VIC, the related cost and the absence of personnel from Venezuela. In fact, the presence of the VIC in the shipyard site was one of the elements of the economic-financial equation of the Contract. It was in the Ministry's best interest to follow up the overhaul of the vessels and to have handy a decision-making body. The maintenance of the VIC in the shipyard site was an assumed cost of the overhaul. Nonetheless, the Ministry claims that their extended presence in the United States caused damages because they could not be counted on for their regular activities in Venezuela. The occurrence

of damages was simply enunciated by the Ministry, but it failed to produce evidence of what such damages were and specify and quantify those, as is necessary to allow the indemnification sought to be awarded under the Contract.

1655. The Arbitral Tribunal found that the Contract was well balanced and that the risk associated with the major overhaul has been allocated between the Parties harmoniously. Each Party had available a set of mechanisms that, if used at the appropriate time, would have rendered the fulfillment of the Contract smoother. Nonetheless, the record does not show that any of the Parties has taken, or attempted to take, during the performance period the contractual measures that were at their disposal.

1656. It is understandable that, while on-site and being confronted with adverse situations, the Parties prioritize the completion of the works, especially when delays may have occurred. However, even under those adverse conditions, a party that is actually affected by damages should at least reserve its rights for future claims. In this case, however, the record does not show any evidence that measures were taken with that respect, nor has the Ministry evidenced the alleged damages that remained unproved. Undoubtedly, given the lack of evidence of damages, no indemnification shall be due.

1657. If damages were such as alleged by the Ministry to entitle it to claim indemnification in the context of this arbitration, the Ministry should also have evidenced that it duly exercised its duty to mitigate the loss, as a contractual principle that may not be disregarded. The Ministry, however, did not produce such evidence at all.

1658. Furthermore, certain claims that are encompassed by the counterclaim go beyond the direct damages, triggering a call for indemnification of indirect or consequential damages. In analyzing Claimant's claim, the Arbitral Tribunal found that the spirit, language and the structure of the Contract do not support the award of such indirect or consequential damages. This is another aspect that was disregarded by both Parties in claiming their alleged rights to indemnification.

1659. Nonetheless, the Arbitral Tribunal must adopt a different approach with respect to the operation of the penalty clause. In reality, the penalty clause, as structured, corresponded to the establishment of a pre-liquidated damage amount agreed upon by the Parties in case of occurrence of delays[320]. The operation of the penalty clause is triggered upon the occurrence of the event that gave rise to its provision by the Contract, and it is not a requirement for its operation that the claiming party produce evidence of the damages. The pre-liquidated nature of the penalty clause implies that the occurrence of the trigger event is sufficient for the party to claim the payment therefor. Such position derives from the letter of Article 1258 of the Venezuelan Civil Code.

1660. A significant point related to the matter is the limitation of the penalty calculated in accordance with the scale to a maximum of six (6) months of delay and 10% of the total Contract price, as provided by Clause 9 of the Contract.

1661. In its counterclaim, the Ministry indicates that, although the total Contract price was US$ 315 million, the price allocated to the performance of the works by the Designated Subcontractors should be deducted, and the basis for calculation of the penalty be US$ 278.8 million. Hence, by applying the limitation to six (6) months and to 10% of the Contract price, the Ministry claimed an indemnification of US$ 27.8 million to be paid by Claimant.

1662. However, the Ministry's claim of such amount is based on the fact that it attributed the delay occurred to the exclusive action or omission of Claimant, the latter becoming exclusively responsible for the indemnification due under the penalty clause.

1663. However, the Arbitral Tribunal found that both Parties were responsible for the delay and for its causation. Hence, the penalty clause was designed for those cases where only Claimant was responsible for the delay, which is not the case here.

---

[320] Clause 9 of the Contract.

1664. The causation of the damage by both Parties has to be addressed in accordance with the applicable law. Under the civil liability regime prevailing in the Venezuelan Civil Code, more precisely, as spelt out in Article 1189, whenever the claiming party has contributed to the occurrence of the damages, the obligation to indemnify shall be reduced in proportion to such party's contribution to the occurrence of the event. In other words, the general principle applicable under Venezuelan law is that the indemnification shall be limited to the actual damage suffered by the claiming party. In case of causation by both parties, the damage shall still be the basis for the calculation of the applicable indemnification payment, but it shall only be deemed eligible for indemnification that portion of the damages that results from the application of the reduction percentage rate attributable to such claiming party's contribution to the damage over the total amount evidenced, as determined by the judge or, should it be the case, the arbitral tribunal.

1665. In the case under analysis, the Arbitral Tribunal found that the Ministry, as a claiming party of the indemnification under the penalty clause provided by Clause 9 of the Contract, has actually contributed to the damage by its actions and/or omissions. Nonetheless, under the penalty clause structure, it is assumed that the Parties established the amount of indemnification as an amount certain and just in light of the occurrence of an objective event – the delay. Thus, the responsibility of the Parties does not play any role in the claim and operation of the penalty clause. The only requirement imposed by law to trigger the indemnification derived therefrom is the occurrence of the delay, which is a very objective metric. Furthermore, the damages need not be proved to trigger the claim for indemnification. In establishing and agreeing on the amount of the penalty clause as an expression of the Parties' agreement as to such indemnification being just, the Parties must have examined and analyzed all events underlying the event. It is then assumed that the occurrence of a delay does cause damage to the counterparty, and it must be indemnified. The penalty clause operation is, therefore, a special system under the Venezuelan civil liability regime, and Article 1189 shall not apply.

1666. Nevertheless, the operation of the penalty clause does maintain an

intrinsic relationship with the fulfillment of the obligation by the party against which it is claimed. As a matter of principle, the penalty clause that pre-liquidates damages encompasses another important function, *i.e.* it has a coercive component to the extent that its existence is designed to also dissuade the party subject to it from defaulting.

1667. The continental laws generally contain in their civil codes provisions designed to moderate the stringency of the indemnification under the penalty clause should the party obligated thereunder have, however, performed its obligations under the relevant contract. The amount of indemnification may be excessive depending on the fulfillment of the contractual obligations by such party.

1668. In Venezuela, Article 1260 of the Civil Code actually reflects such circumstance, and it states that the judge (in this case, by the Arbitral Tribunal) may reduce the amount of the indemnification due if the obligation is partially fulfilled.

1669. The first aspect derived from the letter of such provision is the moment for ascertaining the partial fulfillment of the obligation. Indeed, this may only be determined at the end of the contract when the parties shall accept or reject the object of the contract. The other remaining aspect is that such legal provision does not require evidence of a certain percentage of the work actually performed, but it simply refers to partial performance. This implies that the judge (or the arbitral tribunal) may determine the reduction and has to take into account the elements contained in the record and his/her findings as to the factual framework.

1670. The decision to be made by the Arbitral Tribunal on those grounds is the application of a legal provision contained in the Venezuelan legal system. Such provision contains a command to the arbitral tribunal that may reduce the penalty as an equitable solution. This, however, does not mean that the judge (or the arbitral tribunal) in applying such provision is deciding at equity. The decision is made by application of a legal provision, and legal provisions do contain equitable solutions to be applied.

1671. It is undisputed that, despite the delay, the Frigates were redelivered

to the Ministry, to the Ministry's satisfaction. Claimant performed the works even though a punch list may have existed. As aforesaid, such circumstance did not impair the operation of the vessels and it is not unusual on large construction or retrofitting contracts.

1672. The factual elements contained in the record allow the Arbitral Tribunal to assert that Claimant's obligations were substantially performed, and the acceptance of the vessels by the Ministry is a strong evidence of such conclusion. Even if it should be considered the extension of the work that Claimant had performed by the time the penalty ceased to be applicable, the partial performance was characterized. In no event, however, may such percentage be determined with certainty.

1673. In applying by analogy the solution provided by Article 1195 of the Venezuelan Civil Code (which is a principle consistent with the legal system), which enunciates that whenever the impossibility in determining the percentage liability of a party in case of joint liability arises, this leads to a parity allocation between all involved, the Arbitral Tribunal decides to reduce the indemnification owed by Claimant to the Ministry under the penalty clause by 50%. Hence, Claimant shall pay to the Ministry an indemnification in the amount of US$ 13,900,000 plus interest accruing thereon.

1674. In view of the foregoing, and, especially, in view of the lack of appropriate evidence of the damages allegedly suffered by the Ministry as grounds for its claims, other than the indemnification partially awarded under the penalty clause, the Arbitral Tribunal dismisses the remaining portions of the counterclaim.

## XIV. Interest Rate applicable to Pecuniary Orders

1675. In appraising the relief sought by the Parties, the Arbitral Tribunal awarded some of them, wholly or in part, and dismissed others. With respect to the relief awarded, the amounts ordered to be paid by one Party to the other are expressed in their historical value, the Arbitral Tribunal having ordered that such amounts shall be paid together with interest accruing thereon.

1676. As discussed earlier, the Parties have not agreed on the applicable interest rate. The interest rate has been the subject of extensive opinions prepared by the Parties' experts and also during the joint examination during the Hearing. Mr. Bello, the Ministry's expert challenged the interest rate defined by Ms. LeeVan, Ms. LeeVan having identically demonstrated the appropriateness of her determinations. While Ms. LeeVan determined that the interest rate should be 8.981%, Mr. Bello, based on his criticism as to the technical mistakes of Ms. LeeVan's calculations, concluded that by applying the same methodology proposed by Ms. LeeVan, with due consideration of the adjustments required, the interest rate should be 8.713%.

1677. The Ministry had, in its Memorials with respect to the Counterclaim, proposed that interest should be computed on the basis of the interest rate paid by the U.S. Global Bonds.

### Decision of the Arbitral Tribunal

1678. In view of the disagreement between the Parties, the Arbitral Tribunal reviewed the Contract and found in Clause 28, Fifth Paragraph, item (b) on dealing with the consequences of the termination of the Contract an express reference to interest rate. The interest rate mentioned therein is referred to as the Prime Rate.

1679. The concept of Prime Rate has been evolving throughout the time. Originally, it had to be referred to a given bank or a menu of selected banks since such rate was the rate applicable to the bank's high-end clients. More recently, a bank establishes the Prime Rate as a given number of basis points over the rate of U.S. T-Bills.

1680. In any event, it is not a question of using a Prime Rate especially because the Contract does not identify which bank's Prime Rate should be applicable, but it may be extracted from such clause that the intention of the Parties has always been to apply an interest rate that remunerates the cost of money for the given Party.

1681. The Arbitral Tribunal accepts the arguments made by the Ministry as to the adjustments that are necessary in applying Ms. LeeVan's calculations.

Therefore, the Arbitral Tribunal determines that the principal amount of the pecuniary orders shall accrue interest at a rate of 8.713% per annum.

1682. Furthermore, the Arbitral Tribunal has to establish the starting date for computing interest. The amounts due hereunder by one Party to the other did not have a pre-determined due date. Pursuant to the applicable law, in such case debtor has to be notified to fulfill its obligation. Hence, in order to determine the starting date for computing the interest for late payments, the Arbitral Tribunal has to determine on which date the Parties were deemed duly notified by the service of a notice of default.

1683. Claimant's constructive claims, balance of the Contract price and indemnification claim were the subject of a first arbitration filed by Claimant against the Ministry in 2002. Notwithstanding the outcome of such arbitration, the date of institution corresponded to the date of the service of the notice of default. Such arbitration was initiated on April 5, 2002.

1684. Hence, in all payments ordered by the Arbitral Tribunal to be made by the Ministry to Claimant, the original amount of the order shall accrue interest at the rate of 8.713% per annum from April 5, 2002 to and including the actual payment date.

1685. In the case of the amount due by Claimant to the Ministry under the counterclaim, the original amount shall accrue interest at a rate of 8.713% per annum from the date of initiation of this arbitration, i.e. March 10, 2011 to and including the actual payment date. The March 10, 2011 date corresponds to the date on which the United States District Court for the Southern District of Mississippi issued an Order that amended the previous Order dated December 4, 2010, which compelled arbitration.

## XV.  Request for Reversal of the Interim Measure regarding the Trust Fund

1686. In its Statement of Defense and Counterclaim, the Ministry brings to the attention of the Arbitral Tribunal a request for reversal of the interim measure granted by the United States District Court of the Southern District of Mississippi on October 25, 2002, which enjoined the funds deposited with the Bank of New York – BONY, as the trustee, and decided that such funds

should remain under the authority of the Court.

1687. The Ministry alleges that such judicial measure was of a temporary nature, while the decisions of arbitral tribunals and doctrine are unanimous in asserting that once the arbitral tribunal has been formed and, in exercise of its jurisdiction, the arbitral tribunal must decide to maintain the measure or revoke it.

1688. The Ministry also asserts that none of the intrinsic elements for maintaining the interim measure is presently contemplated in the facts of the arbitration. The main reason for the granting of such measure was urgency. Such urgency may no longer exist after more than 12 years have elapsed.

1689. The *periculum in mora* is designed to protect the effectiveness of the judgment (in this case, the award) in the event that the relief sought by the one who requested the granting of the measure is based on estimation. The Ministry asserts that the measure granted by the Federal Court does not contemplate an analysis of such requirement. It seems, the Ministry avers, that the Court considered the likelihood of the funds being transferred from its jurisdiction by the mere fact that those funds were under the control of a Sovereign State. The behavior of the Bolivarian Republic of Venezuela, in turn, evidences that it has respected the procedural orders issued at all times by arbitral tribunals.

1690. The Ministry explained that on November 8, 2002 the Court judge, in light of Claimant's predecessor request, converted the Temporary Restraining Order, as originally granted, into a preliminary injunction. By way of such conversion, the transfer of any funds out of such account were prohibited, save to make payments to Claimant in strict accordance with the Trust Agreement.

1691. The Ministry raised in its submission arbitral tribunals' and judicial decisions and doctrine regarding the recognition of the authority of an arbitral tribunal to decide as to the existence and continuity of a provisional

measure or preliminary injunction[321].

1692. The Ministry, after reviewing and analyzing the decisions and doctrine, concludes its remarks by recognizing that the members of this Arbitral Tribunal are those who must decide on the existence and continuity of such preliminary injunction granted by the Federal Court in Mississippi.

1693. The Ministry avers that, as is the case in national laws, the two requirements for the granting of a provisional measure are (i) *fumus boni iuris* and (ii) *periculum in mora.* The courts must evaluate whether its is really a case of urgency that requires the adoption of appropriate measures to avoid certain damages or losses, frequently referred to as giving rise to an irreparable harm. The Ministry claims to have evidenced that such two fundamental requirements are not complied with after more than 12 years having elapsed since the measure was originally granted.

1694. The Ministry also states that, after due examination of the record of the case, the Mississippi District Court declined jurisdiction in favor of the Arbitral Tribunal, and Claimant, in initiating this arbitration, has recognized the jurisdiction of the Arbitral Tribunal and implicitly accepted that the Court declined jurisdiction. The Ministry concludes that it is irrelevant that the funds affected by the provisional measure are sitting in the United States since the Courts have already exercised their jurisdiction over the dispute, and the jurisdiction of the Arbitral Tribunal goes beyond that of the Court. In sum, the Ministry avers that there exists no urgency, nor did urgency exist at the time the provisional measure was requested in Court by Claimant.

1695. Lastly, the Ministry states that, should the provisional measure be maintained, Claimant must be required to post a bond in an amount not lower than 20% of Claimant's claims.

1696. In its Reply to Statement of Defense and Answer to Counterclaim, Claimant refers to the request filed by the Ministry to assert that such measure prohibits BONY, which is not a party to the arbitration, from

---

[321] See ¶¶ 454-465 in Respondent Statement of Defense and Counterclaim.

releasing monies from the Frigate project trust fund for any purpose other than paying Claimant for work under the Contract.

1697. Claimant states that BONY has filed status reports in the District Court action (which is still pending) stating that it continues to abide by the Court's preliminary injunction and will not transfer or allow to be transferred any funds from the trust account for any purpose other than to pay Claimant in accordance with the trust agreement.

1698. Claimant raises the argument that the Arbitral Tribunal has no jurisdiction over BONY and no authority to vacate a United States District Court order. The Arbitral Tribunal also has no authority over other persons who have claimed an interest in the trust fund monies. As per Claimant, the December 4, 2010 order compelling arbitration states that "*the Court will retain jurisdiction over this matter as BONY is an interested party which will not participate in the arbitration proceeding*". The basic assumption by the Ministry that the Court proceedings are terminated is erroneous, and the extract of the order transcribed above is a confirmation by the Court that the judicial proceeding is still pending.

1699. Claimant also asserts that none of the authorities cited and quoted by the Ministry on general principles involving the use of preliminary orders by courts and tribunals with concurrent jurisdiction over arbitral disputes addresses the unique facts of this case.

1700. Claimant contests the Ministry's assertion that such measure is not needed to protect the funds deposited in the trust account from misappropriation by Venezuela during the pendency of this arbitration is unfounded. Claimant states that Venezuela has improperly taken monies from the fund in the past. As a result of the discovery during litigation with the Ministry, Claimant learnt that it had removed approximately US$ 57.6 million between December 1997 and October 2000. While the funds, at BONY's request, have been returned, the Ministry did not supplement the account with the value of income and interest that would have been earned on the US$ 56.7 million had the monies had not been removed. As per Claimant, the BONY calculated this value to be US$ 9.2 million.

1701. Claimant rejects the arguments by the Ministry that Claimant should be required to post a bond if the Arbitral Tribunal decides to maintain the preliminary injunction in place, especially because the Ministry has not established any facts that place Claimant's creditworthiness in doubt and, further, that the amount claimed for the bond is arbitrary.

1702. On November 27, 2017, the Ministry filed a request for the granting of a provisional measure with a view to order Claimant to refrain from taking any action with respect to the funds deposited with the trust fund. The reason for this request was the Ministry discovering that Crystallex International Corporation, a third party unrelated to this arbitration had filed a request with the District Court of New York to attach assets pertaining to the Ministry and deposited with BONY.

1703. Furthermore, the Ministry reported in its request that it had come to its knowledge that Claimant, on the basis of an undisclosed agreement with Crystallex, had promised not to present any opposition to the intended action by Crystallex in exchange for the payment of a certain amount, should Crystallex's actions be successful.

1704. On November 28, 2017, the Arbitral Tribunal communicated to Claimant the request for a provisional measure filed by the Ministry and granted leave for Claimant to respond until December 8, 2017.

1705. On December 8, 2017, Claimant filed its memorial in response to the request for provisional measure filed by the Ministry. Claimant explained in detail the various judicial aspects related to the attempt by Crystallex to enforce its rights under a certain arbitral award against the Bolivarian Republic of Venezuela against funds deposited with BONY. Claimant detailed the actions taken before the New York District Court by Crystallex and by itself, as well as by Claimant before the Mississippi District Court.

1706. Claimant further reports that the Ministry has also taken measures with that same respect with a view to protect the funds with BONY. Moreover, Claimant explained that there is nothing fraudulent in connection with its agreement with Crystallex, as the Ministry apparently intended to record in its memorial. Claimant asserted that its agreement with Crystallex

has no bearing on the Ministry's own claims to the amounts deposited in the trust fund in relation to Crystallex.

1707. Claimant further advanced that the provisional measure filed by the Ministry would soon be moot to the extent that it had been disclosed that Crystallex had reached an agreement with the Bolivarian Republic of Venezuela with respect to the award in its favor. Disclaiming that the terms of the agreement were still sealed, Claimant reported that rumors were that Crystallex would withdraw all actions against Venezuela upon receiving the first installment under the agreement.

1708. Moreover, Claimant, while recognizing the jurisdiction and authority of the Arbitral Tribunal to grant the relief sought under the request filed by the Ministry, it asserted that such request was vague and baseless, and should then be denied.

1709. Responding to the Ministry's assertion that Claimant had abandoned its claims against the Ministry in stating that its claims were against the Bolivarian Republic of Venezuela, Claimant stated that it has never abandoned such claims, nor should such claims be deemed abandoned since it was the Ministry that in litigation referred to it as the Ministry and the Bolivarian Republic of Venezuela.

1710. The Arbitral Tribunal in receipt of the memorial filed by Claimant granted leave for the Ministry to comment on such memorial by not later than December 15, 2017.

1711. On the agreed upon date, the Ministry filed its comments to Claimant's memorial on the request for provisional measure.

1712. Initially, the Ministry pointed out that Claimant has radically changed its position with respect to the jurisdiction and authority of arbitral tribunals to grant provisional measures, this Arbitral Tribunal having undisputed authority to grant the interim measure sought.

1713. The Ministry confirms in general terms the procedural history of the case before the U.S. Courts, but it states that the funds are far from being protected from the attacks by Claimant and its counterparties. Furthermore,

the Ministry asserts that although the settlement agreement between Crystallex and the Bolivarian Republic of Venezuela is sealed, it may be said that such agreement does not contemplate the trust fund and the Parties are not yet performing it. Thus, it may not be said that the funds in the trust account do not deserve or require appropriate protection.

1714. The Ministry further asserted that Claimant has not contested the fulfillment of all requirements for the granting of the interim relief by it, and, further, that it did not confirm against whom it is claiming its rights, the Ministry or the Republic.

### Decision by the Arbitral Tribunal

1715. In contrast with the position defended by the Ministry with respect to the power and authority conferred upon an arbitral tribunal to revoke a provisional measure granted by a Court of competent jurisdiction, the Arbitral Tribunal finds that it lacks the power and authority to do so, especially when the judicial proceedings are ongoing.

1716. Nonetheless, the provisional measure was applied and obtained for the purposes of protecting the funds deposited with BONY against the inappropriate use by the Ministry. The funds were then reserved for payment of Claimant's credits against the Ministry upon final decision by the Arbitral Tribunal.

1717. This Arbitral Award resolves the dispute between the Parties, and decides all claims filed by Claimant against the Ministry as well as the counterclaim. This decision has awarded various of the constructive claims filed by Claimant, the contract price balance and the indemnification payment sought by it. Hence, to the extent that Claimant may hold a credit against the Ministry, it is in the best interest of the Parties that the funds sitting with BONY, as the trustee, may be released to the creditor. Nevertheless, those funds are subject to a lien created by the provisional measure granted by the Court, and such lien has to be lifted by the Court so that the Parties may apply the funds to the settlement of credits under the orders contained in the Arbitral Award.

1718. Thus, the Arbitral Tribunal orders Claimant to move that the Court lift

the provisional measure after Claimant shall have been paid in full for all amounts to which it is entitled under this Award, or shall have otherwise used or disposed of such amounts or bonds deposited with BONY.

1719. Any and all other aspects, questions or relief sought by the Parties with respect to the funds deposited under the trust agreement with BONY must be submitted to a Court of competent jurisdiction, as such matters fall outside the jurisdiction of the Arbitral Tribunal.

## XVI. Allocation of Arbitration Costs

1720. On July 24, 2015, Claimant and the Ministry submitted their respective Statements of Costs, pursuant to the Arbitral Tribunal's request dated June 30, 2015.

1721. Claimant states that it is entitled to all of the attorneys' fees and costs it incurred in this arbitration, pursuant to Clause 42, Paragraph 3 of the Contract. In analyzing the language of the aforementioned contractual provision, Claimant concludes that it is well-settled that such reimbursable costs and expenses encompass fees and expenses of the Tribunal, associated administrative expenses (here, the administrative expenses of the International Court of Arbitration of the International Chamber of Commerce, as depositary and collection and paying agent), the fees and expenses of expert witnesses engaged by the prevailing party, and reasonable attorneys' fees and associated costs incurred by Claimant for the arbitration.

1722. Although the Venezuelan Arbitration Act of 1998 is silent on the issue, under the 1976 UNCITRAL Arbitration Rules – which the Arbitral Tribunal specifically invoked in instances where the Venezuelan Arbitration Act does not specifically regulate an issue – costs include, among others, the costs of experts, travel costs for witnesses, and reasonable costs for legal representation and assistance of the successful party.

1723. Claimant asserts that should the Arbitral Tribunal determine that Claimant is entitled to any damages in relation to its claims, Claimant submits that the Arbitral Tribunal must grant full costs to Claimant in its Final Award. While the Venezuelan Arbitration Act indicates that an

apportionment of costs by the arbitral tribunal may be appropriate in some instances, in this case, the Parties agreed in the Contract that the full costs would be borne by the defeated party. If the Arbitral Tribunal determines that the Ministry has wronged Claimant, the Contract requires the Ministry to make Claimant whole by granting it all of the costs and expenses it bore in pursuing the claims.

1724. Four Appendices that evidence the reimbursement claimed by Claimant accompany Claimant's Statement of Fees. Appendix A contains a break-down of the amounts disbursed by Claimant as the Arbitral Tribunal and ICC Fees and Expenses that amount to US$ 1,255,000 (such amount encompasses payments made by Claimant of its share and the one that was due by the Ministry that Claimant was called to substitute for the Ministry in light of the Ministry's failure to pay. Claimant has also expended the amount of US$ 100,680.94 (which includes US$ 13,399.97 to cover the balance of the Ministry's share in those costs) in connection with the Hearing held in Rio de Janeiro, Brazil).

1725. In summary, Claimant claims the reimbursement of the following costs, as detailed below:

(1)   US$ 1,255,000, which corresponds to the fees and expenses of the Tribunal and administrative fees of the ICC[322];

(2)   US$ 100,680.94, which corresponds to the expenses Claimant paid to the ICC in connection with the Hearing;

(3)   US$ 43,040.80, which corresponds to travel-related expenses for Claimant employees in connection with the arbitration; and

(4)   US$ 11,152,048.26, which corresponds to the fees and expenses of Claimant's legal counsel and independent experts retained in this arbitration.

---

[322] Since this is an ad-hoc arbitration, any references to ICC shall be interpreted as ICC acting as depositary of the funds, collection and paying agent. ICC was appointed by the Arbitral Tribunal to act in such capacity. This role played by ICC is independent of its role as administrator of arbitrations under the ICC Rules, which is not the case here.

1726. In its Statement of Costs, the Ministry revisited the development of the arbitration underscoring certain facts and circumstances that, in the Ministry's view, increased the costs and expenses incurred by forcing it to review a voluminous number of documents provided by Claimant that were irrelevant for the decision to be made by the Arbitral Tribunal as well as the behavior adopted by Claimant in submitting witness statements of witnesses who Claimant knew beforehand would not be available to be examined in person during the Hearing.

1727. Similarly to the analysis made by Claimant, the Ministry analyzed the Arbitration Act of Venezuela and the UNCITRAL Arbitration Rules and reached to the same conclusion that the Arbitral Tribunal has the power and authority to decide on the reimbursement of costs and expenses. The Ministry also concluded that costs and expenses shall have the same extent as advanced by Claimant.

1728. Nonetheless, the Ministry provides the Arbitral Tribunal with certain arbitral awards which, in the Ministry's understanding, give a clear sense of the criteria utilized for the determination of such allocation of costs and expenses between the Parties.

1729. The Ministry introduces certain remarks on the procedural behavior adopted by Claimant throughout this arbitration, which, in the Ministry's opinion, would justify the allocation of costs to Claimant[323].

1730. The Ministry claims to have incurred costs in the amount of US$ 572,613.86 as arbitration costs. The Ministry highlights that Claimant paid US$ 497,482.00 to ICC on behalf of the Ministry, while it paid directly the amount of US$ 75,131.86 in connection with the expenses for the holding of the Hearing.

1731. The Ministry indicates that the legal fees incurred by it in connection with the legal assistance in the arbitration amounted to US$ 3,948,538.23.

---

[323] The Ministry refers, among others, the appointment of Mr. Tom Dalton as witness and who had passed away prior to the submission of the Statement of Claim; the absence of Mr. Hinkel from the Hearing for health reasons; the fact that Mr. Higginbotham had left Claimant six years prior to the submission of the Statement of Claim.

Lastly, the Ministry claims to have incurred in costs with travel and lodging expenses of its counsel and witnesses that should also be reimbursed. Those costs amount to US$ 94,599.79.

1732. Therefore, those are the costs to be allocated by the Arbitral Tribunal.

### Decision by the Arbitral Tribunal

1733. It is undisputed that the Arbitral Tribunal under the Venezuelan Arbitration Act and the 1976 UNCITRAL Rules of Arbitration has the power and authority to fix the costs of arbitration in its award. Furthermore, the Arbitral Tribunal has sufficient discretion to apportion the costs of arbitration between the Parties if it determines that such apportionment is reasonable, always taking into account the circumstances of the case.

1734. This same discretion is held by the Arbitral Tribunal with respect to the costs of legal representation, the Arbitral Tribunal being entitled to determine which party will bear such costs or may even apportion such costs between the parties, should it determine that such apportionment is reasonable.

1735. Firstly, the Ministry claimed that the Arbitral Tribunal decide on the increased costs derived from certain facts referred to in paragraph 1726 above that should be taken into account by it in the costs allocation.

1736. After examining the arguments put forward by the Ministry and having reviewed the record of the case, the Arbitral Tribunal understands that such costs are inherent to the development of the arbitration, and its findings did not point out to any fact or circumstance that should determine it to sanction Claimant upon allocating the arbitration costs.

1737. In view of the decisions adopted in Section XVII below, and the mutual successes and defeats resulting from this Award, the Arbitral Tribunal decides that each party shall bear its own legal costs and expenses in connection with this arbitration and shall split evenly the costs and fees (including the arbitrators' fees) related to this arbitration.

1738. Since Claimant made payments on behalf of the Ministry of the Ministry's share in the advance on costs in connection with the fees and

expenses of the Arbitral Tribunal and administrative fees of the ICC in its capacity as depositary, collection and paying agent, and, further, since the Arbitral Tribunal decided that such costs and fees shall be borne evenly by the Parties, Claimant is entitled to a credit in the amount of US$ 627,500.00 and the Ministry is ordered to pay such amount to Claimant.

1739. As far as the costs and expenses for the holding of the Hearing are concerned, a significant amount was paid by the ICC in its capacity as paying agent on behalf of the Parties. To that end, the share of each Party in such costs and expenses amounted to US$ 87,280.97. The Ministry paid to ICC the amount of US$ 73,881.00 and the balance was paid by Claimant. Hence, Claimant is entitled to a credit in the amount of US$ 13,399.97 and the Ministry is ordered to pay such amount to Claimant.

1740. In its Statement of Costs, Claimant explains that it disbursed the amount of US$ 63,203.47, which corresponds to the advance payment made by Claimant for securing the Hearing room and breakout rooms at the Caesar Park Hotel, in Rio de Janeiro. Claimant explains that such payment was made by the law firm assisting Claimant in this case, Hughes, Hubbard & Reed LLP. This payment is detailed in footnotes 11 and 12 to Claimant's Statement of Costs and referred to in Appendix B thereto. Hence, Claimant is entitled to a credit in the amount of US$ 31,601.74 and the Ministry is ordered to pay such amount to Claimant.

## XVII. Dispositive Section

The Arbitral Tribunal, after careful consideration, decides as follows:

(1)   Claimant's constructive claims listed below and identified by the respective REA number are awarded, and the Arbitral Tribunal orders the Ministry to pay Claimant the following amounts indicated below together with interest accruing thereon, at the rate and from the date indicated hereinbelow:

| REA # | AMOUNT IN US$ |
|-------|---------------|
| 84    | 1,170,842.50  |
| 93    | 288,060.00    |

| REA # | AMOUNT IN US$ |
|---|---|
| 94 | 100,581.50 |
| 95 | 4,299.00 |
| 97 | 7,065.00 |
| 98 | 1,416,767.00 |
| 99 | 2,863,798.00 |
| 100 | 7,191.00 |
| 101 | 29,714.00 |
| 109 | 170,735.00 |
| 110 | 272,105.00 |
| 115 | 61,147.00 |
| 118 | 443,181.00 |
| 121 | 29,512.00 |
| 122 | 14,085.00 |
| 123 | 303,125.00 |
| 125 | 53,562.00 |
| 127 | 8,702.00 |
| 128 | 38,501.00 |
| 132 | 89,135.00 |
| 1 | 403,320.00 |
| 2, 3 & 91 | 3,606,375.00 |
| 6 | 45,839.00 |
| 8 | 954,449.00 |
| 13 | 84,973.00 |
| 15 | 2,847,031.00 |
| 17 | 17,973.00 |
| 18 | 5,032.00 |
| 19 | 208,624.00 |
| 20 | 256,374.00 |
| 21 & 47 | 3,415,644.00 |
| 28 | 179,684.00 |
| 30 | 22,415.00 |

| REA # | AMOUNT IN US$ |
|-------|---------------|
| 32 | 238,750.00 |
| 42 | 1,747,557.00 |
| 57 | 930,494.00 |
| 69 | 19,410.00 |
| 70 | 13,793.00 |
| 76 | 36,913.00 |
| 79 | 430,783.00 |
| 87 | 837,840.00 |
| 90.2.1 | 11,220.00 |
| 90.2.2 | 427,557.00 |
| 90.2.4 | 1,732,177.00 |
| 90.2.6 | 4,770.00 |
| 5 | 521,906.00 |
| 26 | 1,448,307.00 |
| 29 | 1,734,205.00 |
| 31 | 1,084,033.00 |
| 43 | 1,917,027.00 |
| 45 | 557,800.00 |
| 50 | 4,173,074.00 |
| 54 | 3,453,242.00 |
| 73 | 45,985.00 |
| 82 | 64,012.00 |
| 91 | 3,606,375.00 |
| 105 | 62,503.00 |
| 108 | 701,446.00 |
| 114 | 456,218.00 |
| 131 | 626,074.50 |

(2)   All of Claimant's other constructive claims are hereby dismissed by the Arbitral Tribunal.

(3)     Claimant's claim for indemnification for delay damages is partially awarded and the Ministry is ordered to pay Claimant the amount of US$ 16,755,862.50 together with interest accruing thereon, at the rate and from the date indicated hereinbelow.

(4)     Claimant's claims for indemnification for unabsorbed overhead and cross contract claims are hereby dismissed by the Arbitral Tribunal.

(5)     Claimant's claim for outstanding payments under the fixed price portion of the Contract is awarded and the Ministry is ordered to pay Claimant the amount of US$ 3,951,341.00 together with interest accruing thereon, at the rate and from the date indicated hereinbelow.

(6)     The Ministry's counterclaim is admitted by the Arbitral Tribunal solely for the purposes of examining and deciding the claim for indemnification for delay damages.

(7)     The Ministry's claim for indemnification for delay damages under the penalty clause is partially awarded and Claimant is ordered to pay the Ministry the amount of US$ 13,900,000.00 together with interest accruing thereon, at the rate and from the date indicated hereinbelow.

(8)     All other claims by the Ministry under the counterclaim are hereby held inadmissible by the Arbitral Tribunal.

(9)     The pecuniary orders provided by this Awarded shall be paid together with interest at the rate of 8.713% per annum, and interest shall be computed as follows:

   (y) in the case of payments to Claimant, interest shall be computed from April 5, 2002 to and including the actual payment date; and

   (z) in the case of payments to the Ministry, interest on the claim awarded under the Ministry's counterclaim shall be computed from March 10, 2011 to and including the actual payment date.

(10)  The Ministry's claim with respect to the lifting of the provisional measure affecting funds deposited with BONY is hereby partially awarded to order Claimant to lift such measure but only after being paid in full all amounts to which it is entitled under this Award or having otherwise used or disposed of such amounts or bonds.

(11)  The Arbitral Tribunal decides that each Party shall bear its own legal costs and expenses in connection with this arbitration and shall split evenly the costs and fees (including the arbitrators' fees) related to this arbitration. In view of the foregoing, Claimant is entitled to the following payments to be made by the Ministry: (i) US$ 627,500.00, as costs and expenses associated with the arbitration; (ii) US$ 13,399.97, as the balance of the amount due for payments made directly by the ICC in connection with the Hearing, and (iii) US$ 31,601.74, as the Ministry's share of the advance of costs related to the reservation of the Hearing and breakout rooms paid by Claimant to Caesar Park Hotel. The Ministry is ordered to make such payments to Claimant.

(12)  All other claims by the Parties are hereby dismissed.

THIS EXECUTION PAGE IS AN INTEGRAL PART OF THE FINAL AWARD RENDERED ON THE DATE INDICATED BELOW IN AN AD-HOC ARBITRATION BETWEEN HUNTINGTON INGALLS INCORPORATED vs. THE MINISTRY OF DEFENSE OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

Place of Arbitration:    Rio de Janeiro, Brazil

Date:                    19th February 2018


Horacio Grigera Naón

Co-arbitrator

(Dissenting in part)



Antonio Hierro

Co-arbitrator



José Emilio Nunes Pinto

Chairman

THIS EXECUTION PAGE IS AN INTEGRAL PART OF THE FINAL AWARD RENDERED ON THE DATE INDICATED BELOW IN AN AD-HOC ARBITRATION BETWEEN HUNTINGTON INGALLS INCORPORATED vs. THE MINISTRY OF DEFENSE OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

Place of Arbitration:     Rio de Janeiro, Brazil

Date:                     19th February 2018

Horacio Grigera Naón

Co-arbitrator

(Dissenting in part)

Antonio Hierro

Co-arbitrator

José Emilio Nunes Pinto

Chairman

THIS EXECUTION PAGE IS AN INTEGRAL PART OF THE FINAL AWARD RENDERED ON THE DATE INDICATED BELOW IN AN AD-HOC ARBITRATION BETWEEN HUNTINGTON INGALLS INCORPORATED vs. THE MINISTRY OF DEFENSE OF THE BOLIVARIAN REPUBLIC OF VENEZUELA

Place of Arbitration:      Rio de Janeiro, Brazil

Date:                               19th February 2018

Horacio Grigera Naón

Co-arbitrator

(Dissenting in part)

Antonio Hierro

Co-arbitrator

José Emilio Nunes Pinto

Chairman

**Horacio A. Grigera Naón**
*Doctor en Derecho*

5224 Elliott Road
Bethesda, MD, 20816, USA
Tel.: 301-229 1985/202 436 4877
Facsimile: 301- 320 3136
   emails: hgnlaw@gmail.com
   hgrigeranaon@yahoo.com

### Note of Dissent

Ref: <u>Ad-hoc UNCITRAL Arbitration Huntington Ingalls Incorporated v/ Ministerio de la Defensa de la República Bolivariana de Venezuela</u>

My colleagues in the Arbitral Tribunal hearing the present case are issuing by majority a Final Award (the "Award") in this arbitration. Since I do not agree with parts of the reasoning and accompanying decisions regarding delay claims and the counterclaim, I am forced to dissent as follows:

1. **Delay /Extended Labor Costs Claims -Overhead Claims**

The Claimant's expert on delay claims, George H. Householder, has carried out a critical path analysis as a result of which Mr. Householder concludes that facts not attributable to the Claimant have led to 1095 days of delay. He broke down his analysis into three periods. According to him, the dominating delay factor in Period I was the Work Definition Conferences ("WCSs"); in Period II the force majeure events; in Period III, for Frigate F-21 the gas turbines, for Frigate F-22 the Dardo System.

During the hearing, in cross-examination, counsel to the Respondent attempted to undermine the credibility of Mr. Householder's analysis[1]. But the only specific part of this cross concretely addressing his analysis was aimed at showing that, when estimating the 90-day delay for Period I, he failed to take into account that the first payment for the Contract price was delayed for reasons not attributable to the Respondent[2]. Mr. Householder was not cross-examined on his analysis or conclusions regarding Periods II and III.

Seemingly in part on that basis, the Award (para. 1591) accepts Mr. Householder's delay analysis and conclusion regarding Period II and Period III, which leads to accepting 1,005 delay

---

[1] Transcript at 968-1057, Vol. 5.

[2] Transcript at 1048-1049, Vol. 5.

1

days. It should be noted that the force majeure reasons giving rise to Mr. Householder's Period II analysis are undisputed; it is only his assessment of facts and their impact on the work schedule that is apparently subject to challenge without any expert evidence or analysis supporting such challenge. As far as gas turbine/Dardo claims are concerned[3], it should be also noted that they have been granted under the Award as Contract Clause 59 Claims, a factor that militates in favor of accepting Householder's Period III analysis.

 Based on Mr. Householder's delay report, Ms.Cheryl A. Lee Van, Claimant's damage expert, calculated the delay damages and came up with specific figures quantifying the Claimant's damage entitlement.

However, the Award decides that (1) since it is impossible to identify with certainty the percentage participation of each Party in the delay, responsibility for delay damages corresponding to Support/Service Labor and Materials and other Costs  is allocated on an equitably determined parity basis to both Parties (resulting in granting Claimant compensation amounting to US$  16,755,862.50  (Award, paras.  1614, 1616)); and (2) rejects the Unabsorbed Overhead claim and any other claim susceptible of being characterized as a claim for compensation of consequential or indirect damages.

I disagree with both decisions.

As to (1), the Award dismisses the conclusions of Householder's expert report on this specific point without any contrary expert report or meaningful cross-examination challenging his opinion in that respect, which would have permitted to  determine in an informed and concrete way  if there was concurrent  responsibility for delays and, if such was the case, the allocation to each Party , on the basis of a causation analysis, of  such responsibility and ensuing damages and respective quantification. It is precisely because a rebuttal expert report has not been provided that it is not possible to dismiss Mr. Househoder's conclusion by determining concurring delay and cost impact exclusively attributable to the Claimant. The absence of such specific and particularized evidence cannot be substituted for an equitable estimate leading to such a substantial reduction of the Claimant's delay damages claims.

As to (2), the Award  rejects the unabsorbed overhead  Claimant's claim  by characterizing it as an indirect and consequential damages and loss of profit claim.

In support of this view, the Award refers to the existence of a practice in all construction contracts and considers that the liquidated damages provision in Clause 9 par. 7 of the Contract, exclusively limiting the amount of delay penalties payable under the Contract pursuant to this Clause, sets forth a general principle implicitly excluding a claim for indirect/consequential damages/loss of profit, which would reflect such practice..

In this respect, it should be pointed out first that Clause 9 clearly and exclusively applies when the Contractor is in default; it does not apply when the Owner (Respondent) is in default or when the Owner is in breach of contract.

---

[3] Rea 1, Rea 2,Rea 3, Rea 91.

Further, I disagree with the Award's interpretation, which introduces new and non-existing wording into the Contract in a scenario in which what is at stake is the Owner's, not the Contractor's, contractual breach. On the other hand, such argument or interpretation has not been advanced by the Respondent and, in any case, the Claimant has not had the opportunity to address it, and the existence of the contractual practice referred to in the Award has not been raised by any Party nor is part of the evidence in this arbitration.

Moreover, as expressed by the Respondent, the Contract meticulously governs all the details of the legal relationship between the Parties and is a sophisticated document which is the outcome of meticulous negotiations covering in a detailed way the different aspects pertaining to its subject-matter[4]. It should be narrowly construed without reading in it wording the Parties have not included in its carefully negotiated text.

As the Award properly finds, Ms. Lee Van's expert reports are reliable. In her first report[5] - as the Award accepts – the daily cost delay rate (for every single day of the frigate program delay) is US$ 33,345.00, which multiplied by 1005 days yields a compensation for delay costs corresponding to Support, Service, Labor and Materials and other Costs equal to US$ 33,511,725.00 that should be granted to the Claimant.

I do not see any argument to deny the Claimant compensation for its overhead claim proportionate to the delay costs. Ms. Lee Van has in Table 12 of her 6 March Report persuasively established a daily overhead for the Claimant of US$ 28.26, which multiplied by 1005 days of delay yields an unabsorbed delay overhead of US$ 29,004,300.00, that should be also granted to the Claimant (the criticism of Ms. Lee Van basis for calculating delay overhead by Mr. Bello is unconvincing).

However, I do not find sufficient support for the Claimant's claims regarding disrupted and inefficiency/impacted contract lost opportunity and acceleration premium costs, also calculated by this expert.


2. **Counterclaims**


In his Supplemental Report, an expert witness on Venezuelan law, Mr. Luis A. Ortiz Alvarez, gave an opinion in support of the Claimant's allegation that the statute of limitations had run out in respect of the counterclaims. In cross-examination in the hearing this expert was not meaningfully cross-examined on his testimony in this respect, nor evidence was examined in the hearing to rebut his testimony in such regard[6].

---

[4] Respondent's Answer and Counterclaim Memorial of 4 July 2014, pars.22, page 6; 49, page.15.

[5] 6 March 2014 Report, at 36.

[6] Transcript day 5, at 884 & fol.

Further:

1. It is undisputed that the applicable statute of limitations is 10 years (Article 1977 Venezuelan Civil Code). Undoubtedly, statute of limitation provisions are mandatory (public policy).

2. The Respondent alleges that it was tolled as a result of service of process on the Claimant's attorneys-in-fact of a Venezuelan court order to compel the Claimant to arbitrate pursuant to the Contract. The Respondent's position is that it was unclear that such individuals had ceased to be Ingalls's representatives with the concomitant implication that by serving process on those persons, process was properly served on the Claimant and, therefore, that the statute of limitations period was tolled.

3. However, even assuming that a claim to compel the Claimant to arbitrate can be equated with the filing of an arbitration request actually fleshing out the Respondent's counterclaims (which is very doubtful), unchallenged evidence shows that the order was issued on 28 April 2005 and served on the Claimant's presumptive representatives on 14 June 2005. Unchallenged evidence also shows that on 9 June 2004, as registered by a Notary public in Venezuela, the said mandate had been waived[7].

4. Thus, by the time process was served on these individuals, they no longer represented the Claimant and process served on them could not have had the effect of interrupting the statute of limitations period. It should be noted that the above are public documents, with full effects *erga omnes* , in respect of which there is no evidence that they were challenged or successfully attacked as to their form or substance.

5. Also, according to the Respondent's statements, the ten year statute of limitations period in connection with the different counterclaims that according to the Claimant would be time-barred started to run, as the case may be, as from 16 May 2002, 25 October 2002, 16 May 2003 and 25 October 2003[8]. But it is undisputed that by the time the Respondent filed its counterclaim of 4 July 2014, the ten year statute of limitations had already ran out if computed, as the Respondent claims, from such dates. The Respondent's argument that this is not the case because one should take into account the date of the filing of the arbitration request in 2011 *by the Claimant*, and not of the counterclaim, *filed by the Respondent* in 2014, is unwarranted[9].

6. In any case, the right of the Respondent to benefit from a reduction or allocation of penalty payments based on an interpretation of Venezuelan law regarding Clause 9 of the

---

[7] Exhibits J-1903 and J-1910.

[8] Réplica a la Constestación a la Reconvención, paras. 430-432.

[9] *Ibidem*, at para 433.

4

Contract (as set forth in the Award paras.1667 & fol.) has not been raised in the arbitration, and the Claimant has not had the opportunity to address it.

7. Moreover, if both Parties are deemed responsible for delays (as the Award posits), no delays can be the source of penalties on the Contractor since Contract Clause 9 exclusively applies to situations in which the Contractor is solely responsible for the delay. As already expressed, the Respondent has not discharged its burden of proof in such regard.  It is on that exclusive basis (all delays are attributable to the Claimant) that the Counterclaim has been pleaded by the Respondent. If there is shared responsibility for the delay, Clause 9 does not apply. As already said (and recognized by the Respondent), the Contract is sophisticated and has been carefully negotiated by the Parties. There is then no room for creative interpretations of Clause 9 not originated in any Party and not raised in the arbitration.

8. For the above reasons the Counterclaim should be rejected.

9. Since the Claimant has prevailed on a substantial part of its claims, the Respondent should pay for 80 % of the Claimant's arbitration and legal representation cost and fees. Since the Respondent had to resort to arbitration to assert its rights and paid for most of the costs and fees of the arbitrators without the contribution of the Respondent, including those pertaining to the Counterclaim, the Respondent should reimburse the Claimant all sums paid by the Claimant for arbitrators' fees and costs and the administrative charges of the ICC.

19 February 2018.



5