**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HUNTINGTON INGALLS INCORPORATED,

       Petitioner,

v.

                                   CIVIL CASE NO: 18-469

THE MINISTRY OF DEFENSE OF THE
BOLIVARIAN REPUBLIC OF VENEZUELA,

       Respondent.
_____/

**MOTION TO DISMISS THE PETITION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................1

ARGUMENT AND MEMORANDUM OF LAW ..................................................................7

I.   The Petition presents no basis for this Court's subject matter jurisdiction ...........7

    A.   The FSIA sets the legal standard ...............................................................7

    B.   The Petition presents no basis for this Court's subject matter jurisdiction ...............7

        1.   Section 1605(a)(6)(A): The arbitration did not take place in the United States, nor did both parties intend it to  ...............................................8

        2.   Section 1605(a)(6)(B): No treaty regarding the enforcement of arbitration awards applies to the Award  ..........................................8

        3.   Section 1605(a)(6)(C): Ingalls could not have brought the underlying claim in a United States Court  ....................................................12

        4.   Section 1605(a)(6)(D): The Ministry did not otherwise waive its immunity ...............................................................................12

II.   This Court should deny recognition and enforcement of the Award because the Tribunal departed from the parties' arbitration agreement  ...............................13

    A.   The Panama Convention sets the legal standard  ......................................13

    B.   The Tribunal did not apply the parties' arbitration agreement  ..............13

III.   The Tribunal exceeded its authority under the FAA by unilaterally changing the seat of arbitration from Caracas, Venezuela to Rio de Janeiro  ......................16

CONCLUSION ........................................................................................................................20

<u>TABLE OF AUTHORITIES</u>

**Cases**

*All Am. Trading Corp. v. Cuartel Gen. Fuerza Aerea Guardia Nacional De Nicaragua*, 818 F. Supp. 1552 (S.D. Fla. 1993). ........................................................................................... 10-11

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). ...................... 11

*Bear, Stearns & Co., Inc. v. Bennett*, 938 F.2d 31, 32 (2d Cir. 1991) .......................................... 19

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1315, 197 L. Ed. 2d 663 (2017) .................................................................................................... 11

*Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 167 (D.C. Cir. 1994) .................................... 10

*Diag Human v. Czech Republic-Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016)............. 9

*DRC, Inc. v. Republic of Honduras*, 999 F. Supp. 2d 1, 6 (D.D.C. 2012) .............................. 16, 19

*Entergy Operations, Inc. v. United Gov't Sec. Officers of Am. Int'l Union*, 856 F.3d 561, 567 (8th Cir. 2017)16

*First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 943–45, 115 S. Ct. 1920 (1995)................. 17

*Freaner v. Valle*, 966 F. Supp. 2d 1068, 1079 (S.D. Cal. 2013) .................................................. 17

*Harper Ins. Ltd. V. Century Indem. Co.*, 819 F. Supp. 2d 270, 276 (S.D.N.Y. 2011).................. 16

*Hoeft v. MVL Grp., Inc.*, 343 F.3d 57, 71 (2d Cir. 2003). ........................................................... 16

*Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 82–3, 123 S. Ct. 588 (2002)............................. 17

*I.S. Joseph Co. v. Michigan Sugar CO.*, 803 F.2d 396, 399 (8th Cir. 2001). ............................... 15

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 281 (5th Cir. 2004) ............................................................................................................. 17

*KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 52 (1st Cir. 1999).......................................................................................................................... 16

*LeDonne v. Gulf Air, Inc.*, 700 F. Supp. 1400, 1408 (E.D. Va. 1988).......................................... 10

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 102-104 (2d Cir. 2017) ..................................................................................................................................... 8-9

*National Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 332 (5th Cir. 1987) ..................... 19

*Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569, 133 S. Ct. 2064, 2068, 186 L. Ed. 2d 113 (2013) ................................................................................................................................... 13

*Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 841 (9th Cir. 2010) .......................................... 18

*PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 264 (5th Cir. 2015)* .. 17-19

*Ranzy v. Tijerina*, 393 Fed. App'x. 174, 176 (5th Cir. 2010) ...................................................... 18

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S. Ct. 2160, 2166, 119 L. Ed. 2d 394 (1992) ................................................................................................................. 9, 10

*Samantar v. Yousuf*, 560 U.S. 305, 312, 130 S. Ct. 2278, 2285, 176 L. Ed. 2d 1047 (2010)....... 11

*Saudi Arabia v. Nelson*, 507 U.S. 349, 363, 113 S. Ct. 1471, 1480, 123 L. Ed. 2d 47 (1993)..... 11

*S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 110 (D.D.C. 2012) ...................................... 9

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 487, 103 S. Ct. 1962, 76 L.Ed.2d 81 (1983) .......................................................................................................................... 11

## Statutes and Constitution

28 U.S.C. § 1603 .............................................................................................................................. 9

28 U.S.C. § 1604 .............................................................................................................................. 7

28 U.S.C. § 1605 ...................................................................................................................... *passim*

28 U.S.C. § 1611 ............................................................................................................................ 10

## Treaties

Inter-American Convention on International Arbitration, Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245 (the "Panama Convention") ........................................................................ 13, 16

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 330 U.N.T.S. 38 (the "New York Convention") .................................................................... 13, 16

## INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Ingalls's Motion to Compel Arbitration |
| Exhibit B | Ingalls's Submission of Arbitrators |
| Exhibit C | Ministry's Motion to Vacate |
| Exhibit D | Order Staying Arbitration |
| Exhibit E | Appellate Decision re Settlement |
| Exhibit F | Ministry's Motion to Compel Arbitration |
| Exhibit G | Order Compelling Arbitration (Second) |
| Exhibit H | Appellate Decision Dismissing Appeal |
| Exhibit I | Notice of Appointment of Mediators |

Respondent, The Ministry of Defense of the Bolivarian Republic of Venezuela (the "Ministry"), by and through its undersigned counsel, hereby files this Motion to Dismiss (the "Motion") the Petition filed by Huntington Ingalls Incorporated ("Ingalls"), and in support states as follows:

## INTRODUCTION

The Petition tests two fundamental principles: 1) any attempt to enforce an arbitration award against a foreign state must show the proper basis for subject matter jurisdiction; and 2) an arbitral tribunal cannot set the place of arbitration against the will of the parties. This Court should dismiss the Petition for the following reasons:

- The Petition does not establish a basis for subject matter jurisdiction because the contract at issue is of a military nature, meaning that it is not commercial and does not fall within the bounds of any treaty upon which the Petition relies;

- Ingalls cannot enforce the arbitration award because the arbitral tribunal did not follow the procedure agreed by the parties in relation to the seat (or place) of arbitration; and

- The Court should otherwise vacate the arbitration award because the arbitral tribunal exceeded its powers by arbitrarily setting the seat of arbitration in a place to which neither of the parties had agreed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. On or about December 18, 1997, Ingalls and the Ministry entered into a contract relating to work to be done on two warships owned by the Ministry (the "Contract").

2. The Forty-Second provision (the "Arbitration Provision") provides, in relevant part:

> FORTY-SECOND: Should a dispute or breach or interpretation issue arise in connection with Contract, "THE CONTRACTOR" and "THE MINISTRY" shall get together and negotiate in good faith [to] resolve the matter in a friendly manner. Should the parties fail to resolve the matter within thirty (30) days of the emergence of the dispute, then at the request of either party, the matter shall be submitted to arbitration according to this Clause. Should the matter still not be resolved through arbitration, both parties shall be entitled

to resort to the competent Courts of the Republic of Venezuela.

First Paragraph: Any disputes, lawsuits, controversies and/or differences that arise from this Contract or related to its interpretation, fulfillment, completion, or invalidation, shall be subjected to the rules provided herein and secondarily to the rules of the Civil Procedure Code of Venezuela. Arbitration actions shall take place in Caracas, Venezuela, in Spanish-English. …

Second Paragraph: Any arbitration under this Contract shall take place in Caracas, Venezuela. The parties agree that in the case of arbitration, they will abide by the rules contained in the Civil Procedure Code of Venezuela.

ECF No. 1-8, pp. 79-80.

3.      The Forty-Fifth provision (the "Modification Provision"), under the heading "Amendments," provides: "No amendments to this Contract shall be valid, unless made through written documents and signed by the contracting parties with the approval of the General Controller's Office of the National Armed Forces. Such modifications shall be an integral part of the contractual instrument." ECF No. 1-8, p. 83.

4.      Notwithstanding the parties' agreement to arbitrate, Ingalls sued the Ministry for breach of contract on October 24, 2002 in a case captioned *Northrop Grumman Ship Systems, Inc. v. The Ministry of Defense of the Republic of Venezuela*, Case No. 1:02-cv-785-HSO-RHW in the U.S. District Court for the Southern District of Mississippi (the "Mississippi Action").

5.      Before the Ministry had entered an appearance, Ingalls moved to compel arbitration. *See* Motion to Compel Arbitration, Exhibit A. Ingalls proposed three arbitrators that the court should appoint on behalf of the Ministry. *See* Submission of Potential Arbitrators, Exhibit B, p. 2. On or about April 16, 2003, the Mississippi court ordered the Mississippi Action to arbitration for the first time. ECF No. 1-10. The court appointed Steven Hammond as an arbitrator on behalf of the Ministry. *See id.*, p. 3. The court further found that the arbitration would have to take place in Mississippi or in other venue in the United States of America, due to the political situation in

Venezuela at that time. *See id., p. 2*. The court did not change the applicable law. *See generally id.*

6.      A tribunal was subsequently formed and seated in Mexico City, proceeding under the Inter-American Commercial Arbitration Commission Rules (the "IACAC Rules"). This arbitral tribunal, without the participation of the Ministry, purported to select Mexico City as the seat of arbitration, under the premise that it would facilitate travel from both the U.S. and Venezuela.

7.      On January 30, 2004, the Ministry formally appeared in the Mississippi Action, filing a Motion to Vacate all of the court's prior orders. *See* Motion to Vacate, Exhibit C. The Ministry expressly and forcefully objected (among other things) to any arbitration taking place outside of Caracas. *See id.*, p. 4. The Ministry also sought the suspension of the Mexico City arbitration. *See ibid.*

8.      Due to the pending motion to vacate, the Mississippi Court stayed the Mexico City arbitration on March 31, 2005. *See* Order Staying Arbitration, Exhibit D. The Mexico City panel ultimately disbanded itself on November 27, 2008. ECF No. 1-12. The Ministry never consented to Mexico City being the seat of arbitration.

9.      After the suspension of the Mexico City arbitration, the Parties purportedly reached a settlement agreement. In fact, while Ingalls and the Ministry had reached in principle certain understandings regarding certain monetary terms of a settlement, they never reached a settlement as to certain critical non-monetary terms, and the Ministry's counsel at the time lacked authority to finalize a settlement agreement.

10.      Within days of the supposed settlement taking effect, and upon learning of the existence of such instrument, the Ministry sought to set aside the settlement agreement. The district court denied the Ministry's motion to set aside the settlement agreement, and the Ministry appealed

3

to the Fifth Circuit in a case captioned *Northrop Grumman Ship Systems, Inc., et al. v. The Ministry of Defense of the Republic of Venezuela*, Case No. 07-60861 (the "Settlement Appeal").

11.     The Ministry prevailed in the Settlement Appeal in a decision dated July 9, 2009. The Fifth Circuit expressly withheld any decision as to whether Caracas would be a suitable situs for the arbitration, instead holding that the matter would be best resolved on remand to the district court. *See generally* Appellate Decision on Settlement, Exhibit E. To be clear, the Fifth Circuit did not make any findings regarding the selection of Caracas as the forum of arbitration in the Contract, holding that the enforceability of that provision should be taken up by the district court on remand. *See id.*, p. 19.

12.     On remand, both Parties filed cross-motions to compel arbitration. Ingalls moved for arbitration outside of Venezuela, but it did not offer a contractual basis for doing so. The Ministry again asked the Mississippi Court to compel arbitration in Caracas. *See generally* Ministry's Motion to Compel Arbitration, Exhibit F. On December 14, 2010, the district court then entered an order compelling arbitration. *See generally* Order Compelling Arbitration (Second), Exhibit G.

13.     The district court held that "the contract language regarding the location of the arbitration is mandatory." *Id.*, pp. 6-7. Nonetheless, the district court found "that enforcing the Caracas forum selection clause will for all practical purposes deprive [Ingalls] of its day in court." *Id.*, p. 8. Accordingly, the district court declined to order arbitration in Caracas, and instead directed the parties to select a "mutually agreeable alternative forum." *Ibid.*

14.     The Ministry appealed this order to the Fifth Circuit, which ultimately dismissed the appeal for a lack of jurisdiction on March 23, 2011. *See* Decision Dismissing Appeal, Exhibit H.

15.     On March 30, 2011, the parties held a telephone conference with the district court judge in order to decide a place for the court-ordered arbitration. A minute entry on the docket in the Mississippi Action indicates that the parties "have agreed to arbitration in Washington, D.C., at a location to be named." ECF No. 1-15, p. 39.

16.     At this time, the Ministry had already preserved its argument regarding the seat of the arbitration by virtue of its appeal. In its Notice of Appointment of Arbitrator, the Ministry made its appointment, "subject to and without waiver of any and all of contractual, arbitral and litigation rights it has heretofore asserted[.]" Notice of Appointment of Arbitrator, Exhibit I, p. 1. The Ministry went on to clarify that this included the "right to request enforcement of the December 1997 Contract as written." *Ibid.* The Ministry "expressly reserve[d] the right to challenge the District Court's Orders of December 4, 2010 [Doc. 227] and March 10, 2011 [Doc. 241]" and made sure to clarify that this challenge was pending before the Fifth Circuit and reserved the right to vindicate its position "as it may do at any other appropriate time and in any other appropriate proceeding and/or forum." *Ibid.*

17.     While no transcript of the conference exists on the record in the Mississippi Action, the Ministry capitulated to arbitration in Washington D.C. only because the district court judge indicated that he would choose the seat of arbitration if the parties did not decide. *See* ECF No. 1, ¶ 18. The Ministry had a strong aversion to permitting the district court to choose the arbitration seat; the district court's prior choice for the arbitration seat was Pascagoula, Mississippi, which is in Ingalls's backyard. *See* ECF No. 1-10, ¶ 8.

18.     Arbitration proceedings administered by the ICC were convened, and early in the ensuing arbitration, the Ministry objected to the jurisdiction of the arbitral tribunal, arguing that it only acceded to arbitrate in Washington under undue pressure, fearing that the district court might

order arbitration in an even more unfavorable location. As noted before, the Ministry had also already preserved its right of appeal on this point. Put differently, the Ministry did not freely consent to arbitration in Washington. *See* ECF No. 1-16, pp. 29-35.

19.      The arbitral tribunal rejected the Ministry's arguments, and it attempted to interpret the actions before the Mississippi Court, stating that "the behavior of the parties before the U.S. Courts does correspond to an amendment of the arbitration clause." ECF No. 1-16, ¶ 93. The arbitration tribunal continued, stating that the "U.S. Court, in a reasoned decision, clearly stated that the arbitral proceedings shall be held outside the territory of the Republic." *Id.*, ¶ 94. Then in an unusual turn, it unilaterally decided that the seat of the ICC arbitration would be Rio de Janeiro, Brazil. *Id.*, ¶ 97. More specifically, the tribunal decided:

> 96.      …[T]he choice of Washington, D.C. is disputed by the [Ministry], despite its having been chosen by the Parties before the US Court. In any case, as indicated above, the Arbitral Tribunal has authority to choose the location where the proceedings shall be held outside of Venezuela. In making such determination, the Arbitral Tribunal's objective is to safeguard both the neutrality and integrity of the arbitration. The Arbitral Tribunal is very much aware of its duties in such regard, which include ensuring the *effet utile* of its decisions and awards. For these reasons the Arbitral Tribunal finds appropriate that the arbitral proceedings be not held in the country of any of the Parties, which therefore excludes any place in the territories or under the jurisdiction of Venezuela and the United States.
>
> 97.      Hence, the Arbitral Tribunal decides that the arbitral proceedings shall be held in the City of Rio de Janeiro, Brazil.

*Id.*, ¶¶ 96-97.

20.      Neither the Ministry nor Ingalls ever advocated to move the seat (or place) of the arbitration to Rio de Janeiro. Likewise, the parties did not agree or take the necessary steps to modify the Contract to permit arbitration in Rio de Janeiro.

21.      On February 19, 2018, the arbitral tribunal rendered an award in favor of Ingalls

(the "Award"), which is the subject of the instant Petition. ECF No. 1-6.

22.     On February 27, 2018, Ingalls filed its Petition, advocating for both confirmation of the Award or, in the alternative, recognition of the Award. Ingalls alleged that the parties modified the arbitration clause to change the seat of the arbitration to Washington D.C. ECF No. 1, ¶ 32.

23.     The Ministry is currently attempting to have the Award annulled in Caracas as per the terms of the Contract. The court with jurisdiction has found that the Ministry's request has met the preliminary formal requests and assigned the case to the relevant division. Now, the Venezuelan courts will proceed with service on Ingalls as well as ruling on the merits of the Ministry's action, including its request for a suspension of enforcement. The Ministry will keep the Court updated regarding the status of this proceeding.

**ARGUMENT AND MEMORANDUM OF LAW**

Ingalls cannot show that this Court should confirm the Award. First, there is no treaty that applies to this arbitration because the underlying contract is not "commercial," as that term applies to contracts of this type. This Court therefore lacks subject matter jurisdiction. Second, the Court should refuse to confirm the Award because the Tribunal failed to apply the correct place of arbitration, presuming an amendment to the arbitration clause that did not exist. Third, even adopting Ingalls' incorrect position regarding the seat of arbitration, this Court must vacate the Award because the Tribunal exceeded its authority by making Rio de Janeiro the seat of arbitration. The Ministry will present each of these arguments with their respective legal standard.

**I.      The Petition presents no basis for this Court's subject matter jurisdiction**

**A.      The FSIA sets the legal standard**

As established in 28 U.S.C. §1604, a foreign state is presumptively immune from jurisdiction unless the other party can show that an exception applies in 28 U.S.C. §§1605-1607.

7

Here, Ingalls has asserted that 28 USC §1605(a)(6) applies, to which the Ministry must respond. ECF 1, ¶ 3. The beginning of Section 1605(a)(6) presents two scenarios: a party seeking to enforce an arbitration agreement or a party seeking to confirm an arbitration award. Only the latter applies in this case.

**B.      The Petition presents no basis for this Court's subject matter jurisdiction**

A party seeking to confirm an arbitration award must satisfy one of the four subsections of Section 1605(a)(6), any one of which can serve to grant subject matter jurisdiction. None of the four applies to the Award.

      1.     Section 1605(a)(6)(A): The arbitration did not take place in the United States, nor did both parties intend it to

The first portion of this clause is essentially satisfied: the arbitration did not take place in the United States. Only the second portion could be in doubt, but the Award is decisively in favor of the Ministry's position. The Award makes clear, on each of the signature pages, that the "place of arbitration," in the eyes of the Tribunal, was Rio de Janeiro, Brazil. ECF 1-6, pp. 352-354. The Contract states that arbitration shall take place in Caracas, Venezuela. ECF No. 1-8, pp. 79-80. The Ministry consistently objected to any departure from this contractual obligation, and only after it had preserved its right to appeal did it accede, under pressure, to offer Washington, D.C. But as discussed in Section II, this alleged amendment of the arbitration agreement did not follow the contract's rules for modification, and it had no legal effect in light of the Ministry's consistent stance in the Mississippi Action. In other words, the arbitration did not take place in the United States, and the Ministry never validly expressed an intent to do so.

      2.     Section 1605(a)(6)(B): No treaty regarding the enforcement of arbitration awards applies to the Award

On this point, the Court must ultimately decide on the application of "commercial" exception to the Panama and New York Conventions. When the United States ratified the New

8

York Convention, it included a reservation, stating that the New York Convention would only apply to "commercial" matters. Similarly, the Panama Convention only applies to "commercial" matters, as per its own terms. Few Federal courts have interpreted the meaning of the term "commercial" as used in the United States' reservation and in the Panama Convention, but where the Court of Appeals for the District of Columbia has studied the issue, it has found unequivocally that a failure to satisfy the "commercial" reservation means that the treaty does not apply.

The "commercial" reservation or condition generally applies to those relationships "whether contractual or not, that arise out of or in connection with commerce." *Diag Human v. Czech Republic-Ministry of Health*, 824 F.3d 131, 136 (D.C. Cir. 2016), *cert. denied sub nom. Czech Republic - Ministry of Health v. Diag Human S.E.*, 137 S. Ct. 1068, 197 L. Ed. 2d 177 (2017) (quotation omitted). But when applied to a relationship with a foreign state or its governmental instrumentalities, the Foreign Sovereign Immunities Act (the "FSIA") naturally qualifies its meaning. The FSIA is the only means through which a private party can obtain jurisdiction over a sovereign, and treaties such as the New York or Panama Conventions cannot change this result. *See Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 102-104 (2d Cir. 2017) (discussing the history of the FSIA, and explaining that it is the sole means of obtaining jurisdiction over foreign sovereigns irrespective of other concerns).

Within the context of the FSIA, the term "commercial" does not include every kind of contractual relationship. Instead, the FSIA essentially defines "commercial" through the use of the word "commercial activity," which means:

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. §1603(d). In keeping with this definition, "commercial activity" does not extend to every

act that involves commerce; there are restrictions. To determine what qualifies as "commercial activity," a court must look to "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S. Ct. 2160, 2166, 119 L. Ed. 2d 394 (1992) (quoting Black's Law Dictionary 270 (6th ed. 1990)); *see also S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 110 (D.D.C. 2012) (holding the same). As decided in this Circuit, whether a government has engaged in a "commercial activity" depends on "whether the activity is one in which commercial actors typically engage." *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 167 (D.C. Cir. 1994). "Under this test, the immunity question turns on whether the activity in question could be legally engaged in by a private party as well as a government, or whether it could only be appropriately pursued by a government." *LeDonne v. Gulf Air, Inc.*, 700 F. Supp. 1400, 1408 (E.D. Va. 1988).

By every measure applicable in this Circuit, the Ministry's activities here are decidedly not "the type of actions by which a private party engages in 'trade in traffic or commerce.'" *Weltover*, 504 U.S. at 614. The Ministry's activities were confined to the purchase of various upgrades (including weapons systems) to a pair of naval warships. *See generally* ECF No. 1-6. The transaction required substantial government oversight and approval on both sides, as well as the exchange of secret information. Needless to say, the retrofitting of military warships and the exchange of top secret information is not something that private parties do. Put differently, no private commercial party would find itself in the position of the Ministry. Consequently, the Ministry has not engaged in "commercial activity" within the meaning of the FSIA.

The exclusion of military functions from the scope of "commercial activity" finds support elsewhere in the FSIA. Specifically, the FSIA has granted immunity from execution and

attachment to all property that "is, or is intended to be, used in connection with a military activity and (A) is of a military character, or (B) is under the control of a military authority or defense agency." 28 U.S.C. §1611(b)(2). This immunity exists, "notwithstanding" the waiver of immunity for property used in "commercial activity." *See* 28 U.S.C. §1611(b). In other words, property that might be used in "commercial activity" can still be immune if it meets the criteria for use in connection with a military activity. Moreover, the extent of this immunity broadly applies where the property at issue is even of tangential military character. For example, in *All Am. Trading Corp. v. Cuartel Gen. Fuerza Aerea Guardia Nacional de Nicaragua*, 818 F. Supp. 1552 (S.D. Fla. 1993), the court found that unarmed passenger jets used on occasion to ferry military personnel overseas possessed sufficient military character to be immune under Section 1611(b). *See id.* at 1555-56.

It is of no moment that this language is only in the section regarding execution and attachment, and not expressly provided in Section 1605. As the Supreme Court has held, the FSIA's "manifest purpose [is to] codify the restrictive theory of foreign sovereign immunity." *Saudi Arabia v. Nelson*, 507 U.S. 349, 363, 113 S. Ct. 1471, 1480, 123 L. Ed. 2d 47 (1993). Under the restrictive theory, "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Samantar v. Yousuf*, 560 U.S. 305, 312, 130 S. Ct. 2278, 2285, 176 L. Ed. 2d 1047 (2010) (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 487, 103 S. Ct. 1962, 76 L.Ed.2d 81 (1983)) (emphasis supplied). The applicable test for determining what constitutes commercial acts under the restrictive theory is indistinguishable from the test discussed in the preceding paragraphs. *See, e.g., Nelson*, 507 U.S. at 360 ("a state engages in commercial activity under the restrictive theory where it exercises 'only those powers that can also be exercised by private citizens,' as distinct

11

from those 'powers peculiar to sovereigns.'"). Put simply, under the restrictive theory of sovereign immunity codified in the FSIA, a foreign sovereign is presumed to be immune from jurisdiction for its public or sovereign acts. *See, e.g., Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1315, 197 L. Ed. 2d 663 (2017). Accordingly, activities of a military nature—which are uniquely characteristic of a sovereign—do not trigger the commercial exception to immunity. *See, e.g., Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441, 109 S. Ct. 683, 692, 102 L. Ed. 2d 818 (1989) (finding no exception to immunity for the deployment of military aircraft).

For these reasons, there can be no subject matter jurisdiction under the FSIA, and without subject matter jurisdiction, Ingalls's invocation of the Panama convention is irrelevant, as is the text of the New York Convention in light of the United States' reservation thereunder. The Ministry has not engaged in "commercial activity" within the meaning of the FSIA, and consequently there is no "commercial" dispute to be regulated by the Panama Convention.

3.     Section 1605(a)(6)(C): Ingalls could not have brought the underlying claim in a United States Court

The analysis of this portion of the statute largely draws on the argument above. Because the contract was intended to be and was used in connection with a military activity and is both of a military character and under control of a military agency, no court in the United States would have had jurisdiction over the dispute. The parties' conduct supports this notion. The contract calls for any court proceedings to be in Caracas, Venezuela, where Ingalls would have the ability to sue the Ministry. The funds made available by the Ministry to pay for Ingalls's work were in a trust whose trustee, Bank of New York, expressly required a waiver of sovereign immunity. Stated another way, the Ministry's immunity from suit in the United States was a well-known fact, the Ministry provided a forum to sue it (Caracas, Venezuela), and Ingalls accepted this forum. *See*

ECF No. 1-8, pp. 79-80.

4. <u>Section 1605(a)(6)(D): The Ministry did not otherwise waive its immunity</u>

This last element directs the reader from Section 1605(a)(6) back to Section 1605(a)(1), which merely provides that a waiver of sovereign immunity is sufficient grant a court subject matter jurisdiction. There is no waiver from the Ministry as to the Contract, and this element cannot provide jurisdiction.

## II. **This Court should deny recognition and enforcement of the Award because the Tribunal departed from the parties' arbitration agreement**

### A. **The Panama Convention sets the legal standard**

As an initial matter, disputes concerning an arbitrator's interpretation of the arbitration clause are subject to *de novo* review. *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569, 133 S. Ct. 2064, 2068, 186 L. Ed. 2d 113 (2013). Although the Panama Convention does not apply, under Article 5(1)(d) of the Convention, an award should not be recognized if "the constitution of the arbitral tribunal or the arbitration procedure has not been carried out in accordance with the terms of the agreement signed by the parties…" Panama Convention, 1438 U.N.T.S. 245, Art. 5(1)(d); *see also* New York Convention, 330 U.N.T.S. 38, Art. 5(1)(d). By any measure, the arbitration procedure here was not carried out as written, and the tribunal decidedly abandoned the terms of the Contract between the parties. Consequently, the Court should decline to confirm or recognize the Award as a result.

### B. **The Tribunal did not apply the parties' arbitration agreement**

At the outset, Count I of the petition asks the Court to confirm the Award on the basis that it was rendered pursuant to arbitration in Washington, D.C. From the record, however, it appears that only Ingalls believes that arbitration actually took place in Washington, D.C. In the Mississippi Action and on appeal, the Ministry consistently maintained its objection to conducting the

arbitration anywhere other than Caracas, which was the seat where both parties agreed to arbitrate. *See* ECF No. 1-8, pp. 79-80. The Ministry filed a motion to compel arbitration in Caracas, and when this measure failed, it appealed the issue to the Fifth Circuit, which denied the appeal for a lack of jurisdiction. *See* Exhibit H. Accordingly, the Ministry timely raised and preserved its objection to arbitrate anywhere other than Caracas. At the same time, the tribunal unilaterally changed the place of arbitration to Rio de Janeiro. ECF No. 1-16, ¶¶ 96-97. [1] Likewise, the Award acknowledges that the place of arbitration was Rio de Janeiro. ECF No. 1-6, pp. 352-354. Accordingly, only Ingalls maintains, erroneously, that any arbitration ever took place in Washington, D.C.

Ingalls will no doubt point to the minute entry of March 30, 2011 as proof that the Ministry agreed to arbitrate in Washington, D.C. *See* ECF No. 1-15, p. 39. Ingalls maintains that this evidences a "modification" of the arbitration provision. ECF No. 1, ¶33. But the Modification Provision of the Contract provides that modifications may only be made by a signed writing exchanged between the parties, after certain approvals by high officials within the Ministry. ECF No. 1-8, p. 83. No such written modifications were ever made, and the Ministry gave no such internal approval. Consequently, no modification of the Arbitration Provision could have taken place according to the terms of the Contract. To the extent that Ingalls argues that a modification occurred, then, such modification would be in direct derogation of the terms of the Contract, in which case Article 5(1)(d) would prohibit the confirmation of the Award.

The Ministry's ultimate, forced capitulation to Washington, D.C. must be taken in context. As noted above, the Ministry has taken every possible step to preserve its objection to arbitrating outside of Caracas. When the Mississippi Court ordered arbitration outside of Caracas, the

---

[1] In the following section, the Ministry discusses the separate but closely related issue of whether the tribunal exceeded its authority under the Federal Arbitration Act.

Ministry had little choice but to comply, irrespective of the location of arbitration. Its only other course of action would have been to refuse to participate in that arbitration, in which case it would have faced a default in the proceedings and potential contempt for defying the Mississippi Court's order. Accordingly, the Ministry had no choice but to capitulate to the court-ordered arbitration in protest. Accordingly, the minute entry cited by Ingalls should have little meaningful weight in this analysis.

Ingalls' alternative count to recognize the Award from Rio de Janeiro is also without merit. This alternative count is proof positive that even Ingalls is unsure where the arbitration was seated and that the arbitral proceedings deviated from the parties' written agreement. Indeed, it was a rather confusing measure for the tribunal to unilaterally change the seat of arbitration, as neither Ingalls nor the Ministry made such a request. Notably, the tribunal acknowledged that such a measure required a modification of the Contract, reasoning that the parties Arbitration Provision "may be subject to review and, if certain conditions are met, also modification." ECF No. 1-16, ¶87. But it is undisputed that the conditions for modification of the Contract did not took place. The Modification Provision of the Contract provides that "[n]o amendments to this Contract shall be valid, unless made through written documents and signed by the contracting parties with the approval of the General Controller's Office of the National Armed Forces." ECF No. 1-8, p. 83. There is no evidence of this conditions having come to pass. Further, even Ingalls acknowledges that the tribunal's attempt to modify the arbitration seat was ineffective. *See* ECF No. 1, ¶21. The tribunal's decision to change the location of the proceedings evidences a wholesale and unsolicited departure from the written agreement to arbitrate, and this is something that cannot be cured by the fiat of the tribunal. For these reasons, "the arbitration procedure has not been carried out in accordance with the terms of the agreement signed by the parties," and consequently the Court

should refuse to confirm or recognize the Award under Article 5(1)(d) of the Panama Convention. Panama Convention, 1438 U.N.T.S. 245, Art. 5(1)(d); New York Convention, 330 U.N.T.S. 38, Art. 5(1)(d).

### III.    The Tribunal exceeded its authority under the FAA by unilaterally changing the seat of arbitration from Caracas, Venezuela to Rio de Janeiro

Even following Ingalls' flawed argument that the seat of arbitration is Washington, D.C., the Tribunal rejected this position, requiring vacatur of the Award. The relevant standard for the vacatur of an arbitration award is the Federal Arbitration Act. Under the Federal Arbitration Act, an arbitration tribunal is obligated to honor the letter of the arbitration agreement between the parties. "[A]ny power that the arbitrator has to resolve the dispute must find its source in a real agreement between the parties. He has no independent source of jurisdiction apart from the consent of the parties." *I.S. Joseph Co. v. Michigan Sugar CO.*, 803 F.2d 396, 399 (8th Cir. 2001). Consequently, "[a]n arbitrator exceeds his powers when he 'rule[s] on issues not presented to [him] by the parties.'" *Hoeft v. MVL Grp., Inc.*, 343 F.3d 57, 71 (2d Cir. 2003) (citation omitted). Although they each express it in varying terms, the consensus among federal courts is that tribunals are strictly constrained to abide by the language of the arbitration agreement. *See, e.g., Entergy Operations, Inc. v. United Gov't Sec. Officers of Am. Int'l Union*, 856 F.3d 561, 567 (8th Cir. 2017) ("[T]he arbitrator cannot ignore or amend the parties' agreement.") (citation omitted); *Harper Ins. Ltd. V. Century Indem. Co.*, 819 F. Supp. 2d 270, 276 (S.D.N.Y. 2011) (An arbitration tribunal "cannot re-write a new agreement for the parties.") (citation omitted).

The choice of an arbitration seat is not merely a matter of convenience or efficiency. The decision is of weighty consequence and substantive legal significance. For example, this Court has recently noted one major consequence of parties' choice of seat. In *DRC, Inc. v. Republic of Honduras*, 999 F. Supp. 2d 1, 6 (D.D.C. 2012), this Court noted that "an action to annul or suspend

16

an award must be filed in the seat of arbitration and must comply with the procedural laws of the seat of arbitration." Likewise, honoring the parties' choice of seat "obviates the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 281 (5th Cir. 2004) (quotation omitted).

Federal courts broadly require that Tribunals honor the parties' choice of seat. "Courts may not rewrite the parties' agreements and compel arbitration of their dispute in a forum which is not one of those enumerated in an arbitration agreement's forum selection clause." *KKW Enterprises, Inc. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 52 (1st Cir. 1999) (citation omitted). Accordingly, "[i]f the parties' agreement specifies that the laws and procedures of a particular forum shall govern any arbitration between them, that forum-selection clause is an 'important' part of the arbitration agreement…" *PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 264 (5th Cir. 2015) (quotation omitted). At bottom, "[t]he proper forum for resolving disputes regarding an arbitrator's jurisdiction is typically a matter left to the agreement of the parties." *Freaner v. Valle*, 966 F. Supp. 2d 1068, 1079 (S.D. Cal. 2013) (citing *Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 82–3, 123 S. Ct. 588 (2002); *First Options of Chi., Inc. v. Kaplan,* 514 U.S. 938, 943–45, 115 S. Ct. 1920 (1995)).

The instant case can perhaps most readily be analogized to the Fifth Circuit's decision in *PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 264 (5th Cir. 2015). The parties in that case were insurance carriers who entered into an arbitration agreement, which (1) required the appointment of an arbitrator by Anguillan authorities; and (2) required arbitration in accordance with ICC rules. *See id* at 263-64. In spite of the express language of the contract, the

claimant submitted the dispute to the American Arbitration Association ("AAA"), which referred the matter to a Texas arbitrator notwithstanding the language of the arbitration agreement. *See id.* at 260. The arbitrator then went on to employ AAA rules to decide the dispute, in spite of the agreement's language requiring ICC rules. *See ibid.* The arbitrator ultimately decided in favor of the claimant, over the respondent's objections relating to the applicable rules and the selection of the arbitrator. When the claimant sought confirmation of the award in the district court, the respondent moved the court to vacate the award and reject the confirmation petition due to the arbitrator's failure to abide by the express language of the arbitration agreement. *See id.* at 261-62. The district court granted respondent's motion.

On appeal, the Fifth Circuit vindicated the respondent and the district court with simple, direct analysis. The Fifth Circuit observed that the arbitrator's "departure from the contractual selection process fundamentally contradicts its role in voluntary dispute resolution." *Id.* at 263. As for the parties' agreement to apply ICC rules, the court ruled that such a provision amounted to a forum selection clause that became an "important part of the arbitration agreement." *Id.* at 264 (citing *Ranzy v. Tijerina*, 393 Fed. App'x. 174, 176 (5th Cir. 2010)). Accordingly, the court had little trouble holding that "[b]ecause Ramos acted contrary to the express arbitrator- and forum-selection clauses in the arbitration agreements to which PoolRe was a party, we affirm the district court's holding that Ramos exceeded his authority under 9 U.S.C. § 10(a)(4)." *PoolRe*, 783 F.3d at 265. Affirming the district court, the Fifth Circuit went on to vacate the entire award, noting that the arbitrator's errors "tainted the entire process." *Ibid.* at 262.

Furthermore, the Fifth Circuit's decision in *PoolRe* hardly stands alone. Other circuits have likewise held that arbitrators are bound to uphold the express language of parties' arbitration agreements. *See, e.g., Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 841 (9th Cir. 2010) ("The

arbitrator could not override the parties' express agreement in favor of general procedural rules. Indeed, adherence to the parties' agreed-upon procedures is regularly enforced, such as where relevant to the choice of forum of arbitration…") (citing *Bear, Stearns & Co., Inc. v. Bennett*, 938 F.2d 31, 32 (2d Cir. 1991); *National Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 332 (5th Cir. 1987)).

As in *PoolRe*, the arbitral tribunal here refused to enforce the express language of the parties' contractual selection of forum, and instead held arbitration in Rio de Janeiro—a seat which neither the parties nor the Mississippi court proposed or agreed to. The Tribunal's decision to change the seat of arbitration contradicts the express language of the Parties' agreement, and consequently the Tribunal exceeded its contractually defined authority. Here, the Mississippi court found that the forum selection clause of the Arbitration Provision was mandatory. *See* Exhibit G, pp. 6-7. In the subsequent court-ordered arbitration, neither Ingalls nor the Ministry put forward any argument that the proceedings should be seated in Rio de Janeiro. Notwithstanding the findings of the Mississippi court and the submissions of the parties, the tribunal unilaterally changed the seat of arbitration to Rio de Janeiro. *See* ECF No. 1-16, ¶ 97. In doing so, the tribunal substantially exceeded its authority, leaving the parties with a flawed award that cannot be confirmed.

Apart from contravening the plain language of the Contract and the numerous policy concerns that favor enforcing arbitration clauses, the tribunal left the parties with a flawed award that cannot be confirmed. As this Court has noted, a party seeking to suspend or annul an arbitration award must bring a proceeding at the seat of arbitration. *See DRC, Inc.*, 999 F. Supp. 2d at 6. The Ministry's current efforts to annul the Award comport with this requirement.

The parties never agreed to arbitrate in Rio de Janeiro under the Contract. The Arbitration Provision included a mandatory forum selection clause seating any arbitration in Caracas, and the

parties never took any steps to change this fact through the Contract's Modification Provision. Neither Ingalls nor the Ministry petitioned the tribunal to move the arbitration to Rio de Janeiro. The tribunal's unilateral decision has tainted the proceedings in a manner that cannot be remedied. Accordingly, there can be no doubt that the tribunal exceeded its authority under 9 U.S.C. § 10(a)(4), and consequently the Award cannot be confirmed.

## CONCLUSION

This Court has no subject matter jurisdiction because Ingalls has not shown that any of the statutory prerequisites apply. In any event, the Court should deny recognition and enforcement of the Award because the Tribunal did not apply the terms of the arbitration clause. And applying Ingalls' incorrect argument that the place of arbitration is Washington, D.C., the Court must vacate the Award because Tribunal exceeded its power by unilaterally altering the terms of the arbitration agreement and changing the seat of arbitration to Rio de Janeiro.

The Ministry respectfully requests that the Court grant this Motion and enter an order dismissing the Petition. Although there is no subject matter jurisdiction, the Ministry requests and order denying recognition and enforcement of the Award, or in the alternative, vacating the Award, and granting any other relief that it deems just and equitable under the circumstances.

Respectfully Submitted,

*/s/ Quinn Smith*

**GST LLP**
Rodney Quinn Smith
Fla. Bar No. 59523
e-mail: quinn.smith@gstllp.com
J. Derek Womack
Fla. Bar No. 93318
e-mail: derek.womack@gstllp.com
1111 Brickell Avenue

Suite 2715
Miami, Florida 33131
(T) (305) 856-7723
(F) (786) 220-8265

**GST LLP**
Gary J. Shaw
DC Bar No. 1018056
Email: gary.shaw@gstllp.com
1875 I St. NW, Floor 5
Washington DC 20009
(T) (202) 681-0529

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF filing system, which shall serve copies of this filing on every party to this action. I further certify that I am unaware of any non-CM/ECF parties.

By: */s/ Gary Shaw*