**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HUNTINGTON INGALLS
INCORPORATED,

        Petitioner,

    v.

THE MINISTRY OF DEFENSE OF THE
BOLIVARIAN REPUBLIC OF
VENEZUELA,

        Respondent.

Civil Case No. 1:18-cv-00469-KBJ

**OPPOSITION TO RESPONDENT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

Page(s)

PROCEDURAL POSTURE: THIS COURT MAY NOT HEAR THE MINISTRY'S
    REQUEST FOR VACATUR .......................................................................1

STANDARD OF REVIEW .............................................................................3

ARGUMENT.....................................................................................................5

I.    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS
    ACTION TO RECOGNIZE AND ENFORCE THE FINAL AWARD
    UNDER THE FSIA ....................................................................................6

    A.    A United States District Court Has Already Held That The Underlying
        Contract Was Commercial, Consistent With The Supreme Court's
        Guidance In *Weltover*............................................................................9

    B.    The Tribunal Similarly Concluded That The Parties' Relationship Was
        "Exclusively Commercial" In Nature ...............................................11

    C.    The D.C. Circuit Has Foreclosed Venezuela's Attempt To Distinguish
        "Governmental" From Other "Commercial" Contracts For Purposes Of
        The FSIA's Arbitration Exception ....................................................11

II.    THE TRIBUNAL ACTED WITHIN ITS POWERS IN FIXING THE
    PLACE OF ARBITRATION IN BRAZIL. .............................................14

    A.    After A Federal District Court Found That The Parties' Original Choice
        Of Forum Was No Longer Feasible, The Ministry Freely Chose To
        Arbitrate In Washington, D.C..............................................................15

    B.    In Response To The Ministry's Request For Relief From Its Agreement
        To Arbitrate In Washington, D.C., The Tribunal Exercised Its Authority
        To Select An Alternative Legal Seat For The Arbitration. ..................17

CONCLUSION .................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Africard Co. v. Republic of Niger,*
    210 F. Supp. 3d 119, 123 (D.D.C. 2016) ........................................................................13

* *Argentine Republic v. Nat'l Grid PLC,*
    637 F.3d 365 (D.C. Cir. 2011) .................................................................................2, 4

*Belize Soc. Dev. Ltd. v. Gov't of Belize,*
    668 F.3d 724 (D.C. Cir. 2012) ..........................................................................................3

* *Belize Social Dev. Ltd. v. Government of Belize,*
    794 F.3d 99 (D.C. Cir. 2015), *rehearing en banc denied* (Sept. 28, 2015), *and*
    *cert. denied*, 137 S. Ct. 617 (2017) ....................................................................... 12, 13

*Beverly Health & Rehab. Servs., Inc. v. NLRB,*
    317 F.3d 316 (D.C. Cir. 2003) .......................................................................................8, 9

* *BG Group v. Republic of Argentina,*
    134 S. Ct. 1198 (2014) ................................................................................. 3, 11, 15, 19

*Creighton Ltd. v. Gov't of State of Qatar,*
    181 F.3d 118 (D.C. Cir. 1999) ........................................................................................14

*Ergoinvest DD v. Democratic Republic of Congo,*
    355 F. Supp. 2d 9 (D.D.C. 2004) ....................................................................................14

*Howsam v. Dean Witter Reynolds, Inc.,*
    537 U.S. 79 (2010) ...........................................................................................................20

*In re Chromalloy Aeroservices, Inc., v. Arab Republic of Egypt,*
    939 F. Supp. 907 (D.D.C. 1996) ..........................................................................4, 13, 14

*Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.,*
    763 F. Supp. 2d 12 (D.D.C. 2011) ..................................................................................19

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
    500 F.3d 111 (2d Cir. 2007) ............................................................................................3

*Kevlin Servs., Inc. v. Lexington State Bank,*
    46 F.3d 13 (5th Cir.1995) ................................................................................................16

*Kurke v. Oscar Gruss & Sons, Inc.,*
    454 F.3d 350 (D.C. Cir. 2006) ..........................................................................................3

*LaPrade v. Kidder, Peabody & Co.,*
94 F. Supp. 2d 2 (D.D.C. 2000) ........................................................................4

*M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad & Tobago,*
725 F. Supp. 52 (D.D.C. 1989) ......................................................................14

*McDonnell Douglas Corp. v. Islamic Republic of Iran,*
758 F.2d 341 (8th Cir. 1985), *cert. denied*, 474 U.S. 948 (1985)........................10

*Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Sys., Inc.,*
665 F.3d 1091 (9th Cir. 2011) ......................................................................14

*Mitsubishi Motors Corp. v. Soler-Chrysler-Plymouth, Inc.,*
473 U.S. 614 (1985) ........................................................................................3

*Nat'l Iranian Oil co. v. Ashland Oil, Inc.,*
817 F.2d 326 (5th Cir. 1987) ........................................................................16

* *Northrop Grumman Ship Sys. v. Ministry of Defense of Republic of Venezuela,*
No. 1:02CV785, 2010 WL 5058645 (S.D. Miss. Dec. 4, 2010)....................... 16, 17

* *Northrup Grumman Ship Sys. v. Ministry of Defense of the Republic of Venezuela,*
No. 1:02CV785, 2007 WL 2783343 (S.D. Miss. Sept. 24, 2007) ........................8, 9

* *Oxford Health Plans LLC v. Sutter,*
569 U.S. 564 (2013) ............................................................... 4, 11, 19, 20

*PoolRe Ins. Corp. v. Org. Strategies, Inc.,*
783 F.3d 256 (5th Cir. 2015) ........................................................................19

*Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.,*
23 F.3d 41 (2d Cir. 1994) ...........................................................................4, 12

* *Republic of Argentina v. Weltover,*
504 U.S. 607 (1992) ..............................................................5, 8, 9, 10, 11, 12

*Stati v. Republic of Kazakhstan,*
199 F. Supp. 3d 179, 190 (D.D.C. 2016).......................................................7, 13

*Teamsters Local Union No. 61 v. United Parcel Serv., Inc.,*
272 F.3d 600 (D.C. Cir. 2001) ......................................................................20

*TermoRio S.A. E.S.P. v. Electranta, S.P.,*
487 F.3d 928 (D.C. Cir. 2007) .....................................................................4, 12

*Transaero, Inc. v. La Fuerza Aerea Boliviana,*
  30 F.3d 148 (D.C. Cir. 1994) ................................................................6

*UNC Lear Services, Inc. v. Kingdom of Saudi Arabia Ministry of Defense &*
  *Aviation,*
  581 F.3d 210 (5th Cir. 2009), *cert. denied*, 559 U.S. 971 (2010).........................10

*Walter Fuller Aircraft Sales, Inc. v. Republic of the Phil.,*
  965 F.2d 1375 (5th Cir. 1992) ................................................................9

*Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v.*
  *Navimpex Centrala Navala,*
  989 F.2d 572 (2d Cir. 1993) ................................................................14

*Zeiler v. Deitsch,*
  500 F.3d 157 (2d Cir. 2007) ................................................................4

**STATUTES**

9 U.S.C. §§ 9, 207, 302 ................................................................2

9 U.S.C. § 10(a) ................................................................3

9 U.S.C. § 10(a)(4) ................................................................3

9 U.S.C. § 12 ................................................................1

9 U.S.C. §§ 202, 302, and 305 ................................................................7

9 U.S.C. § 203 ................................................................7

9 U.S.C. § 207 ................................................................3

9 U.S.C. §§ 207 and 302 ................................................................3

9 U.S.C. § 301 ................................................................1

9 U.S.C. §§ 301, 305 ................................................................7

28 U.S.C. §§ 1330 ................................................................5

28 U.S.C. §§ 1605(a)(1) ................................................................14

28 U.S.C. § 1605(a)(2) ................................................................12

28 U.S.C. § 1605(a)(6) ................................................................6, 7

28 U.S.C. § 1605(a)(6)(B) ................................................................7, 10, 12

28 U.S.C. §§ 1605(a)(6)(B) and (C) ........................................................................ 14

28 U.S.C. § 1605(a)(6)(C) ......................................................................................... 7

Brazilian Arbitration Act ............................................................................................ 2

Federal Arbitration Act, 9 U.S.C. §§ 9, 207, 302 and 304 ............................. 1, 2, 6, 20

Venezuelan Arbitration Act Article 9 ....................................................................... 18

**OTHER AUTHORITIES**

22 C.F.R. §§ 120 *et seq.* ......................................................................................... 16

Restatement (Third) of Foreign Relations Law § 487 cmt. f ................................... 13

Petitioner Huntington Ingalls Incorporated ("Petitioner" or "Ingalls"), by and through its undersigned counsel, respectfully submits this Opposition to the Motion to Dismiss (the "Motion to Dismiss" or "MTD") (ECF No. 21) filed by the Ministry of Defense of the Bolivarian Republic of Venezuela (the "Ministry" or "Venezuela") in response to Ingalls's February 27, 2018, Petition to Confirm, or Alternatively, To Recognize and Enforce an Arbitral Award (the "Petition") (ECF No. 1).  Ingalls's Petition seeks routine and summary relief, the recognition and enforcement of an international arbitration award, rendered by an arbitral tribunal (the "Tribunal") on February 19, 2018, in an ad hoc arbitration (the "Arbitration"), pursuant to articles 4 and 5 of the Inter-American Convention on International Commercial Arbitration (the "Panama Convention") of 1975[1] and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9, 207, 302 and 304.  Venezuela's Motion to Dismiss is mistaken as to the nature of the Award[2] and the law of this Circuit and, as a result, lacks merit.  Accordingly, as Venezuela asserts no other defenses, this Court must recognize and enforce the Award.

## PROCEDURAL POSTURE: THIS COURT MAY NOT HEAR THE MINISTRY'S REQUEST FOR VACATUR

If Washington, D.C. had been the arbitral seat, the Ministry's request for vacatur would be time-barred.  Under the FAA, 9 U.S.C. § 12, "[n]otice of a motion to vacate, modify, or correct an award must be served . . . *within three months* after the award is filed or delivered" (emphasis added).  The Award in this case was rendered on February 19, 2018. Pet. ¶ 22.  The Ministry confirmed receipt of the electronic copy of the Award on the same date and a physical

---

[1] *See* Inter–American Convention on International Commercial Arbitration [*opened for signature* Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245], (reprinted after 9 U.S.C. § 301).

[2] As used in this brief, "Award" refers to the Final Award between Ingalls and the Ministry, dated February 19, 2018, attached as Exhibit 1 to the February 27, 2018, Declaration of John F. Wood ("Wood Decl."); "Yanos Decl." refers to the July 27, 2018, Declaration of Alexander A. Yanos in Support of Ingalls' Opposition to Venezuela's Motion to Dismiss; and "Pet." refers to Ingalls's February 27, 2018 Petition to Confirm, or Alternatively, to Recognize and Enforce the Award.

copy of the Award was received by the Ministry on March 15, 2018. *See* Yanos Decl., Ex. 1 ¶¶ 5, 10. Thus, *even* if the seat of arbitration had been Washington, D.C., the Award would have ceased to be subject to a "motion to vacate, modify, or correct" as of <u>May 19, 2018</u> or, at the latest, June 15, 2018. The Court has no discretion to extend the three-month statutory deadline for seeking vacatur. *Argentine Republic v. Nat'l Grid PLC*, 637 F.3d 365, 369 (D.C. Cir. 2011) ("the district court had no authority to grant Argentina's motion to extend time to serve notice [of a petition to vacate an arbitral award] and therefore acted within its discretion in treating the motion as moot."). Thus, to the extent that the Motion to Dismiss can be read as a Petition for Vacatur, it is too late and cannot be considered by this Court.

That being said, Washington, D.C. was not the arbitral seat. Ingalls's Petition originally was framed in terms of alternative requests for relief: confirmation of the Award if the Court held that the seat of arbitration had been Washington, D.C; recognition and enforcement of the Award in the event that the Court were to determine that the seat of arbitration had been Rio de Janeiro, Brazil. Pet. ¶ 40. However, subsequent to the filing of Ingalls's Petition, the Ministry submitted a Request for Correction of the Award to the Tribunal on April 5, 2018. *See* Yanos Decl., Ex. 1 ¶ 10. On May 7, 2018, the Tribunal rejected the Ministry's Request for Correction as untimely. *See* Yanos Decl., Ex. 1 ¶¶ 35-38, 40. In that decision, the Tribunal clarified that it had moved the legal seat—and not just the venue—of the arbitration to Rio de Janeiro, Brazil. *Id.* at ¶ 39 (recognizing the Brazilian Arbitration Act as "the law of the place of arbitration"). Based on the Tribunal's clarification, Ingalls no longer seeks confirmation of the Award before this Court. Ingalls only seeks recognition and enforcement of the Award pursuant to 9 U.S.C. §§ 9, 207, 302 and 304. Pet. ¶¶ 38-41.

It follows that the Ministry's request for "vacatur" of the Award pursuant to 9 U.S.C. § 10(a)(4), *see* MTD at 16, 20, must be dismissed for want of jurisdiction or as moot.  Vacatur is available only before a court "in and for the district wherein the award was made."  9 U.S.C. § 10(a).[3]  Neither party now contends that Washington D.C. was the seat of arbitration.  *See* MTD at 18.  While the Court may neither vacate nor confirm the Award, the FAA and the Panama Convention nevertheless require that the Court recognize and enforce the Award for the reasons set out below.

## STANDARD OF REVIEW

Judicial review of an international arbitral award is "extremely limited."  *Kurke v. Oscar Gruss & Sons, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006).  Consistent with the parties' choice to arbitrate their disputes and the strong federal public policy in favor of international arbitration that applies "with special force in the field of international commerce," a federal district court enjoys "little discretion in refusing or deferring enforcement of foreign arbitral awards."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v. Soler-Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).  To the contrary, in a proceeding under the Panama Convention, a court "shall confirm" a foreign arbitration award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in" the Inter-American Convention.  *See* 9 U.S.C. §§ 207 and 302 (providing that "the Convention" referenced in 9 U.S.C. § 207 "shall mean the Inter-American Convention").  Arbitral decisions must be given "considerable deference," *BG Group v. Republic*

---

[3] *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115 n.1 (2d Cir. 2007) (explaining that courts of "the country in which, or under the [arbitration] law of which, [an] award was made" have "*primary* jurisdiction" and authority to set aside an arbitral award, while all other countries "are *secondary* jurisdictions, in which parties can only contest whether that State should enforce the arbitral award.") (emphasis in original).

*of Argentina*, 134 S. Ct. 1198, 1210 (2014), and "[i]t is not enough" for a party opposing

enforcement of an arbitral award "to show that the [Tribunal] committed an error-or even a

serious error." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)

It follows that a court must recognize and enforce an international arbitration award

under the Panama Convention unless the party opposing enforcement meets its burden of

proving that one of the enumerated defenses to recognition and enforcement is satisfied.[4] *See In*

*re Chromalloy Aeroservices, Inc., v. Arab Republic of Egypt*, 939 F. Supp. 907, 909 (D.D.C.

1996) (a court "*must* grant [a][p]etition to [r]ecognize and [e]nforce [an] arbitral award unless it

finds one of the grounds for refusal . . . of recognition or enforcement of the award specified in

the . . . Convention.") (emphasis in original); *LaPrade v. Kidder, Peabody & Co.*, 94 F. Supp. 2d

2, 4 (D.D.C. 2000) ("[A] court must confirm an arbitration award where some colorable support

for the award can be gleaned from the record"); *see also Argentine Republic*, 637 F.3d at 369

("the party opposing confirmation has the high burden of establishing that one of the defects

exists") (internal citations omitted); Panama Convention, art. 5.1 ("The recognition and

execution of the decision may be refused . . . only if [the] party [challenging enforcement] is able

to prove to the competent authority of the State in which recognition and execution are

requested" that one of the Convention's grounds for non-enforcement applies.); *Zeiler v. Deitsch*,

500 F.3d 157, 164 (2d Cir. 2007) ("The party opposing enforcement of an arbitral award has the

burden to prove that one of the seven defenses [to enforcement] under the . . . Convention

applies.") (internal citations omitted).

---

[4] The D.C. Circuit has recognized that the Panama Convention and the New York Convention are "substantially identical," such that interpretations of the latter's provisions concerning recognition and enforcement of arbitral awards are equally applicable to cases governed by the Panama Convention. *TermoRio S.A. E.S.P. v. Electranta, S.P.*, 487 F.3d 928, 933 (D.C. Cir. 2007); *see also Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 45 (2d Cir. 1994) (same); Pet. ¶ 29.

## **ARGUMENT**

In its Motion to Dismiss, the Ministry raises two principal reasons for this Court to refuse recognition and enforcement of the Award:

(a) the Ministry argues that the Court lacks subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-11, on the theory that the parties' dispute was not "commercial," under the Supreme Court's definition of commercial activity in *Republic of Argentina v. Weltover*, 504 U.S. 607 (1992), even though *Weltover* explicitly said that contracts for the sale of military equipment are commercial in nature.  MTD at 8-13.

(b) the Ministry argues that the Tribunal failed to apply the parties' arbitration agreement by moving the legal seat of the arbitration to Rio de Janeiro, Brazil from Caracas, Venezuela after the Tribunal deferred to a federal district court's holding that due to changed circumstances, Caracas was no longer a feasible legal seat for the arbitration and after the parties themselves had agreed to move the seat to Washington, D.C. – an agreement that the Ministry itself then asked the Tribunal to excuse it from honoring. MTD at 13-15.

Both of those defenses fail on the merits and under the law of this Circuit.  In particular, with respect to Venezuela's first defense, this Court has subject matter jurisdiction because, under any definition of commerciality, a contract between a State and a private party for the refurbishment of military equipment is commercial.  As noted, this is explicit in the Supreme Court's decision in *Weltover*, 504 U.S. at 612-613; as well as in the decision of the federal district court for the Southern District of Mississippi *in this case*.  Venezuela's objection is all the more inapposite when viewed in light of this Circuit's decisions applying the New York and

Panama Conventions, which leave no room for doubt that contracts between governments and private parties to purchase or repair military equipment are commercial.

With respect to Venezuela's second defense, the Ministry would have this Court believe that the Tribunal spontaneously decided to upend the parties' agreement to arbitrate in Caracas. This is contrary to the facts and the express terms of the Award.  In reality, the Tribunal recognized that the federal courts in the United States, after years of litigation, had held that it was impossible for the parties to arbitrate in Venezuela.  In addition, the Tribunal found that the parties themselves had agreed to move the arbitral seat out of Venezuela and to Washington, D.C., but that subsequent to this agreement (and a change in counsel) Venezuela had regretted its choice.  Venezuela then asked the Tribunal for relief from its agreement to arbitrate in Washington, D.C.  Then, and only then, did the Tribunal – faced with a federal district court's finding that the original seat of the arbitration was infeasible and Venezuela's request for relief from the parties' alternate selection – choose to use its powers under Venezuelan law to move the arbitral seat to Rio de Janeiro, Brazil.  *See generally* Wood Decl., Ex. 11 ¶¶ 81-97 (ECF No. 1).  Under the circumstances, the Tribunal's actions were neither subject to judicial review nor wrong.  The Court must therefore issue an order recognizing and enforcing the Award pursuant to 9 U.S.C. §§ 9, 207, 302, 304 and Articles 4 and 5 of the Panama Convention.

## I.      THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS ACTION TO RECOGNIZE AND ENFORCE THE FINAL AWARD UNDER THE FSIA

As a "foreign state"[5] within the meaning of the FSIA, the Ministry is subject to this Court's jurisdiction pursuant to the FSIA's "arbitration exception."  28 U.S.C. § 1605(a)(6); Pet.

---

[5] *See generally Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994) (holding that "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state").

¶ 3.  In particular, the FSIA gives this Court jurisdiction over a "foreign state" in a proceeding to confirm a foreign arbitral award where, in relevant part:

> . . . . (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, [or] (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607.

28 U.S.C. § 1605(a)(6).

Both of these independent grounds for the Court's exercise of jurisdiction over the Ministry under the FSIA are satisfied here:  *First*, the Court may exercise jurisdiction over this action pursuant to 28 U.SC. § 1605(a)(6)(B) because the Award is governed by the Panama Convention.  The FAA provides that "[t]he district courts of the United States . . . shall have jurisdiction" over any "action or proceeding falling under the [Panama] Convention."  9 U.S.C. § 203.  Venezuela, Brazil, and the United States are signatories to the Panama Convention and are members of the Organization of American States.  *See* 9 U.S.C. §§ 301, 305.  Ingalls is a U.S. corporation, while the Ministry is an organ of the Venezuelan government.  Pet. ¶¶ 1-2.  In turn, any arbitral award "arising out of a legal relationship" between the parties, "whether contractual or not, which is considered as commercial . . . falls under the [Panama] convention." 9 U.S.C. §§ 202, 302, and 305.  The Panama Convention thus provides the basis upon which this Court may enforce the Award.  *See e.g., Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 190 (D.D.C. 2016) ("all that is required for jurisdiction under the FSIA is a non-frivolous argument that the controversy is covered by the Convention.").

*Second*, the Court may exercise jurisdiction over this action pursuant to 28 U.S.C. § 1605(a)(6)(C) because, as another U.S. district court has already found in a litigation between the same parties, the underlying claim for breach of contract could have been brought in a United

7

States court based upon the Ministry's commercial activity carried on in the United States.  *See Northrup Grumman Ship Sys. v. Ministry of Defense of the Republic of Venezuela*, No. 1:02CV785, 2007 WL 2783343, *3 (S.D. Miss. Sept. 24, 2007)[6] (finding that a "contract for the performance of specified work on two frigates" satisfied the commercial activity requirement under the FSIA").[7]

In its Motion to Dismiss, the Ministry's sole basis for contesting this Court's subject matter jurisdiction over the enforcement of the Award is its contention that, contrary to the findings of the Tribunal and the United States District Court for the Southern District of Mississippi, the agreement between the Ministry and Ingalls was not "commercial" because it involved "activities of a military nature" – a contract to refurbish two Lupo Class Frigates.  MTD at 8-12.  In particular, the Ministry argues that, because the Supreme Court in *Weltover* defined "commercial activity" as "the type of actions by which a private party engages in trade and traffic or commerce," a contract to refurbish a military vessel cannot be commercial because private parties usually do not own warships.  *Id.*  If the agreement did not involve commercial activity, reasons the Ministry, then it is not subject to the Panama Convention and could not have been brought in a United States court.

---

[6] Northrop Grumman Ship Systems, Inc., the plaintiff in the Mississippi proceedings, was a successor in interest to Ingalls Shipbuilding, Inc. and a predecessor in interest to Petitioner.  Wood Decl. ¶ 9; Pet. ¶ 10 n. 3.

[7] The Ministry should be estopped from arguing that its contractual relationship with Ingalls did not fall within the "commercial exception" to the FSIA where that issue was conclusively litigated between the same parties before the federal district court in Mississippi.  As the D.C. Circuit has explained, an earlier holding from another federal court will have preclusive effect where (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case;" (2) the issue was "actually and necessarily determined by a court of competent jurisdiction in that prior case;" and (3) issue preclusion in the second case will not work a "basic unfairness to the party bound by the first determination."  Venezuela has not suggested that any of these criteria were lacking with respect to the litigation between the parties before the federal district court in Mississippi.  That court's decisions should have preclusive effect between the parties.  *Beverly Health & Rehab. Servs., Inc. v. NLRB*, 317 F.3d 316, 322 (D.C. Cir. 2003) (internal citations omitted).

As set forth below, that argument does not withstand scrutiny. The United States District Court for the Southern District of Mississippi has already rejected the very same argument raised by the Ministry. That court's decision was in step with other United States courts, including the United States Supreme Court in *Weltover*, that have consistently found contracts for the construction or refurbishment of military equipment to be commercial in nature. *See* 504 U.S. at 612-613. The Tribunal also decided the same question, specifically finding that the contractual relationship between the parties was "exclusively commercial." Wood Decl., Ex. 11 ¶ 71. Finally, the Ministry's argument ignores a long line of cases in this Circuit, all finding that the meaning of commercial activity in the New York and Panama Conventions is even broader than the meaning of commercial activity defined in *Weltover*.

A.      **A United States District Court Has Already Held That The Underlying Contract Was Commercial, Consistent With The Supreme Court's Guidance In *Weltover***

As noted, the Ministry's attack on the notion that the contract between Ingalls and the Ministry was commercial is based on its interpretation of *Weltover*. In that decision, the Supreme Court defined commercial activity as "the type of actions by which a private party engages in trade and traffic or commerce." *Weltover*, 504 U.S. at 614. Based on that language, the Ministry asserts that "no court in the United States would have had jurisdiction over the dispute" had there been no agreement to arbitrate, because private enterprises cannot own warships. MTD at 12.

Venezuela's attempt to re-argue the "commerciality" of the parties' relationship is precluded, *see, e.g.*, *Beverly Health & Rehab. Services, Inc.*, 317 F.3d at 322, by the decision of the U.S. District Court for the Southern District of Mississippi. *Northrup Grumman Ship Sys.*, No. 1:02CV785, 2007 WL 2783343, *3 (explicitly grounding its jurisdiction in the FSIA's "commercial activity" exception) (citing *Walter Fuller Aircraft Sales, Inc. v. Republic of the*

*Phil.,* 965 F.2d 1375, 1384-5 (5th Cir. 1992)).  In that case, the court held that the Ministry's "contract for the performance of specified work on two frigates" satisfied the commercial activity requirement under the FSIA.  *Id.*  In so ruling, the Mississippi federal district court noted that "contracts for the procurement of goods and services typically satisfy the commercial activity requirement of the FSIA."  *Id.*

The Mississippi federal district court's exercise of jurisdiction did not break new ground. In fact, a close reading of the *Weltover* decision shows that the United States Supreme Court clearly intended contracts for procurement of goods and services—including for foreign militaries—to be treated as *commercial* in nature.  *See Weltover*, 504 U.S. at 614 ("[T]he commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose,' . . . a contract to buy army boots ***or even bullets*** is a 'commercial' activity.") (emphasis added); *see also UNC Lear Services, Inc. v. Kingdom of Saudi Arabia Ministry of Defense & Aviation*, 581 F.3d 210, 217-18 (5th Cir. 2009) (holding that a contract for repair services as well as parts and components for the Saudi Air Force's fighter aircraft was a commercial activity), *cert. denied*, 559 U.S. 971 (2010); *McDonnell Douglas Corp. v. Islamic Republic of Iran,* 758 F.2d 341, 349 (8th Cir. 1985) ("[A] contract by a foreign government to buy equipment for its armed services constitutes a commercial activity to which sovereign immunity does not apply."), *cert. denied*, 474 U.S. 948 (1985).  The Contract at issue in the parties' dispute and upon which the Award was based was analogous to that at issue in *UNC Lear*: a commercial agreement to provide repair services to the Venezuelan military.  It follows that this Court may exercise subject matter jurisdiction under 28 U.S.C. § 1605(a)(6)(B).  *See Weltover*, 504 U.S. at 614; *UNC Lear*, 581 F.3d at 217-18.

**B.    The Tribunal Similarly Concluded That The Parties' Relationship Was "Exclusively Commercial" In Nature**

The Tribunal likewise found the parties' relationship to be "exclusively commercial." Wood Decl., Ex. 11 ¶ 71.  That conclusion is entitled to deference under the settled law favoring arbitral decision making.  *See generally BG Group*, 134 S.Ct at 1210; *Oxford Health*, 569 U.S. at 569.  The Tribunal's reasoning on "commerciality" was also consistent with the Supreme Court's guidance in *Weltover*.  In Procedural Order No. 2, the Tribunal observed that "[e]ven if the dispute submitted to the Arbitral Tribunal opposes the Ministry of Defense, as an instrumentality of the government of the Republic, to a private party, its subject matter is purely of a commercial nature."  Wood Decl., Ex. 11 ¶ 71.  In particular, it noted that the Ministry had "contracted with the Claimant the overhaul and retrofitting services of the two frigates" and "assumed the obligation to pay" for those services.  *Id.*  Like the Supreme Court in *Weltover*, the Tribunal determined the commercial character of the parties' agreement "by reference to its 'nature' rather than its 'purpose,'" *see* 504 U.S. at 614, finding that the Ministry's procurement of maintenance services evinced "not a trace of the exercise by the Republic of its '*ius imperium*,'" and that "any State, its entities, agencies and instrumentalities may enter into commercial transactions with private parties without thereby enjoying any privilege or special prerogative in the performance of the contract or changing the commercial nature of the transaction."  Wood Decl., Ex. 11 ¶ 71 (emphasis in original).

**C.    The D.C. Circuit Has Foreclosed Venezuela's Attempt To Distinguish "Governmental" From Other "Commercial" Contracts For Purposes Of The FSIA's Arbitration Exception**

Even if, *quod non¸* the Supreme Court's definition of commercial activity in *Weltover* did not encompass the contract at issue here, this Court would still have subject matter jurisdiction over the enforcement of the Award because this Circuit has held that the definition of

commercial activity under the New York and Panama Conventions is broader than the definition of commercial activity addressed in *Weltover,* which did not consider the "arbitration exception" to the FSIA, 28 U.S.C. § 1605(a)(6)(B), but only construed the "commercial activity" exception found at 28 U.S.C. § 1605(a)(2). *See Weltover*, 504 U.S. at 611 ("The most significant of the FSIA's exceptions—and the one at issue in this case—is the 'commercial' exception of § 1605(a)(2)").

But it is the former definition that determines this Court's jurisdiction under the FSIA's arbitration exception.  Indeed, the D.C. Circuit has warned against attempts by sovereign award debtors to confuse these two standards.  In *Belize Social Dev. Ltd. v. Government of Belize*, 794 F.3d 99 (D.C. Cir. 2015), *rehearing en banc denied*, (Sept. 28, 2015), *and cert. denied*, 137 S. Ct. 617 (2017), a sovereign opposing confirmation of an arbitration award argued—as the Ministry does here—that the arbitration exception to the FSIA could not apply because the underlying dispute involved the grant of "certain tax and duty exemptions" which involved the exercise of "powers peculiar to sovereigns" as opposed to "powers that can also be exercised by private citizens."  *Id.* at 105.

The D.C. Circuit, however, rejected the attempt to distinguish "governmental" from "commercial" transactions for purposes of the FSIA's arbitration exception and explained that:

> Congress was ***not*** codifying the restrictive theory of foreign sovereign immunity when it ratified and implemented the New York Convention.  Rather, the treaty concerns international arbitration . . . in implementing the Convention, Congress intended that word to have the meaning generally attached to that term ***in the international commercial arbitration context***.

794 F.3d at 105 (emphases added).

The same analysis applies to the Panama Convention.  *See TermoRio*, 487 F.3d at 933; *Productos Mercantiles*, 23 F.3d at 45.  Because the meaning of the term "commercial" at Section

1605(a)(6)(B) is found in the relevant "treaty or other international agreement in force for the United States," the D.C. Circuit declined to limit the meaning of "commercial" under the New York Convention to the definition applied under the commercial activity exception of the FSIA. Instead, "commercial" in this context means "matters or relationships, whether contractual or not, that arise out of or in connection with commerce." *Belize Social Dev. Ltd.*, 794 F.3d at 103-04;[8] *see also Africard Co. v. Republic of Niger*, 210 F. Supp. 3d 119, 123 (D.D.C. 2016) (the term "commercial" . . . refers to "matters or relationships, whether contractual or not, that arise out of or in connection with commerce"); *Stati*, 199 F. Supp. 3d at 186-87 (same). The D.C. Circuit in *Belize Social Development* also explained that the "***full scope*** of 'commerce' and 'foreign commerce' as those terms have been broadly interpreted, is available for arbitral agreements and awards." 794 F.3d at 104 (emphasis added).

By this standard, there can be no doubt that the relationship between the Ministry and Ingalls is one arising in "connection with commerce" and that the relationship between Ingalls and the Ministry was sufficiently "commercial" to fall within the coverage of the Panama Convention under this Circuit's ruling in *Belize Social Development*. 794 F.3d at 102-03.

It is telling that the Ministry cannot muster any examples of a court refusing to recognize or enforce an arbitral award under the New York or Panama Convention on the basis that a defense contract is somehow insufficiently "commercial." Venezuela's lack of authority is unsurprising: federal courts routinely enforce arbitral agreements and awards arising out of defense contracts. In *Chromalloy*, for example, this district court enforced under the New York Convention an arbitral tribunal's award of compensation for the Egyptian Air Force's wrongful

---

[8] *See also Belize Social Dev.*, 794 F.3d at 104 (quoting Restatement (Third) of Foreign Relations Law § 487 cmt. f (1987) (explaining that "the fact that an agreement to arbitrate is in the contract between a government and a private person may confirm its commercial character")).

termination of a contract for maintenance and repair of its helicopters.[9]  *See also Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Defense Sys., Inc.*, 665 F.3d 1091, 1103 (9th Cir. 2011) (affirming district court's order granting Iran's request to confirm under the New York Convention an award against a military supplier for failure to deliver the military system and equipment to the Iranian Air Force).

For all these reasons, the Court has jurisdiction to recognize and enforce the award under the arbitration exception to sovereign immunity found at 28 U.S.C. §§ 1605(a)(6)(B) and (C).[10]

## II.   THE TRIBUNAL ACTED WITHIN ITS POWERS IN FIXING THE PLACE OF ARBITRATION IN BRAZIL

Turning now to the merits of Ingalls's Petition to enforce the Award, the Ministry argues that this Court should not enforce the Award because the Tribunal improperly moved the legal seat of arbitration to Brazil, in disregard of the parties' original agreement to arbitrate in Caracas, Venezuela.  *See* MTD at 16.  In advancing this argument, the Ministry ignores the fact that, in

---

[9] In *Chromalloy*, the award was enforced despite the respondent state having procured an order annulling the award from its own courts (Venezuela's barely-disguised plan here).  *See* 939 F. Supp. at 912 (noting Egypt's attempt "to repudiate its solemn promise to abide by the results of the arbitration").

[10] In addition to the above, this Court also has jurisdiction to recognize and enforce the Award because Venezuela waived any sovereign immunity by agreeing to arbitration governed by the Panama Convention.  *See* 28 U.S.C. §§ 1605(a)(1) (providing that a "foreign state shall not be immune from the jurisdiction of the courts of the United States . . . in any case in which the foreign state has waived its immunity either explicitly or by implication") and 1605(a)(6)(D) (providing that a federal court will have jurisdiction to enforce an arbitration award against a foreign sovereign where "paragraph (1) of this subsection is otherwise applicable").  While the Ministry cursorily asserts that there was "no waiver" under its contract with Ingalls, *see* MTD at 13, its agreement to an arbitration governed by the Panama Convention constituted an implied waiver of sovereign immunity from proceedings seeking the recognition and enforcement of any resulting award as courts in this Circuit have repeatedly recognized.  *See Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999) ("when a country becomes a signatory to the Convention, the signatory state must have contemplated enforcement actions in other signatory states.") (citing *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 579 (2d Cir. 1993)); *see also M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad & Tobago*, 725 F. Supp. 52, 55 (D.D.C. 1989) ("To accept Respondent's contention that it did not waive its sovereign immunity by agreeing to arbitrate this dispute under the terms of the [New York] Convention would defeat the very purpose of the Convention which is to provide for the enforcement of foreign arbitration awards."); *Ergoinvest DD v. Democratic Republic of Congo*, 355 F. Supp. 2d 9, 11 (D.D.C. 2004) (finding an implicit waiver of sovereign immunity under 28 U.S.C. § 1605(a)(1) where the respondent State had agreed to arbitration governed by New York Convention).

moving the legal seat to Brazil, the Tribunal faced two circumstances that left it with no other choice: (a) a federal district court had already found that it was impossible for the arbitration to take place in Venezuela; and (b) although the parties had agreed to move the legal seat of arbitration to Washington, D.C., the Ministry itself asked the Tribunal to relieve it of the specific choice of Washington, D.C.  In these circumstances, bound by a prior determination that arbitration in Venezuela was impossible and a later agreement to arbitrate in Washington, D.C. that the Ministry asked the Tribunal to disregard, the Tribunal acted to safeguard the arbitration agreement by moving the legal seat of the arbitration to a neutral forum.

The Tribunal's decision to change the arbitral seat to Rio de Janeiro was within the scope of its authority under the Venezuelan Arbitration law governing the arbitral procedure, and in response to the Ministry's *own* request that it be released from its agreement to arbitrate in Washington, D.C.  *See* Pet. ¶ 18; *see also* Wood Decl., Ex. 11 ¶¶ 81-85, 96.  As such, it is not subject to further review before this Court.  *See generally BG Group*, 134 S. Ct. at 1210.

A. **After A Federal District Court Found That The Parties' Original Choice Of Forum Was No Longer Feasible, The Ministry Freely Chose To Arbitrate In Washington, D.C.**

The Ministry contends that the Tribunal rejected the parties' original selection of the arbitral seat – Caracas, Venezuela, and improperly moved that seat out of Venezuela.  MTD at 14.  But this inaccurately portrays the Tribunal's decision.  In fact, the Tribunal did not independently decide that the parties' original choice of forum, Caracas, had become unworkable.  Instead, after a U.S. Court found that Caracas was an unworkable site for the arbitration, the parties agreed to arbitrate in Washington, D.C.

Crucially, the question of whether the arbitration could be held outside of Venezuela was extensively litigated between the parties currently before this Court and decided by the United States District Court for the Southern District of Mississippi.

15

That court concluded that Venezuela's legal system had deteriorated to a point that would effectively deny Ingalls due process if the parties proceeded with arbitration in Caracas.[11] *Northrop Grumman Ship Sys. v. Ministry of Defense of Republic of Venezuela*, No. 1:02CV785, 2010 WL 5058645, *4 (S.D. Miss. Dec. 4, 2010) ("enforcing the Caracas forum selection clause will for all practical purposes deprive [Ingalls] of its day in court"); *see also id*. at *3 (noting the "diplomatic rupture between the United States and the Republic" and expert evidence that "any attempt to litigate against the Venezuelan government within the country would not result in a fair outcome, as the legal system within Venezuela favors judgments for the government."). The Mississippi federal district court did not reach this conclusion lightly, but, as the Tribunal recognized, only after the parties had "litigated extensively before the U.S. Courts." Wood Decl., Ex. 11 ¶ 88. Indeed, the district court set aside the parties' original choice of forum only after holding Ingalls to the heightened standard applicable to any effort to set aside a forum-selection clause. *See Northrop Grumman Ship Sys.*, No. 1:02CV785, 2010 WL 5058645, *3-4 ("explaining that "[a] forum selection provision in a written contract is *prima facie* valid and enforceable unless the opposing party shows that enforcement would be unreasonable" but that "[e]nforcement of forum selection clauses is improper if the party resisting the clause can "clearly show that enforcement would be unreasonable and unjust.") (emphasis in original) (citing *Kevlin Servs., Inc. v. Lexington State Bank,* 46 F.3d 13, 15 (5th Cir.1995) and *Nat'l Iranian Oil co. v. Ashland Oil, Inc*., 817 F.2d 326, 335 (5th Cir. 1987)).

---

[11] The Mississippi federal district court also noted that controlled defense "[t]echnical data" was "central to the dispute" and that the U.S. International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120 *et seq.*, could make it impossible for Ingalls to present its case if the seat of the arbitration were in Venezuela, while suggesting that this issue "would be better resolved in the arbitration proceedings." *See Northrop Grumman Ship Sys.*, No. 1:02CV785, 2010 WL 5058645, *2. Indeed, in deciding that the seat of arbitration should be Brazil, the Tribunal noted Ingalls's concern that "US Federal Arms Control provisions . . . no longer permit it to take to Caracas evidence in support of its case." Wood Decl., Ex. 11 ¶ 83.

Having found the parties' original forum selection clause unenforceable, the Mississippi federal district court gave the parties the opportunity to select a mutually agreeable alternative forum. *See Northrop Grumman Ship Sys.*, No. 1:02CV785, 2010 WL 5058645, *4. After discussions with Ingalls, the Ministry agreed to arbitration in Washington, D.C., a decision that was memorialized in the docket of the Mississippi federal district court. Wood Decl., Ex. 10 ("Telephone Conference held March 30, 2011. The parties have agreed to arbitration in Washington, D.C., at a location to be determined."); *see also* Wood Decl., Ex. 11 ¶ 91 ("irrespective of the place being Washington, D.C. or elsewhere, the Republic actually chose a place outside Venezuela and consented to holding these arbitral proceedings outside its territory").

**B.**     **In Response To The Ministry's Request For Relief From Its Agreement To Arbitrate In Washington, D.C., The Tribunal Exercised Its Authority To Select An Alternative Legal Seat For The Arbitration**

As soon as the Arbitration commenced, however, the Ministry promptly repudiated its agreement to arbitrate in Washington, D.C., and asked the Tribunal for relief. *See* Wood Decl., Ex. 11 ¶¶ 81, 96. Venezuela's demand to be released from its agreement to arbitrate in Washington, D.C. placed the Tribunal in a situation in which Venezuela sought relief from its agreement to arbitrate in Washington, D.C., while a federal district court had already held that the arbitration could not be held in Caracas, Venezuela. *See Northrop Grumman Ship Sys.*, No. 1:02CV785, 2010 WL 5058645, *1–2.

Under these circumstances, the Tribunal acted in an exemplary manner. *First*, rather than "abandoning the terms of the Contract between the parties," MTD at 13, the Tribunal found that the reasoned decision of the United States District Court for the Southern District of Mississippi holding the parties' forum selection clause unenforceable was entitled to *res judicata* effect. *See* Wood Decl., Ex. 11 ¶ 94. The Tribunal further found that through "their litigation before the US

courts, the Parties had consented to the arbitral proceedings taking place outside Venezuela" and

that "the behavior of the Parties before the U.S. Courts does correspond to an amendment of the

arbitration clause." *Id.* at ¶¶ 89, 93.  The Tribunal thus concluded that the Mississippi federal

district court's decision on the matter had the force and effect of *res judicata*:

> This is what the U.S. Court decision means.  There is no room
> available to the Parties to re-litigate before this Arbitral Tribunal if
> the proceedings will be held outside or within the territory of the
> Republic.  The U.S. Court, in a reasoned decision, clearly stated that
> the arbitral proceedings shall be held outside the territory of the
> Republic.  Such decision has the force and effects of res judicata.

*Id.* at ¶ 94.

In short, the Tribunal found that the question of arbitration in Venezuela was no longer

on the table: "[c]onsent of the Parties is of the essence of arbitration.  In the case at stake, the

Republic consented to such change [to a legal seat outside of Venezuela]." *Id.*

*Second,* given the Ministry's own request for relief from its agreement to arbitrate in

Washington, D.C., the Tribunal exercised its authority under Article 9 of the Venezuelan

Arbitration Act to determine a new seat for the arbitration. *Id.* at ¶¶ 95–96; *see also* Yanos

Decl., Ex. 2.  Article 9 of the Venezuelan Arbitration Act provides, in relevant part, that:

> The parties may freely determine the place of arbitration.  Failing
> such agreement, the place of arbitration will be determined by the
> arbitral tribunal taking into account the circumstances of the case,
> including convenience for the parties.

Yanos Decl., Ex. 2, art. 9.  Careful to "safeguard both the neutrality and integrity of the

arbitration," and given the Ministry's demands to be released from its agreement to arbitrate in

Washington, D.C., the Tribunal selected Rio de Janeiro, Brazil as a substitute seat for the

arbitration. *See* Wood Decl., Ex. 11 ¶¶ 81, 96–97.  Thus, far from acting outside its authority,

the Tribunal acted to assure the effectiveness of the parties' fundamental agreement to arbitrate

their dispute.[12]  *Id.* at ¶ 96 ("The Arbitral Tribunal is very much aware of its duties in such

regard, which include ensuring the *effet utile* of its decisions and awards.").  The Tribunal's

choice of an arbitral seat, within the Tribunal's powers under the curial law, is entitled to

deference.  *See supra* at 3-5; *BG Group*, 134 S.Ct. at 1210.[13]

The Ministry, ignoring its own role in: (a) agreeing to arbitrate outside of Venezuela; and

(b) having sought relief from the Tribunal from its choice to arbitrate in Washington, D.C., now

wants to argue that the Tribunal was wrong to have afforded *res judicata* effect to the decision of

the Mississippi federal district court, and should instead have sent the parties back to Venezuela.

*See* MTD at 13-15.  Even if the Tribunal's decision to accord the Mississippi federal district

court's decision *res judicata* effect had been a mistake (and it was not), that would be no basis

for this Court to decline to recognize and enforce the Award because "[i]t is not enough" for a

party opposing enforcement of an arbitral award "to show that the [Tribunal] committed an error-

or even a serious error."  *Oxford Health Plans*, 569 U.S. at 569; *see also Int'l Trading & Indus.*

*Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) ("[T]his Court

'do[es] not sit to hear claims of factual or legal error by an arbitrator' in the same manner that an

appeals court would review the decision of a lower court.") (quoting *Teamsters Local Union No.*

*61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001)).

---

[12] This case is therefore not at all analogous to *PoolRe Ins. Corp. v. Org. Strategies, Inc.*, 783 F.3d 256 (5th Cir. 2015), on which the Ministry relies, *see* MTD at 17–18.  There, in a rather uncomplicated application of the FAA, the court found that the arbitrator had failed to honor the parties' contractual choice of forum when he unilaterally decided to apply the AAA Arbitration Rules, as opposed to the ICC Arbitration Rules as provided in the controlling agreement, thus exceeding his authority under the FAA.  *PoolRe Ins. Corp.*, 783 F.3d 256 at 264–65.  Here, unlike in *PoolRe*, the parties' initial contractual choice of forum was deemed impracticable by a binding decision of a federal district court.

[13] If any party could have objected to the Tribunal's decision to discard the parties' mutual decision of Washington, D.C., it would have been Ingalls.  For the avoidance of doubt, Ingalls has not objected to the Tribunal's decision and does not object to the Tribunal's decision.

Nor is the Tribunal's conclusion that the arbitration agreement had been modified subject to *de novo* review.  Such an assertion, *see* MTD at 13, misses the mark as a matter of law and fact.  As an initial matter, the case cited by the Ministry, *Oxford Health Plans*, does not stand for the proposition that "disputes concerning an arbitrator's interpretation of the arbitration clause are subject to *de novo* review."  MTD at 13.  Rather, *Oxford* simply observes in a footnote that "questions of arbitrability" are "presumptively for courts to decide."  *Oxford Health Plans*, 569 U.S. at 569 n.2.  The Ministry provides no support or argument for the proposition that either the Tribunal's conclusion that the Mississippi federal district court's decision was *res judicata* or that a particular contractual clause had been modified raised "question[s] of arbitrability."  *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84–85 (2010) (explaining that the phrase "question of arbitrability" has "limited scope").  To the contrary, the Tribunal's determination is precisely the sort to which the Court owes deference.  *See Oxford*, 569 U.S. at 569 ("Because the parties bargained for the arbitrator's construction of their agreement, an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits.") (internal quotations and citations omitted).

## CONCLUSION

For the reasons set forth above, the Ministry's defenses to recognition and enforcement of the Award fail: the Award falls within the scope of the Panama Convention and the Tribunal acted within the equitable powers delegated to it by the parties in designating an arbitral seat and uphold the parties' fundamental agreement to arbitrate where their original choice of a seat had become impracticable.  Absent one of the grounds for refusal or recognition or enforcement enumerated in the Panama Convention, it follows that Ingalls is entitled to an order recognizing and enforcing the Award pursuant to 9 U.S.C. §§ 9, 207, 302, 304 and Articles 4 and 5 of the Panama Convention.

Dated: July 27, 2018
       New York, New York

Respectfully submitted,

/s/ _Alex Yanos_
Alex Yanos (Bar No. NY0219)
Carlos Ramos-Mrosovsky (Bar No. 986363)
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
Tel:    202-210-9400
Fax:    212-210-9444
alex.yanos@alston.com
carlos.ramos-mrosovsky@alston.com

Eric Parnes (Bar No. 489071)
Michael A. DeBernardis (Bar No. 989876)
Tabitha Bartholomew (Bar No. 1044448)
HUGHES HUBBARD & REED LLP
1775 I Street, NW
Washington, D.C. 20006
Tel:    (202) 721-4600
Fax:    (202) 721-4646
Eric.parnes@hugheshubbard.com
michael.debernardis@hugheshubbard.com
tabitha.bartholomew@hugheshubbard.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF filing system, which shall serve copies of this filing on every party to this action. I further certify that I am unaware of any non-CM/ECF parties.

By: _/s/ Alex Yanos_____